IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC. and THOMAS J. SHAW, | § § § | Civil Action No. 2:08-cv-16-LED-RSP |
| Plaintiffs, | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| BECTON, DICKINSON & COMPANY, | § § | |
| Defendant. | § § | |

## JOINT PROPOSED JURY INSTRUCTIONS

The parties respectfully submit the attached joint proposed jury instruction materials in accordance with the Court's directions. Agreed instruction language appears without any highlighting, as does any footnote material indicating the source for the agreed instruction.

Instruction language proposed by Plaintiffs to which Defendant Becton Dickinson and Company ("BD") objects appears in blue, as does any footnote support supplied by Plaintiffs for that language. Objections by BD to that language appear in yellow in the footnotes. Correspondingly, instruction language proposed by BD to which Plaintiffs object appears in yellow, as does any footnote support supplied by BD for that language.

The parties object to all of the other parties' highlighted language unless otherwise indicated. If an objection is not noted in the footnotes, it does not mean that the language is acceptable.

Both Retractable and BD have labored diligently to work out agreements and to state their requested instructions and objections in the time allowed for the filing of these instructions. Nevertheless, because of the case's complexity, the parties ran out of time to show each other their various objections and proposals prior to the filing deadline. Following the parties'

telephone conference on Sunday, BD received RTI's revision of the document late in the afternoon on Monday and could not return the document to Retractable until early Tuesday evening.  The pink-highlighted language is language BD added, which Retractable received for the first time the evening of the day the instructions were due.  As a result, Retractable has not had the opportunity to respond to that language.  Additionally, because Retractable only had a few hours with the instructions at the end of the filing day after receiving BD's last set of changes, Retractable verbally informed BD of the general nature of the changes it would be making, but did not have the opportunity to send the instructions back to BD for its review prior to filing.  Counsel for both parties agree that they are working well together and will continue to confer on these matters in a collaborative process.

BD submits these proposed jury instructions subject to its motions for summary judgment (and if necessary, motions for judgment as a matter of law), and reasserts its position that none of Retractable's claims is viable.  BD does not acquiesce in the submission of any jury questions and nothing in this document is a waiver of BD's grounds for judgment as a matter of law.

A. **GENERAL INSTRUCTIONS**

**CHARGE OF THE COURT**

**MEMBERS OF THE JURY:**[1]

You have heard the evidence in this case.  I will now instruct you on the law that you must apply.  It is your duty to follow the law as I give it to you.  On the other hand, you the jury are the judges of the facts.  Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of the case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist you in understanding the evidence and the parties' contentions.

**GENERAL INSTRUCTIONS**

 A verdict form has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.

Answer each question on the verdict form from the facts as you find them.  Do not decide who you think should win and then answer the questions accordingly.  Your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

---

[1]  In drafting the introductory instructions, the parties rely on prior jury instructions issued by this Court. In particular, much of the language in this section comes from the general charge submitted by this Court in *Fractus, S.A. v. Samsung Electronics Co.*, Civil Action No. 6:09-CV-203, Doc. 997 (jury instructions filed May 23, 2011).

**CONSIDERING WITNESS TESTIMONY**

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess.  We met because often during a trial something comes up that does not involve the jury.  You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

**HOW TO EXAMINE THE EVIDENCE**

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked of a witness in advance of trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, the witness testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weight as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

Finally, if you find that a party intentionally destroyed important evidence in bad faith, you may infer that it did so because the contents of that evidence were unfavorable to that party. Otherwise, you may not consider whether either party failed to provide the opposing side with documents or other evidence that were not presented in this case.[2]

## DEMONSTRATIVE EXHIBITS

Certain exhibits shown to you are illustrations.   We call these types of exhibits "demonstrative exhibits."   Demonstrative exhibits are a party's description, picture, or model to describe something involved in this trial.   If your recollection of the evidence differs from the exhibit, rely on your recollection.

## EXPERT WITNESSES

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters.   However, you are not required to accept that opinion.   As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert has been or will be paid for reviewing the case and testifying, or from evidence that he or she

---

[2]   BD proposes the instruction in this paragraph, which does not appear in the *Fractus* charge, based on *Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) ("Under the spoliation doctrine, a jury may draw an adverse inference 'that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'") (citations omitted).  BD has a pending motion on spoliation by Retractable.   *See* Doc. 385 (BD motion for sanctions with respect to spoliation).  If that motion is granted, the first sentence of this instruction should be revised to instruct the jury that Retractable intentionally spoliated evidence in bad faith.   Otherwise, the issue should be submitted to the jury for resolution in accordance with this instruction.   Whether or not the evidence would have been admissible is not material to the spoliation inquiry.   Retractable objects to this language for the reasons stated in its response to BD's motion for sanctions, and because the evidence that was the subject of the sanctions motion has been ruled inadmissible.   Thus, BD has accused Retractable of failing to maintain evidence that would not have been admissible at trial.

testifies regularly as an expert witness and that income from such testimony represents a significant portion of the expert's income.

Instruction No. 2
## PLAINTIFFS' CLAIMS AND DEFENDANT'S DEFENSES

## CONTENTIONS OF THE PARTIES

I will first give you a summary of each side's contentions in this case.  I will then tell you what Plaintiff Retractable Technologies, Inc. must prove to win the case.[3]

Plaintiff Retractable and Defendant BD both manufacture and sell conventional syringes, safety syringes, and safety IV catheters.

Retractable contends BD has used various kinds of unlawful conduct to restrain competition, maintain a monopoly, and restrict Retractable's access to and success in the relevant markets.  Retractable contends BD entered into improper contracts and engaged in other behavior that had anticompetitive effects.  Retractable further contends BD engaged in false advertising wherein BD misrepresented the qualities and characteristics of Retractable's VanishPoint safety syringes and BD's competing products.  Retractable asserts causes of action for violations of federal antitrust laws, federal false advertising laws, product disparagement, tortious interference with prospective contract or business relations, and unfair competition.

BD contends it has not engaged in any unlawful conduct and denies Retractable's allegations.  BD contends that its agreements with hospitals and other customers benefit those customers by offering them discounts and lower prices, and do not prevent Retractable or any other competitor from competing in the relevant markets.  BD also contends that its advertising has been truthful and has not harmed Retractable or interfered with its ability to sell its products. BD also contends that its conduct has caused no injury to competition or to Retractable and that Retractable is not entitled to recover any of the damages it is seeking.

---

[3] This sentence is derived from a corresponding sentence in the *Fractus* charge, but was revised to reflect that Retractable bears the burden of proof on its claims.

In considering Retractable's claims in this case, you may not consider any of BD's conduct or contracts in force before July 2, 2004.[4]

**ISSUES TO BE DECIDED**

Your job is to decide whether Retractable has proved these claims, or any of them.

If you decide that any of Retractable's claims has been proved, you will then need to decide the amount of money damages to be awarded to Retractable.

**BURDEN OF PROOF**

As I told you at the beginning of this trial, in any legal action, facts must be proved by a required amount of evidence, known as the burden of proof.

With the exception described in the next paragraph, Retractable must prove every essential part of its claims by the applicable burden of proof. If the proof fails to establish any essential part of one of Retractable's claims by the applicable burden of proof, you should find for BD as to that claim.

With respect to damages, BD bears the burden of proving its mitigation defense.

When a party has the burden of proof on any claim or defense by a preponderance of the evidence, that means the evidence must persuade you that the claim or defense is more likely than not true.

---

[4] With respect to the release, Retractable released BD "from any and all causes of action, demands, damages, costs, debts, liabilities, losses or claims of any kind, whether known or unknown, that the Retractable Releasors may now have or ever had, or hereafter, shall, or may have against BD, for, upon, or by reason of any matter, cause, or thing, whatsoever, which accrued on or at any time prior to [July 2, 2004.]"  The defense is proved here as a matter of law.  *See* Docs. 441, 174; *Faris v. Williams WPC-1, Inc.*, 332 F.3d 316, 322 (5th Cir. 2003).  If the Court determines that any aspect of the release is ambiguous, BD proposes a bench trial on that issue.

Clear and convincing evidence means evidence that produces in your mind a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required.[5]

In determining whether any fact has been proved, you should, unless otherwise instructed, consider all of the evidence, including the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them.

---

[5] FIFTH CIRCUIT PATTERN JURY INSTRUCTION ("FIFTH CIRCUIT PATTERN") 2.14. As noted by BD below, this proof standard does apply in this case. First, BD contends that any effort to prove willful patent infringement as anticompetitive conduct must be proved, if at all, by clear and convincing evidence. Second, BD contends that certain essential elements of RTI's business disparagement claim (specifically, alsity and malice) must be proved by clear and convincing evidence. *See, e.g.*, Texas PJC 110.15 ("Standard of Proof for Defendant's Fault"); *Turner v. KTRK Tele., Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (assuming without deciding that falsity may be decided by a preponderance of the evidence but noting the possibility that falsity must be proved by clear and convincing evidence for constitutional reasons); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003) ("Actual malice must be proved by clear and convincing evidence at trial."). Retractable objects. There is no reason to charge the jury on a "clear and convincing" evidentiary standard in this case because all claims and defenses are subject to a "preponderance of the evidence" standard. BD's ads do not involve any first amendment concerns. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.3d 914, 939 (3d Cir. 1990); *see also Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68 (1983).

## B.  ANTITRUST CLAIMS

Instruction No. 3
### PURPOSE OF THE ANTITRUST LAWS

The antitrust laws were designed to ensure economic liberty and are aimed at preserving free and unfettered competition and at securing everyone an equal opportunity to engage in business, trade, and commerce.[6] They rest on the central premise that free competition produces the best allocation of our economic resources, the lowest prices, the highest quality, the greatest output of products, and the greatest material progress.  An act only becomes unlawful when it constitutes an unreasonable restraint on interstate commerce.[7] An act is not a violation of the antitrust laws unless RTI proves that BD's activities caused an injury to competition.[8]   That is

---

[6] *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).  BD does not oppose a general instruction on the purposes of the antitrust laws, provided it is addresses the fundamental concept of injury to competition. BD proposes an appropriate instruction based on current authority.

[7] *See* Fifth Circuit Pattern Jury Instructions – Civil No. 6.1 (Sherman Act) (2006); *see also* ABA Model Instructions in Civil Antitrust Cases, Sherman Act-General, Instr. 1 at A-2 (2005).

[8] BD submits this sentence as the appropriate statement regarding the essence of the antitrust laws as required by the Fifth Circuit's recent decision on remand from the Supreme Court in the *Leegin* case, *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (citation omitted); *see also Benson v. St. Joseph Regional Health Center*, 575 F.3d 542, 549 (5th Cir. 2009) (antitrust violation "requires proof that the practice 'actually had an adverse effect on competition") (citation omitted).  Retractable objects to this additional sentence as unnecessary and cumulative.  Each cause of action lists injury as an element and there is an entire instruction dedicated to antitrust injury.

because the purpose of the antitrust laws is protection of *competition*, not *competitors*.[9]

Evidence of injury to a competitor may suggest injury to competition in the relevant markets.[10]

Preventing harm to the quality of products on the market, such as by stifling innovation, is an important function of the antitrust laws.[11]

---

[9] BD proposes this language as essential to any proper description of the purposes of the antitrust laws. The instruction is taken verbatim from the Supreme Court's recent decision in *Leegin Creative Leather Products, Inc.*, 551 U.S. 877, 906 (2007) (emphasis in original), and accurately reflects the current view of the Supreme Court regarding antitrust law. Retractable objects to BD's additional proposed instruction as argumentative and unnecessary. The instruction proposed by Retractable clearly is focused on harm to competition. BD solely adds language about what is not required in order to slant the instructions in its favor. Retractable also objects to this proposed instruction because it improperly implies that harm to a competitor is irrelevant.

[10] Injury to a competitor is relevant when it is part in parcel of injury to competition. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 n. 6 (5th Cir.1983) (" Yet such evidence may overlap, since evidence of injury to a competitor may suggest damage to the competitive marketplace."); *see also LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("Even the foreclosure of one significant competitor from the market may lead to higher prices and reduced output."); *Blue Shield of Va. v. MCCready*, 457 U.S. 308, 313-14 (1978) ("Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations.").

[11] *Viazis v. American Ass'n of Orthodontists*, 182 F. Supp. 2d 552, 570 n.2 (E.D. Tex. 2001) ("total or near total exclusion of a ***truly innovative product*** could have two market-wide output detrimental effects: (a) insulating other products already in the market from quality-based competition or (b) preventing introduction of an item that could stimulate interest in the product category as a whole thereby suppressing production of the item in the market as a whole."); *see also Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 299-302 (2d Cir. 1979, cert. denied, 444 U.S. 1093 (1980)(monopolist found to have conspired to have kept innovative devices from competitors); L. Sullivan & W. Grimes, The Law of Antitrust: An Integrated Handbook 16, 38, 39 (2d ed 2006) ("A monopolist has a reduced incentive to innovate; if it does innovate, it may be motivated to suppress or delay commercialization. Indeed to protect its monopoly, a firm may even attempt to suppress or discourage others from marketing available innovation;" also describing how innovation threatens dominant firms and how AT&T when a monopolist resisted innovation.); F.M. Scherer & D. Ross, Industrial Market Structure and Economic Performance 654-60 (3d ed. 1990) (concluding that high concentration and high entry barriers undermine innovation and its marketing. BD objects to this sentence because RTI provides no authority concerning innovation as a separate purpose of the antitrust laws. The *Viazis* district court opinion does not state that innovation is a purpose of the antitrust laws. Indeed, the district court dismissed the antitrust claim in that case, and the Fifth Circuit affirmed the dismissal but not the comment on innovation. *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758, 761 (5th Cir. 2002). Furthermore, innovation in general has never been considered a thumb on the scale for proving an antitrust claim. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 209 (1993). To the contrary, the Supreme Court recently observed that the "opportunity to charge monopoly prices – at least for a short period – is what attracts 'business acumen in the first place; it induces risk taking that products innovation and economic growth'. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful

Instruction No. 4
## GENERAL DEFINITIONS

The following definitions apply, where indicated, to Plaintiffs' antitrust claims.

Interstate commerce:  The federal antitrust laws apply only to conduct or restraints that affect interstate commerce.  In this case, the interstate commerce element of Retractable's federal antitrust claims is not in dispute between the parties.  This element, therefore, is established.[12]

Relevant market:  To prove a "market," Retractable must prove both a relevant product market and a relevant geographic market.[13]  The geographic market—the United States—and product markets for safety syringes, conventional (or "non-safety") syringes, and safety IV

unless it is accompanied by an element of anticompetitive conduct."  *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Innovation, therefore, is a beneficial result of monopoly pricing but is not relevant to prove anticompetitive conduct.  Without the benefit of *Trinko*, the cited case simply speculated about a hypothetical theory, but that hypothesis has never been tested because the decision in question dismissed an antitrust claim and it was affirmed (before *Trinko*).  Taken literally, this instruction would permit a jury to find that fair competition violated the antitrust laws simply because it succeeded in keeping "innovative" products from the market, which is not the law (indeed, it would turn the law upside down).  Finally, this instruction is improper in a general discussion of the purpose of antitrust law because it singles out for favorable comment one aspect of Retractable's case, improperly favoring Retractable.  None of the cases provided by BD prevent the jury from considering harm to innovation as an anticompetitive act.  It is nonsensical to argue innovation only results from monopoly pricing.  To the contrary, as a matter of economics, "[i]f firms are foreclosed from a significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investment and innovation."  *See* Retractable's Response to BD's Motion for Summary Judgment on Antitrust and Unfair Competition, at p. 15 (March 11, 2013); *see also* DOJ/FTC Horizontal Merger Guidelines, issued August, 19, 2010, which notes that price is not the only consideration when evaluating the anticompetitive effects of a merger: "Enhanced market power can also be manifested in non-price terms and conditions that adversely affect customers, including reduced product quality, reduced product variety, reduced service, or diminished innovation."  Guidelines at p. 1.

[12] BD agrees to this instruction and to the stipulation that interstate comment is not in dispute on the condition that the "Why Can't It Be Zero" advertisement will not be admitted for liability or damages purposes during the trial.  If RTI chooses to rely on this advertisement, BD reserves the right to contend that the element of interstate commerce remains in dispute.

[13] ABA Model Instructions in Civil Antitrust Cases, Relevant Geographic Market, at C-13.

catheters are not in dispute between the parties. You should, therefore, proceed as if this element is established as to these three markets.[14]

Retractable must prove by a preponderance of the evidence that GPO brokerage services in the United States qualify as a valid antitrust market.[15]

In determining whether GPO brokerage services constitute a separate economic market, you must determine what, if any economic forces restrain BD's alleged freedom to set prices for

---

[14] BD objects to this sentence because a dispute remains over RTI's allegations about GPO brokerage services, so "this element" has not been "established" generally.

[15] This language proposed by BD substantively tracks the first sentence of ABA Model C-6 verbatim, while substituting "Retractable" for "Plaintiff." *See Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625-26 (5th Cir. 2002) (an antitrust plaintiff "must first identify the relevant product and geographic market"); *accord PSKS*, 615 F.3d at 417. Retractable objects to BD's inclusion of GPO Brokerage Services in the discussion of relevant product markets that must be proven as a required element of an antitrust claim. As stated later, GPO Brokerage Services is relevant to the foreclosure analysis of the Section 1 and Clayton Act §3 with respect to the conventional syringe and safety IV catheter product markets.

BD contends that the GPO brokerage services market cannot be a "relevant" antitrust market in this case. To be a relevant antitrust market, both the defendant and the plaintiff must be participants in that market, either as a supplier or a purchaser of the relevant product. *See Apani*, 300 F.3d at 626 ("[i]n ascertaining the relevant product market, courts consider the extent to which the *seller's product*" has certain economic characteristics) (emphasis added). As ABA Model C-6 states, "[d]efining the relevant market is essential because you are required to make a judgment about whether the defendant has monopoly power in a properly defined economic market." Because BD is not a provider of GPO brokerage services, it cannot conceivably have monopoly power in or monopolize any such market. Because Retractable does not provide or purchase GPO brokerage services, it cannot establish an antitrust injury in any such market. *See, e.g., Norris v. Hearst Trust*, 500 F.3d 454, 466 (5th Cir. 2007) ("Plaintiffs are neither consumers (buyers of advertising, or users of advertising such as subscribers) nor competitors (sellers of advertising) in the relevant market. Plaintiffs have not suffered antitrust injury."); *Hughes v. Tobacco Institute Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."). Thus, this theory fails as a matter of law.

If a GPO brokerage services market is nevertheless presented to the jury, the truncated market instructions submitted by Retractable do not include all the instructions necessary to determine whether Retractable has proved a valid antitrust market. *See PSKS*, 615 F.3d at 417-19 (principles for proving a relevant antitrust market). To be complete, BD proposes the appropriate ABA Model Instructions below.

or restrict the output of GPO brokerage services.[16]   The most likely and most important restraining force will be actual and potential competition from other firms and their services.[17] This includes all firms and products that act as restraints on BD's alleged power to set prices as it pleases.  All the firms and products that exert this restraining force are within what is called the relevant market.[18]

There are two aspects you must consider in determining whether Retractable has met its burden to prove the relevant market in GPO brokerage services by a preponderance of the evidence.   The first is the relevant product market; the second is the relevant geographic market.[19]

Relevant Product Market.   The relevant product market includes the services that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Services need not be identical or precisely interchangeable as long as they are reasonable substitutes.[20]

---

[16] This language largely tracks the third sentence of ABA Model C-6.  BD would note that the sentence reveals the irrelevance of the GPO services market.  Because BD does not provide services in this market, it neither sets prices nor could it restrict output in the market.  There is no evidence to support such a theory in this case (hence the term "alleged").  BD also submits that any instruction on relevant markets must include all the pertinent ABA Model instructions, which BD proposes below.

[17] This sentence tracks the fourth sentence of ABA Model C-6, with "services" substituted for "products."

[18] BD proposes the last two sentences in this paragraph, which track the fifth and sixth sentences of ABA Model C-6 verbatim except for the reference to "BD."

[19] BD proposes the language in this paragraph, which tracks the language in the second paragraph of ABA Model C-6 except for the reference to "Retractable" and the alleged product market.  *See PSKS*, 615 F.3d at 417; *Apani*, 300 F.3d at 627.

[20] BD proposes this paragraph, which tracks three sentences from the first paragraph of ABA Model C-7, with "services" substituted for "products" and "providers" substituted for "manufacturers."

In deciding whether Retractable has proven a relevant product market, you may also consider the cross-elasticity of supply, namely the extent to which providers of one service would be willing to shift their resources to providing another service in response to an increase in the price of the other service.  If, in determining the parameters of the relevant product market, you find that there are providers that have the ability to provide services that can be reasonably substituted with BD's – even though they do not presently compete with BD – you may consider whether the existence of these potential alternative providers can influence the prices that BD charges for its services and, if so, that amount of the services that these suppliers are likely to produce.[21]

<u>Relevant Geographic Market</u>.  The relevant geographic market is the area in which BD faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases.  When analyzing the relevant geographic market, you should consider whether changes in prices of services in one area have substantial effects on prices or sales in another area, which would tend to show that both areas are in the same relevant geographic market.[22]

In determining whether Retractable has demonstrated that its proposed geographic market is proper, you may consider several factors, including

- the geographic area in which BD sells and where BD's customers are located;

---

[21] BD proposes this paragraph, comprised of language from the first sentence of the first paragraph and the first sentence of the third paragraph of ABA Model C-11, with "BD" substituted for "defendant," "services" substituted for "products," and "providers" substituted for "manufacturers."  This language also reveals the inapplicability of a GPO brokerage services market as a relevant product market, because the focus is on the prices charged by BD and BD does not provide services in this market at any price. *See PSKS*, 615 F.3d at 417-18 (quoting *Apani*, 300 F.3d at 628).

[22] BD proposes this paragraph, which is comprised of the first two sentences of ABA Model C-13 with appropriate substitutions as explained previously.

- the geographic area to which customers turn for services;

- the geographic area to which customers have turned or have seriously considered turning; and

- the geographic areas that suppliers view as potential sources of competition.[23]

Anticompetitive Conduct.  The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine.  This is because all companies have a desire to increase their profits and increase their market share.  These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals – or the achievement of these goals – unlawful, as long as a company does not use anticompetitive means to achieve these goals.[24]

In determining whether BD's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits of price, quality, or service, whether it provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.[25]

---

[23] BD proposes this paragraph, based on the last sentence of the second paragraph of ABA Model C-13 with appropriate substitutions as explained previously.  The language of the Model further demonstrates that the proposed GPO services market is not a relevant market because BD does not sell any services in the market (making the first bullet point wholly inapplicable).

[24] This paragraph is the third paragraph of ABA Model Civil Jury Instructions in Civil Antitrust Cases (2005) ("ABA Model") C.10 – Willful Acquisition or Maintenance of Monopoly Power.

[25] This paragraph is taken verbatim from the fourth paragraph of ABA Model C.10 verbatim, with "BD's" substituted for "defendant" and use of the phrase "of price, quality, or service" to explain the meaning of competition "on the merits."  *See Stearns Airport*, 170 F.3d at 523 ("Generally, a finding of exclusionary conduct requires some sign that the monopolist engaged in behavior that – examined without reference to its effects on competitors – is economically irrational.").

Developing more efficient processes and developing the ability to sell profitably at lower prices is legitimate business competition and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.[26]

Anticompetitive conduct must represent something more than the conduct of business that is part of the normal competitive process or commercial success.  It must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason.[27]

Retractable alleges BD engaged in a variety of anticompetitive acts.  I will instruct you what acts Retractable alleges, and BD's contentions in response, in support of each claim below.

---

[26] This sentence proposed by BD is the last sentence of the fifth paragraph of ABA Model C.10 verbatim. Fifth Circuit precedent supports even stronger language.  *See Stearns Airport*, 170 F.3d at 524 (noting that when a consumer voluntarily enters into a particular agreement with a supplier, that contract represents the consumer's judgment that it is beneficial and thus constitutes competition on the merits). Retractable objects because the rule of reason says you look to whether there are anticompetitive harms, and then if so, you look to see any efficiencies, and if they are competing matters.  Then the issue is whether there was a less restrictive way to get the same result.  The rule of reason does not say that if there is any efficiency justification, there is no antitrust violation.  This portion of the instructions states general principles concerning anticompetitive conduct, and is not limited to Section 1 rule of reason principles.

[27] This paragraph proposed by BD is the eighth paragraph of ABA Model C.10, with three changes. "BD" is substituted for "a company."  The phrase "anticompetitive conduct" is substituted for the phrase "acts and practices" (and corresponding grammatical changes are made) simply to align the instruction with the fundamental requirement that the jury find "anticompetitive" conduct.   And references to "monopoly power" are omitted because the instruction is applicable to all the antitrust claims. Retractable objects because the antitrust laws are concerned with any clog on competition.  *Standard Oil & Standard Stations v. U.S.*, 337 U.S. 293, 314 (1949).  Parties do not have to completely exclude to violate the antitrust laws.  It is acknowledged that the presumptions in this Supreme Court decision no longer apply "today," after later Supreme Court decisions.  *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 65-66 (1st Cir. 2004); *accord Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 123 (1st Cir. 2011).  Furthermore, the Supreme Court has more recently established a more stringent principle of general application: "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

Causation and Antitrust Injury.  As part of each of its antitrust claims, Retractable must establish that it suffered injury in its business or property as a proximate result of any antitrust violation.[28]

In the course of normal, lawful competition, some businesses may suffer economic losses or even go out of business.  An injury to a business is the "proximate result" of an antitrust violation only when the act or transaction constituting the violation directly and in natural and continuous sequence produces, or contributes substantially to producing, the injury.  In other words, the defendant's alleged violation of the antitrust laws must be a direct, substantial and identifiable cause of the injury that plaintiff claims to have suffered.  Proof of an antitrust violation does not necessarily mean the plaintiff was injured.[29]  A plaintiff can recover only if the loss stems from a reduction in competition because of the defendant's behavior.  There is no antitrust injury unless that behavior reduced competition, even if the behavior violated the antitrust law at issue.[30]

The antitrust laws were enacted for the protection of *competition,* not *competitors*.  Thus, Retractable must prove more than an injury causally linked to an antitrust violation.  Retractable must also prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Your focus here should be on harm to competition as a whole, not just to an individual competitor—

---

[28] This tracks language in the first sentence of the first paragraph on page 68 of FIFTH CIRCUIT PATTERN 6.1, altering the order of phrases and specifying all of the antitrust claims rather than the "conspiracy" claim addressed in 6.1.

[29] This language tracks verbatim language in the second through fifth sentences of the first paragraph on page 68 of FIFTH CIRCUIT PATTERN 6.1, with the exception of substituting the word "injured" for "damaged" because this instruction would not appear in the damages instructions.

[30] These two sentences are from the FIFTH CIRCUIT PATTERN 6.1.

although, harm to an individual competitor can be relevant and may help establish harm to competition.[31]  For example, a firm complaining about the harm it suffers from above-cost price competition is really claiming that it is unable to raise prices.   This is not antitrust injury.

Cutting prices in order to increase business often is the very essence of competition.[32]

[31] This language proposed by BD is virtually a direct quotation from the Fifth Circuit's decision in *Norris*, 500 F.3d at 465, which in turn quotes the Supreme Court in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,  488-89 (1977). It is essential to correctly submit the critical concept of "antitrust injury." *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (antitrust law requires a fact-finder to "measure damages resulting from the particular antitrust injury on which [the] liability . . . is premised"). Retractable objects to this language as repetitive and argumentative.  BD solely offers the proposed language to slant instructions in its favor.  The constant repetition of this language improperly implies that harm to a competitor is irrelevant.  It can be relevant to establish harm to competition.  Retractable proposes the language in blue instead as a fair balance. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 n. 6 (5th Cir.1983) (" Yet such evidence may overlap, since evidence of injury to a competitor may suggest damage to the competitive marketplace."); *see also LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("Even the foreclosure of one significant competitor from the market may lead to higher prices and reduced output."); *Blue Shield of Va. v. MCCready*, 457 U.S. 308, 313-14 (1978) ("Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations.").

[32] The last three sentences proposed by BD are direct quotes from *Atlantic Richfield Co. v. USA Pet. Co.*, 495 U.S. 328, 337-38 (1990), with the word "above-cost" substituted for "non-predatory" as explained previously.  It is necessary to instruct the jury correctly on the law applicable to antitrust injury with respect to pricing claims.  *See Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 451-58 (6th Cir. 2007) (antitrust complaint dismissed because discount agreements with exclusivity terms did not cause antitrust injury). Pricing is unmistakably part of this case, and BD is just as entitled to present its theory to the jury as RTI. BD contends that pricing is critical to the case, and at the very least, BD is entitled to legally correct instructions that submit its theory to the jury.  Each party, not just the plaintiff, "is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to" the party's theory. *United States v. Gunter*, 876 F.2d 1113, 1119 (5th Cir. 1989).   As discussed later in detail, this instruction is improper as Retractable does not need to establish BD's prices were below cost in order to prevail on its antitrust claims.  As such, this instruction is unnecessary, argumentative, and deviates substantially from the Fifth Circuit Pattern Jury Instruction on which the majority of the language for this definition is based.

Instruction No. 5[33]

**GENERAL INSTRUCTIONS REGARDING BD AGREEMENTS**

You will need to determine whether certain BD agreements with purchasers in the relevant markets contain terms that are anticompetitive. The following instructions apply to all of Retractable's allegations regarding BD's agreements.

Claims Relating to Pricing.[34]

---

[33] Retractable objects to BD's submission of an entire instruction describing its contracts. This is simply an attempt by BD to re-hash arguments already dismissed by the Court when it denied its motion for summary judgment on antitrust claims and entirely inappropriate for a jury submission. First, Retractable does not allege theories of predatory pricing or anything else that would trigger a below-cost pricing analysis. Second, BD's language regarding exclusive dealing theories sets forth requirements that are not necessary for the claims at issue. This section is improperly argumentative, confusing, and misleading. BD uses this section as an opportunity to misstate Retractable's claims. Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119. To the contrary, as the footnote authority makes clear, this material submitted by BD comes directly from the ABA Model Instructions and is necessary to instruct the jury correctly with respect to the claims made by RTI and the agreements challenged by RTI. Each party, not exclusively the plaintiff, "is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to" the party's theory. *United States v. Gunter*, 876 F.2d 1113, 1119 (5th Cir. 1989). Although the Court may have denied a motion for summary judgment on these issues, that ruling was not a definitive decision that these legally correct principles are inapplicable to this case, as a matter of law. BD is entitled to instruct the jury on its legally correct theory of the case.

[34] The Supreme Court has declared unequivocally that "regardless of the type of antitrust claim involved," the below-cost/dangerous probability of recoupment test as explained in this section applies to any claim based on pricing practices of the defendant. *E.g.*, *Brooke Group*, 509 U.S. at 223 (citation omitted). Moreover, the Supreme Court has also observed that "for antitrust purposes, there is no reason to distinguish between price and nonprice components of a transaction." *Pacific Bell Tel. Co. v. Linkline Communications, Inc.*, 129 S. Ct. 1109, 1119 (2009). Retractable has admitted that it has no evidence of below-cost pricing or a dangerous probability of recoupment, so BD moved for summary judgment and BD will, if necessary, move for judgment as a matter of law under Rule 50. *See Docs. 173, 371.* Retractable has now conceded that it has no evidence to satisfy the cost-price test, so all of its antitrust claims based on BD's contracts with pricing terms fail as a matter of law. *See Stearns Airport*, 170 F.3d at 518 (affirming summary judgment on Section 2 claim for failure to prove below-cost pricing); *Jostens*, 216 F.3d 465 (affirming post-trial judgment as a matter of law on Sherman Act § 2 claim). Because Retractable has not withdrawn those claims even though it has no evidence to support them, BD proposes the necessary instructions, which would be essential to any submission of antitrust claims based on agreements that include pricing terms. Retractable objects to BD's proposed language as it is not applicable to the allegations of this case. The Court already rejected application of the price-cost test to Retractable's claims when it adopted Magistrate Judge Payne's Report and Recommendations denying BD's motion for summary judgment. Retractable is not asserting a claim for predatory pricing. Including BD's requested instruction would be error. Recent authority explicitly rejects the price-cost test BD is advocating. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, (3d Cir. 2012) ("[n]othing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful

You will need to determine whether BD's agreements with GPOs and hospitals that contain price, discount, or rebate terms are anticompetitive.  To prevail on this theory, Retractable must prove that BD priced its products below cost, as I will define that term for you, to drive out or injure competition and with a dangerous probability that a higher price could be charged once competition had been substantially lessened or eliminated, allowing BD to make up its lost profits.  In order to prevail on this theory, Retractable must prove both that BD's prices were below cost and that there was a dangerous probability that BD would recoup its losses on the below-cost prices, including the time value of money, by charging higher prices in the future after it eliminated competition.[35]

exclusive dealing agreement lawful"; imposing this rule as requested by BD "would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification"; "[t]he law has long recognized forms of exclusionary conduct that do not involve below-cost pricing").  To the contrary, RTI's claims have always been, and still remain, based on the pricing provisions of BD agreements.  *See* RTI Third Amended Complaint (Doc. 73 ¶ 229 ("exclusionary contracts that rely on loyalty discounts or rebates"); RTI Antitrust Summary Judgment Response (Doc. 392) at 4 ("disloyalty conditions penalize buyers for purchasing rival products by raising *prices*").  Indeed, the contract provisions that RTI claims make BD's GPO agreements anticompetitive are identified in the agreements themselves as "Pricing Terms" (Dkt. No. 173, Atkins Decl. Ex. 28 at BD-RTIAT 17 (2010 BD-Premier Agreement)), "Pricing Structure" (*id.*, Ex. 36 at BD-RTIAT 343 (2006 BD-Novation Agreement)), or simply, "Pricing" (*id.*, Ex. 42 at BD-RTIAT 509 (2009 BD-Broadlane Agreement); *id.*, Ex. 43 at BD-RTIAT 583 (2008 BD-MedAssets Agreement)).  As these agreements reveal, what RTI calls a "penalty" is considered by BD and its customers as a "discount."  This is a case about pricing, and RTI is simply playing semantic games to avoid that conclusion because it cannot meet the test.

[35] This language proposed by BD tracks the substance of ABA Model C.2 – Predatory Pricing Definition, with three exceptions.  First, it modifies the introductory phrase to provide a transition from the preceding sentence.  Second, it refers specifically to BD and adjusts the tense accordingly.  Third, it substitutes "below cost pricing" for the loaded and imprecise phrase "predatory pricing" in accordance with Fifth Circuit law.  *Stearns Airport*, 170 F.3d at 532.  ABA Model C-47 is based on the Supreme Court's articulation of the price-cost test in *Brooke Group*, 509 U.S. at 222, 224 ("First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs. . . . [Second, the plaintiff must prove] that the competitor had . . . a dangerous probability of recouping its investment in below-cost prices.").  ABA Model Instruction C-47 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.  Retractable objects to BD's proposed language as it is not applicable to the allegations of this case.  The Court already rejected application of the price-cost test to Retractable's claims when it adopted Magistrate Judge Payne's Report and Recommendations denying BD's motion for summary judgment.  Including BD's requested instruction would be error.  Recent authority explicitly rejects the price-cost test BD is advocating.  *See ZF Meritor, LLC v. Eaton Corp.*, 696

In deciding whether Retractable has proved that BD's price was anticompetitive, it is important for you to consider the evidence in light of the way in which the competitive process is expected to work. Lowering prices is a proper means of competing, and it is one of the beneficial results of the competitive process. Thus, lowering prices to win business away from other firms in the market, standing by itself, is indicative of healthy competition. It is not unlawful or improper, even if the firm intends by its actions to drive rivals from the market. If one firm is able to offer a low price, and still make a profit, while rival firms are unable to meet that price, it would naturally follow that the rival firms eventually may go out of business. In these circumstances, the failure of rival firms because they cannot meet the lower prices offered by the more efficient seller is a natural consequence of the competitive process.[36]

The law does not prohibit a firm from offering low prices that are profitable to it, even if the seller expects that all of its competitors will be unable to meet its low prices, and that eventually they will go out of business. Offering low, but profitable, prices is a legitimate practice, and should not be confused with anticompetitive pricing. The fact that BD possessed

F.3d 254, (3d Cir. 2012) ("[n]othing in the case law suggests, nor would it be sound policy to hold that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful"; imposing this rule as requested by BD "would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification"; "[t]he law has long recognized forms of exclusionary conduct that do not involve below-cost pricing").

[36] Except for use of "anticompetitive" in the first sentence as a substitute for the loaded and imprecise phrase "predatory pricing," this paragraph proposed by BD tracks the language of the second paragraph of ABA Model C-55 verbatim. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."); *Virgin Atlantic Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 265 (2d Cir. 2001) ("Rewarding customer loyalty promotes competition on the merits."). Retractable objects for the same reasons asserted in the footnotes above. This language is not relevant and improper for the claims asserted. ABA Model Instruction C-55 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

financial resources that would allow it to remain in business while charging low prices does not show that its prices were anticompetitive.[37]

The question you must decide is whether BD's price was anticompetitive.  In deciding this question, you must consider whether BD's price was expected to be profitable.  There are various recognized categories of costs that a firm will incur in running its business.  For purposes of determining whether BD's challenged prices were anticompetitive, you must apply the cost tests that will now be explained.[38]

## <u>Volume and Market Share Discounts</u>

Sellers often provide discounts to purchasers who buy large volumes and/or large shares of a particular product from a particular seller.  Sometimes the amount of the discounts increases with larger purchases.  Volume and market share discounts may apply to purchases made at a particular point in time or to cumulative purchases made over the course of a specified time period, such as one year.  Volume and market share discounts often reflect cost savings and other efficiencies associated with larger purchases and provide incentives for buyers to purchase more from the seller.  Like other low prices, volume and market share discounts are not anticompetitive merely because smaller sellers cannot match them without losing money.[39]

---

[37] *Id.*  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-55 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[38] *Id.*  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-55 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[39] This paragraph is the first paragraph of ABA Model C.15 – Volume and Market Share Discounts, verbatim except for inclusion of the phrase "market share" in the instruction (conforming to the title and the substantive law) and incorporation of "anticompetitive" as noted above.  To the extent that Retractable asserts an argument at trial about discounts involving multiple product lines, the appropriate substantive test should be drawn from *Cascade Health Solutions v. Peace Health*, 515 F.3d 883, 909 (9th Cir. 2008) ("a plaintiff who challenges a package discount as anticompetitive must prove that, when the full amount of the discounts given by the defendant is allocated to the competitive product or products, the resulting

In this case, Retractable contends that BD offered volume and market share discounts that would have been difficult or impossible for Retractable to match without losing money.  Even if you find that this is true, Retractable has not met its burden of proving anticompetitive pricing unless you also find that BD's volume and market share discounts resulted in prices below BD's average variable costs and that there was a dangerous probability that  BD would recoup those losses through future price increases.   In the case of volume and market share discounts, Retractable must prove that the amount of the discount applied to the total amount of goods sold resulted in sales below BD's cost.[40]

### Prices Below Cost

A seller's costs in making and selling a product are divided into two categories: costs that the seller will incur whether or not it makes a particular sale, and costs that the seller incurs only in connection with the manufacture and sale of a specific unit of its product.[41]

The first kind of cost is referred to as fixed or indirect cost.[42]  This type of cost is not to be considered in deciding whether BD's prices were below cost.[43]

price of the competitive product or products is below the defendant's incremental cost to produce them").  BD understands RTI's concession to mean that it has no evidence to satisfy this test.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-80 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[40] This paragraph is the second paragraph of ABA Model C-80 verbatim except for inclusion of the phrase "market share" in the instruction (conforming to the title and the substantive law) and incorporation of "anticompetitive" as noted above.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-80 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[41] This sentence tracks the language of the first paragraph of ABA Model C-58 verbatim.   Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

The second kind of cost is referred to as "variable cost."  Variable costs, as the name suggests, are those costs that increase with the production of each additional unit of the product.[44]  "Average variable cost" is the sum of all variable costs, divided by the total number of units expected to be produced and sold.[45]

A price is not below cost for purposes of the test if it actually produces income in excess of BD's average variable cost.  Likewise, a price is not below cost if BD believed, at the time the price or price term was set, that the price actually charged would be at least as high as BD's average variable cost.[46]

A low price charged by BD or a price term to which BD agreed is not below cost where, at the time the price or price term was offered, there was no dangerous probability that BD would

---

[42] This sentence tracks the language of the first clause of the second paragraph of ABA Model C-58 verbatim.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[43] This sentence tracks the language of the last sentence of the second paragraph of ABA Model C-58 verbatim.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[44] The first two sentences of this paragraph track the language of the first two sentences of the third paragraph of ABA Model C-58 verbatim.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[45] This sentence tracks the language of the last sentence of the third paragraph of ABA Model C-58 verbatim.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[46] This paragraph uses the substantive language of the fourth paragraph of ABA Model C-58, revised to instruct the jury what it must find under Retractable's burden of proof, and to make reference to price terms in the agreements on which Retractable bases its antitrust claims.  *See Stearns Airport*, 170 F.3d at 532.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-58 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

be able to raise prices in the future to levels higher than would be offered in a competitive market, and thereby make up its lost profits, including the time value of money, and obtain some additional gain.  Making up lost profits in that way is called recoupment.[47]

### Dangerous Probability of Recoupment

To prove a dangerous probability of recoupment, Retractable must meet a two-prong test. First, Retractable must demonstrate that the below-cost pricing scheme was capable of driving the defendant's competitors, or at least the object of the below-cost pricing, from the relevant market.  Second, Retractable must prove that, after eliminating competition in the relevant market, BD then could raise prices long enough to recoup its lost profits, including the time value of money, without drawing new competitors to the market.[48]

To analyze whether there is a probability of sustained excessive pricing, you must consider a number of factors about the market, including the number of competitors, whether entry is easy, whether firms in the market have excess capacity or could quickly create or purchase new capacity to absorb the market share of its rivals, whether firms not in the market could shift assets to the market, and whether substitute products might be available to defeat a price increase.[49]

---

[47] This paragraph is comprised of the first two sentences of the first paragraph of ABA Model C-50, slightly revised to conform to prior paragraphs in this section and to specify BD as defendant.  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-50 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[48] This paragraph tracks the second paragraph of ABA Model C-50, specifying Retractable as plaintiff and BD as defendant and substituting "below-cost pricing" for "predatory pricing."  Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant and improper for the claims asserted.  ABA Model Instruction C-50 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[49] Except for the reference to the "probability" of recoupment through sustained excessive pricing, this paragraph proposed by BD tracks the language of the fourth paragraph of ABA Model C-50 verbatim. Retractable objects for the same reasons asserted in the footnotes above.  This language is not relevant

Claims Relating to Alleged Exclusive Dealing.[50]

You will also need to determine whether, separate and apart from any pricing provisions, BD's agreements contain terms that prohibit customers from buying products from competitors (specifically, sole- and dual-source agreements with GPOs in the markets for conventional syringes and safety IV catheters),[51] and whether BD's agreements with distributors prohibit competition in the relevant markets.[52]

and improper for the claims asserted.   ABA Model Instruction C-50 is a proposed instruction for monopolization claims based on predatory pricing, which Retractable is not asserting in this case.

[50]   Retractable generally objects to BD's proposed instructions describing their exclusive dealing agreements.  First, the location of this discussion is misplaced.  Retractable should not be required to discuss is exclusive dealing claims long before the portion of the charge that directly addresses exclusive dealing.  Additionally, BD mischaracterizes Retractable's claims, as explained in Retractable's objections that follow.  Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.  To the contrary, RTI asserts its exclusive dealing arguments in support of all its antitrust claims; a general instruction on the law applicable to those claims is therefore required and the efficient location for such a generally applicable instruction is here.  Moreover, whether or not RTI agrees, BD's theory of the case is that the legal principles applicable to exclusive dealing arrangements are the controlling rules for any attempt to prove anticompetitive conduct based on contract terms separate and apart from pricing provisions.  BD is entitled to legally correct instructions that submit its theory to the jury.  Each party, not just the plaintiff, "is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to" the party's theory.  *United States v. Gunter*, 876 F.2d 1113, 1119 (5th Cir. 1989).   If not given here, BD submits that the instructions should be given in connection with the specific antitrust claims.

[51] Retractable objects to this language as it wrongly singles out certain contracts.  For example, there may be an exclusive dealing agreement if distributors are told to Pull BD syringes out of their bags to show to customers and are not allowed to carry competitor's products.  To the contrary, marketing advice does not constitute an exclusive dealing arrangement if the customer is free to purchase syringes from other competitors through other distributors.

[52]   To the extent that Retractable asserts antitrust claims related to these provisions, the standard for liability must be the exclusive dealing standard.  BD submits the proper instructions for such a theory, although Retractable has no evidence to satisfy these rigorous standards and BD anticipates that it will be entitled to judgment as a matter of law under Rule 50 on any such allegations.  Although the Court may have denied a motion for summary judgment on these issues, that ruling was not a definitive decision that these legally correct principles are inapplicable to this case, as a matter of law.  BD is entitled to instruct the jury on its legally correct theory of the case.   Retractable objects to this proposed language because there is no requirement that BD's contracts contain specific terms of exclusivity or expressly prohibit dealing with competitors to be anticompetitive.  Retractable alleges that BD's contracts were *de facto*, not explicit, exclusive dealing agreements.  And the pricing provisions of BD's agreements are irrelevant to the claims at hand.  The jury should evaluate the full contracts.  BD offers no authority to support this proposed language.  The Court rejected these same arguments when it adopted Magistrate Judge Payne's

These terms can only amount to anticompetitive conduct if they are exclusive dealing arrangements.[53]  Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time.   There are several forms of exclusive dealing arrangements.  The arrangement may take the form of an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors or a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier.  Some practices may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.[54]

Report and Recommendations denying BD's motion for summary judgment.  *See Retractable Tech. v. Becton Dickinson & Co.*, No. 2:08-cv-16, at p.6 (E.D. Tex. March. 14, 2013) (Doc. #367) ("the Court must consider the practical effects of the contracts").  BD's contracts, by their terms, increase a buyer's price if the buyer does not meet certain conditions, penalizing the buyer for non-compliance.  BD's own expert recognizes this theory for exclusivity.  *See* Klein & Murphy, *How Exclusivity is Used to Intensify Competition for Distribution—Reply to Zenger*, Antitrust L. J. 692, 698 (2011) ("[A] dominant firm may impose exclusivity . . . by artificially increasing its first non-exclusive price option significantly above the profit-maximizing level before offering the second option of a discount contingent on the acceptance by the distributor of exclusivity.").

[53] *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (Plaintiffs failed to show "anticompetitive conduct," because they "did not demonstrate that Brunswick's discount program was in any way exclusive.  The programs did not require the boat builders to commit to Brunswick for any specified period of time.")

[54] This description of exclusive dealing is taken from the first paragraph of ABA Model B.2 – Exclusive Dealing – Definition and Elements.  Retractable reasserts its general objections.  Additionally, Retractable objects to use of the word "forbidding" as it is not the appropriate legal standard for exclusive dealing.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1963) (describing foreclosure not as total prohibition, but instead, a "clog on competition" that "deprive[s] rivals of a fair opportunity to compete").  This particular *Brown Shoe* decision has nothing to do with RTI's claims.  It involves a merger case brought by the U.S. under Clayton Act § 7, which contains standards different from those of Sherman Act §§ 1 and 2 and Clayton Act § 3.  Moreover, the decision uses the term "foreclosing" and the word "forbidding" is the appropriate Sherman Act synonym in vertical agreement cases.  Finally, the language cited by RTI comes from a section of this *Brown Shoe* decision titled "Vertical Aspects of the Merger."  However, the Supreme Court has since rejected precedent pre-dating and post-dating this decision that regarded vertical restraints as anticompetitive.  *Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*, 551 U.S.877, 901-02 (2007) (rejecting per se theory of vertical price maintenance and summarizing previous cases similarly rejecting vertical theories).

If you find BD's agreements were exclusive dealing arrangements, Retractable must demonstrate that those arrangements resulted in a substantial harm to competition in a relevant market. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Retractable is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.[55]

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, or lower quality, then there has been no competitive harm.[56]

---

[55] This BD proposal is the first paragraph of ABA Model A-6, modified only to revise the introductory language and to include a reference to the relevant market (which has been addressed previously in the instructions and need not be addressed again here). Retractable objects to this language, in addition to its general objection to a separate instruction describing BD's contracts, because it goes beyond the scope of describing the contracts at issue. Instead, BD goes into detailed description regarding harm, which is discussed in the instructions for each separate cause of action. Addressing harm again here is confusing and misleading.

[56] This BD proposal is the fourth paragraph of ABA Model A.3B – Proof of Competitive Harm, modified only to omit a transition from the omitted instructions regarding relevant markets and also to omit "some other competitive benefit." That phrase was removed based on Fifth Circuit law, which recognizes as competitive harms only price, supply, and quality. *See Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007) (per curiam) (identifying as competitive harm increased price, decreased supply, and decreased quality). Retractable objects to BD's instruction as a misstatement of the law. The law is clear that there is not set list of forbidden exclusionary practices, *Trinko*, 540 U.S. at 4144 (the "means of illicit exclusion…are myriad"). Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way. *Aspen Skiing*, 472 U.S. at 605 n.32. These factors would have to also include buyer choice, and increased innovation in a given market. To the contrary, no Fifth Circuit decision has ever separately identified these factors. *See Jostens*, 216 F.3d at 483; n.___, *supra* (discussing innovation). Buyer choice, of course, is subsumed in all three factors. In a competitive market, buyers can choose between lower prices and higher quality. Separately identifying buyer choice and innovation would incorrectly suggest that in order to protect innovation, a buyer should not be allowed to choose a lower-priced product instead of a higher-priced innovative product. This would turn antitrust law on its head. RTI misleadingly cherry-picks language from *Trinko* out of context. In the following sentences, the Court went on to say that because of its concerns about "false positives" from the imposition of antitrust liability, it would not "unduly" expand that liability to newly challenged practices. 540 U.S. at 414.

---

In determining whether the challenged agreements had a substantially harmful effect on competition in a relevant market, you should consider whether buyers of the products or services had independent reasons for entering into the challenged arrangements or were coerced into entering into them; whether other competing suppliers also offer similar arrangements; the extent of competition among competing suppliers for similar arrangements with buyers; BD's position in the marketplace; the competitive alternatives to BD's products or services; the reasons BD and buyers enter into such arrangements; and the effect of the use of such arrangements on the ability of new firms to enter the market and the effect on price and other competition in the market.[57]

Furthermore, in determining the extent to which the challenged agreements had a substantially harmful effect on competition in a relevant market, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure.[58]   Where the exclusive

[57] This paragraph proposed by BD tracks verbatim the substantive language in the first paragraph of ABA Model B.3 on exclusive dealing, except to refer to "the challenged agreements" and "such/similar arrangements" in lieu of "exclusive dealing contracts."   Reference to the "nature and history" of the challenged agreements is omitted to conform to rulings on motions in limine.   Retractable objects to this language, in addition to its general objection to a separate instruction describing BD's contracts, because it goes beyond the scope of describing the contracts at issue.   Instead, BD goes into detailed description regarding harm, which is discussed in the instructions for each separate cause of action.   Addressing harm again here is confusing and misleading.

[58] This paragraph proposed by BD is based on the first two sentences from the third paragraph of ABA Model B.3, substituting "had a substantially harmful effect on competition in a relevant market" for "foreclose competition on the merits" (for consistency) and referring to the "challenged agreements" as explained in the preceding footnotes.

Retractable's expert (Professor Elhauge) has asserted that in determining whether the level of market foreclosure is substantial, it is appropriate to aggregate the foreclosure allegedly caused by BD's contracts with foreclosure allegedly caused by non-party Covidien's contracts.   That approach to determining substantial foreclosure has no basis because Retractable has not alleged that there is collusion between BD and Covidien.   *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (holding that, absent an allegation of collusion, it was improper to consider the "cumulative harm" of defendant's agreements with other purchasers in assessing the potential anticompetitive effects of an agreement with a specific purchaser); *Barnosky Oils, Inc. v. Union Oil Co.*, 582 F. Supp. 1332,1335-36 (E.D. Mich. 1984) (finding that the foreclosure due to defendant's exclusive dealing contracts was not substantial as a matter of law, and that "existence of other alleged exclusive dealing arrangements" involving defendant's non-party competitors were "not relevant" because there were "no allegations of horizontal conspiracy, collusion, or any kind of concerted action" between defendant and others).   It would be especially

dealing arrangements foreclose less than 20% of the market, the harm from the foreclosure of competition is not substantial because there are alternatives available.[59]  If the level of market foreclosure is less than 30 or 40%, it is unlikely to be substantial.[60]  In determining whether a

improper to instruct the jury regarding aggregate foreclosure because Retractable and its expert have conducted no analysis and adduced no evidence to demonstrate the effect of Covidien's contracts or the portion of the market they cover.  If, however, the Court does permit Retractable to present arguments about aggregate foreclosure to the jury, then the jury should be instructed that if the level of foreclosure caused by BD's and Covidien's contracts together is found to be less than 50%, it is not substantial, and if it is less than 65%, it is unlikely to be substantial.  The flaws in Retractable's proposed submission on this issue are addressed in n.___, *infra*.  Retractable objects to this proposed language because the Supreme Court and other federal courts have held that cumulative foreclosure by rivals engaged in exclusive dealing may be considered in measuring anticompetitive effects. *United States v. Standard Oil Co.*, 337 U.S. 293, 309, 314 (1949); *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 272 (3d Cir. 2012); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007); *Genico, Inc. v. Ethicon, Inc.*, No. 5:04-cv-00228-DF, slip op. at 7-8 (E.D. Tex. Mar. 23, 2006). Retractable further objects to the substitution of language for "foreclose competition on the merits" because the latter is precisely what Retractable is claiming; that BD's exclusionary conduct foreclosed competition in the relevant markets on the merits, which both injured Retractable and harmed competition.

[59] This BD proposal omits the phrase "this is an indicator" from the language of ABA Model B.3 because the reference relied on by the ABA Model is the Fifth Edition of Antitrust Law Developments, which has been superseded.  The current edition states:  "Since the early 1970s, judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less.  Although foreclosure of 20 to 30 percent was a gray area before *Jefferson Parish*, the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market share thresholds are a prerequisite to finding exclusive dealing unlawful -- and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion."  ABA Section of Antitrust Law, Antitrust Law Developments 217 (6th ed. 2007).  Therefore, the stronger language in this proposed instruction is legally accurate.  Retractable objects to this proposed language because minimum foreclosure shares do not apply in monopolization cases brought under Section 2 of the Sherman Act.  *United States v. Microsoft Corp.,* 253 F.3d 34, 70-71 (D.C. Cir. 2001) (en banc); *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254 (3d Cir. 2012) ("Exclusive dealing arrangements are of special concern when imposed by a monopolist."); *United States v. Dentsply Int'l,* 399 F.3d 181, 187 ((3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."; *LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003)(en banc); *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (3d Cir. 1978).)

[60] This sentence is proposed by BD to reflect the current consensus in the case law and treatises, which cast serious doubt on the possibility that less than 30% foreclosure by a single firm could ever be considered "substantial," and provide a "virtual safe harbor" for less than 20% foreclosure.  *See, e.g.*, *Sterling Merchandising*, 656 F.3d at 123–24 ("'foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,' and while high numbers do not guarantee success for an antitrust claim, 'low numbers make dismissal easy,'" quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)); *B & H Medical, L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008) ("Courts routinely observe that foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." (internal quotation marks omitted); *Midwest Agency Servs., Inc. v. JP*

market is foreclosed, the relevant inquiry is what products are reasonably available to a consumer, not what products the consumer ultimately chooses to buy.[61]

*Morgan Chase Bank, N.A.*, 2010 WL 935450 (E.D. Ky. Mar. 11, 2010) ("As a matter of law, courts have concluded that foreclosure levels of less than 30 or 40 percent are not a substantial share."); AREEDA & HOVENKAMP, *supra*, ANTITRUST LAW ¶ 1821 ("[S]ingle-firm foreclosure percentages of less than 30 or 40 percent in a properly defined market would seem to be harmless to competition."). Retractable objects to this proposed language because it does not accurately state the law with respect to minimum market foreclosure percentages for several reasons. First, BD references only Section 1 cases. Numerous cases have held that "[e]xclusive dealing arrangements are of special concern when imposed by a monopolist," which is the case before the court. *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, (3d Cir. 2012); *United States* v. *Dentsply Int'l*, 399 F.3d 181, 187 ((3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."); *United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (en banc). Further, courts do not consider only the percentage of the market foreclosed but also take into account other factors such as "the restrictiveness and the economic usefulness of the challenged practice in return to the business factors extant in the market." *Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 110-11 (3d Cir. 1992)(quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1251-52 n.75 (3d Cir. 1975); *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, (3d Cir. 2012) ("There is no set formula for evaluating the legality of as exclusive dealing agreement . . ."). Finally, there is certainly no judicial consensus that a 30 to 40% foreclosure share is a minimum to establish competitive harm. *See e.g., LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) (en banc) (exclusive bundling contracts found to be exclusionary conduct under Section 2 without specification of the amount of the market foreclosed); *United States v. Microsoft Corp.,* 253 F.3d 34, 69 (D.C. Cir. 2001) (en banc) (exclusive dealing contracts found exclusionary without specification of the amount of the market foreclosed); *Twin City Sportservice, In. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1298, 1304 (9th Cir. 1982) (24% foreclosure enough to establish competitive harm); Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARV. L. REV. 397, 469 n.219 (Dec. 2009).

[61] BD proposal based on *Southeastern Mo. Hosp. v. C.R. Bard, Inc.* 642 F.3d 608, 616 (8th Cir. 2011) ("[I]n determining whether a market is foreclosed the relevant inquiry is what products are reasonably available to a consumer, not what products the consumer ultimately chooses to buy."). BD has proposed this sentence because this case involves, in part, allegations of *de facto* exclusive dealing arrangements. To constitute a *de facto* exclusive dealing arrangement, a contract must do more than prevent a competitor from selling to the buyer; the contract must prevent a competitor from *competing* for sales to the buyer. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961) (noting that the crucial question is "whether the pre-emption of competition to the extent of the tonnage involved tends to substantially foreclose *competition* in the relevant coal market") (emphasis added); *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 997 (9th Cir. 2010) ("The market-share discount agreements at issue here did not foreclose Tyco's customers from competition because a competing manufacturer needed only offer a better product or a better deal to acquire their business.") (citation omitted); *Digene Corp. v. Third Wave Technologies,Inc.*, 323 F. App'x 902, 911 (Fed. Cir. 2009) ("To prevail on such an exclusive dealing claim, Third Wave must show that a substantial share of the relevant market was foreclosed to competitors."); *Roland Mach. Co. v. Dresser Indus*, 749 F.2d 380, 394 (7th Cir. 1984) (even an express exclusive dealing arrangement is actionable only if "it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market"); *U.S. v. Visa*, 344 F.3d 229, 242 (2d Cir. 2003) ("For an exclusive dealership arrangement to cause a harm to competition (and overcome the presumption of legality), it must prevent competitors from getting their

Similarly, the shorter the duration of a challenged agreement, the less likely it is to harm competition.  The longer the duration of a challenged agreement, the more likely it is to harm competition, unless it is clear that there was vigorous competition to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.[62]

In considering all of these facts, you should determine whether the challenged arrangements adversely affected the price paid by buyers, output, or the quality of products

products to consumers at all.").   Retractable objects to this proposed language because it ignores the direct competitive impact of BD's anticompetitive conduct on BD's rivals, which has in turn injured competition in the relevant markets by reducing output, raising prices, and limiting consumer choice. Supreme Court precedent expressly recognizes that the exclusion of rival sellers for meaningful access to markets establishes competitive injury to the market. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 45 (1984) (O'Connor, J. concurring) ("Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods"); *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961) (exclusive dealing contracts illegal "if their practical effect is to prevent lessees or purchasers from using or dealing in the goods, etc., of a competitor or competitors of the lessor or seller."); *Std. Oil Co. v. United States,* 337 U.S. 293, 314 (1949); *LePage's, Inc.* v. *3M,* 324 F.3d 141, 159 (3d Cir. 2003) (en banc) ("The inquiry in *Microsoft* was whether the monopolist's conduct excluded a competitor").  Further, it is not true, with regard to allegations of so-called *de facto* exclusive dealing, that a different standard of proof exists. *See ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254,  (3d Cir. 2012); *LePage's, Inc.* v. *3M*, 324 F.3d 141, 159 (3d Cir. 2003) (en banc) (" When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e., predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."). Whether expressly exclusive or de facto exclusive, the arrangement must exclude competition from rivals.  That is the proposition that these cases establish.

[62] This paragraph proposed by BD tracks verbatim the language of the third and fourth sentences of the third paragraph of ABA Model B.3, changing "contract" to "challenged arrangement" in the interest of consistency.  *See Sterling Merchandising,* 656 F.3d at 124 ("short terms allay fears" of harm to competition); *Allied Orthopedic,* 592 F.3d at 997 ("easy terminability of an exclusive dealing arrangement negates substantially the potential to foreclose competition"); *Roland Machinery Co. v. Dresser Indus.,* 749 F.2d 380, 395 (7th Cir. 1984) ("Exclusive dealing contracts terminable in less than a year are presumptively lawful.")   Retractable objects to BD's additional language proposed for this section.  The language is not relevant and is improper for the claims asserted.  If the parties do not agree to a resolution of the differences in their instructions in this section, Retractable will provide further authority for its objections.

offered in the relevant market.  Where a challenged arrangement does not adversely affect price, output, or product quality, it does not substantially harm competition.[63]

---

[63] This language proposed by BD tracks verbatim the last two sentences of ABA Model B.3, changing "exclusive dealing arrangement" to "challenged arrangement."  The last sentence has been revised to comply with Fifth Circuit authority, which emphasizes that competitive harm requires the loss of a competitive benefit—which is characterized as higher prices, lower supply, or lower quality.  *See Taylor*, 216 F. App'x at 412 (defining competitive harm as increased price, decreased supply, or lower quality). Retractable objects to BD's additional language proposed for this section.  The language is not relevant and is improper for the claims asserted.  If the parties do not agree to a resolution of the differences in their instructions in this section, Retractable will provide further authority for its objections.

Instruction No. 6 7
## SECTION 2: MONOPOLIZATION[64]

Retractable alleges it was injured by BD's unlawful monopolization of the product markets for safety syringes, conventional syringes, and safety IV catheters in the United States.

To prevail on its monopolization claims, Retractable must prove the following elements:

---

[64] BD has acceded to the sequence proposed by Retractable. The normal sequence begins with Section 1, as do the ABA Model Instructions, but BD is willing to accede to Retractable's preferred sequence (for any claims that survive BD's summary judgment and Rule 50 motions), provided that the jury is properly instructed on all essential elements of each claim. BD moved for summary judgment on Retractable's monopolization claims. *See* Docs. 173, 371; *see also Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000) (affirming judgment as a matter of law on Sherman Act § 2 claim after verdict); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) (affirming summary judgment on Sherman Act claims). As the specific objections in this section will illustrate, Retractable's Section 2 claims fail as a matter of law and BD is entitled to judgment as a matter of law under Rule 50.

1. First, that the alleged market is a valid antitrust relevant market;[65]

2. Second, that BD possessed monopoly power in that market;

3. Third, that BD willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

4. Fourth, that BD's conduct occurred in or affected interstate commerce;[66] and

5. Fifth, that Retractable was injured in its business or property due to because of[67] BD's anticompetitive conduct.[68]

You should refer to the definitions and instructions provided above for relevant market, interstate commerce, anticompetitive conduct, and causation and antitrust injury.  In addition, to the extent the allegations involve BD agreements, you should follow Instruction 5 regarding those agreements.[69]

Monopoly power:[70]  Monopoly power is the power to maintain prices above competitive levels or restrain control prices and exclude competition in a relevant market.[71]  Monopoly

---

[65] Except to make precise party references, the yellow language proposed by BD tracks ABA Model C-2 verbatim and largely conforms to the language used in FIFTH CIRCUIT PATTERN 6.1.  Correspondingly, BD objects to the blue language as without support in the ABA Models or FIFTH CIRCUIT PATTERNS.

[66] As noted above, BD stipulates that the conduct in question occurred in interstate commerce except for one allegation of alleged anticompetitive conduct (regarding a particular act of alleged false advertising). If that allegation is dismissed in accordance with BD's understanding as set forth in the prior footnotes, the interstate commerce element is undisputed.

[67] BD proposes use of the phrase "because of," which is used in ABA Model C-2 and properly expresses the element of causation.  BD objections to Retractable's proposed alteration of the model instruction because it would dilute the causation element.

[68] The agreed and yellow language in these elements tracks ABA Model C-2.

[69] Retractable objects to this language and reasserts the objections it made to the referenced instruction.

[70] BD proposes at this point the full scope of the ABA instructions necessary to adequately instruct the jury on the issue of "monopoly power," because Retractable's truncated proposal is woefully inadequate and varies wildly from the ABA Models.  Retractable's monopoly power instruction is sufficient.  The fact that the ABA Model Rules provide detailed and intricate instructions on monopoly power does not make them necessary.  There are antitrust cases that submit charges to the jury with shorter instructions on monopoly power.  *E.g.*, Charge to the Jury, *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, no. 2:12-cv-103-J (N.D. Tex. Jul. 30, 2013) (solely instructing that "Monopoly Power is the

---

power, in and of itself, is not unlawful, but becomes unlawful where it involves anticompetitive or exclusionary acts or conduct.[72]   More precisely, a company has monopoly power if it can profitably raise its prices for a significant period of time substantially above the prices charged by its competitors.[73]

There can be both direct and indirect proof of the existence of monopoly power in a market.

**Indirect Evidence**

Monopoly power may be proven indirectly, by evidence of the structure of the market, market share, and barriers to entry into the market.  If this evidence establishes that BD has the power to control prices and exclude competition in the relevant market, then you may conclude that BD has monopoly power in the market.

power to control prices or exclude competition in a relevant market" and describing proof of monopoly power in a single paragraph that follows).  As such, Retractable objects generally to BD's request to enlarge the monopoly power definition to such a broad scope as it is unduly lengthy, unnecessary, confusing, and misleading to the jury's deliberation.

[71] BD objects to the blue language as unsupported by any authority and contrary to the ABA Models. Instead, the yellow text proposed by BD tracks the substantive language of ABA Model C.2 –Monopoly Power Defined – verbatim.  Without more, merely "restraining" competition or temporary pricing "above competitive levels" do not establish monopoly power.  Mere high pricing that does not exclude competitors is not monopoly power.  Retractable's diluted definition would lower its burden of proof. BD' proposes the full ABA Model instructions on this issue, which place these terms into proper context.

[72] BD agrees with much of the language in this sentence, but submits that it more appropriately belongs in the instruction on anticompetitive conduct in the Section 2 series.  For the reasons explained previously, BD objects to the flawed premise that any "exclusionary" act can be anticompetitive.  *See* n._, *supra*. Retractable's truncated proposal merely states technical concepts without giving any meaningful explanation of those concepts to the jury.  The instructions regarding anticompetitive conduct on the Section 2 claim address that issue fully, and BD submits that this issue should be addressed in that section.

[73] This yellow language proposed by BD largely tracks the language from ABA Model C.9 – Existence of Monopoly Power –verbatim.  Model C.9, however, uses the term "monopolist," which conflates and confusingly muddies the important distinction between monopoly power and monopolistic conduct. Because this is an instruction on the possession of monopoly power, BD replaces the phrase "a firm is a monopolist" with the more appropriate phrase "a company has monopoly power."

The first factor you should consider is BD's market share.  Based on the evidence you have heard, you should determine BD's market share as a percentage of total industry sales.[74] But you should also consider other aspects of the market, such as: the existence of barriers to entry into the market to potential competitors, entry into and exit from the market by competitors, and the size and number of competitors in the market.[75]

Along with BD's market share, these factors should inform you as to whether BD has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.[76]

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power.[77]  However, if you find that the other evidence demonstrates that

---

[74] The language in these two yellow sentences proposed by BD tracks language from ABA Model C.8 – Indirect Proof – verbatim.  Retractable objects to BD's additional language proposed for the section on Indirect Evidence stating that BD's market power should be determined as "total industry sales."  The language is not relevant and is improper for the claims asserted, as well as vague and confusing to the jury.  Retractable submits that a more appropriate determination of market share would be with regard to the percentage of BD's shares in the relevant markets.

[75] *See* ABA Model Instructions in Civil Antitrust Cases, Existence of Monopoly Power—Indirect Proof, at C-16; ABA Model Instructions in Civil Antitrust Cases, Existence of Monopoly Power—Direct Proof, at C-23; *see also Z-Tel Commc'ns*, 331 F. Supp. 2d at 521; *see also, e.g., Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003).  In connection with BD's requested instruction concerning the "power to control prices <u>and</u> exclude competition in the relevant market," the "and" should be "or."   Monopoly power is the power of a seller "to control prices <u>or</u> exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956). (emphasis added).  BD objects to the truncated Retractable proposal because it merely states concepts without giving any meaningful explanation of those concepts to the jury.  BD thus submits the proper explanatory instructions in the following paragraphs.

[76] The language in these two yellow sentences proposed by BD tracks language in ABA Model C.9 verbatim.  For authority, see Model C.9 nn. 2, 3.

[77] The language in this sentence proposed by BD tracks language in ABA Model C.9 verbatim.  Together with the following sentence, it is a neutral statement of a principle established by the Fifth Circuit: "[A]bsent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.3d 480, 489 (5th Cir. 1984).  Retractable objects to BD's excessive use of a 50% cutoff for market share in order to establish monopoly power.  This is an attempt to improperly influence the jury as there is no 50%

---

the defendant does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that the defendant has monopoly power.[78]

## Market Share Trends[79]

The trend in BD's market share is something you may consider.  An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

requirement or cutoff.  *Broadway Delivery v. UPS*, 651 F.2d 122, 126-130 (2d Cir. 1981) (Newman, J.) (concluding it was error for the district court to instruct the jury that a finding of less than 50% of market share precluded finding of monopoly power because "the true significance of market share data can be determined only after careful analysis of the particular type of market"); *Hayden Publ'g Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."); *Yoder Bros. v. Cal-Fla Plant Corp.*, 537 F.2d 1347, 1367 n.19 (5th Cir. 1976) (rejecting "a rigid rule requiring 50% of the market for a monopolization offense without regard to any other factors"); *Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.*, 656 F.Supp. 914 (S.D.N.Y. 1987) (stating that just 25% might be sufficient).

[78]  The language in this sentence proposed by BD tracks language in ABA Model C.8 verbatim.  For authority, see Model C.8 n. 4.

[79]  The language in this section proposed by BD tracks the substantive language of ABA Model C.8 verbatim, substituting "BD" for "defendant."  Retractable objects to BD's additional language proposed for this section.  Just as there is no 50% cutoff, similarly there is no requirement that a monopolist show increasing or maintained market share.  To the contrary, multiple courts have found monopolization despite a decrease in market share.  *See American Tobacco*, 328 U.S. at 795 (monopolization found despite decline in share from 90.7% to 68%); *Reazin v. Blue Cross*, 899 F.2d 951, 970 (10th Cir.) (upholding finding of monopoly power despite decline in market share), cert. denied 497 U.S. 1005 (1990); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366-67 (9th Cir.1988) (same despite declining share and entry).  Indeed, "a decline in market share might indicate that market power exists and is being exercised." Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law¶835.2a (1995).  Areeda & Hovenkamp, ¶ 1802(c), Requirements Contracts Foreclosing Markets and Deterring Entry (August 2012) (noting that a dominant manufacturer may institute exclusive dealing contracts once it starts to lose market share to a younger rival, thereby slowing the rival's expansion and resulting in consumer injury); *see also Conwood Co. v. U.S. Tobacco Co*., 290 F.3d 768, 789-90 (6th Cir. 2002) (finding sufficient evidence to support an antitrust jury verdict where the defendant's market share had decreased and competitors' share had increased, because evidence showed that but for the anticompetitive behavior, competitor shares would have increased at a greater rate).

## Barriers to Entry[80]

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry are long-run costs that were not incurred by the existing companies in a relevant market but must be incurred by new competitors to enter the market, or other factors in a market that deter entry of new competitors while permitting existing companies to earn monopoly profits.[81]

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Evidence of low or no entry barriers may be evidence that BD does not have monopoly power, regardless of BD's market share, because new competitors could enter easily if BD attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that BD has monopoly power.

## Entry and Exit By Other Companies[82]

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that BD lacks monopoly

---

[80] Except for the sentence explained in the next footnote, the language in this section proposed by BD tracks language in ABA Model C.8 verbatim, again substituting "BD" for "defendant."

[81] BD proposes this definition of "barriers to entry" in accordance with ABA Model C.8 and more recent Fifth Circuit authority. *See Chicago Bridge v. FTC*, 534 F.3d 410, 428 n.8 (5th Cir. 2008) ("Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.' 'Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market.'") (citations omitted).

[82] The language in this section proposed by BD tracks the substantive language of ABA Model C.8 verbatim, substituting "BD" for "defendant." *See, e.g., Deauville Corp. v. Federated Dep't Stores*, 736 F.2d 1183, 1188-92 (5th Cir. 1985) (proof of ease of entry defeats Section 2 claims as a matter of law despite direct evidence of monopolistic intent).

power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that BD has monopoly power.

### Number and Size of Competitors[83]

You may consider whether BD's competitors are capable of effectively competing.  In other words, you should consider whether the financial strength, market shares and number of competitors act as a check on defendant's ability to price its products.  If BD's competitors are vigorous or have large or increasing market shares, this may be evidence that BD lacks monopoly power.  On the other hand, if you determine that BD's competitors are weak or have small or declining market shares, this may support an inference that BD has monopoly power.

### Negotiating Power[84]

Finally, if you decide that buyers in the relevant market are sophisticated businesses with power in negotiating contracts, this may offset any monopoly power BD might otherwise have.

### Direct Evidence

Monopoly power may also be proven by direct evidence of a company's actual exclusion of its competitors or control over prices in the market.  In other words, a firm is a monopolist if it

---

[83] The language in this section proposed by BD tracks the substantive language of ABA Model C.8 verbatim, substituting "BD" for "defendant."

[84] The language in this section proposed by BD is derived from ABA Model B.3 ("If you determine that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power defendant might otherwise have.")  *See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 986-97 (D.C. Cir. 1990) (United States did not challenge conclusion that customer "sophistication . . . was likely to promote competition even in a highly concentrated market").  Retractable objects to BD's additional language proposed for this section.  The language is not relevant and is improper for the claims asserted.  Retractable notes that BD has pulled this language from the ABA Model Section related to Section 1 of the Sherman Act and has not cited any authority for the proposition that "negotiating power" is a factor relevant to the determination of market power under Section 2  Retractable objects to its inclusion here as misleading and confusing to the jury as to the factors necessary to determine market power under Section 2.

can exclude rivals from significant portions of the market, reduce output for the market, raise rivals' costs, or profitably raise or maintain prices above the competitive level for a significant period of time.[85]

Retractable has the burden of proving that BD has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Retractable must prove that BD has the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.

Retractable must also prove that BD has the power to maintain prices above a competitive level for a significant period of time. If BD attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then BD does not have monopoly power.

Similarly, Retractable must prove that BD has the ability to exclude competition. For example, if BD attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then BD does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that BD has monopoly power. Other factors may enable a company without monopoly power to

---

[85] BD objects to the blue language in this paragraph because it is concededly a "synopsis" that fails to instruct the jury about the complex legal and economic principles stated. Instead, BD proposes the following four paragraphs, based on ABA Model C-23, as appropriate and complete instructions regarding proof with direct evidence. This is a synopsis of model instruction language, as with the remainder of Retractable's monopoly power definition that BD has broken up. *See* ABA Model Instructions in Civil Antitrust Cases, Existence of Monopoly Power—Indirect Proof, at C-16; ABA Model Instructions in Civil Antitrust Cases, Existence of Monopoly Power—Direct Proof, at C-23; *see also Z-Tel Commc'ns*, 331 F. Supp. 2d at 521; *see also, e.g., Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003).

sell at higher prices or earn higher profit margins than its competitors, such as the ability to offer superior products or services, the ability to maintain an efficient business operation, or superior marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that BD would lose a substantial amount of sales if it raised prices substantially, or that BD's profit margins were low compared to its competitors, erratic, and/or decreasing, might be evidence that BD does not have monopoly power.[86]

Thus, monopoly power is determined by a variety of factors, and you may determine BD has monopoly power in a market even if it has less than a 50% market share[87] or if its market share is declining.[88]

---

[86] BD proposes these four paragraphs on direct proof of monopoly power, which track the substantive language of ABA Model C.9 verbatim, substituting "Retractable" for "Plaintiff" and "BD" for "defendant."

[87] *Broadway Delivery v. UPS*, 651 F.2d 122, 126-130 (2d Cir. 1981) (Newman, J.) (concluding it was error for the district court to instruct the jury that a finding of less than 50% of market share precluded finding of monopoly power because "the true significance of market share data can be determined only after careful analysis of the particular type of market"); *Hayden Publ'g Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."); *Yoder Bros. v. Cal-Fla Plant Corp.*, 537 F.2d 1347, 1367 n.19 (5th Cir. 1976) (rejecting "a rigid rule requiring 50% of the market for a monopolization offense without regard to any other factors"); *Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.*, 656 F.Supp. 914 (S.D.N.Y. 1987) (stating that just 25% might be sufficient). BD objects to the blue language because it is not supported by the cited authority, some of which is outdated or otherwise not authoritative. There are many cases holding that a percentage below 50% is inadequate. *E.g., Domed Stadium Hotel,* 732 F.2d at 489-90; *Dimmit Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir. 1982). Citing Learned Hand, the Fifth Circuit agrees that "'it is doubtful whether 60 or 64 percent would be enough; and certainly 33 percent is not.'" *Domed Stadium*, 732 F.2d at 489 (citation omitted). The Fifth Circuit also stated that "*absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization.*" *Id.* (emphasis added). "There is no hard and fast rule." *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.3d 1347, 1367 n.19 (5th Cir. 1976). RTI, however, is proposing a "hard and fast" rule that is incorrect. The ABA Model C-.9, by contrast, handles this point correctly. BD misrepresents the law it cites. For example, the Yoder Brothers cite relied on by BD supports Retractable's position that a 50% market share is not required for a monopolization claim to succeed. *See Yoder Bros.*, 537 F.2d at 1367 n.19 ("We agree…that the district court would have been mistaken to apply a rigid rule requiring 50% of the market for a monopolization offense without regard to any other factors.").

<u>Willful acquisition or maintenance of monopoly power</u>:   If you find BD possessed monopoly power, you must next determine whether it willfully acquired or maintained monopoly power through anticompetitive acts or practices.[89]   Anticompetitive acts are acts, other than competition on the merits, that have the effect of restraining preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete for customers within the relevant market.[90]

[88] *Am. Tobacco*, 328 U.S. at 795 (monopolization found despite decline in share from 90.7% to 68%); *Reazin v. Blue Cross*, 899 F.2d 951, 970 (10th Cir.) (upholding finding of monopoly power despite decline in market share), *cert. denied*, 497 U.S. 1005 (1990); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366-67 (9th Cir.1988) (same, despite declining share and entry); *see also* Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, ANTITRUST LAW ¶ 835.2a (1995) ("A decline in market share might indicate that market power exists and is being exercised.").   Once again, BD objects to the blue language because it does not appear in the ABA Model and it is not a correct statement of law; many cases hold declining market share is inconsistent with monopoly power.   *See, e.g., Forro Precision, Inc. v.* IBM, 673 F.2d 1045, 1058-59 (9th Cir. 1982); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980) (share declines from 48% and 54% reflect no monopoly power as a matter of law).   Further, the cited treatise is far out of date and it refers only to "market power," not "monopoly power."   It does not support Retractable's ambitious rule.   The current version of the cited treatise suggests the opposite: "With aggressive competition, market shares often fluctuate, one firm gaining in one year and another in the following year."   Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, ANTITRUST LAW ¶ 520c (2013 ed.) (electronic).   Again, there is not a hard and fast rule, and ABA Model C.9 handles this point correctly.

[89] ABA Model C.10 – Willful Acquisition or Maintenance of Monopoly Power; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610 (1985).

[90] BD proposes the yellow language from the second sentence of ABA Model C.10.   BD objects to the word "restraining," which has no support in the case law and is demonstrably incorrect under Section 2. Even under Section 1, the Supreme Court has stated "time and time again" that a mere restraint is not actionable; there must be an "unreasonable" restraint.   *Leegin*, 551 U.S. at 885.   Retractable's effort to alter the language of the ABA Model instructions would dilute its burden of proof.   Restraining is more proper than preventing or excluding.   *See Brown Shoe*, 370 U.S. at 324 (describing a "clog on competition" that "deprive[s] rivals of a fair opportunity to compete").   As noted previously, this *Brown Shoe* decision is a merger case that deals with the unique language of Clayton Act § 7, and thus has no bearing on the Sherman Act § 2 issues, and represents an outdated view of vertical restrictions.   The ABA Model language is consistent with current Supreme Court authority under Section 2.   *See Spectrum*, 506 U.S. at 458.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.[91]   In addition, you should distinguish the acquisition or maintenance of monopoly power through anticompetitive acts from the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, which is not unlawful.[92]

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.   A company with monopoly power may compete aggressively without violating the antitrust laws, and may charge monopoly prices without violating the antitrust laws.   Conduct only becomes unlawful where it involves anticompetitive acts.[93]

This is to be distinguished from competition on the merits which results in growth or development as a consequence of a superior product, business acumen, or historic accident and provides benefits to consumers.[94]   In evaluating BD's conduct, you should consider whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to

---

[91] This sentence proposed by BD tracks the third sentence of ABA Model C.10.

[92] This sentence proposed by BD tracks the fourth sentence of ABA Model C.10.  *See Stearns Airport*, 170 F.3d at 522 (distinguishing anticompetitive acts from monopoly power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident). Retractable objects to this language as unnecessary, unduly complicated, and cumulative as it is sufficiently covered in Retractable's proposed language that follows.

[93] This paragraph proposed by BD is the second paragraph of ABA Model C.10, modified to substitute "company with monopoly power" for "monopolist." Retractable objects to this language as unnecessary, unduly complicated, and cumulative as it is sufficiently covered in Retractable's proposed language that follows.

[94] BD objects to this instruction, which departs from the text of ABA Model C.9 and omits much of the substance in the preceding paragraphs.  The yellow text proposed by BD earlier in this section is the correct formulation.

consumers, and whether the conduct would make business sense apart from any effect it has on restricting excluding competition or harming competitors.[95]

Competitive harm occurs when a reduction in competition results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. buyer choice, and increased innovation in a given market.  If the challenged conduct has not resulted in higher prices, decreased output, or lower quality, restricted buyer choice, or the loss of some other competitive benefit such as innovation, then there is no competitive harm.  Your focus here should be on harm to competition as a whole, not just to an individual competitor— although, harm to an individual competitor can be relevant and may help to establish harm to competition.[96]

In determining whether there has been competitive harm, you may consider whether BD's conduct has caused significant exclusion of an innovative product from the market.  Such

---

[95] ABA Model Instructions in Civil Antitrust Cases, Monopolization—General, at C-26; *Z-Tel Commc'ns*, 331 F. Supp. 2d at 521; *see also, e.g., Verizon Commc'ns Corp. v. Law Offices of Curtis V. Trinko LLP*, 124 S. Ct. 872, 879 (2004); *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001).  As noted in the preceding footnotes and confirmed by the contrast with ABA Model C-26, Retractable's use of the term "restricting" improperly dilutes its burden of proof on the Section 2 claim.  Finally, BD proposes the additional language in yellow to track the fourth paragraph of ABA model C.9 fully.

[96] ABA Model Instructions in Civil Antitrust Cases, Monopolization-General, at C-26-30.  Without the entirety of these sentences as suggested, Retractable cannot agree to the portions to which BD has agreed.  BD has only agreed to the portions of the sentences that favor its theory of the case and does not allow for Retractable's theory of the case.  BD objects to this language because it departs significantly from the language in the third sentence of the ABA Models, which is accurately set forth in yellow in the instructions proposed by BD.  With respect to Retractable's requested instruction about "innovation," *see* n.__, *supra* and the next footnote.  Please see Retractable's response to that footnote as well.  Additionally, harm to competitors is not irrelevant.  This language is taken directly from ABA C-27.  *See also Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 986 n. 6 (5th Cir.1983) (" Yet such evidence may overlap, since evidence of injury to a competitor may suggest damage to the competitive marketplace."); *LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("Even the foreclosure of one significant competitor from the market may lead to higher prices and reduced output."); *Blue Shield of Va. v. MCCready*, 457 U.S. 308, 313-14 (1978) ("Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations.").

an exclusion would insulate products in the market from quality-based competition and prevent or significantly hinder introduction of a product into the market that could stimulate interest in the product category as a whole.[97]

[97] *See, e.g., Viazis v. Am. Ass'n of Orthodontists*, 182 F. Supp. 2d 552, 569-70 (E.D. Tex. 2001). BD objects because, as explained above, there is no meaningful authority for giving this instruction as a matter of law, so that it would unduly emphasize a Retractable factual argument. Further, BD objects to this paragraph for multiple reasons. Innovation in general has never been considered a thumb on the scale for antitrust analysis. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 209 (1993); *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758, 761 (5th Cir. 2002) (affirming dismissal of antitrust claims and holding allegations about a superior patented product irrelevant). To the contrary, the Supreme Court recently observed that the "opportunity to charge monopoly prices – at least for a short period – is what attracts 'business acumen in the first place; it induces risk taking that products innovation and economic growth.' To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Innovation, therefore, is a beneficial result of monopoly pricing but is not relevant to prove anticompetitive conduct. Without the benefit of *Trinko*, the cited case simply speculated about a hypothetical theory, but that hypothesis has never been tested because the decision in question dismissed an antitrust claim and it was affirmed (before *Trinko*). Taken literally, this instruction would permit a jury to find that fair competition violated the antitrust laws simply because it succeeded in keeping "innovative" products from the market, which is not the law. The preceding instructions from the ABA Model correct submit the standard for "anticompetitive" conduct, and there is no reason to single out "innovation" for special (and erroneous) treatment None of the cases provided by BD prevent the jury from considering harm to innovation as an anticompetitive act. It is nonsensical to argue innovation only results from monopoly pricing. To the contrary, as a matter of economics, "[i]f firms are foreclosed from a significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investment and innovation." *See* Retractable's Response to BD's Motion for Summary Judgment on Antitrust and Unfair Competition, at p. 15 (March 11, 2013); *see also* DOJ/FTC Horizontal Merger Guidelines, issued August, 19, 2010, which notes that price is not the only consideration when evaluating the anticompetitive effects of a merger: "Enhanced market power can also be manifested in non-price terms and conditions that adversely affect customers, including reduced product quality, reduced product variety, reduced service, or diminished innovation." Guidelines at p. 1; *see also Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 299-302 (2d Cir. 1979, cert. denied, 444 U.S. 1093 (1980)(monopolist found to have conspired to have kept innovative devices from competitors); L. Sullivan & W. Grimes, The Law of Antitrust: An Integrated Handbook 16, 38, 39 (2d ed 2006) ("A monopolist has a reduced incentive to innovate; if it does innovate, it may be motivated to suppress or delay commercialization. Indeed to protect its monopoly, a firm may even attempt to suppress or discourage others from marketing available innovation;" also describing how innovation threatens dominant firms and how AT&T when a monopolist resisted innovation.); F.M. Scherer & D. Ross, Industrial Market Structure and Economic Performance 654-60 (3d ed. 1990) (concluding that high concentration and high entry barriers undermine innovation and its marketing.

Alleged anticompetitive acts:[98]   Retractable contends BD has engaged in anticompetitive

acts, including, but not limited to, the following: entering into alleged penalty contracts with

customers; entering into sole- and dual-sourced GPO contracts for conventional syringes and IV

catheters; entering into allegedly exclusionary or restrictive contracts with distributors;[99] raising

Retractable's costs; engaging in disparagement and false advertising to customers concerning

Retractable's products[100]; engaging in allegedly deceptive false advertising to customers

---

[98] BD objects to the specific allegations on substantive grounds.  RTI's specific allegations attempt to submit claims to the jury about fierce, but fair, competitive conduct.  "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."  *Brooke Group*, 509 U.S. at 225; *see also Jostens*, 216 F.3d at 476 ("Antitrust law is rife with . . . examples of what competitors find to be disreputable business practices that do not qualify as predatory behavior.").

[99] To the extent that Retractable's case depends on the pricing terms of the identified contracts, those allegations require proof of, and thus an instruction on, below-cost pricing.  The law is settled that when price is the mechanism of exclusion, the price-cost test is the sole test for liability.  *Brooke Group*, 509 U.S. at 222; *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 276-77 (3d Cir. 2012) (if the essence of a monopolization case is exclusionary pricing, "the plaintiff ha[s] an obligation to show that the defendant's prices were below its costs"); *accord Cascade Health Solutions v. Peace Health*, 515 F.3d 883, 892 (9th Cir. 2008); *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (en banc); *Concord Boat v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000); *Stearns Airport*, 170 F.3d at 532-34; *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983).  There is no question that the below-cost test applies to a Section 2 case.  *Stearns*, 170 F.3d at 532-34; *Pacific Bell Tele. Co. v. Linkline Communications, Inc.* 555 U.S. 438, 447-48 (2009); *Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 n.1 (2007) ("the standard adopted in *Brooke Group* applies to predatory-pricing claims under § 2 of the Sherman Act").  Retractable fails to propose any instructions on the price-cost test, because it cannot meet that test as a matter of law.  BD has proposed proper instructions on that test in Instruction No. 5.

To the extent that Retractable's case turns on the premise that BD's contracts are exclusive dealing arrangements, that allegation is subject to its own demanding substantive legal test.  BD proposes proper instructions on that test in Instruction No. 5.  Insofar as Retractable alleges any aspect of the contracts aside from pricing terms is anticompetitive, the test for exclusive dealing must be met.  Retractable cannot satisfy it; there is no evidence that any purchaser entered into any exclusive contract to purchase BD products.

[100] BD objects to references to business disparagement or false advertising as anticompetitive conduct.  BD moved for summary judgment on Retractable's claim that BD has engaged in anticompetitive conduct through allegedly false advertising and product disparagement.  *See* Docs. 371, 173.  In the Fifth Circuit, such conduct is presumed competition on the merits.  *Stearns Airport*, 170 F.3d at 524.  Other circuits have held that conduct only in "rare, gross cases" may a business tort rise to the level of anticompetitive conduct.  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002).  As the Supreme Court says, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a

concerning the quality and safety of BD's products;[101] infringing upon Retractable's patents by selling a product that allegedly exhibited design flaws and allegedly tainted the market with respect to all retractable syringe products.[102]

Retractable contends each of these practices is anticompetitive and that, when taken together, also demonstrate a pattern of anticompetitive and/or exclusionary conduct that is harmful to competition.  If you do not believe an individual practice is anticompetitive in itself, you should consider BD's conduct as a whole and may find that, taken together, some or all of its actions demonstrate a pattern of anticompetitive conduct that has enabled BD to maintain, or prolong, its monopoly power.[103]

claim under the federal antitrust laws."  *Brooke Group*, 509 U.S. at 225; *see also Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 476 (5th Cir. 2000) ("Antitrust law is rife with . . . examples of what competitors find to be disreputable business practices that do not qualify as predatory behavior.").  Here, there is no evidence sufficient to overcome that strong presumption, much less to demonstrate that BD's alleged conduct had "'a significant and enduring impact on competition itself in the relevant markets.'" *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 832 (C.D. Cal. 2010) (quoting *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997)) (emphasis added).  Therefore, BD is entitled to judgment as a matter of law on this allegation.  Out of an abundance of caution, however, BD will propose instructions on this theory at the end of this section on monopolization.  At the very least, BD is entitled to legally correct instructions that submit its theory to the jury.  Each party, not just the plaintiff, "is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to" the party's theory. *United States v. Gunter*, 876 F.2d 1113, 1119 (5th Cir. 1989).

[101] *Id.*

[102] The final proposition in this sentence alleges patent infringement.  BD objects separately to that language because patent infringement is not a valid antitrust claim.  *Kinnear-Weed Corp. v. Humble Oil & Ref. Co.*, 214 F.2d 891 (5th Cir. 1954).  Relying primarily on *Kinnear-Weed* and subsequent authority following it, BD has moved for summary judgment and a motion in limine regarding patent infringement issues.  Docs. 372, 420, 476.  Furthermore, Retractable's proposed statement about patent infringement is non-sensical; it reduces to the claim that copying Retractable's patents taints the market with inferior products.  There is no sound legal basis to instruct the jury on such a theory—and perhaps for that reason, Retractable does not suggest any instructions to guide the jury's consideration of this baseless allegation.  These objections all fail as transparent attempts to re-hash BD's failed summary judgment claims and for the reasons previously objected to.

[103] *Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 522-23 (E. D. Tex. 2004); *see also Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (explaining that "the means of

BD contends that its GPO agreements offer discounts that benefit customers through lower prices; that contracts offering lower prices to customers who buy more are not "penalty" contracts and that BD does not penalize customers; that BD's GPO agreements do not require hospitals to buy any products and do not prevent competitors (including Retractable) from competing by offering lower prices; that its agreements with distributors are not exclusive and do not prevent competitors from distributing their products; that its advertising is neither false nor disparaging; and that it has competed fairly in the market and Retractable's alleged injuries are the result of competition on the merits.  BD contends its practices are beneficial to competition and Retractable has failed to prove that these practices harm competition.

Alleged false advertising and business disparagement.[104]  Retractable contends that BD engaged in anticompetitive conduct through false advertising describing its own products and

illicit exclusion, like the means of legitimate competition, are myriad"); *Covad Commc'n Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) ("whether a particular allegation states a monopolization claim under the Sherman Act depends entirely upon the competitive significance of the conduct alleged, and not at all upon the number or detail of the allegations recited in the complaint."); *Conwood Co., L.P., v. US. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."); *Massimo Corp. v. Tyco Health Care Group, L.P.*, Final Jury Instructions (C.D. Cal. March 17, 2005); Areeda & Hovenkamp, ANTITRUST LAW, § 348d(1) (Aug. 2012 (plaintiff can challenge defendant's exclusionary practices that raise plaintiff's costs).  BD objects to this paragraph in its entirety. First, for the reasons explained in footnote __, BD objects to the idea that mere exclusionary conduct, including pro-competitive conduct that prevails in fair competition on the merits, could constitute monopolizing conduct.  BD further objects that conduct that includes pro-competitive practices could not prove a "pattern" of anticompetitive conduct.  And because most (if not all) of the listed allegations are not actionable antitrust violations, for the reasons set forth in the preceding footnote, Retractable's effort to commingle them to prove a "pattern" would contaminate any finding of an antitrust violation that allowed the jury to consider lawful competition.  *See City of Groton v. Conn. Power & Light Co*., 662 F.2d 921, 928 (2d Cir. 1981); *Northeastern Tele. Co. v. AT&T Co*., 651 F.2d 76, 96 (2d Cir. 1981) (reversing antitrust judgment where multiple allegations were not actionable and remanding for a new trial "without resort to evidence of conduct that we have found not to have been anticompetitive"). Therefore, the Court should not instruct the jury that it can aggregate the listed acts, which would imperil any jury finding under Section 2 if one of the listed acts is ultimately held not to be actionable.

[104] As noted in an earlier footnote, BD proposes these instructions even though it is entitled to judgment as a matter of Fifth Circuit law on this issue.  In very rare cases, such claims have been held to be actionable, but the evidence in this case does not approach that level.  Because it is exceedingly rare that such claims go to a jury even in other circuits, it is not surprising that the ABA does not have a model rule

allegedly disparaging Retractable's products.   Retractable has a high burden to meet in its attempt to prove that BD's advertising and alleged disparagement significantly harmed competition in a relevant market.[105]   Ordinarily, false advertising or the disparagement of a rival is not anticompetitive conduct.[106]   Statements to potential customers may be wrong, misleading,

regarding false advertising and product disparagement as the basis of antitrust liability—and it is telling that Retractable does not even submit any instructions explaining to the jury how false advertising can be anticompetitive, and objects to BD's proposed instructions based on outstanding case authority.   In the event that the Court permits Retractable to present such claims to the jury, BD proposes this instruction, which distinguishes Retractable's burden in establishing a Sherman Act claim based on false advertising and disparagement from its burden under the Lanham Act and state tort law.   For this language suggested by BD and throughout the rest of this section, this is was also rejected by the Court when it denied BD's motion for summary judgment.   Specifically, BD attempted to argue that Retractable's false advertising and business disparagement claims cannot constitute anticompetitive conduct.   Specifically, BD relies on a presumption that these categories of acts have a *de minimis* effect on competition and that a plaintiff must meet a six-factor standard.   That "has neither been adopted nor commented upon by the Fifth Circuit and is therefore not necessarily the law in this case."   *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-cv-0341-B, 2008 WL 4391020, at *7 (N.D. Tex. Sept. 29, 2008).   Additionally, the presumption conflicts with Supreme Court guidance in *Eastman Kodak Co. v. Image Tech. Services*, 504 U.S. 451, 467 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.   This court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record.").

[105] BD proposal based on *TYR*, 709 F. Supp. 2d at 827 (a plaintiff asserting a "disparagement-based antitrust claim" faces "a high burden of proof" which requires "a preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer) before these practices can rise to the level of exclusionary conduct'" (quoting *Harcourt Brace*, 108 F.3d at 1151 and citing 3 Phillip Areeda & Donald F. Turner, Antitrust Law ¶737b (1978)).

[106] BD proposes this instruction based on the Fifth Circuit's holding in *Stearns Airport*, 170 F.3d at 524 ("arguments made by FMC to its potential customers may have been wrong, misleading or debatable [but] they are all arguments on the merits, indicative of competition on the merits") and the test established in *Harcourt Brace*, 108 F.3d at 1151 ("While the disparagement of a rival or compromising a rival's employee may be unethical and even impair the opportunities of a rival, its harmful effects on competitors are ordinarily not significant enough to warrant recognition under § 2 of the Sherman Act.   *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ('Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.') (citation omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ('The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself . . . . Thus, this Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it.'); *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 370 (9th Cir. 1988) ('The goal of the antitrust laws, . . . unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors.') We therefore insist on a 'preliminary showing of significant and more-than-temporary

or debatable; but so long as they are statements about the merits of competing products, they reflect competition on the merits.[107]

Thus, even if you find BD falsely advertised its products or disparaged Retractable's products, and even if you find that BD acted unfairly or unethically, that does not mean that BD's conduct was anticompetitive.  It also is not enough for Retractable to show that it was harmed, that its profits were reduced, or that particular buyers were deceived by BD's advertising.  Retractable must prove that the advertising or disparagement caused significant and enduring harm to competition.[108]

To prove that BD's advertising or alleged disparagement was anticompetitive conduct, Retractable must show significant and more-than temporary harmful effects on competition –

harmful effects on competition (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct. 3 P. Areeda & D. Turner, Antitrust Law ¶ 737b at 278 (1978).") (omissions in original).

---

[107] This instruction proposed by BD substantively tracks language from *Stearns Airport*, 170 F.3d at 524 ("arguments made by FMC to its potential customers may have been wrong, misleading or debatable [but] they are all arguments on the merits, indicative of competition on the merits"); *see also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (statements about competing products in advertising "just set the stage for competition in a different venue: the advertising market").

[108] This element proposed by BD is elsewhere recognized by the ABA Model Instructions and supported by controlling authority.  *See* ABA Model C-22, n.2 ("If conduct injures a particular competitor without injuring competition, Section 2 is probably not violated."); *see also Brooke Group*, 509 U.S. at 224-25 ("It is axiomatic that the antitrust laws were passed for the protection of competition, not competitors. . . . [W]e held in the Sherman Act § 2 context that it was not enough to inquire whether the defendant has engaged in 'unfair' or 'predatory' tactics; rather, we insisted that the plaintiff prove a dangerous probability that the defendant would monopolize a particular market.") (internal quotation marks and citations omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458–59 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.  It does so not out of solicitude for private concerns but out of concern for the public interest.  Thus, this Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it.  It is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects; moreover, single-firm activity is unlike concerted activity covered by § 1, which 'inherently is fraught with anticompetitive risk.'") (citations omitted); *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) ("Deceptive conduct – like any other kind – must have an anticompetitive effect in order to form the basis of a monopolization claim.").

i.e., not merely upon Retractable as competitor.[109]   If Retractable has made that showing, Retractable must also prove that the challenged statements were:

> (1) clearly false;
>
> (2) clearly material;
>
> (3) clearly likely to induce reasonable reliance;
>
> (4) made to buyers without knowledge of the subject matter;
>
> (5) continued for prolonged periods, and
>
> (6) not readily susceptible of neutralization or other offset by rivals.[110]

In applying these six factors, you must find that Retractable has proven that BD's advertisements were not just false or unfair to Retractable, but tended to destroy competition in

---

[109] The language in this sentence proposed by BD tracks a sentence in *Harcourt Brace*, 108 F.3d at 1151 (citation omitted), with changes for transition and precise reference to the parties.

[110] This six-factor proposed by BD is taken largely verbatim from *Harcourt Brace*, 108 F.3d at 1152, with changes for transition and precise reference to the parties.  It has been followed by district courts in the Fifth Circuit.  *See, e.g.*, *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998) (Lake, J.) (citing *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab.*, 850 F.2d 904, 916 (2d Cir. 1988)).  The Fifth Circuit has not adopted these factors, and many authorities hold—without any reference to the special factors urged by BD—that false advertising can be part of the anticompetitive conduct under the Sherman Act.  *See, e.g.* *Aspen Skiing Co. v. Aspen Highlands, Inc.*, 472 U.S. 585, 593 (1985) ("…Ski Co. embarked on a national advertising campaign that strongly implied to people who were unfamiliar with Aspen that [Ski Co.'s slopes] were the only ski mountains in the area."); *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 & n.14 (3d Cir. 2010) (anticompetitive conduct can include "making false statements about a rival to potential investors and customers"); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir.2002) (anticompetitive conduct included providing misleading information to retailers in an effort to dupe them into carrying defendants products and to discontinue carrying plaintiff's products); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (holding that Microsoft's deceptive marketing of its "Java" development tool was anticompetitive); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980) (upholding treble damages antitrust award against airline for false, deceptive, and misleading ads discouraging public patronage of travel group charters); *Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (holding that anticompetitive conduct included fraudulent misrepresentations to advertisers).

the relevant market.[111] If the challenged statements have not resulted in higher prices, decreased output, or lower quality, then there has been no competitive harm.[112]

[111] This language proposed by BD largely tracks the language of *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

[112] This language proposed by BD largely tracks the substantive language used by the Fifth Circuit in *Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x at 412.

Instruction No. 7 8

## SECTION 2: ATTEMPTED MONOPOLIZATION[113]

Retractable alleges that it was injured by BD's attempted monopolization of the product markets at issue in this case.   BD contends that it engaged in legitimate competition and Retractable's alleged injuries are the result of competition on the merits.

To prevail on this claim, Retractable must prove:[114]

1.  First, that BD engaged in anticompetitive conduct;

2.  Second, that BD had a specific intent to achieve monopoly power in a relevant market;

3.  Third, that there was a dangerous probability that BD would achieve monopoly power in the relevant market.

4.  Fourth, that Retractable was injured in its business and property by BD's anticompetitive conduct.

You should rely on the instructions given to you in the previous sections concerning monopolization; relevant markets; anticompetitive conduct; and causation and antitrust injury in deciding whether BD engaged in anticompetitive conduct.  In addition, to the extent the allegations involve BD agreements, you should follow Instruction 5 regarding those agreements.[115]

---

[113] BD has moved for summary judgment on both of Retractable's Sherman Act § 2 claims for essentially the same reasons, and is entitled either to summary judgment or to judgment as matter of law under Rule 50.  Docs. 371, 173; *see also Jostens*, 216 F.3d F.3d 465 (affirming judgment as a matter of law in attempted monopolization case).

[114] Except to refer to Retractable and BD, this  tracks ABA Model C.1 (at C-84) – Attempt to Monopolize Elements – verbatim.

[115] Retractable objected to the instruction BD refers to and incorporates those objections again here by reference.

Intent to monopolize:   To prove a claim for attempted monopolization, Retractable must prove BD had a specific intent to monopolize a relevant market.  In other words, you must decide if the evidence shows the defendant acted with the conscious aim of acquiring the power to control prices or to exclude or restrain destroy competition in the relevant market.[116]

There are several ways in which Retractable may prove BD had the specific intent to monopolize.  There may be evidence of direct statements of BD's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of BD at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of BD.  You must be careful, however, to distinguish between a defendant's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Specific intent may be inferred from what BD did.  For example, if the evidence shows the natural and probable consequence of BD's conduct in the relevant market was to give BD control over prices or and to exclude or restrain destroy competition, and this was plainly foreseeable by BD, then you may (but are not required to) infer BD specifically intended to acquire monopoly power.[117]

---

[116] Retractable objects to BD's improper use of the word "destroy" here.  As described by the Supreme Court, total destruction is not the standard.  It is better described as a "clog on competition." *Brown Shoe*, 370 U.S. at 324.  BD proposes omitting both "restrain" and "destroy."  For reasons previously stated, BD opposes the use of the word "restain."  For the reasons stated previously, this *Brown Shoe* decision does not support RTI.

[117] ABA Model Instructions in Civil Antitrust Cases, Attempt to Monopolize—Specific Intent, at C-90-91.  Because Retractable's proposed instruction in this section varies from the ABA Model, BD proposes the yellow language to track the third and fourth paragraph of ABA Model C.3 – Specific Intent (at C-90) accurately.  BD makes the same proposal made in the previous footnote.

<u>Dangerous probability of achieving monopoly power</u>:  In determining whether there was a dangerous probability that BD would acquire monopoly power the ability to control price in a market, you should consider such factors as BD's market share, whether the barriers to entry into the market for potential competitors made it difficult for competitors to enter the market, harm to innovation or decreased quality of products in the market,[118] and the likely effect of any anticompetitive conduct on BD's share of the market.

A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that BD would ultimately acquire monopoly power.

One important distinction between monopolization and attempted monopolization is that BD may be liable for attempted monopolization even if you find that Retractable suffered no harm, as long as you find Retractable has met its burden of proof with respect to the requisite conduct, intent, and risk of success.[119]

---

[118] BD objects to the blue language as departures from ABA Model C-4 Dangerous Probability of Success (at C-95) with no legal support.  Additionally, with regard to "innovation," *see* nn._, *supra*.  Retractable cites support for harm to innovation as an anticompetitive act through these instructions and incorporates it by reference here.  Regarding the remaining differences, Retractable is "entitled to have the trial judge advise the jury of [its]theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.

[119] *Taylor Publ'g*, 216 F.3d at 474 (citing *Multiflex v. Samuel Moore & Co.*, 709 F.2d 980, 999 (5th Cir. 1983)).  BD objects because this sentence defies the Fifth Circuit's holding: "As Taylor failed to provide sufficient evidence that the Jostens practice we have identified as predatory—representative raiding—materially contributed to its injuries, Taylor's attempted monopolization claim fails as a matter of law." *Id.* at 485.  As ABA Model C-95 reflects, Retractable must unquestionably prove economic harm caused by anticompetitive acts.  *Brunswick Corp.*, 429 U.S. at 489; *Jostens*, 216 F.3d at 484-85.  The passage cited by Retractable pertains to the prophylactic *liability* elements of the monopolization and attempt to monopolize claims and does not relieve Retractable of its burden of proving proximate causation and antitrust injury under Clayton Act § 4 in a damage case before a jury.  This principle has been established by the Supreme Court with respect to similar statutory provisions, and those decisions effectively reject Retractable's position.  *J. Truett Payne v. Chrysler Motors Corp.*, 451 U.S. 557, 561-63 (1981) (Robinson-Patman Act § 2(a)); *Brunswick*, 429 U.S. at 484-89 (Clayton Act § 7).

Instruction No. 8 9

## SECTION 1: CONTRACTS UNREASONABLY RESTRAINING TRADE RESTRAINT OF TRADE CLAIMS[120]

Retractable alleges that BD's agreements also unreasonably restrain trade.

To establish this claim, Retractable must prove the following:

1. First, that there was a contract or combination between or among at least two separate entities;

2. Second, that the contract and/or combination at issue unreasonably restrains trade in a relevant market; and

3. Third, that the restraint caused Retractable to suffer injury to its business or property.

Existence of contracts:  There are three types of BD contracts at issue under this claim:

(a) Alleged penalty or disloyalty contracts with needle device users.  These alleged penalty contracts with the end users were often brokered by group purchasing organizations ("GPOs"), but also were often entered into by BD directly with end users.[121]

---

[120] BD moved for summary judgment on Retractable's Sherman Act § 1 claims, Docs. 371, 173, and BD will be entitled to judgment as a matter of law on the Section 1 claim under Rule 50 at the conclusion of trial.  *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d 307 (5th Cir. 2000) (affirming summary judgment on Section 1 claim).  This claim should not be submitted to the jury.

BD objects to the blue language in the section heading because it unfairly suggests that there has already been a determination that BD contracts unreasonably restrains trade.  Instead, BD proposes the yellow language that corresponds to Retractable's heading for the Section 2 claims.  The fact that summary judgment was denied does not mean the Court ruled that the contracts "unreasonably restrain trade." BD's summary judgment motion on this claim was denied.

[121] BD objects on substantive grounds to the theory that its discounts are "penalty or disloyalty contracts." A volume or market share discount is a legitimate pricing mechanism.  To refer to them as penalty contracts in an effort to avoid the rules on volume and market share discounts and the applicable price/cost test is pure sophistry and legally invalid.  The Court rejected BD's position that these contracts were *per se* legal by denying BD's motion for summary judgment.  *See Retractable Tech. v. Becton Dickinson & Co.*, No. 2:08-cv-16, at p.6 (E.D. Tex. March. 14, 2013) (Doc. #367) ("the Court must consider the practical effects of the contracts").  BD's contracts, by their terms, increase a buyer's price if the buyer does not meet certain conditions, penalizing the buyer for non-compliance.  BD's own expert recognizes this theory for exclusivity.  *See* Klein & Murphy, *How Exclusivity is Used to Intensify Competition for Distribution—Reply to Zenger*, Antitrust L. J. 692, 698 (2011) ("[A] dominant firm may

(b) Sole-source and dual-source arrangements with GPOs that allegedly prevented the GPOs from brokering contracts for BD's rivals.[122]

(c) Distributor contracts that allegedly prevented distributors from offering their most efficient or effective means of distribution to BD's rivals.

BD contends that its agreements promote competition and generate competitive benefits. BD contends that its agreements with GPOs offer price discounts that benefit customers through lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit. BD contends that its agreements with GPOs do not require hospitals to buy products from BD and do not prevent hospitals from buying products from BD's competitors. BD contends that its competitors (including Retractable) have their own agreements with GPOs and that BD's GPO agreements do not prevent competitors from selling their products to any customers. BD contends that its agreements with distributors do not prevent competitors (including Retractable) from efficiently distributing their products and that competitors have access to the same distributors as BD. BD contends that RTI's alleged injuries are a result of competition on the merits, including price competition.

You should refer to the definitions and instructions provided above for relevant market, anticompetitive conduct, and causation and antitrust injury. In addition, to the extent the

impose exclusivity . . . by artificially increasing its first non-exclusive price option significantly above the profit-maximizing level before offering the second option of a discount contingent on the acceptance by the distributor of exclusivity."). Although the Court may have denied a motion for summary judgment on these issues, that ruling was not a definitive decision that these legally correct principles are inapplicable to this case, as a matter of law.

---

[122] BD objects on substantive grounds to the theory that its agreements "prevented" GPO's from "brokering contracts for BD's rivals." Nothing prevented GPOs from brokering contracts with BP's rivals rather than voluntarily entering into contracts with BD that the GPOs found more favorable on balance. In other words, these agreements reflect competition for GPO contracts on the merits; Retractable's allegation of "prevention" is legally and factually flawed. Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.

allegations involve BD agreements, you should follow Instruction 5 regarding those agreements.[123]

Rule of Reason:[124]   In determining whether the conduct at issue unreasonably restrains trade, you should consider the cumulative effects of (or aggregate restraint or foreclosure caused by) BD and other firms' anticompetitive conduct.[125]   In other words, you are not limited to considering only the effects of BD's anticompetitive actions, if any, on competition, but may

---

[123]   Retractable objected to BD's separate instruction regarding its agreements and incorporates those objections here by reference.

[124]   BD proposes the neutral and legally correct heading "Rule of Reason."   BD then proposes that the ABA Model Instructions on the rule of reason (A-4 and A-6) be used in lieu of the gerrymanded instructions in blue text proposed by Retractable.  Those instructions appears in the agreed and yellow text on the following pages.  "Reasonableness" is legally appropriate and does not deviate from the intent of the "rule of reason."  It is simpler for the jury to understand.  In fact, BD argued for, and Retractable accepted, its request to add the word "unreasonable" to the introductory statement regarding Retractable's section 1 claim.  *See* Charge to the Jury, *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, no. 2:12-cv-103-J (N.D. Tex. Jul. 30, 2013) (using "reasonableness" in its section 1 discussion).

[125]   *See, e.g., Genico, Inc. v. Ethicon, Inc.*, No. 5:04-cv-00229-DF (E.D. Tex. Mar. 23, 2006); *see also Standard Oil & Standard Stations v. United States*, 337 U.S. 293, 295, 309, 314 (1949); *FTC v. Motion Picture Adver. Serv.*, 344 U.S. 392, 395 (1953); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365–66 (1963) (interpreting *Standard Stations* and *Motion Picture* to rest on cumulative foreclosure measures); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004) (concluding the relevant "extent of foreclosure" includes that resulting from defendant's exclusionary contracts and "other existing foreclosures" such as by another seller's exclusionary contracts).  BD objects because this sentence and the following sentence find no support in either the FIFTH CIRCUIT PATTERNS or the ABA Models and are contrary to Fifth Circuit law: "Proof that a *defendant's* activities, on balance, adversely affected competition [in relevant markets] is essential to recovery under" Section 1.  *Apani*, 300 F.3d at 627 (quoting *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997)) (emphasis added); *accord PSKS*, 615 F.3d at 417.  The cited analysis in *Stop & Shop* is unstable authority, as the First Circuit ultimately upheld exclusion of the plaintiff's expert testimony that would have aggregated market share in an improperly defined market.  *See Stop & Shop*, 373 F.3d at 60, 66-67.  As *Stop & Shop* itself notes, *id.* at 65-66, the *Standard Stations* analysis is now outdated.  And neither the *Motion Picture* decision (Federal Trade Commission Act § 5) nor the *Philadelphia Bank* decision ( Clayton Act § 7) involved a private Sherman Act § 1 claim.  Finally, the sentence is not neutral but unfairly bolsters Retractable's case by assuming the existence of disputed facts.  *See* n.__, *supra*.  Indeed, as BD has explained above, Retractable's expert has done no analysis and Retractable has adduced no evidence to prove the effect of Covidien's contracts or the portion of the market they cover.  *See* n.__, *supra*.  In short, Retractable's instruction is both legally and factually insupportable.

also consider the cumulative effects of anticompetitive conduct by BD and other firms that have substantial market shares (such as Covidien).[126]

The challenged agreements do not need to foreclose Retractable from 100% of a buyer's purchases in order to have an anticompetitive effect; Retractable may have some access to each buyer, but still be foreclosed or restricted from competing as it would otherwise be able to do in a market without any anticompetitive restraints.[127]

---

[126] BD objects that besides being contrary to Fifth Circuit authority as explained in the previous footnote, and unsupported by the model instructions, this language unduly emphasizes Retractable's factual arguments without assisting the jury.  *See* n._, *supra.*

[127] *See FTC v. Brown Shoe*, 384 U.S. 316, 318-19 & n.13 (1966) (condemning discount conditioned on 75% loyalty); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) (condemning agreements that did not require 100% exclusivity but only that dealers not add new rival product lines);); *United States v. Microsoft*, 253 F.3d 34, 68 (D.C. Cir. 2001) (en banc) (condemning agreements conditioning favorable terms on 75% commitment).  BD objects to this sentence because it presents Retractable's factual argument, rather than a neutral instruction about governing legal rules.  *See* n._, *supra.*  Instructing the jury about what Retractable does *not* need to prove, rather than an instruction on what Retractable *does* need to prove, would simply tilt the scales in favor of Retractable—as evidenced by Retractable's attempt to inject the concept of "restriction" alongside the legally required element of "foreclosure."  The proper test is set forth in BD's proposed instructions regarding the Rule of Reason, and Retractable's effort to add instructions that minimize its burden under that test is unwarranted.  For example, the instruction logically but incorrectly implies that a 10% requirements contract (i.e., not 100%) might be an "anticompetitive restraint."  That is not the law.  Finally, none of the cited cases involved a private Section 1 claim, but only government FTC Act and Section 2 claims.

The agreements at issue in this *Brown Shoe* decision were contracts that required the retailers to purchase and resell exclusively the defendant's products with respect to the Brown Shoe product lines in question.  The purchasers were obligated to buy all of the products covered by the contract from Brown, as the defendant provided "valuable consideration to hundreds of retail shoe purchasers in order to secure *a contractual promise* from them that they will deal primarily with Brown *and will not purchase conflicting lines of shoes from Brown's competitors*."  *Brown Shoe*, 384 U.S. at 319 (emphasis added).  The 75% referenced in Retractable's parenthetical simply referred to the Brown share of the dealers' total requirements, as the contract "resulted in franchise stores purchasing 75% of their total shoe requirements from Brown – the remainder being for the most part shoes which were not 'conflicting' lines, as provided by the agreement." *Id.* at 319 n.2.  BD has no similar agreement.

Furthermore, that decision concerned the FTC's authority under the FTC Act, and explicitly reaffirmed that under its own statute, the FTC was not bound by other antitrust statutes. *Id.* at 320-22.  In particular, the Court noted that the FTC could challenge "trade practices that conflict with the basic policies of the Sherman and Clayton Acts *even though such practices may not actually violate those laws.*"  *Id.* at 321 (emphasis added).  It was only in this limited context -- that practices in contravention of statutory policy "might not actually violate those laws" -- that the decision commented that the Brown Shoe program

Retractable's own participation in GPO contracting schemes has no bearing on its Section 1 claims because the allegation that an antitrust plaintiff is guilty (or in equal fault) of the conduct of which it complains is not a defense to an antitrust action.[128]   Those restraints include loyalty (or penalty) contracts with customers, sole- and dual-source agreements with GPOs, and exclusionary or restrictive contracts with distributors.[129]

"conflicts with" the policies of Section 1. *Id.* The decision, therefore, did not hold that even the true exclusive dealing agreements at issue constituted a violation of Section 1.

Finally, the *Brown Shoe* decision was issued in an era when the Court considered vertical agreements a meaningful threat to competition. The Court's more recent cases have thoroughly rejected that concern because of the precompetitive aspects of all nature of vertical agreements. *See Leegin*, 551 U.S. at 901-02 (in the course of rejecting the per se rule against vertical price fixing, discussing four previous decisions in which the Court had rejected or limited previous decisions concerning vertical restraints, including two (*GTE Sylvania* and *Khan*) in which the Court rejected decisions on vertical constraints from the two terms following the 1966 ruling in *Brown Shoe* (*Schwinn* [1967] and *Albrecht* [1968]). The *Brown Shoe* theory is not only inapplicable to the facts of this case, but (aside from its FTC Act holding) it is an anachronism that cannot be reconciled with the latest generation of Supreme Court and Fifth Circuit precedent.

*Brown Shoe* is applicable to Retractable's allegations. *Id.* at 318-19 (explaining that discounts conditioned upon an obligation to deal primarily with a business—which in practice meant 75% of purchases—"obviously conflicts with the central policy of both §1 of the Sherman Act and §3 of the Clayton Act.").

[128] *Am. Airlines, Inc. v. Travelport, Ltd.*, Cause No. 4:11-cv-244-Y, at p. 21 (N.D. Tex. Aug. 7, 2012) (Means, J.) (rejecting a defendant's argument that "[a] plaintiff that voluntarily enters into and enjoys the benefits of a contract cannot later complain that the contract violates the antitrust laws"). *In pari delicto* is not a defense to an antitrust action. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968), overruled on other grounds by *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 777 (1984) (stating that a "plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition").BD objects to this sentence because it is improper on several levels. BD does not assert an *in pari delicto* defense. The authority cited provides no support. No case of which BD is aware has held a plaintiff's entry into the same type of contract that it challenges "has no bearing" on rule of reason analysis. All rule of reason authority is to the contrary, as reflected in BD's proposed instructions and cited authority. The Fifth Circuit most recently noted that a practice that is "widespread in the relevant market" contradicts any claim that there is "no competition" in that market. *PSKS*, 615 F.3d at 419. This must necessarily be true of any practice that is so widespread that it has been adopted by the plaintiff itself.

[129] RTI TAC ¶¶ 306-24.   BD objects to this sentence because it is not an instruction but a summary of Retractable's allegations (as indicated by the reference to Retractable's operative pleading). It improperly implies that the Court has found that each of these agreements is in fact an unreasonable restraint of trade, assuming the existence of disputed facts. And it includes objectionable language that characterizes the agreements in question in a non-neutral manner that assumes the existence of disputed facts. Reference to

The "rule of reason" is the accepted standard for testing whether an agreement unreasonably restrains trade.  Under this rule, you should weigh all of the circumstances in deciding whether a challenged contract imposes an unreasonable restraint on competition.[130]

You must first determine whether Retractable has proven the challenged restraints have resulted in or are likely to result in substantial harm to competition in the relevant markets.[131]  It is not necessary for Retractable to prove BD has monopoly power in the relevant markets for a Section 1 claim.[132]

A harmful effect on competition, or competitive harm (competitive harm) refers to a reduction in competition that results in the loss of some of the benefits of competition, such as which typically are lower prices, increased output, and higher product quality.[133]  If the Retractable's pleading is proper.  As the plaintiff, Retractable is entitled to determine what allegations form the basis of its lawsuit against BD.

---

[130] This proposal is derived from language in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007), modified to conform to prior instructions and to read as a jury instruction.  This language also usefully specifies the determination being referenced in the following agreed language from ABA Model A.2 – Rule of Reason – without which the introductory phrase of the following paragraph is confusing.

[131] This sentence tracks verbatim the third sentence of ABA Model A.2.

[132] BD objects that this blue statement is neither necessary for a Section 1 claim nor helpful to the jury.  There is no need to tell the jury what Retractable does *not* have to prove, instead of what it *does* have to prove.  What Retractable does have to prove is set out in ABA Model A.3B – Rule of Reason – Proof of Competitive Harm, the key portions of which BD proposes in proper sequence later in the text.  In particular, the Fifth Circuit requires proof of market power.  *PSKS*, 615 F.3d at 418 & nn.4, 5.  Thus, mentioning "monopoly power" in this context risks misleading the jury.  To the contrary, monopoly power and market power are different concepts.  It is important to have this instruction so that the jury is not confused into thinking monopoly power is a relevant determination for section 1.  In contrast to monopoly power for monopolization claims, market power is not an element for a section 1 claim.

[133] BD objects because the blue language is derived from the second sentence of the fifth paragraph of ABA Model A.3B, but it deviates from the language of the model instruction.

challenged conduct has not resulted in higher prices, decreased output, or lower quality, then there has been no competitive harm.[134]

Therefore, in determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors: the effect of the restraint on prices, output, product quality, buyer choice and/or innovation, and service; the purpose and nature of the restraint; the nature and structure of the relevant markets, both before and after the restraint was imposed; the number of competitors in the market and level of competition among them; and whether BD possesses a significant market share.[135]

A harmful effect on competition can also be inferred if the contracts restrained competition by more than 20-30% of any market.[136]   In ascertaining the share of the market

---

[134] This sentence proposed by BD tracks the third sentence of the fifth paragraph of ABA Model A-6, omitting the verdict-forcing instruction and the undefined reference to "some other competitive benefit." That phrase was removed based on Fifth Circuit law, which recognizes as competitive harms only price, supply, and quality.  *See Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007) (per curiam) (identifying as competitive harm increased price, decreased supply, and decreased quality). It is essential to correctly frame the substantial harm test. This statement of the law only contains BD's version of the law and does not contain Retractable's theories the Court considered when rejecting BD's summary judgment.  These factors should include "restricted buyer choice, or the loss of some other competitive benefit such as innovation".

[135] BD objects to this sentence as out of proper sequence and as a deviation from the model instruction. The language is derived from the sixth paragraph of ABA Model A-6, but it is rewritten.  In particular, Retractable adds the phrase "buyer choice and/or innovation" to the list of factors to consider without support (*see* n._, *supra*) and substitutes "significant market share" for "market power," which is legally wrong.  On the next page, BD proposes using the pertinent language from Model A-6 verbatim. Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way.  *Aspen Skiing*, 472 U.S. at 605 n.32.  These are two ways in which Retractable alleges BD has engaged in anticompetitive conduct.

[136] *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1304 (9th Cir. 1982) (24% enough); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (generally at least 30–40%); 9 Phillip E. Areeda, ANTITRUST LAW ¶ 1729, at 377, 387 (1991) (20%); *id.* ¶ 1729, at 328, 337 (30%); 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1821, at 152, 164–65 (1998) (20%); 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1821, at 167, 182 (2d ed. 2005) (20%); id. at 176, 182 (30%).  BD objects to this statement because the cases cited involve the percentage of the market necessary to prove market power for a rule of reason case, not harm to competition.  And they require "foreclosure" of competition in that share of the market, not merely a "restraint" on

restrained, the effects of one type of restraining contracts should be aggregated with other types because the anticompetitive effect turns on their combined effects.[137]   Additionally, Retractable alleges that BD restrained a substantial share of the GPO Brokerage Services in the conventional syringe and safety IV markets by entering into sole- and dual-source contracts.  GPO Brokerage Services refers to a GPO's role in negotiating standardized contracts with medical device manufacturers and suppliers and then offering those standardized contracts to GPO members, which are typically hospitals or other end users.[138]

If you find that the challenged restraint has resulted in substantial harm to competition in a relevant market, you must consider whether the restraints produced countervailing competitive benefits.  If you find they did, you must then balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.  and Section 1 is violated if you find the challenged restraint has a net anticompetitive effect on competition.[139]


competition (which may include pro-competitive conduct such as lower prices).  These cases do not hold, and no case has ever held, that "harm to competition" is established solely by market share—much less merely 20-30%.  As ABA Model Instruction A-6 reflects, the jury is to consider several factors in determining whether there is competitive harm—not just one.

[137] See 9 Areeda & Hovenkamp, *supra*, ¶ 1709, at 78, 87. BD objects to this sentence as a misstatement of the treatise material and as indefensible in light of Fifth Circuit law about the rule of reason.  *See* n._, *infra*.  For the reasons stated in the previous footnote, BD objects to the use of word "restraint" in this context.

[138] BD objects to this paragraph referencing GPO Brokerage Services.  First, it appears to allege a restraint of a market, but Retractable has conceded that it is not attempting to establish a relevant market in GPO brokerage services.  If Retractable confirms that concession, then these two sentences unduly emphasize a factual argument of Retractable that is not a proper subject of jury instruction; absent proof of a relevant market, it is not a claim.  If this is a claim that needs to be submitted to the jury, then the full panoply of relevant market instructions would be required as set forth above.  ABA Model A.

[139] *See* 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS at 75-76 (6th ed. 2007); ABA Model Instructions in Civil Antitrust Cases, Sherman Act—General, at A-4 (citations omitted); Fifth Circuit Pattern Jury Instructions – Civil No. 6.1 (Sherman Act) (2006); *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 627 (5th Cir. 2002);  *Doctor's Hosp. of Jefferson, Inc. v. Sw. Med. Alliance, Inc.*,

If you find the challenged restraints had no countervailing competitive benefit, then you must find a violation if you find the challenged restraints had any anticompetitive effect.[140]

If you find that Retractable has proven that the challenged restraint results in a substantial harm to competition in a relevant market,[141] then you must consider whether the restraint

123 F.3d 301, 307 (5th Cir. 1997). BD objects to this instruction as a misstatement of the law, most of all because it omits the essential element of "competitive" harm and it misstates the balancing test by suggesting a "net anticompetitive effect" test. *See Apani,* 300 F.3d at 627 ("Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason."). The "plaintiff is required to demonstrate that the alleged conduct unreasonably restrains trade in light of actual market forces under the rule of reason." *Benson v. St. Joseph Regional Health Ctr.*, 575 F. 3d 542, 549 (5th Cir. 2009). The Fifth Circuit remains "cautious in Section 1 cases as antitrust limits the range of permissible inferences from ambiguous evidence." *Stewart Glass*, 200 F.3d at 312. And the Supreme Court has insisted on liability limiting rules that avoid "false positives." *Trinko*, 540 U.S. at 414. A restraint for which the competitive benefits and disadvantages are close to equal does not represent either an "adverse" affect on competition or an "unreasonable" restraint of trade. Permitting antitrust liability for such a restraint risks false positives. The applicable principles, therefore, require the Model's "substantially outweigh" test rather than RTI's proposed "net anticompetitive effect" test. The *Quarter Horse Association* case is not analogous because it involved an agreement among competitors and unique trade association law under § 1. BD proposes the legally correct balancing test from ABA Model A.3A in the following paragraph (and it notes the deviations in this instruction for convenience). Additionally, as noted in the previous footnotes, BD also objects to the word "restraint" in this context. And the phrase "After determining . . ." implies that the jury will find competitive harm, assuming the existence of a disputed fact. *See* n.__, *supra.* The ABA instructions are voluminous and not always necessary. They are model instructions, not the law. At times, Retractable shortens or proposes alternatives to those instructions to best suit Retractable's allegations in this case. BD deviates from the instructions to the extent doing so is favorable to its defenses. By doing so, BD concedes such instructions are not always appropriate. The "net anticompetitive effect" test is a simpler way of stating the rule of reason and will be easier for the jury to understand. *See* 1 ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS at 75-76 (6th ed. 2007). It does not deviate from Fifth Circuit law on the rule of reason. *See Apani,* 300 F.3d at 627 ("Proof that the defendant's activities, on balance, adversely affected competition"); *see also* Charge to the Jury, *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, no. 2:12-cv-103-J (N.D. Tex. Jul. 30, 2013) ("If the association's rules impair competition in a relevant market without a legitimate justification, then those rules to exclude potential competitors, together with the other elements, violates Section 1.").

---

[140] BD objects to this statement as an incorrect statement of the law, for the reasons stated in the prior footnote, and because such "verdict-forcing" instructions are not being given elsewhere in the instructions; there is no need for such an instruction here. BD proposes the correct recitation of the rule of reason in the following paragraph. BD again objects to the use of the word "restraints" in the improper context established in the previous paragraph. BD provides no legal reason why Retractable is prohibited from using the word "restraints" or some derivative of the word. As the plaintiff, Retractable may frame its case as it chooses and "restraint" is in line with the relevant statutory language.

produces countervailing competitive benefits.[142]  If you find that it does, then you must balance the competitive harm against the competitive benefit.[143]  The challenged restraint is unreasonable only if you find that the competitive harm substantially outweighs the competitive benefit.[144]

In addition, in assessing competitive harm and benefit, you should follow the specific instructions in the following paragraphs.

In determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors: the effect of the restraint on prices, output, product quality and/or innovation, and service; the purpose and nature of the restraint; the nature and structure of the relevant markets, both before and after the restraint was imposed; the number of competitors in the market and level of competition among them; and whether BD possesses market power.[145]

The last factor mentioned, market power, has been defined as an ability profitably to raise prices above those that would be charged in a competitive market for a sustained period of time.

---

[141] Retractable objects to the remaining  proposed language by BD as repetitive, unnecessary, and excessive.  The ABA instructions are voluminous and not always necessary.  They are model instructions, not the law.  At times, Retractable shortens or proposes alternatives to those instructions to best suit the case.

[142] This sentence proposed by BD is the fourth sentence of ABA Model A.3A – Rule of Reason Overview.  *See PSKS,* 615 F.3d at 417 ("balance the 'anticompetitive evils of a restrictive practice . . . against any procompetitive benefits or justifications within the confines of the relevant market'") (quoted Fifth Circuit citation omitted); *accord Benson v. St. Joseph Reg'l Health Center*, 575 F.3d 542, 549 (5th Cir. 2009).

[143] This sentence proposed by BD is the fifth sentence of ABA Model A.3A verbatim.

[144] This sentence proposed by BD is the sixth sentence of ABA Model A.3A verbatim.  *See Apani,* 300 F.3d at 627 ("Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason.").

[145] This paragraph proposed by BD tracks verbatim the sixth paragraph of ABA Model A.3A.  The Fifth Circuit recently acknowledged that in a Section 1 case challenging a vertical restraint arising from an agreement between companies at different levels of production, proof of "market power" is required.  *PSKS, Inc.*, 615 F.3d at 418 (citing *Leegin*, 551 U.S. at 898).

A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products, however, is not market power.[146]

An important factor in determining whether BD possesses market power is market share; that is, BD's percentage of the products and services sold in each relevant market by all competitors.  If BD does not possess a substantial market share, it is less likely that BD possesses market power.[147]

You may also consider the trend in market share.  An increasing market share may show that a company has market power, particularly where that company has a high market share, while a decreasing share might show that a company does not have market power.[148]

Other factors that you may consider in determining whether BD has market power include barriers to entry, entry and exit by other companies, the number and size of competitors, whether the buyers are sophisticated businesses with power in negotiating contracts, and whether the process in which BD secured the challenged agreements itself involved competition.[149]

---

[146] This paragraph proposed by BD includes the first three sentences of the seventh paragraph of ABA Model A.3B – Rule of Reason – Proof of Competitive Harm – verbatim.

[147] This paragraph proposed by BD includes the fourth and sixth sentences of the seventh paragraph of ABA Model A-6, modified only to refer specifically to BD.

[148] Retractable objects separately to this assertion.  The Court, in denying BD's motion for summary judgment, rejected BD's proposition that a declining market share is evidence that they cannot violate the antitrust laws.  As such, it is important to exclude this reference proposed by BD and to explain that a declining share does not necessarily mean a party does not have monopoly or market power.  A summary judgment denial establishes no hard and fast legal rule, whereas the jury should be instructed on appropriate considerations under the law in a Rule of Reason case. Movement in market share is just such a consideration that might show market power or lack thereof.  As the Fifth Circuit has indicated, Rule of Reason analysis must be guided by "economic sense."  *See Stewart Glass*, 200 F.3d at 315.

[149] This paragraph proposed by BD is the fifth sentence of the seventh paragraph of ABA Model A.3B, modified only to refer specifically to BD and to list the relevant factors in this case.

Barriers to entry are long-run costs that were not incurred by the existing companies in a relevant market but must be incurred by new competitors to enter the market, or other factors in a market that deter entry of new competitors while permitting existing companies to earn monopoly profits.[150]

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.   Evidence of low or no entry barriers may be evidence that BD does not have market power, regardless of BD's market share, because new competitors could enter easily if BD attempted to raise prices for a substantial period of time.   By contrast, evidence of high barriers to entry along with high market share may support an inference that BD has market power.[151]

The history of entry and exit in the relevant market may be helpful to consider.   Entry of new competitors or expansion of existing competitors may be evidence that BD lacks market power.   On the other hand, departures from the market, or the failure of companies to enter the market, particularly if prices and profit margins are relatively high, may support an inference that BD has market power.

You may consider whether BD's competitors are capable of effectively competing.   In other words, you should consider whether the financial strength, market shares, and number of competitors limit BD's ability to price its products.   If BD's competitors are vigorous or have

---

[150]BD has added this sentence for consistency with Fifth Circuit precedent regarding barriers to entry.  *See Chicago Bridge v. FTC*, 534 F.3d 410, 428 n.8 (5th Cir. 2008) ("Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'  'Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market.'") (citations omitted).

[151] BD proposes this paragraph, and the next two paragraphs, based on ABA Model C.8 concerning monopoly power, which have a direct bearing on proof of market power.

large or increasing market shares, this may be evidence that BD lacks market power.  On the other hand, if you determine that BD's competitors are weak or have small or declining market shares, this may support an inference that BD has market power.

If you decide that the buyers are sophisticated businesses with power in negotiating contracts, this may offset any market power BD might otherwise have.  If Retractable cannot show that BD had the power to force buyers to enter into exclusive dealing arrangements they did not want, this would indicate that BD lacked market power.

Finally, you should consider whether the process in which BD secured the challenged agreements itself involved competition.  If you determine that the buyers formally or informally put their contracts out for bid, and other competitors had an equal opportunity to compete for the contracts against BD, this is also evidence that BD does not have market power.

If BD does not possess market power, then it is less likely that the challenged agreements have resulted in a substantial harmful effect on competition in the market.[152]

---

[152] This paragraph proposed by BD is the last sentence of the seventh paragraph of ABA Model A.3B, modified only to refer specifically to BD and to refer to the "challenged agreements."

Instruction No. 9 10
## CLAYTON ACT SECTION 3[153]

Retractable also claims BD violated Section 3 of the Clayton Act.  Retractable alleges

BD used competition-restraining arrangements[154] to restrain competition in a substantial portion

of the relevant market, and that it was injured as a result of these competition-restraining

arrangements[155] exclusive dealing agreements.  BD contends its agreements are not exclusive, do

---

[153] BD is entitled to judgment as a matter of law on Retractable's claim under Clayton Act § 3.  As noted above, Retractable's exclusive dealing arrangements are flawed and they should fail as a matter of law.  Clayton Act § 3 requires an "agreement or understanding" that the purchaser "shall not use or deal in the goods . . . of a competitor or competitors . . . of the seller . . . ."  15 U.S.C. § 15; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 330 (1961) (to "satisfy this initial requirement" of Clayton Act § 3, the "contract" must be "truly an exclusive-dealing" one); *Apani*, 300 F.3d at 625 ("a buyer agrees to purchase . . . exclusively from a particular seller").  There is no evidence of such an agreement.  As will be revealed, moreover, Retractable's proposed instructions attempt to evade the requirements of the statute.  BD is re-hashing its failed motion for summary judgment arguments.  Retractable reasserts its responses to BD's argument concerning the agreements at issue as set forth earlier in this document in objecting to BD's proposed instruction describing its agreements.  Although the Court may have denied a motion for summary judgment on these issues, that ruling was not a definitive decision that these legally correct principles are inapplicable to this case, as a matter of law.

[154] BD objects because Retractable's substitution of the ill-defined phrase "competition- restraining agreements" for the "truly exclusive" agreements required by Clayton Act § 3 is patently invalid.  Clayton Act § 3 requires an "agreement or understanding" that the purchaser "shall not use or deal in the goods . . . of a competitor or competitors . . . of the seller . . . ."  15 U.S.C. § 15; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 330 (1961) (to "satisfy this initial requirement" of Clayton Act § 3, the "contract" must be "truly an exclusive-dealing" one); *Apani*, 300 F.3d at 625 ("a buyer agrees to purchase . . . exclusively from a particular seller").  Retractable's overbroad and undefined theory that any sort of "competition-restraining agreement" is governed by the statute defies the language of Clayton Act § 3 as interpreted by the Supreme Court and Fifth Circuit.  In addition, the parties have elsewhere avoided explicit reference to statutes in the instructions.  Competition-restraining agreements is a term Retractable has used to describe BD's agreements.  There is nothing improper about use of this term as it is specifically described as a an allegation and consistent with the statutory language.  Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.  But the Court may only do so in legally correct terms, whereas RTI is proposing language that has no foundation in either the statute nor any Supreme Court decision.

[155] BD objects to the blue language for the reasons explained in the previous footnote.  Additionally, actionable arrangements must "foreclose[]," not merely restrain, "competition in a substantial share of the established market." *Apani*, 300 F.3d at 625, 627 (citing *Tampa Electric*, 365 U.S. at 327-28).  Finally, BD also objects to the summary of Retractable's contentions as an unfair emphasis on Retractable's factual theories. *See* n.\_, *supra*.  BD's proposal in yellow conforms to its prior proposals for neutral presentation of the Retractable claims.  Restrain is another way of saying foreclose.. *See Brown Shoe*, 370 U.S. at 324 (describing foreclosure as a "clog on competition").  It is proper to tell the jury what

---

not prevent customers from buying products from BD's competitors, and promote competition for lower prices in the market.

To prevail on this claim, Retractable must prove the following elements:

1. First, that there were the existence of competition-restricting contracts exclusive dealing agreements between BD and its customers;[156]

2. Second, that there is a relevant valid antitrust market; and[157]

3. Third, that the exclusive dealing agreements the contracts or agreements are likely to substantially foreclose (i.e., decrease or restrict) foreclosed competition in a substantial share of a relevant market;[158] and

---

allegations pertain to each cause of action so they know what to consider. Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.

[156] BD objects to the blue language and proposes the yellow language based on the Fifth Circuit's decision in *Apani* as reflected in the preceding footnote. BD proposes the yellow language using the format of the ABA Models and FIFTH CIRCUIT PATTERN 6.1. Neither the ABA Model nor the FIFTH CIRCUIT PATTERNS contain a sample instruction on Clayton Act § 3. BD's objections are contrary to the plain language of the statute, which nowhere states exclusive dealing, but does refer to "agreements" that "lessen competition." *See* 15 U.S.C. §14.

[157] *Id.*

[158] 15 U.S.C. § 14; *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 329-30 (1961); *Apani*, 300 F.3d at 625; *see also Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, No. 2:08-cv-00016-DF (E.D. Tex. March 15, 2011) ("The Sherman Act requires that an exclusive dealing arrangement actually forecloses competition, while the Clayton Act requires only that an agreement is likely to foreclose competition") (order denying BD's Motion to Dismiss) (quoting *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, No. CV 10-02175, 2010 WL 4366849, at *2 (C.D. Cal. Sept. 23, 2010). BD objects to the blue language and proposes the yellow language verbatim from the Fifth Circuit's decision in *Apani*, 300 F.3d at 627. Using the word "substantially" as an adverb modifying "foreclose" rather than the adjective "substantial" modifying "share" would lead the jury away from the critical inquiry under Clayton Act § 3. In addition, a mere likelihood that an agreement might foreclose competition in the future could not serve as the basis for recovery in a private civil case, even though it might be the basis for the United States to request injunctive relief. If no competition has been foreclosed, then Retractable could not have suffered antitrust injury. As stated in FIFTH CIRCUIT PATTERN 6.1, Retractable "can recover under the antitrust laws only if its loss stems from a reduction in competition because of the defendant's behavior." Implicitly applying this principle, the Fifth Circuit in *Apani* held that the key question in a private action under Clayton Act § 3 is "whether the arrangement foreclosed competition in a substantial share of the established market." *Apani*, 300 F.3d at 627. It is this language that should be used to instruct the jury; otherwise the foreclosure element and the antitrust injury causation element will be diluted. Retractable further states that the language of the statute supports its position. *See* 15 U.S.C. § 14 ("effect…may be to substantially lessen competition or tend to create a monopoly").

4. Fourth, that Retractable was injured as a result foreclosure of competition by exclusive dealing arrangement caused Retractable to suffer injury to its business or property.[159]

You should follow the instructions given above for relevant market, anticompetitive conduct, and causation and antitrust injury.   In addition, in determining whether the challenged GPO, hospital, and distributor agreements between BD and purchasers foreclosed competition in a substantial share of the market, you should follow Instruction 5 regarding those agreements.[160]

Competition restricting contracts Exclusive Dealing Agreements:[161]   There must be competition-restricting agreements, which are often referred to as "exclusive dealing" agreements.   The term "exclusive dealing" may be misleading in that an agreement may be an exclusive dealing agreement even when it does not require a 100% commitment from a purchaser.[162]

---

[159] BD proposal: As with any private antitrust action for the recovery of damages, proximate causation and antitrust injury are essential elements of Retractable's claim under Clayton Act § 3.  *See* n.___, *supra*; *Norris*, 500 F.3d at 465; *Jostens*, 216 F.3d at 484-85.  Retractable objects to BD's reference to foreclosure again in this element as cumulative and unnecessary.   Foreclosure is adequately addressed in the remaining language of this instruction.

[160] BD proposes that the jury should be instructed to consider the price-cost instructions because the alleged mechanism of foreclosing competition is pricing terms.  *See Atlantic Richfield*, 495 U.S. at 340 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. ... We have adhered to this principle regardless of the type of antitrust claim involved."); *Brooke Group*, 509 U.S. at 224 (same); *see also ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 273 (3d Cir. 2012) ("the price-cost test" applies "when the plaintiff alleges that price is the vehicle of exclusion").  The price-cost test instructions are irrelevant and improper for the reasons set forth by Retractable in objecting to BD's separate instruction on its agreements.

[161] BD objects to this heading and proposes a proper heading, because a Clayton Act § 3 claim requires a truly "exclusive" agreement.  *See Tampa Elec. Co.*, 365 U.S. at 330 (to "satisfy this initial requirement" of Clayton Act § 3, the "contract" must be "truly an exclusive-dealing" one); *Apani*, 300 F.3d at 625 ("buyer agrees to purchase . . . exclusively from a particular seller").   This language is not part of the statutory language or necessary for the jury to evaluate Retractable's claims. Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.

[162] *FTC v. Brown Shoe*, 384 U.S. 316, 318 (1966) (condemning discounts conditioned on obligation to "concentrate" dealer business on the defendant's shoes, which in practice meant 75% of purchases).  BD objects to this language as profoundly incorrect.  The *Brown Shoe* case involved a true exclusive dealing

To meet the first element, the challenged contract must require true exclusive dealing.[163] Exclusive dealing occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller.[164]  Contracts do not need to contain specific terms of exclusivity as long as the practical effect of the agreement is to exclude competitors and harm competition.[165]

Retractable alleges the contracts at issue under this claim are the same contracts previously described above on page ___ (Section 1).

BD contends that its agreements offer price discounts that benefit end users by delivering lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit.  BD contends that its agreements do not require customers to buy products from BD exclusively (or at all) and do not foreclose competition in the market.

---

contract in which purchasers were obligated to buy all of the products covered by the contract from Brown Shoe; the 75%  threshold referenced in Retractable's parenthetical simply reflected the fact that those products covered only 75% of the purchasers' requirements.  Additionally, *Brown Shoe* applied Section 5 of the FTC Act, and the Supreme Court specifically held the FTC could proscribe the "concentration" practice under Section 5 without the evidence required to satisfy Clayton Act § 3.  *See Brown Shoe*, 384 U.S. at 321-22.  *See* n. __, *supra* (discussion of *Brown Shoe*).

As the Court held in *Tampa Electric*, Clayton Act § 3 requires proof that the challenged arrangements "prevent the . . . purchasers from . . . dealing in the goods," and by doing so, "foreclose competition." *Tampa Electric*, 365 U.S. at 327.  *Tampa Electric* stressed that to "satisfy this initial requirement of" Clayton Act § 3, a contract must be "truly an exclusive-dealing" one.  *Id.* at 330; *see also* n.___, *supra*. Retractable is trying to dilute the burden of proof.

[163] BD proposal based on *Tampa Electric*, 365 U.S. at 330 (in order to "satisfy this initial requirement of" Clayton Act § 3, a contract must be "truly an exclusive-dealing" one).

[164] BD proposal based on *Apani*, 300 F.3d at 625 (sentence tracked verbatim except for omission of the transitional phrase "by contrast").  This language is argumentative, confusing, and not necessary for the jury to deliberate this case.

[165] *Tampa Elec.*, 365 U.S. at 329-30; *see also Massimo Corp. v. Tyco Health Care Group, L.P.,* Final Jury Instructions (C.D. Cal. March 17, 2005).  BD agrees to this language, which confirms the challenged contract must truly exclude competition.

Likelihood of substantial foreclosure:[166] If you determine that BD entered into restrictive contracts in a relevant market, your next consideration should be to determine whether competition was substantially lessened in a relevant market.[167]   Exclusive dealing agreements violate the antitrust laws when they foreclose (or restrict) competition in a substantial share of the market.   In the context of the antitrust laws, foreclosure really just means restricted.[168] Competition with respect to a particular buyer is foreclosed if rival sales to that buyer are restricted by a contract that imposes conditions that make it more difficult for rivals to sell to that buyer than would otherwise be the case.[169]   In determining whether foreclosure from – or restraint on competition within – a relevant market is substantial, you should take into account

[166] BD objects to the blue reference to "likelihood" of substantial foreclosure because, to recover damages, Retractable must have actually have been foreclosed.   As this Court has noted, a key distinction between the two sections is that Section 1 requires that an arrangement actually foreclose competition, while Section 3 requires only that the agreement is likely to foreclose competition.  [*See* DE #62, p. 7]  In that respect, it is easier to prove a claim for a Section 3 violation.

[167] BD objects to this sentence because it is unnecessary, and the language proposed by Retractable is incorrect.   Its reference to "restrictive" contracts is another way of saying "competition-restricting agreements," which legally erroneous for the reasons explained above.   And its reference to "lessening" competition dilutes the "substantial foreclosure" standard.   The Fifth Circuit has held that the key question in a private action under Clayton Act § 3 is "whether the arrangement foreclosed competition in a substantial share of the established market."  *Apani* , 300 F.3d at 627.   Retractable is not permitted to vary the legal standard.   "Lessen" is the statutory language.   With respect to the rest of BD's arguments here, Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.

[168] BD objects to this sentence because, as explained in prior footnotes, its propositions are made up out of whole cloth and cannot be squared with *Tampa Electric* or *Apani*.   Foreclosure means true "exclusivity," for the reasons explained in the preceding footnotes.   Retractable's proposed instruction is contrary to law.   Retractable's proposed language is consistent with the law on point as set forth in prior footnotes.

[169] BD objects to this sentence because, as explained in prior footnotes, it cannot be squared with the holdings in either *Tampa Electric* or *Apani*.   Aggressive above-cost pricing can make it more difficult for competitors to make sales, but that is merely competition on the merits, not "foreclosure" of competition. *See, e.g.*, *Atlantic Richfield*, 495 U.S. at 340 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. . . . We have adhered to this principle regardless of the type of antitrust claim involved.").   Retractable's effort to equate "foreclosure" to "restriction" dilutes its burden of proof, as explained in the preceding footnotes. Retractable incorporates its objections to BD's price-cost test instructions from earlier in this document.

the relative strength of Retractable and BD within the relevant market, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market, and the provable immediate and future effects of exclusion of competitors from the market on competition.[170]

Additionally, you should consider the cumulative effects of (or aggregate restraint or foreclosure caused by) BD and other firms' anticompetitive conduct in determining substantial foreclosure of the relevant markets.[171]   In other words, you are not limited to only considering

---

[170] *Tampa Elec.*, 365 U.S. at 329-30; *see also Massimo Corp. v. Tyco Health Care Group, L.P.*, Final Jury Instructions (C.D. Cal. March 17, 2005). BD objects that Retractable's proposed instruction is not supported by authority.  BD knows of no authority that would make Retractable's strength in the market a relevant factor concerning the competition foreclosed by BD contracts with purchasers.  The real question is whether a contract preventing a buyer from dealing with another competitor has an adverse impact on competition in a "substantial share" of the market.  *Apani* , 300 F.3d at 627; *see also Tampa Electric*, 365 U.S. at 329 (demonstrating that the starting point is the volume excluded from competition as compared to the volume of sales in the market as a whole).  Retractable's effort to transform the "substantiality" inquiry into a modification of the extent of "restraint" instead of the impact on a substantial share of the market is the nominal justification for this instruction, and is both incorrect on its own terms and an invitation to an undefined balancing analysis that has no place under Clayton Act § 3.  There is nothing "relative" about the requirement of exclusivity.

[171] *See, e.g., Genico, Inc. v. Ethicon, Inc.*, No. 5:04-cv-00229-DF (E.D. Tex. Mar. 23, 2006); *see also Standard Oil & Standard Stations v. United States*, 337 U.S. 293, 295, 309, 314 (1949); *FTC v. Motion Picture Adver. Serv*., 344 U.S. 392, 395 (1953); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365–66 (1963) (interpreting *Standard Stations* and *Motion Picture* to rest on cumulative foreclosure measures); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004) (concluding that the relevant "extent of foreclosure" includes that resulting from defendant's exclusionary contracts and "other existing foreclosures" such as by another seller's exclusionary contracts). BD objects to this sentence, which contradicts all the applicable authority.  The focus of Clayton Act § 3 is the competitive impact of truly exclusive dealing arrangements, i.e., "whether the arrangement foreclosed competition in a substantial share of the established market."  *Apani*, 300 F.3d at 627 (citing *Tampa Elec.*, 365 U.S. at 327-28).  No authoritative decision under the statute suggests that any cumulative effect is relevant.  The cited discussion in *Stop & Shop* is unstable authority, as the First Circuit ultimately upheld exclusion of the plaintiff's expert testimony that would have aggregated market shares in an improperly defined antitrust market.  *Stop & Shop*, 373 F.3d at 60, 66-67.  As *Stop & Shop* itself points out, *id.* at 65-66, the *Standard Stations* analysis is now outdated authority.  And neither the *Motion Picture* case (Federal Trade Commission Act § 5), nor the *Philadelphia Bank* case (Clayton Act § 7) involved a private claim like this one.  *Genico* did not even address this question and it does not support the proposition that "foreclosure shares" should be aggregated, as Retractable claims.  Finally, the sentence is not neutral but unfairly bolsters Retractable's case by assuming the existence of disputed facts.  *See* n._, *supra.*  Indeed, as BD has explained above, Retractable's expert has done no analysis and Retractable has adduced no

---

the effects of BD's anticompetitive actions, if any, on competition, but may also consider the effects of any anticompetitive conduct by BD when combined with that of other firms which have substantial market share (such as Covidien).[172]   And the agreements challenged do not need to foreclose Retractable from 100% of any buyer purchases in order to have an anticompetitive effect; Retractable may have some access to each buyer, but still be foreclosed (or restricted) from competing as it would in a market without any anticompetitive restraints.[173]

A harmful effect on competition can also be inferred if the contracts restrained competition by more than 20-30% of any market.[174]   In ascertaining the share of the market

evidence to prove the effect of Covidien's contracts or the portion of the market they cover.  *See* n.__, *supra*.  In short, Retractable's instruction is both legally and factually insupportable.

[172] BD objects that, besides being contrary to Fifth Circuit authority as explained in the previous footnote, this language unduly emphasizes Retractable's arguments without assisting the jury.  *See* n._, *supra*.

[173] *See FTC v. Brown Shoe*, 384 U.S. 316, 318-19 & n.13 (1966) (condemning discount conditioned on 75% loyalty); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) (condemning agreements that did not require 100% exclusivity but only that dealers not add new rival product lines); *United States v. Microsoft*, 253 F.3d 34, 68 (D.C. Cir. 2001) (en banc) (condemning agreements that conditioned favorable terms on 75% commitment).  BD objects to this sentence as incorrect and not supported by the authority cited or by any other authority.  None of these cases is a decision involving Clayton Act § 3.  Significantly, the Court in *Brown Shoe* noted that the FTC had not proved an essential element of Clayton Act § 3.  *Brown Shoe*, 384 U.S. at 322; *see also* n. _, *supra* (extended discussion of *Brown Shoe*).  In *Dentsply*, the United States lost its claim under Clayton Act § 3, and did not appeal that defeat.  *Dentsply*, 399 F.3d at 186.  In *Microsoft*, the court held that the agreements did not violate Section 1, and the United States did not appeal this conclusion.  *Microsoft*, 253 F.3d at 70.  The D.C. Circuit did conclude that the agreements there violated Section 2, but only because the agreements were "exclusive deals" entered into with "fourteen of the top fifteen access providers in North America" by Microsoft, which had enormous monopoly power.  *Id.* at 270-71.  Retractable has no support for this instruction in the context of Clayton Act § 3.

[174] *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1304 (9th Cir. 1982) (24% enough); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (generally at least 30–40%); 9 Phillip E. Areeda, ANTITRUST LAW ¶ 1729, at 377, 387 (1991) (20%); *id.* ¶ 1729, at 328, 337 (30%); 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1821, at 152, 164–65 (1998) (20%); 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1821, at 167, 182 (2d ed. 2005) (20%); id. at 176, 182 (30%).  BD objects to this statement because the cases cited involve the percentage of the market necessary to prove market power for a rule of reason case, not harm to competition.  And they require "foreclosure" of competition in that share of the market, not merely a "restraint" on competition (which may include pro-competitive conduct such as lower prices).  These cases do not hold, and no case has ever held, that "harm to competition" is established solely by market share—much less

restrained, the effects of one type of restraining contracts should be aggregated with other types because the anticompetitive effect turns on their combined effects.[175]   Additionally, Retractable alleges that BD restrained a substantial share of the GPO Brokerage Services in the conventional syringe and safety IV markets by entering into sole- and dual-source contracts.  GPO Brokerage Services refers to a GPO's role in negotiating standardized contracts with medical device manufacturers and suppliers and then offering those standardized contracts to GPO members, which are typically hospitals or other end users.[176]

merely 20-30%.  As ABA Model Instruction A-6 reflects, the jury is to consider several factors in determining whether there is competitive harm—not just one.

---

[175] See 9 Areeda & Hovenkamp, *supra*, ¶ 1709, at 78, 87. BD objects to this sentence as a misstatement of the treatise material and as indefensible in light of Fifth Circuit law about the rule of reason.  *See* n.__, *infra*.  For the reasons stated in the previous footnote, BD objects to the use of word "restraint" in this context.

---

[176] For the reasons previously stated, BD objects to any reference to GPO brokerage services as factual argument rather than description of a separate claim, and to the extent that RTI relies on these services, BD adheres to its position that any reliance on GPO brokerage services must satisfy the relevant market requirements set forth above.

**FALSE ADVERTISING: LANHAM ACT**

Instruction No. 11 13

ELEMENTS[177]

To recover on its false advertising claim, Retractable must prove:[178]

1. First, that BD made a false or misleading statement of fact about the nature, characteristics, or quality of[179] its own product or Retractable's product in commercial advertising or promotion;

2. Second, that the statement deceived, or had the capacity to deceive,[180] a substantial segment of potential consumers;

3. Third, that the deception was material, meaning it was likely to influence consumers' purchasing decisions;

4. Fourth, the product alleged statement was made in interstate commerce; and[181]

---

[177] BD moved for summary judgment that, by reason of the parties' stipulated dismissal of Lanham Act claims in 2004, Retractable's Lanham Act claims are precluded under the doctrines of res judicata and release. *Oreck Direct LLC v. Dyson, Inc.*, 560 F.3d 398 (5th Cir. 2009). *See* Doc. 441, 178. If necessary, BD will move for judgment as a matter of law under Rule 50 on this basis. The Court denied BD's motion for summary judgment on these allegations.

[178] BD proposes a form comparable to the form it has proposed to list the essential elements of the claim.

[179] BD proposes the yellow language to further instruct the jury with appropriate limiting language from Section 43(a) of the Lanham Act. Retractable agrees to include the language of the statute, but this word would have to be included as well.

[180] BD objects to this phrase because the "capacity for future deception" is not a matter for the jury here. The Fifth Circuit holds that "to recover monetary damages," a Lanham Act plaintiff "must prove actual deception." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 497 (5th Cir. 2000). Although a plaintiff "seeking injunctive relief must prove that defendant's representations 'have a tendency to deceive customers,'" *id.*, the jury will not be responsible for awarding injunctive relief. Thus, the issue of "tendency to deceive" should not be part of the jury instruction. Retractable is seeking both damages and injunctive relief and, for that reason, both terms are included.

[181] As set forth above, BD agrees that all statements were made in interstate commerce except for the "Why Can't It Be Zero" advertisement. BD understands that RTI does not intend to rely on that statement for purposes of its Lanham Act claim. To the extent that this statement remains at issue, however, BD's proposed language is the legally correct test. Although the blue language appears in *Pizza Hut*, BD proposes the yellow language as the appropriate element under the statute as it has read since 1998. As it currently reads, the statute makes potentially liable any person who "uses in commerce any" false advertising as defined. 15 U.S.C. § 1125(a)(1). Previously, the statute applied if the person

---

5. Fifth, that Retractable either has been or is likely to be injured as a result of the statement at issue.[182]

In this case, it is undisputed that the interstate commerce element (element #4) is established.[183]

You are instructed that, for the advertising at issue in this case, BD has admitted "Brand A Retracting Syringe" and "Brand A 3 mL Retracting Syringe" referred to Retractable's VanishPoint 3 mL syringe.[184]

---

caused "such goods or services to enter into commerce."  The *Pizza Hut* recitation of the elements, therefore, carries forward the commerce element based on "products" that has now been replaced with a requirement that the advertising be used "in commerce."  BD's revision of the *Pizza Hut* language is fully supported by the current language of the statute.  If Retractable formally withdraws any allegations based on advertisements only made in foreign markets, as it has indicated it will, then the interstate commerce element will become a moot point.

[182] 15 U.S.C. § 1125(a); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495-97 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 (5th Cir. 1996); *Tacquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990); *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *Laughlin Prods., Inc. v. ETS, Inc.*, 257 F. Supp. 2d 863, 867 (N.D.Tex. 2002).  BD objects to the blue phrase.  The Fifth Circuit holds that to recover damages, a plaintiff must prove both "actual deception"  *Pizza Hut*, 227 F.3d at 497, and also actual damage, *IQ Prods. Co. v. Pennzoil Prod. Co*, 303 F.3d 368, 375-77 (5th Cir. 2002).  Likelihood of future injury is relevant only to future injunctive relief, so this instruction impermissibly lowers Retractable's burden of proof on its damage claims.

[183] See the footnote discussing the interstate commerce element for the conditions of BD's agreement to this instruction.  If those conditions are not satisfied, BD reserves the right to contest the interstate commerce element.

[184] Becton, Dickinson and Company's Answer to Plaintiff's Third Amended Complaint (Doc #79), ¶¶ 99, 107, 132, 185; *Landry v. U.S.*, 20 F.3d 469, 473 (5th Cir. 1994) ("factual assertions made in a party's pleadings constitute judicial admissions that are ordinarily binding on that party"); *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, (5th Cir. 1987) (facts admitted in pleadings are no longer at issue); *Carrolton Properties, Ltd. v. City of Carrolton*, 2006 WL 2559535 (E.D. Tex., Sept. 1, 2006) (admission in pleadings conclusively binds the party who made it).  BD presented George Goldman to testify on its behalf as a 30(b)(6) witness on September 1, 2011.  During that deposition, Mr. Goldman also admitted that "Brand A" was VanishPoint.  *See* Goldman Depo. 9/1/11, 48:21-25; 61:20-63:10; 72:6-10; 195:24-197:13; 212:2-214:7. BD objects to any reference to this pretrial admission in the jury instructions as unduly prejudicial.  The admission can be introduced into evidence, but it is not a proper subject for a jury instruction; highlighting it is a comment on the evidence that will tilt the jury.  *See* n.__, *supra*.  The dispute at trial turns on the *purchaser's understanding* of the advertising reference, but Retractable's

<u>False or misleading statement of fact (element #1)</u>:

<u>Statement</u>.  A claim for false advertising may be supported by a designation, description, or representation ("statement") of fact that is either false or misleading.  A false or misleading statement may be either written, oral, pictorial, or any combination thereof.[185]

<u>Statement of fact</u>.  The statement at issue must be one of "fact" and not mere a bald assertion of superiority or general statement of opinion.[186]  A statement of fact is one that is objectively capable of proof or disproof.  In other words, in order to constitute a statement of

instruction improperly implies that there is no dispute about the *purchasers' understanding*.  BD has made no judicial admission regarding that essential element of the claim.

Retractable's effort to establish falsity through a stipulation proves that this advertisement is not "literally false" as a matter of law.  "[O]nly an *unambiguous* message can be literally false."  *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007), quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002); *accord  Pernod Ricard USA, LLC v. Bacardi USA, Inc.*, 653 F.3d 241, 248 (3d Cir. 2011); *see Pizza Hut*, 227 F.3d at 495 (distinguishing between "literally false" and "ambiguous" statements).  BD submits that, as in contract interpretation, ambiguity should be resolved as a matter of law.

[185] CALLMAN ON UNFAIR COMP, TRADEMARKS & MONOPOLIES § 5.18.65 (4th ed.); *Mead Johnson & Co. v. Abbot Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000); *Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir. 2000); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998).  BD objects to this full paragraph, including the blue paragraph heading, because it is unnecessary and it adds nothing to the first element of the claim, which is listed above, and the standard instructions regarding the burden of proof.  At most, the second sentence is the only sentence that adds any new information (although BD objects to that sentence as well because it is not necessary to assist the jury in resolving any disputed facts).

[186] BD proposes the yellow language, which is taken verbatim from *Pizza Hut*, 227 F.3d at 496.  The proposed language relates to puffery and Retractable objects to it.  There has been no mention in this case of any of the advertisements containing puffery—either in the pleadings or in discovery.  Furthermore, puffery is a question of law for the court to decide and is not a jury issue.  *See, e.g., In re Clorox Consumer Litigation*, 894 F. Supp. 2d 1224, 1234 (N.D. Cal. 2012); *see also Newcal Industries v. Ikon Office Solution*, 513 F. 3d 1038, 1053 (9th Cir. 2008) (puffery is a "legal question"); *Baden Sports, Inc. v. Molten*, 541 F. Supp. 2d 1151 (W.D. Wash. 2008) ("… whether a statement is puffery is a question of law, not a fact question for the jury.").  Because the truth or falsity of the statements can be objectively determined, none of BD's ads are puffery.  Sharpness and dead space are measurable qualities.  Likewise, safe, safety, and safety-engineered are not puffery.  *See, e.g.,  X-IT Prods, LLC v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 625, 627-28 (E.D. Va. 2001) (reasoning that "safe" and "safest" claims "are all capable of objective confirmation or rejectance [sic], and are therefore not puffery.")

fact, a statement must make a specific and measurable claim.[187]   A statement of fact is one that admits of being adjudged true or false in a way that admits of empirical verification.[188]

Accordingly, a statement of fact cannot be "puffery," which is either an exaggerated, blustering and boasting statement upon which no reasonable buyer would be justified in relying, or a general claim of superiority over other comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion.[189]

Statement is literally false Falsity.[190]   In determining whether a statement of fact is "literally false," false or misleading you must analyze each of the challenged statements in light of the overall context in which it appears. Literally false statements may be explicit or

---

[187] *Sw. Recreational Indus., Inc. v. FieldTurf, Inc.*, No. 01-50073, 2002 WL 32783971 at *3 (5th Cir. Aug. 13, 2002) (citing *Presidio Enter., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)). BD objects to the blue language, which does not set forth the basic definition of a statement of fact as stated in either of the cited authorities. Instead, BD proposes the yellow language that sets forth the correct definition. Once that definition is used, the blue language is unnecessary and does not assist the jury.

[188] BD proposal taken from *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986) ("A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification."); *see also Pizza Hut*, 227 F.3d 496 (quoting this definition from *Presidio* verbatim).

[189] BD's proposed definition of "puffery" is taken verbatim from *Pizza Hut*, 227 F.3d at 497; *see also id.* at 496 ("[o]ne form of non-actionable statements of general opinion" is "referred to as 'puffery'"). Retractable objects to any language on puffery. Puffery is not an issue in this case and is a question of law. *See, e.g., In re Clorox*, 894 F. Supp. 2d at 1234; *see also Newcal*, 513 F. 3d at 1053; *Baden Sports*, 541 F. Supp. 2d 1151. Because the truth or falsity of the statements can be objectively determined, none of BD's ads are puffery. *See, e.g.,  X-IT Prods*, 155 F. Supp. 2d at 625, 627-28.

[190] BD objects to this heading as unnecessary and as an attempt to tilt the jury in favor of Retractable's position, improperly assuming the existence of disputed facts. If a heading is used, it should simply be "Falsity." The instruction that follows is correct except it should refer to "false or misleading" statements rather than "literally false" statements. *Pizza Hut*, 227 F.3d at 495 n.5. The Fifth Circuit cases on this subject frequently discuss statements that are "literally false" vs. statements that are misleading and do so because literally false statements can involve different presumptions. *See, e.g., Pizza Hut*, 227 F.3d at 495–97, 501; *Sw. Recreational Indus., Inc. v. Fieldturf, Inc.*, No. 01-50073, 2002 WL 32783971, at *3 (5th Cir. Aug. 13, 2002); *IQ Prods. Co. v. Penzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002). These cases state that certain other elements do not have to be proven if a statement is literally false.

necessarily implied.  Statements are necessarily implied when, reviewing an advertisement in its entirety, you recognize that statement just as readily as you would had it been explicitly stated.[191]

An "establishment claim" is one where the defendant explicitly or implicitly represents it has data, tests or studies to prove or establish its statements.[192]  An assertion that there are test results or data purporting to prove a claim can be a literally false statement of fact false or misleading if the tests or data do not actually prove the claim.  Even if the statements about the product are true, the claim to have proof, or sufficiently reliable proof, may be false.[193]

Or Statement is misleading.  Even if a statement of fact is not literally false, it may still satisfy this element if the statement is misleading in its context, regardless of whether it is vague, ambiguous, or even literally true.[194]

Deception and materiality (elements #2 & #3):  If you determine BD made a statement that is literally false under element 1 above, then Retractable does not need to prove either

---

[191] CALLMAN § 5.18.65; *Clorox Co. Puerto Rico*, 228 F.3d at 34-35; *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co*., 129 F. Supp. 2d 351, 358 (D.N.J. 2000); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997); *accord Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 865-867 (W.D. Tex. 2001).  BD objects to these sentences in blue because the Fifth Circuit has never adopted the "necessary implication" doctrine, and because the instruction directs the jury how to resolve a dispute in the evidence and thus improperly assumes the existence of disputed facts.

[192] BD objects to this entire paragraph because it is duplicative of material in the preceding paragraph.  The jury does not need to know that the courts refer to "establishment" claims.  Otherwise, the statements in this paragraph are Retractable's arguments, not valid and neutral instructions, which only restate the principle in the preceding paragraph and marshal Retractable's arguments about disputed facts.

[193] *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992) (discussing literal falsity in the context of establishment claims).  In addition to the preceding objections, BD objects that the principles in this paragraph concerning "true but misleading" statements, so they are not proper instructions regarding literal falsity.  With that modification, the unhighlighted passage is a correct and acceptable statement of law.  The remaining instructions are redundant and unnecessary attempts to marshal Retractable's arguments about disputed facts.

[194] *Pizza Hut Inc.*, 227 F.3d at 495, 497, 501.

deception or materiality (elements #2 or #3) with respect to that statement.  If a statement is literally false, you are to assume such statements are material and deceptive.[195]

If you find any statement to be literally false, BD bears the burden of presenting evidence that the statement did not actually deceive purchasers or was not material.  If BD does present such evidence, Retractable bears the burden of proving deception and materiality by a preponderance of the evidence.[196]

If you find any statement to be either ambiguous or true but misleading, Retractable must both present evidence and prove by a preponderance of the evidence that the statement actually deceived purchasers and was material.[197]

If you determine BD made a statement that was not literally false, but was instead misleading, then Retractable must prove: (a) the statement was deceptive (element #2) and (b) the deception was material (element #3).[198]

---

[195] *Pizza Hut*, 227 F.3d at 495–97, 501; *Sw. Recreational Indus., Inc. v. Fieldturf, Inc.*, No. 01-50073, 2002 WL 32783971, at *3 (5th Cir. Aug. 13, 2002); *IQ Prods. Co. v. Penzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002).  These cases do not talk about burdens of producing evidence or burden or persuasion, as BD discusses below.  They discuss establishing a violation without evidence and granting relief without reference to impact.  *See Pizza Hut*, 227 F.3d at 497 (citing *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999); *Johnson & Johnson, Inc.* v. GAC Int'l, Inc., 862 F.2d 975, 977 (2d Cir.1988); *U–Haul Inter'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir.1986)).  BD objects to this paragraph because it is not a proper jury instruction and it misstates the applicable law.  It does not tell the jury the correct legal consequence of the presumption.  Juries should not be told about "presumptions" or "assumptions," but should simply be instructed which party bears the burden of *producing* evidence and which party bears the burden of *persuasion*.  BD proposes the yellow language to implement the presumption properly under the Fifth Circuit's decision in *Pizza Hut*.  To avoid mistake, BD believes it is entitled to judgment as a matter of law that none of the challenged advertisements is "literally false."  Thus, no "burden-shifting" instructions should be necessary.  But if they are required, BD submits appropriate instructions in the following paragraphs.

[196] BD proposes this paragraph as a correct instruction regarding the effect of a presumption under the applicable legal principles.  The first two sentences give effect to the presumption of deception under FED. R. EVID. 301.  The substantive principles come from *Pizza Hut*, 227 F.3d at 497.

[197] *Id.*

If you find the absence of an intent to mislead, then Retractable must prove at least some consumers were confused by the advertisements (capacity to deceive) or a substantial number of consumers were actually deceived by BD's statements (actually deceived).[199] Survey evidence is one—but not the only—way to prove deception.[200] To prove actual deception, Retractable has to produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements.[201]

Materiality (element #3) refers to whether the statement is likely to influence consumers' purchasing decisions.[202] Alternatively, Retractable may establish materiality by evidence of actual or likely influence, including but not limited to survey evidence.[203]

---

[198] BD objects to this paragraph as incorrectly stating the effect of presumptions under FED. R. EVID. 301. The presumption merely switches the burden of presenting evidence on these issues to BD; it does not remove the issue from jury consideration altogether and it does not assist Retractable of the burden of persuasion if BD offers such evidence. *See* n.___, *supra*. Juries should not be told about "presumptions" or "assumptions," but should simply be instructed which party bears the burden of *producing* evidence and which party bears the burden of *persuasion*. Retractable suggests this language to inform the jury what it should do in the event it finds the statements to be misleading, as opposed to literally false.

[199] *Pizza Hut*, 227 F.3d at 497-98. BD objects to this sentence for the reasons stated previously. In addition, the instruction unnecessarily duplicates the list of elements listed earlier and it does not assist the jury. Finally, as to "capacity to deceive," BD objects because the Fifth Circuit holds that to recover damages, Retractable must prove "actual deception." *Pizza Hut*, 227 F.3d at 497. "Capacity to deceive" is relevant only to future injunctive relief, so this instruction lowers Retractable's burden of proof on its damage claims.

[200] The support for this statement comes from *Pizza Hut*, 227 F.3d at 497 ("Actual consumer confusion often is demonstrated through the use of direct evidence, e.g., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests."). In addition to the objections in the prior footnote, BD objects to this sentence because it does not instruct the jury what evidence is required, and the Court should not single out certain categories of proof for special comment. BD instead proposes the following sentence taken verbatim from *Pizza Hut*.

[201] BD proposes this sentence about proof of deception taken verbatim from *Pizza Hut*. 227 F.3d at 497.

[202] *Pizza Hut*, 227 F.3d at 495, 502.

[203] *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495, 502-03 (5th Cir. 2000). BD objects to this sentence for the reasons stated in the preceding footnotes.

Injury (element #5).

Retractable must prove Retractable either has been or is likely to be injured as a result of BD's statements.[204]

---

[204] *Pizza Hut*, 227 F.3d at 496-97; *Sw. Recreational Indus.*, 2002 WL 32783971, at *3 (holding that the plaintiff demonstrated sufficient evidence of injury where executives testified that they had personal knowledge that they lost between fifteen to thirty prospective accounts due to the false statements); *see also Bridal Expo., Inc. v. Van Florestein*, No. 4:08-cv-03777, at * 7 (S.D. Tex. Feb. 3, 2009).  Retractable has included this sentence as phrased because Retractable is seeking both damages and injunction.  BD objects to this sentence because it distorts Retractable's burden of proof.  The Fifth Circuit holds that to recover damages, a plaintiff must prove both "actual deception," *Pizza Hut*, 227 F.3d at 497, and actual damage, *IQ Prods. Co. v. Pennzoil Prod. Co*, 303 F.3d 368, 375-77 (5th Cir. 2002).  The statute permits an award of damages "sustained."  15 U.S.C. § 1117(a).  The likelihood of injury is relevant only to future injunctive relief, so this instruction impermissibly lowers Retractable's burden of proof on its damage claims.

Instruction No. 12 14

**CATEGORIES OF STATEMENTS AT ISSUE**

Retractable claims BD should be liable for false advertising for the following categories or types of statements made in BD's commercial advertising or promotion after July 2, 2004.

**Waste Space Claims.**  Retractable alleges BD engaged in false advertising by making a number of claims regarding waste space.  Those claims include:

**1. "Waste Space" Claims.**  Retractable alleges BD engaged in false advertising with regard to the following:  BD's claims regarding the waste space of Retractable's VanishPoint syringes; BD's claims that users could not get the full number of doses from a multi-dose vial using Retractable's VanishPoint syringes; and BD's claims regarding the degree of medication and cost savings, if any, that would result from any differences in waste space between BD's and Retractable's products.

**2. "Waste Space Establishment Claims."**  Retractable alleges BD engaged in false advertising with regard to BD's claims to have test results or other "data on file" that proved BD's waste space claims.

**Patient Comfort/Needle Sharpness Claims.**  Retractable alleges BD made false claims regarding patient comfort/needle sharpness.  Those allegations include:

**1. "World's Sharpest Needle Claims."**  Retractable alleges BD engaged in false advertising with regard to BD's claims that needles offered for use with its conventional, Safety-Lok, SafetyGlide, Eclipse and Integra hypodermic injection products were the world's sharpest needles and  more comfortable for patients.[205]

---

[205] BD objects to this category of claims because these statements are not verifiable statements of fact, but opinions or puffery that are not actionable as a matter of law.  *See Pizza Hut*, 227 F.3d at 496. Retractable responds that "World's Sharpest Needle" and the patient comfort/harm claims are not puffery because sharpness is a provable, objectively measurable quality, as is relative pain perception of products in blind testing, and tissue damage, and because BD claims in its ads to have "data on file" proving the

**2.   "World's Sharpest Needle Establishment Claims."**   Retractable alleges BD engaged in false advertising with regard to BD's claims to have test results or other "data on file" that proved BD's conventional, Safety-Lok, SafetyGlide, Eclipse and Integra hypodermic injection products had the world's sharpest needles and were more comfortable for patients.

**3.   "Patient Harm Claims."**   Retractable alleges BD engaged in false advertising and promotions by stating or implying in-patient activation of the safety feature on Retractable's VanishPoint syringe would harm, cause more pain to, or have a "negative impact" on the patient.

**Safety Claims.**   Retractable alleges BD engaged in false advertising by making false claims regarding product safety.  Those claims include:

**"BD Product Safety Claims."**   Retractable alleges BD engaged in false advertising with regard to BD's claims that its Safety-Lok, SafetyGlide, and Eclipse hypodermic syringes and/or needles were safe, safety or safety-engineered products in the sense they were effective in eliminating or minimizing to the lowest feasible extent occupational exposures to accidental needlestick injuries.

BD contends that its advertising about the products at issue was truthful.

claims. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 154 (2d Cir. 2007) (holding that "best picture" is not puffery where the commercials made clear that this meant specifically a 1080i-resolution picture); *Castrol, Inc. v. Pennzoil Co*., 987 F.2d 939, 945 (3d Cir. 1993) (holding that stating a motor oil provides "longer engine life and better engine protection" is not puffery); *X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F.Supp.2d 577, 628 (E.D. Va. 2001) (holding that referring to a product as "safe" is objectively verifiable and therefore not puffing); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 341-343 (D.N.J. 1999) (holding that "fastest in the world" is not puffery, particularly where defendant's ads claimed to have tests proving it).  Moreover, BD has proffered an expert who says that "World's Sharpest Needle" is an objectively verifiable claim and that his and BD's tests prove it.   Party expert statements are party admissions in the 5th Circuit.

BD contends that this advertising never deceived a substantial segment of potential customers.

BD contends that nothing materially deceptive was contained in any BD advertisement about the products at issue.

BD denies that Retractable was injured as a result of any BD advertising statement.

**STATE LAW CLAIMS**
Instruction No. No. 13 15
**PRODUCT DISPARAGEMENT**

Retractable also alleges BD disparaged its VanishPoint syringe to potential customers by making misrepresentations regarding the VanishPoint syringe's safety features and by maintaining a defective product on the market creating the false impression among consumers that similar products are unreliable.[206]

To prevail on its claims, Retractable must prove each of the following elements:

1. First, that BD published a disparaging false statement about Retractable's business;

2. Second, that when it published the statement, BD knew the statement was false, acted with reckless disregard as to whether the statement was false, or acted with ill will or intended to interfere with the economic interest of Retractable; and

3. Third, that the publication of the statement played a substantial part in inducing others not to do business with Retractable and resulted in a specific financial loss to Retractable.[207]

---

[206] BD objects to this second phrase because Retractable's "market tainting" theory involves neither a "false statement" nor a "publication" by BD, which are essential elements of a disparagement claim, so it is not viable as a matter of law. There is no authority for submission of such a theory, and the Court should not instruct on a legally futile theory. Retractable is "entitled to have the trial judge advise the jury of [its]theories and claims." *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1289 (5th Cir. 1974); *see also United States v. Gunter*, 876 F.2d 1113, 1119 (5th Cir.1989) (a party "is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to" the party's theory of its case.)

[207] TEX. PJC § 110.15 (2010 Ed.); *see also Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003); *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 624-25 (Tex. App.—Fort Worth 2007, pet. denied). The language to which BD objects is directly from TEX. PJC § 110.15. As for BD's objection to the "ill will" instruction, BD's advertisements do not involve any first amendment concerns. *See, e.g., U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.3d 914, 939 (3d Cir. 1990) (large corporation's advertising campaign was not a limited purpose public figure and was

Retractable has the burden to prove both the first element (falsity) and the second element (knowledge of falsity or reckless disregard for the truth) by clear and convincing evidence.[208]

Publication: A statement was "published" if it was intentionally communicated to a person other than Retractable who is capable of understanding its meaning.[209]

Disparaging Statement: A statement may be "false" when, taken as a whole, it creates a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way.[210]

commercial speech even though it touched on some matters of public concern); *see also Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68 (1983) ("advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech"). BD's cited cases both deal with magazine articles. BD objects to the blue language and proposes the yellow language to conform this instruction to previous instructions on required elements of causes of action and to the elements set forth in the PJC. BD also objects to the "ill will" standard because the speech in question is a matter of public concern subject to constitutional privileges, so it is subject to the constitutionally-required test of "actual malice." *See Forbes*, 124 S.W.3d at 170-71 (actual malice "is not ill will, spite, or evil motive"); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) (assuming that commercial speech in a product disparagement case is subject to the "actual malice" test); PJC 110.15 ("Standard of proof of defendant's fault") (acknowledging this issue).

[208] BD objects to the "preponderance of evidence" standard and submits that falsity and actual malice must be proved in this context by "clear and convincing" evidence. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (assuming without deciding that falsity may be decided by a preponderance of the evidence but noting the possibility that it must be proved by clear and convincing evidence for constitutional reasons); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003) ("Actual malice must be proved by clear and convincing evidence at trial."). Retractable objects to the clear and convincing standard. Falsity must be proved by the preponderance of the evidence, even where the heightened First Amendment standards apply. *See Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002) (in a lawsuit by a public official, "We have not required proof of falsity to be by more than a preponderance of the evidence, and neither has the United States Supreme Court.")). Further, the clear and convincing standard only applies to actual malice, which does not apply in this case.

[209] TEX. PJC § 110.15 (2010 Ed.).

[210] *Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 621 (Tex. App.—Houston [14th Dist.] 2001), *rev'd on other grounds*, 124 S.W.3d 167 (Tex. 2003). The instruction requested by Retractable technically relates to the legal test for "falsity" of a statement, not whether it is "disparaging," as the following notes demonstrate. This concept does not appear in the PJC, and if it is to be included in the jury instructions it must be balanced with a full and correct statement of the legal principles on this issue.

Such a statement is "false" only if it is more damaging to Retractable's product, in the mind of the average reader or listener, than a truthful statement would have been.[211]   A true statement which does not create a false impression by omitting material facts or suggestively juxtaposing them is not "false," regardless of the conclusions that people may draw from it.[212]

In determining whether a statement was "false" in accordance with these instructions, you should consider the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.[213]

Retractable must prove by clear and convincing evidence that BD made the challenged statement either with knowledge that it was false or with reckless disregard of whether it was true or not.   In this context, "reckless disregard" means that Retractable must prove BD

---

[211] In *Forbes*, the Texas Supreme Court specifically analogized business disparagement to defamation. "A business disparagement claim is similar in many respects to a defamation action.  The two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests."  *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (citations omitted).  Retractable's theory of "false and defamatory impression" arises from a line of defamation cases that "represent the converse of the substantial truth doctrine." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).  BD's proposed instruction is the classic statement of that rule:  "The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to Jacobs' reputation, in the mind of the average listener, than a truthful statement would have been." *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).  Retractable objects because the statement is out-of-context and misleading. It is from *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990) and relates specifically to the substantial truth of the whole broadcast or statement.  *Id.* at 16 ("The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to Jacobs' reputation, in the mind of the average listener, than a truthful statement would have been.").  The actual test looks solely at the "gist" of the broadcast or statement in comparison to the fact not all other possible truthful statements. *Id.*

[212] This language is based on *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 118 (Tex. 2000) ("a true account which does not create a false impression by omitting material facts or suggestively juxtaposing them is not actionable, regardless of the conclusions that people may draw from it").  Retractable objects to this language because it is unnecessary and confusing.

[213] *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) (alleged defamatory statement must be "construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it").

---

entertained serious doubts as to the truth of the statement or had a high degree of awareness of the probable falsity of the published information.[214]

For an omission to meet this standard, Retractable must prove that BD knew or strongly suspected that the omission could create a substantially false impression.[215]

In determining whether BD disparaged Retractable's product or business, you may consider the following statements or actions alleged by Retractable:[216]

1. BD allegedly claimed or implied[217] the waste space of the VanishPoint syringe was greater than the amount that actually exists;

---

[214] This BD submission is based on *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171-72 (Tex. 2003) ("Reckless disregard is a subjective standard, focusing on the defendant's state of mind. Mere negligence is not enough.  Rather, the plaintiff must establish 'that the defendant in fact entertained serious doubts as to the truth of his publication,' or had a 'high degree of awareness of ... [the] probable falsity' of the published information.  Constitutional malice generally consists of '[c]alculated falsehood.'  When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect.") (citations omitted); *see also Turner*, 38 S.W.3d at 120 (reckless disregard). Retractable objects because BD's ads do not involve any first amendment concerns.  *See  U.S. Healthcare*, 898 F.3d at 939; *Bolger*, 463 U.S. at 68.

[215] This BD submission is based on *Turner*: "For an omission to be evidence of actual malice, however, the plaintiff must prove that the publisher knew or strongly suspected that it could create a substantially false impression." *Turner v. KTRK Tele., Inc.*, 38 S.W.3d 103, 121 (Tex. 2000) (citation omitted). Retractable has the same objection as above.

[216] *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) (explaining that the plaintiff in a business disparagement claim must plead and prove the falsity of the statement at issue as part of his cause of action).  Retractable is "entitled to have the trial judge advise the jury of [its] theories and claims." *Reyes*, 498 F.2d at 1289; *see also Gunter*, 876 F.2d at 1119.   Further, the remainder of BD's objections to this section present the same legal arguments BD presented in its summary judgment, which was denied.  BD objects to this list of allegations for the reasons stated in footnote __.

[217] BD objects to the phrase "claimed or implied" because the disparagement cause of action requires false statements, not implications.  Retractable believes the language is correct.  A disparagement cause of action can be grounded on a false implication. *See  Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 621 (Tex. App.—Houston [14th Dist.] 2001), *rev'd on other grounds*, 124 S.W.3d 167 (Tex. 2003) (finding that business disparagement claim can be based on misleading impression from omission of material facts or juxtaposition of facts in a misleading way); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (allowing disparagement claims where "the publication's 'gist' is false and defamatory").  This would apply to all of BD's objections to the word "implied" in this group of instructions.

2. BD allegedly claimed or implied[218] the retraction of the safety feature in the VanishPoint syringe was harmful to patients;

3. BD allegedly represented its SafetyGlide and Eclipse syringes as having no negative impact on the patient because they did not retract until they are removed from a patient even though BD understood that safety was increased by reducing the needle exposure period after injection but before disposal;[219]

4. BD allegedly knowingly kept defective 1ml and 3ml Integra syringe designs on the market creating the false impression among customers that all retractable syringes, including the VanishPoint syringes, are unreliable;[220]

5. BD allegedly claimed or implied[221] the VanishPoint syringe may not deliver the full dose of medicine;

6. BD allegedly claimed[222] the VanishPoint could not get the full number of doses from a multi-dose vile; and

7. All other categories of statements set forth in the section on false advertising.[223]

---

[218] *Id.*

[219] BD objects to "advertised" because a disparagement cause of action requires false statements whereas this term suggests an impermissibly broader scope of the claim.  BD also because statements about BD's products are not statements "about Retractable's business," an essential element of the claim.

[220] Retractable's "market tainting" theory involves neither a "false statement" nor a "publication" by BD, so it is not viable as a matter of law.  There is no authority for submission of such a theory.

[221] BD objects to the phrase "claimed or implied" because the disparagement cause of action requires false statements, not implications.

[222] *Id.*

[223] RTI TAC ¶¶ 334-340.  BD objects because not all the claims of false advertising involve statements "about Retractable's business," an essential element of the claim.  Any statements about BD's business are not appropriate subjects of the business disparagement cause of action, as a matter of law.  Therefore, Retractable's instruction would improperly commingle theories that are not viable as a matter of law.

BD contends that all its statements about Retractable's business were truthful and did not disparage Retractable's business.

BD contends that it always intended to make truthful statements and never knowingly made any disparaging statement.

BD contends that no publication of a BD statement played any part in inducing anyone not to do business with Retractable, so that Retractable has not suffered a specific financial loss from any statement about Retractable by BD.

Instruction No. 14 16

## TORTIOUS INTERFERENCE WITH A PROSPECTIVE CONTRACT OR BUSINESS RELATIONS

Retractable also alleges BD tortiously interfered with Retractable's prospective contractual or business relationships with hospitals and healthcare centers by business disparagement and false advertising.

To establish its claim BD tortiously interfered with its prospective contractual relations, Retractable must show:[224]

1. First, a reasonable probability Retractable would have entered into a business relationship with another party;

2. Second, BD engaged in business disparagement or false advertising that prevented the relationship from occurring;

3. Third, BD acted with conscious desire to prevent the relationship from occurring or knew the interference was certain or reasonably certain to occur as a result of the conduct; and

4. Fourth, Retractable suffered actual harm or damages as a result of BD's interference.

---

[224] TEX. PJC § 106.2 (2010 Ed.); *see also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001); *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmnt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App.—Austin 2007, pet. denied); *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Instruction No. 15 17
## UNFAIR COMPETITION[225]

Retractable asserts the tort of unfair competition against BD.

You may find for Retractable on this claim if you find Retractable proved:

1.     BD engaged in an illegal act; and

2.     that illegal act interfered with Retractable's ability to conduct its business.

The "illegal" act need not violate a criminal law, but it must be contrary to honest practice in commercial matters. The requirement of an illegal act is met if you find BD liable for violating any antitrust law, violating the Lanham Act, committing product or business disparagement, or committing tortious interference with a prospective contract or business relation, as previously set forth.[226]

---

[225] BD objects to any separate verdict question or instruction on "unfair competition." As presented here, the concept is either duplicative of other causes of action (an attempt for a second bite at the same apples) or an attempt to assert an alternative theory that conflicts with the elements of those other causes of action (an easier bite at all the same apples). There is no authority for Retractable's approach in the Texas case law. The Texas Pattern Jury Charges do not include an "unfair competition" claim. Retractable's approach conflicts with the RESTATEMENT (THIRD) UNFAIR COMPETITION § 1 (a party cannot recover for competitive harm unless the defendant's conduct is made independently actionable by common law or statute). Therefore, BD cannot suggest an alternative instruction on this illusory claim, which should not be submitted as a matter of law. BD simply opposes these instructions based on the same reasons for which it unsuccessfully moved for summary judgment. This applies to all of BD's objections to this claim.

[226] *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (Unfair competition under Texas law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."); *see also Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 676 (S.D. Tex. 2010); *Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, No. 04-02-00188-CV, 2003 WL 21972724, at *2 (Tex. App.—San Antonio, Aug. 20, 2003, pet. denied) (setting forth many of the independent torts Texas recognizes in support of a claim for unfair competition, including tortious interference with prospective business relations and business disparagement). BD objects because the cited authorities demonstrate that the supposed "unfair competition" claim is simply an "umbrella" term for a category of causes of action, not an independent actionable tort, and Retractable's instruction makes it redundant of the specific theories. This redundant theory should not be submitted. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.3d 661, 665-66 (1999) ("While trial courts should obtain fact findings on all theories pleaded and supported by evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding.").

## C. **INJURY, CAUSATION, AND DAMAGES**

Instruction No. 16 18
### GENERALLY

I will now instruct you as to the role of injury, causation, and damages, which are common issues for all of Retractable's claims.  If Retractable has proven any of its claims against BD by a preponderance of the evidence, you must determine the damages to which Retractable is entitled.  You should not interpret the fact I am giving you instructions about Retractable's damages as an indication I believe Retractable should, or should not, win this case.  It is your task to first decide whether BD is liable.  I am instructing you on damages only so you will have guidance in the event you decide that BD is liable and Retractable is entitled to recover money from BD.[227]

Calculation of damages:  If you find BD is liable for any of Retractable's claims, then you must determine an amount that is fair compensation for all of Retractable's damages.  These damages are called compensatory damages.  The purpose of compensatory damages is to make the plaintiff whole—that is, to compensate a plaintiff for the damage that it has suffered.

You may award compensatory damages only for injuries Retractable proves were proximately caused by BD's alleged wrongful conduct.  The damages you award must be fair compensation for all of Retractable's damages, no more and no less.  You should not award compensatory damages for speculative injuries, but only for those injuries which Retractable has actually suffered.[228]

If you decide to award compensatory damages, you should be guided by dispassionate common sense.  Computing damages may be difficult, but you must not let that difficulty lead

---

[227] Fifth Circuit Pattern Jury Instructions – Civil No. 15.1 (Consideration of Damages) (2006).

[228] Fifth Circuit Pattern Jury Instructions – Civil No. 15.2 (Consideration of Damages) (2006).

you to engage in arbitrary guesswork.  On the other hand, the law does not require the plaintiff to prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts and circumstances in evidence where you find them appropriate.[229]

You are further instructed, in answering questions about damages, you must answer each question separately.  Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be.  Any recovery will be determined by the court when it applies the law to your answers in entering judgment.[230]

If you find for Retractable on any of its claims, Retractable is entitled to recover an amount that will fairly compensate it for any damages Retractable has suffered from July 2, 2004 to date.[231]

---

[229] Fifth Circuit Pattern Jury Instructions – Civil No. 15.2 (Consideration of Damages) (2006).

[230] *See, e.g., Kiva Kitchen & Bath v. Capital Distrib. Inc.*, 319 Fed. Appx. 316, 320 (5th Cir. 2009) (explaining that election of remedies may occur after the jury has rendered a verdict with full knowledge of the amount of both awards) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 347 n.5 (1998)); Tex. PJC § 115.34.

[231] Fifth Circuit Pattern Jury Instructions – Civil No. 15.3 (Consideration of Damages) (2006).

Instruction No. 17 19
**ANTITRUST DAMAGES**

If you find Retractable is entitled to a verdict because BD violated the federal antitrust laws, the law provides Retractable is to be fairly compensated for all damages, if any, to its business and property, that were proximately caused by BD's violation of the antitrust laws. In arriving at the amount of the award, you should include any damages Retractable suffered because of any profits it lost as a proximate result of the violation by BD of the antitrust laws.[232]

**LOST PROFITS**[233]

Retractable claims that it was harmed because it lost profits as a result of BD's alleged antitrust violation. If you find that BD committed an antitrust violation and that this violation caused antitrust injuries to Retractable, you may calculate the profits, if any, that Retractable lost as a result.

---

[232] Fifth Circuit Pattern Jury Instructions – Civil No. 6.1 (Sherman Act) (2006). BD objects to this instruction on antitrust damages because it does not reflect the fundamental principle that all antitrust recovery must be premised on antitrust injury. That requirement is correctly set forth in BD's instructions on loss causation and antitrust damages. The question is not whether Retractable's alleged damages were proximately caused by BD's conduct, but whether they were caused by the alleged harm to competition. BD's proposed instruction sets forth the appropriate instructions on antitrust damages. BD further objects that Retractable's proposed instruction fails to include a "legitimate means of measuring lost profits" as required by ABA Model F-27. Retractable is obligated to designate a "legitimate means of measuring lost profits," and until it does so BD cannot respond with appropriate objections and instructions. Retractable's proposed instruction is taken directly from the Fifth Circuit's pattern instruction. There is no need to overly complicate this language. BD's objection essentially requests the Court to restate the elements of an antitrust claim, which were already covered. By the time the jury considers antitrust damages, it will have already determined BD committed a violation of the antitrust laws. Part of that determination is whether there is an antitrust injury. BD's objection is without merit. This instruction directs the jury to determine the amount of damages resulting from BD's violation of the antitrust laws.

[233] BD proposes this instruction, which is based on the first paragraph of ABA Model F.8 – Damages for Competitors – Lost Profits. The Model calls for the plaintiff to specify a "legitimate means of measuring lost profit, as appropriate based on the evidence." Retractable's damage model does not fit any of the three legitimate measures recognized by the ABA Model, and Retractable's instructions include no "legitimate means of measuring lost profits." When Retractable specifies a measure of lost profits, BD will respond accordingly.

To calculate lost profits, you must calculate net profit: the amount by which Retractable's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.   You may calculate net profit by using the following measure: [*Insert*]

## CAUSATION AND DISAGGREGATION[234]

If you find that BD violated the antitrust laws and that Retractable was injured by that violation, Retractable is entitled to recover only for injuries that were the direct result of that violation.   Retractable may recover damages only for antitrust injuries, that is, injuries that resulted from a reduction in competition.   Retractable may not recover for injuries that resulted from other causes, including heightened competition, the competitive process, or acts that benefitted consumers.

Retractable claims that it suffered injury because it lost sales and profits as a result of BD's antitrust violation.   In the normal course of competitive business activity, competitors will lose sales to each other, and to third parties, for various causes that have nothing to do with antitrust law violations; and businesses can be unprofitable for causes that have nothing to do with the antitrust laws.   Retractable may not recover for lost sales if it lost those sales because of the superior business skills of a competitor, because a competitor offered a superior product, or because of lawful competition from BD or other competitors.   Retractable also may not recover

---

[234] BD proposes this section, which except for the noted modifications and appropriate party references, tracks ABA Model F.4 –Causation and Disaggregation – verbatim.   Retractable may only recover for antitrust injuries, and not merely for injuries that are causally related to a violation of the antitrust laws. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 478 (1977) (rejecting a rule that "divorces antitrust recovery from the purposes of the antitrust laws"); *id.*, at 488 n.13 (discussing cases "in which plaintiffs unsuccessfully sought damages for injuries unrelated to the reason the merger was prohibited"); *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (antitrust law requires a fact-finder to "measure damages resulting from the particular antitrust injury on which [the defendant's] liability . . . is premised").   Because RTI's damage instruction omits the antitrust injury element it is essential that this instruction be included.

if it lost profits as a result of causes that had nothing to do with BD's conduct, such as changes in demand, increased competition from new competitors, changes in product technology, changes in market conditions, poor management or missed opportunities by Retractable, Retractable's prices,[235] or other factors.

Retractable bears the burden of proving that its injuries were caused by the injury to competition from BD's alleged antitrust violation, as opposed to any other factors.  If you find that Retractable's injuries were caused in part by the injury to competition from BD's antitrust violation and in part by other factors, then you may award damages only for that portion of Retractable's injuries that were caused by the injury to competition from BD's antitrust violation. Retractable bears the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes.  If you find that there is no reasonable basis to apportion Retractable's injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

---

[235] BD's proposal referring to "Retractable's prices" is based on *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1419-20 (7th Cir. 1989) ("The antitrust laws simply are not in the business of protecting higher-pricing grocers from lower-pricing competition. Any injury-in-fact suffered by Indiana Grocery as a result of the defendants' lawful prices, therefore, is not antitrust injury."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition.  Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect.").

## GUESSWORK AND SPECULATION[236]

Damages may not be based on guesswork or speculation.  If you cannot base a damages calculation on evidence and reasonable inferences, and instead must determine damages through guesswork or speculation, then you may not award damages.  If the amount of damages attributable to an antitrust violation cannot be separated from the amount of damages caused by factors other than the antitrust violation except through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  It may be difficult for you to determine the precise amount of damage suffered by Retractable.  If Retractable establishes with reasonable probability the existence of an injury directly caused by BD's alleged antitrust violation, you are permitted to make a just and reasonable estimate of the damages.  So long as there is a reasonable basis in the evidence for a damages award, Retractable should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.  The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.  Retractable must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that Retractable has failed to carry its burden of providing a reasonable basis for determining damages, then your verdict must be for BD.  If you find that Retractable has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

---

[236] BD proposes this section, which except for the noted modifications and appropriate party references, tracks ABA Model F.3 – Speculation Not Permitted – verbatim.

Instruction No. 18 20

**FALSE ADVERTISING DAMAGES UNDER THE LANHAM ACT[237]**

Should you find BD committed false advertising that injured or is likely to injure Retractable, you should award Retractable damages for harm Retractable suffered as a result of the false advertising.  In determining these damages, you must decide how much financial harm Retractable has suffered and is reasonably likely to suffer due to BD's false advertising.[238]

Damages may take the form of: (1) Retractable's lost profits; (2) Retractable's cost to engage in remedial advertising; (3) BD's profits that resulted from the false advertising; and (4) Retractable's expenses and fees in pursuing this action.[239]  Lost profits damages may be in the form of profits Retractable lost based on sales diverted to BD or based on Retractable's sales made at prices reduced as a result of BD's false advertising.  Remedial advertising damages are

---

[237] BD objects to this instruction in its entirety because the only evidence of damages Retractable has presented in support of its Lanham Act claim concerns disgorgement of BD's profits.  Disgorgement of BD's profits is an equitable remedy for the court, not the jury, and Retractable has taken the position before the magistrate that "it will not offer evidence of disgorgement."  Doc. 488, p.7.  Therefore, there is no basis for instructions to the jury regarding remedies associated with the Lanham Act.  If the issue of disgorgement is presented to the jury, BD will submit proper instructions on the elements of proof necessary to justify a disgorgement award.

[238] BD objects to this sentence because there is no authority for awarding damages based on future injury.  The Lanham Act, 15 U.S.C. § 1117(a) permits the recovery of "damages sustained by the plaintiff," which limits recovery to damages "sustained" in the past, not speculative future damages.

[239] BD objects to this sentence on several grounds.  First, disgorgement of BD's profits is an equitable remedy for the court, not the jury, and Retractable has taken the position with the magistrate that "it will not offer evidence of disgorgement."  Doc. 488, p.7.  Thus, the third element of damages should be omitted.  Second, while there is authority for disgorgement of profits, remedial advertising costs, or actual damages suffered by the plaintiff as alternative measures damages in appropriate cases, the "one satisfaction" rule bars recovery under two or more theories with respect to the same sales.  *See Century Distilling Co. v. Continental Distilling Corp.*, 205 F.2d 140 (3rd Cir. 1953).  Third, if Retractable intends to rely on any of these measures of recovery, there should be instructions explaining how to calculate damages under each respective measure.  Finally, attorney's fees and costs is a matter for the court under 15 U.S.C. § 1117(a), not a jury question.  *See Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Dist. Co.*, 520 F.3d 393, 401-02 (5th Cir. 2008).  There is no constitutional right to jury trial regarding attorneys' fees.  *RTC v. Marshall*, 939 F.2d 274, 279 (5th Cir. 1991).

how much it has cost or will cost Retractable to conduct advertising and promotion in a manner that will correct the harm that was done by BD's false advertising.[240]

Should you find in accordance with my previous instructions that false advertising by BD injured Retractable, you should determine the amount of damages that Retractable sustained as a proximate result of customers failing to buy products from Retractable that the customers would otherwise have purchased from Retractable in the absence of the BD advertising you have found to be false.  In determining this amount, you should follow my general instructions on damages and on lost profits damages.  As damages, you may also award Retractable's past expenditure on advertising reasonably designed to counteract any false BD advertising explicitly referring to Retractable or its products.[241]

---

[240] *See* Tex. PJC § 115.34, *Brown v. Petrolite Corp.,* 965 F.2d 38, 46 (5th Cir. 1992), *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 767 (Tex. 1987), *see also Szcezpanikv v. FirstS. TrustCo.,* 883 S.W.2d 648, 649 (Tex. 1994). BD notes that the authorities cited in support of these damage instructions relate to the Texas law claim of business disparagement, not the Lanham Act.  BD specifically objects to the last sentence because the Lanham Act, 15 U.S.C. § 1117(a), permits the recovery of "damages sustained by the plaintiff," which limits recovery to damages "sustained" in the past, not speculative future damages.

[241] BD proposal based on the decision in *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 376 (5th Cir. 2002) (summary judgment upheld because IQ "presented no competent summary judgment evidence that indicates that consumers would have bought IQ's tire inflator products instead of Fix-A-Flat in the absence of defendants' allegedly false and misleading statements").  BD submits this instruction as a protective matter but adheres to its position that RTI has no evidence of damages for a jury to award.

Instruction No. 19 21
## PRODUCT DISPARAGEMENT DAMAGES

If you find Retractable has proven BD committed product disparagement and Retractable was injured as a result of such conduct, you may award Retractable the damages it proves it suffered as a result of BD's disparaging remarks.  Damages may take the form of Retractable's lost profits and Retractable's cost to engage in remedial advertising.[242]

Lost profits include the amount of profits lost as a result of BD's conduct, but this does not mean Retractable must set forth a precise calculation for these damages, but just that they be shown with reasonable certainty.  Remedial advertising damages are how much it has cost or will cost Retractable to conduct advertising and promotion in a manner that will correct the harm that was done by BD's false advertising.[243]

"Specific financial loss" means a loss that has been realized or liquidated, as in the case of specific lost sales or lost contracts.[244]  Lost profits not tied to the loss of a specific contract or specific sales do not count as business disparagement damages.[245]

---

[242] *See* TEX. PJC § 15.34; *Brown v. Pertolite Corp.*, 965 F.2d 38, 46 (5th Cir. 1992); *Hurlbut v. Gulf Att. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987); *see also Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). Special damages can come in the form of lost profits and realized losses.  *Hurlbut*, 749 S.W.2d at 767 (defining special damages for business disparagement as "pecuniary loss that has been realized or liquidated as in the case of specific lost sales").   BD objects to this paragraph because it violates the "special damage" rule for business disparagement.  *Hurlbut*, 749 S.W.2d at 767 (upholding take nothing judgment in business disparagement litigation because there was no evidence of special damage).  *Brown v. Petrolite* is a defamation case that did not involve this element.  *Szczepanik* is not a business disparagement case, and there, the Supreme Court reinstated a directed verdict on damages because the plaintiff did not offer proper proof of lost profits.

[243] BD objects to this paragraph because it is contrary to the "special damage" requirement in a business disparagement case.  *Hurlbut*, 749 S.W.2d at 767.  This element is set forth correctly in BD's instructions, but Retractable's instruction does not limit the jury's consideration to specific contracts and sales that Retractable lost because of the disparagement.  BD has moved for summary judgment and is entitled to judgment as a matter of law on the business disparagement claim because Retractable has no evidence of special financial loss.  *See* Doc. 378, 170.

[244] BD proposal based on *Hurlbut*, 749 S.W.2d at 767.  BD has moved for summary judgment and is entitled to judgment as a matter of law on the business disparagement claim because Retractable has

Similarly, it is not enough for Retractable to show a general business decline.  Retractable must specifically identify purchasers, clients, or customers that it lost and the business transactions, such as sales or orders, that it lost.[246]

offered no evidence of special financial loss.  *See* Doc. 378, 170.  Retractable must specify a valid measure of damages in order to recover, and for this tort, the only permissible measure of damages is a "specific financial lost" from specific lost sales or lost contracts.  Retractable objects because the jury has already been instructed that Retractable must show a specific financial loss in the elements section.  This and the following two instructions simply give examples of what is not a specific financial loss.

[245] *Id*.  Retractable has the same objection as above

[246] BD proposal based on *WorldPak Int'l, LLC v. Diablo Valley Packaging, Inc.*, No. 4:08-CV-00469, 2010 U.S. Dist. LEXIS 95689 at *30-32 (E.D. Tex. August 26, 2010); *Astoria Indus. of Iowa*, 223 S.W.3d at 628 (no special damages where the president could not recall the identity of any customer that refused to buy product because of disparagement; cost of corrective advertisement was not special damage).  Retractable has same objection as above.

Instruction No. 20 22
## TORTIOUS INTERFERENCE WITH A PROSPECTIVE CONTRACT
## OR BUSINESS RELATIONS DAMAGES

If you find BD tortiously interfered with Retractable's prospective contracts or business relations, you may award Retractable the damages it proves it suffered as a foreseeable result of BD's interference.[247]

In this case, Retractable seeks damages for its lost profits and amounts spent on remedial advertisement.[248] In evaluating Retractable's damages for tortious interference, you may consider damages for the pecuniary loss of benefits of the contract or prospective business relation and any consequential losses that were also caused by the interference.[249] Again, Retractable does not need to prove an exact calculation for such damages, but Retractable must prove any such damages were a foreseeable result of BD's conduct.[250]

---

[247] BD objects to this sentence because it does not reflect the requirement of the Texas Supreme Court that "plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). In context, this element requires a preponderance of the evidence that independently tortious conduct of BD caused Retractable to lose a reasonably likely prospective business relationship.

[248] BD objects to the blue language because the cost of corrective advertising is not a proper measure of tortious interference damages. Furthermore, this attempt by Retractable to recover damages related to alleged false advertising demonstrates that the claim is redundant of other recognized claims and there is no "independently tortious or unlawful" conduct that will support such a claim.

[249] BD objects to this sentence because any instruction on damages should reflect the Supreme Court's decision in *Sturges*. Retractable states this cause of action allows for Retractable to recover actual damages including lost profits. *Barbarawi v. Ahmad*, No. 14-07-00790-CV, 2008 WL 2261433, at *5 (Tex. App.—Houston [14th Dist.] May 27, 2008, no pet.) (upholding award for tortious interference with prospective contract claim for lost profits in the amount of $33,000). *Sturges* does not contain a substantive discussion on damages.

[250] BD objects to this sentence because it misleadingly states what Retractable does not have to prove and in stating what Retractable does have to prove, it omits the requirements set forth by the Supreme Court's decision in *Sturges*.

Instruction No. 21
## UNFAIR COMPETITION DAMAGES[251]

If you find Retractable has proven its cause of action for unfair competition, then Retractable is entitled to damages.[252]

The appropriate measure of damages in an action for unfair competition is lost profits. Therefore, you may award Retractable the amount of lost profits it proves with reasonable certainty were caused by BD's unfair competition.[253]

---

[251] BD objects to any verdict question or instruction on unfair competition, because it is not a separate cause of action.  *See* p._, *supra*.

[252] BD objects to this sentence because no plaintiff is "entitled to damages" under even a valid cause of action absent proper proof.  *See Logan*, 253 F.3d at 463-65.

[253] *See Assoc. Tel. Dir. Publ., Inc. v. Five D's Publ'g Co.*, 849 S.W.2d 894, 898 (Tex. App. – Austin 1993, no writ) (recognizing unfair competition as a cause of action and that "[t]he measure of damages in an action for unfair competition is lost profits").  BD submits that Retractable's citation establishes that its "unfair competition" claim is not actionable.  The *Five D's* case asserted a cause of action for trade name infringement, and its comment on recoverable damages relied on trade name infringement authority.  The court also used the phrase "unfair competition," but its decision was not a decision on any unfair competition cause of action separate from the trade name infringement claim, just as Retractable has no generic unfair competition claim separate from its product disparagement claim.

Instruction No. ____
## MULTIPLE CLAIMS[254]

You must not award compensatory damages more than once for the same injury. If Retractable prevails on more than one claim, and establishes a dollar amount for its injuries, you must not award additional compensatory damages on each claim. Retractable is only entitled to be compensated for its losses once, and may not recover more than it has lost. Of course, if different injuries are attributed to the separate claims, then you must compensate Retractable fully for all of its injuries.


Instruction No. ____
## MITIGATION

Retractable may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. Retractable is not entitled to increase any damages through inaction. The law requires an injured party to take the commercially reasonable steps it can to avoid further injury and thereby reduce its loss. If Retractable failed to take reasonable steps available to it, and the failure to take those steps results in greater harm to Retractable than it would have suffered had it taken those steps, then Retractable may not recover any damages for that part of the injury it could have avoided.

BD has the burden of proof on this issue. BD must prove by a preponderance of the evidence that Retractable acted unreasonably in failing to take specific steps to minimize or limit its losses, that the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps, and the amount by which Retractable's loss would have been reduced had Retractable taken those steps.

---

[254]BD proposes this section, which except for the noted modifications and appropriate party references, tracks FIFTH CIRCUIT PATTERN 15.14.

In determining whether Retractable failed to take reasonable measures to limit its damages, you must remember that the law does not require Retractable to have taken every conceivable step that might have reduced its damages.  The evidence must show that Retractable failed to take commercially reasonable measures that were open to it.  Commercially reasonable measures mean those measures that a prudent businessperson in Retractable's position would likely have adopted, given the circumstances as they appeared at that time. Retractable should be given a wide latitude in deciding how to handle the situation, so long as what Retractable did was not unreasonable in light of the existing circumstances.

## D.  CLOSING INSTRUCTIONS

Instruction No. 22 23
### INSTRUCTIONS FOR DELIBERATIONS[255]

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges - judges of the facts. Your only interest is to seek the truth from the evidence in the case. You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  A corporation is entitled to the same fair trial as a private individual. All persons, including corporations, and other organizations stand equal before the law and are to be treated as equals.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you regarding your conduct during the trial. The verdict

---

[255]  Most of this final section follows verbatim the final section 7 in the *Fractus* charge.

must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous. After you have reached your unanimous verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Your verdict will be in the form of Questions for you to answer.  You will take these Questions to the jury room, and when you have reached a unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form and then advise the Court Security Officer you have reached a verdict.  During your deliberations you may have any of the exhibits that have been offered into evidence, and the Court will send them to you upon written request.

If you want to communicate with me at any time, please give a written message or question to the court security officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question. After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.

Dated: August 27, 2013                    Respectfully submitted,

                                          /s/ Roy W. Hardin
                                          Roy W. Hardin
                                          Texas Bar No. 08968300
                                          George E. Bowles
                                          Texas Bar No. 02743300
                                          Stephen D. Wilson
                                          Texas Bar No. 24003187
                                          Paul F. Schuster
                                          Texas Bar No. 00784931
                                          Mark R. Backofen
                                          Texas Bar No. 24031838
                                          Jeffrey B. Mead
                                          Texas Bar No. 24057997
                                          Susan E. Adams
                                          Texas Bar No. 24059354
                                          Ethan M. Lange
                                          Texas Bar No. 24064150
                                          Ellen Peeples
                                          Texas Bar No. 24066797
                                          LOCKE LORD, LLP
                                          2200 Ross Avenue, Suite 2200
                                          Dallas, Texas 75201-6776
                                          Telephone: (214) 740-8000
                                          Facsimile: (214) 740-8800
                                          E-mail: rhardin@lockelord.com

                                          Otis Carroll
                                          State Bar No. 03895700
                                          Deborah Race
                                          State Bar No. 16448700
                                          IRELAND, CARROLL & KELLEY, PC
                                          6101 S. Broadway, Suite 500
                                          Tyler, Texas 75703
                                          Telephone: (903) 561-1600
                                          Facsimile: (903) 581-1071
                                          Email: ncrim@icklaw.com

                                          G. William Lavender
                                          State Bar No. 11999590
                                          Lavender Law
                                          210 N. State Line Ave., Suite 503
                                          Texarkana, Arkansas 71854

Telephone: (870) 773-3187
Facsimile: (870) 773-3181
E-mail: blav@lavenderlaw.com

Jim Parsons
State Bar No. 00000065
Jim Parsons Law Offices
1007 N. Mallard St.
Palestine, Texas 75801
Telephone: (903) 723-0580
Facsimile: (903) 723-0580
E-mail: jparsons@jimparsons-law.com

Monty L. Ross
Texas Bar No. 17297300
Ross Barnes LLP
801 E. Campbell Road, Suite 390
Richardson, Texas 75081
Telephone: 214.420.2300
Facsimile: 214.420.2299
Email: mross@rossbarneslaw.com

ATTORNEYS FOR PLAINTIFFS
RETRACTABLE TECHNOLOGIES, INC.
AND THOMAS J. SHAW

Date: August 27, 2013

W. David Carter, Lead Attorney
State Bar No. 03932780
MERCY, CARTER, TIDWELL, L.L.P.
1724 Galleria Oaks Drive
Texarkana, TX 75503
Telephone: (903) 794-9419
Facsimile: (903) 794-1268
Email: wdcarter@texarkanalawyers.com

Of Counsel:

Sam F. Baxter
State Bar No. 01938000
McKool Smith, P.C.
104 E. Houston Street, Suite 300
P.O. Box 0
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099
Email: sbaxter@mckoolsmith.com

Robert Atkins
Jacqueline Rubin
PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757 -3990

Russell S. Post
State Bar No. 00797258
BECK REDDEN, L.L.P.
1221 McKinney, Suite 4500
Houston, TX 77010-2010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720

Respectfully submitted,

By: /s/ Alistair B. Dawson
Alistair B. Dawson
State Bar No. 05596100
BECK REDDEN, L.L.P.
1221 McKinney, Suite 4500
Houston, TX 77010-2010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720

***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on August 27, 2013, that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ Roy W. Hardin