**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC., and THOMAS J. SHAW | § § § | |
| Plaintiff, | § § | |
| VS. | § § | Civil Action No. 2:08-CV-16 |
| BECTON DICKINSON AND COMPANY, INC. | § § § | Chief Judge Leonard Davis |
| Defendant. | § § § § § | Jury Trial |

**DEFENDANT BECTON DICKINSON AND COMPANY'S**
**MOTION FOR JUDGMENT AS A MATTER OF LAW ON**
<u>**RETRACTABLE'S ANTITRUST DAMAGE CLAIMS**</u>

# INTRODUCTION

Because the antitrust damage case presented by Plaintiffs Retractable Technologies, Inc. and Thomas Shaw ("Retractable") is flawed, Defendant Becton Dickinson and Company, Inc. ("BD") respectfully moves for judgment as a matter of law on the antitrust damages.

Most importantly, Retractable's damage case does not measure damages based on an "antitrust injury." The principle of "antitrust injury" implements the text of Clayton Act § 4, which entitles private plaintiffs to sue for antitrust violations and provides treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. . ..." 15 U.S.C. § 15(a). Under this language, for a "plaintiff to recover treble damages on account of" antitrust violations, it "***must prove more than injury causally linked to***" an antitrust violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *accord Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). The plaintiff "must prove *antitrust injury*," which "should reflect the anticompetitive effect either of the violation or the anticompetitive acts made possible by the violation." *Brunswick Corp.*, 429 U.S. at 489 (emphasis in original); *accord Norris*, 500 F.3d at 465.

The Supreme Court recently reaffirmed this holding: To be valid, an antitrust damages model must "***measure damages from the particular antitrust injury on which***" antitrust liability "is premised." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (emphasis added). Otherwise, the case fails. If the "entire proof of damages" is a loss merely causally linked to the pertinent antitrust violation, a defendant is entitled under Rule 50 to judgment as a matter of law "on the damages claim." *Brunswick*, 477 U.S. at 490. Because the "but for" damage model presented by Retractable at trial does not prove anything more than injury causally linked to the alleged antitrust violations, BD is entitled to JMOL on Retractable's damages claim.

Even beyond the antitrust injury principle, the Retractable trial evidence of damages is not substantial evidence to support a damage award.

## JMOL STANDARD

As this Court has acknowledged:

> Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). . . . [A] jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." [*Hiltgen v. Sumrall*, 47 F.3d 695,] 700 [(5th Cir. 1995)]. The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).
>
> The Court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods*, 530 U.S. 133, 150-51 (2000). The moving party is entitled to judgment as a matter of law, "only if the evidence points so strongly and so overwhelmingly in favor the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005.

*Fractus, S.A. v. Samsung Electronics Co.*, 876 F Supp.2d 802 (E.D. Tex. 2012).

Because Retractable's damage case depends heavily on expert testimony, an admonition of the Supreme Court about Rule 50 analysis is critical in this case: "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, . . ., it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).[1]

Because in the eyes of the law Retractable adduced no facts to establish *antitrust* injury, and has no substantial evidence of antitrust damages in any event, Retractable's expert testimony cannot support a damage verdict on any of the antitrust claims in this case.

---

[1] In any event, for the reasons set forth in BD's objections to Judge Payne's orders regarding Retractable's experts, Retractable's expert testimony should have been excluded and thus provides no substantial evidence. *See Weisgram v. Marley Co.*, 528 U.S. 444 (2000); *Brooke Group*, 509 U.S. at 242-43.

## "ANTITRUST INJURY"

On repeated occasions, the Supreme Court has rejected antitrust liability as a matter of law because the plaintiff failed to elicit evidence of "antitrust injury." *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 346 (1990); *Cargill, Inc. v. Montfort of Colo., Inc.*, 479 U.S. 104, 122 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489-90 (1977). In the last decade, the Fifth Circuit has similarly upheld dismissal of antitrust lawsuits for failure to allege an actionable antitrust injury. *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 419 (5th Cir. 2010); *Norris*, 500 F.3d at 469. And in a case involving analogous agreements between a supplier and its customers, the Sixth Circuit dismissed for failure to allege a viable antitrust injury. *NicSand, Inc. v. 3M Co.*, 506 F.3d 442, 451 (6th Cir. 2007) (en banc).

It is important, therefore, to understand precisely what damage evidence is required by the antitrust injury principle.

The seminal decision is *Brunswick*. A jury had found that Brunswick's acquisition of near bankrupt bowling centers violated Clayton Act § 7 (prohibiting anticompetitive mergers). 429 U.S. at 479-81. The jury awarded damages to the plaintiffs – competing bowling centers – in a sum "which represented the minimum estimate . . . of the additional income [the plaintiffs] would have realized had the acquired centers been closed." *Id.* at 481. In the Supreme Court, Brunswick questioned "only whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying [the plaintiffs] an anticipated increase in market share." *Id.* at 484. The Court focused on the express language of Clayton Act § 4, which grants "damages to '[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws,'" *id.* at 485, 15 U.S.C. § 15(a), and concluded that the damages claimed by the plaintiff were "damages for losses which are of no concern to the antitrust laws." *Id.* at 487.

3

Pointing out that the damages plaintiffs obtained were "designed to provide them with the profits they would have realized had competition been reduced," *id.*, the Court held that the "antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*. *Id.* (emphasis in original and quoted citation omitted). "It is inimical to the purposes of" the antitrust laws "to award damages for the type of injury claimed here." *Id.* It was "quite clear" that the plaintiffs had not been injured "by reason of anything forbidden in the antitrust laws." *Id.*

In conclusion, the Court held that plaintiffs "must prove more than an injury causally linked to an illegal presence in the market." *Id.* at 489. They also "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* Antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* When a plaintiff fails to prove such an injury, the defendant is "entitled [under] Rule 50(a) to judgment on the damages claim notwithstanding the verdict." *Id.* at 490.

In *Cargill*, the Court reemphasized that "*Brunswick* holds that **the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition**, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill*, 479 U.S. at 116 (emphasis added). A party's "competition for increased market share" through lowered prices "is not activity forbidden by the antitrust laws." *Id.* To the contrary, it "is vigorous competition." *Id.* "**To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result** . . . ." *Id.* (emphasis added). Because the record did "not support a finding of antitrust injury," the Supreme Court entered judgment for the defendant. *Id.* at 122.

4

In *Atlantic Richfield*, the Court reiterated this requirement yet again, pointing out that *Cargill* "reaffirmed that injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield*, 495 U.S. at 334. The Court emphatically held that antitrust law does not provide a remedy for losses caused by low prices unless those prices were predatory, i.e., below a proper measure of cost: "When a firm . . . lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed" antitrust "violation." *Id.* at 337. "A firm complaining about the harm it suffers from nonpredatory price competition "'is really claiming that it [is] unable to raise prices.'" *Id.* at 337-38 (quoted citation omitted). "This is not *antitrust* injury; indeed, 'cutting prices in order to increase business often is the very essence of competition.'" *Id.* at 338 (emphasis in original; citation omitted). Antitrust injury does not arise "until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct, . . . in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect." *Id.* at 339. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Id.* at 340. "We have adhered to this principle regardless of the type of antitrust claim involved." *Id.*

With these core principles in mind, *NicSand, Inc. v. 3M Co.*, 506 F.3d 442 (6th Cir. 2007) (en banc) provides a roadmap to decision. The facts in *NicSand* are strikingly similar to the facts adduced in this trial. NicSand and 3M competed as nationwide suppliers of certain products and they distributed their products largely through six large retailers. 3M significantly raised its market share at NicSand's expense. NicSand sued for monopolization under Sherman Act § 2,

5

challenging three aspects of 3M agreements with the large retailers: (1) large upfront discounts; (2) multiyear agreements; and (3) exclusivity provisions.  507 F.3d at 451.

With respect to the discounts, Nicsand conceded "that 3M did not engage in any form of predatory pricing."  *Id.* at 452.  The Sixth Circuit held that "[g]iven this concession, and given the realities of the market, 3M's payments do not show antitrust injury."  *Id.*  Most importantly, the up-front payments constituted discounts and thus price competition that cannot cause antitrust injury.  *Id.*  "That 3M offered greater discounts, though still non-predatory discounts, to win the retailers' business does not offend the antitrust laws, much less undermine the competitive environment those laws were designed to foster."  *Id.* at 452-53.

"Just as 3M's advances amounted to legitimate competition, so did its decision to enter into multi-year agreements."  *Id.* at 453.  "From the perspective of a retailer, multi-year agreements permit the retailer to insist that the supplier charge lower prices."  *Id.*  From the perspective of the supplier, the multi-year agreement allowed it to recoup the up-front payments.  *Id.*  NicSand "could have competed for the exact same multi-year agreements with its customers."  *Id.*  NicSand noted that it would have suffered a reduction in its profit margin had it so competed, but could not explain how that reduction in its profit margin could be "a concern of the antitrust laws."  *Id.*  NicSand was therefore "unable to show that it suffered an antitrust injury from 3M's offer to extend the agreements" for a few years."  *Id.* at 454.

The Sixth Circuit further held that the exclusivity provisions of the 3M agreements had not caused any antitrust injury.  "While exclusive agreements in some instances may create impermissible barriers to entry and may permit a supplier to charge monopoly prices, NicSand has not claimed – and cannot tenably claim – that it suffered these anticompetitive effects."  *Id.* (citation omitted).  "While NicSand's loss of business may have propelled 3M into a dominant

…

market position, its injury does not correspond to any allegedly anticompetitive effect on the market but rather a truly competitive one." *Id.* at 455.

In summary, the Sixth Circuit affirmed dismissal of the NicSand complaint for failure to allege facts that would establish "cognizable antitrust injury." *Id.* at 451.

## THERE IS NO EVIDENCE OF DAMAGES RESULTING FROM ANTITRUST INJURY

Retractable's damage evidence was presented by Professor Maness. In every instance, Dr. Maness measured what he himself labeled "but for" damages. If not for the challenged BD tier pricing contracts, Retractable would have made higher profits in all three relevant markets. If not for the challenged false or deceptive advertising, Retractable would have made higher profits in the relevant safety syringe and conventional syringe markets.

This evidence is insufficient on its face. In order to recover damages under *Brunswick* and its progeny, and as the Fifth Circuit has recently reaffirmed, Retractable was required to "prove more than injury causally linked to" alleged antitrust violations. Because Retractable did not do so, BD is entitled to JMOL on Retractable's entire remaining damage claims. There is no substantial evidence of "antitrust injury," and thus BD is entitled to judgment as a matter of law.

## THERE IS NO SUBSTANTIAL EVIDENCE OF DAMAGES IN ANY EVENT

Moreover, Dr. Maness's damage models are flawed and no evidence of damages.

**Safety Syringe Market**

With respect to the safety syringe market, Professor Elhauge testified (and Dr. Maness agreed) that Retractable's measure of damages included profits lost because of "selection bias," the preference of some customers for one competitor's product over another's product. Moreover, Dr. Maness's use of Professor Elhauge's chart without reference to Professor Elhauge's regression analyses, which purported to account for other factors, compounded this error.

7

This "selection bias" also creates a fatal flaw in Dr. Maness's "yardstick" damage model. Dr. Maness used one group of customers as a "yardstick" for another group of customers. "An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden demonstrate the reasonable similarity of the business whose earning experience he would borrow." *Eleven Line, Inc. v. North Tex. State Soccer Ass'n*, 213 F.3d 298, 208 (5th Cir. 2000). Retractable did not meet this burden with respect to this comparison of customers. The customer choice introduced "selection bias," establishing a dispositive dissimilarity. Another dissimilarity is the pricing differences between the two groups of customers.

With respect to the so-called "penalty" or "loyalty" provisions of the BD contracts that Professor Elhauge did challenge, the uncontested trial evidence is that those provisions were never actually enforced to prevent customers from switching purchases to a BD competitor. There is no evidence to the contrary—certainly none to support RTI's damage model.

Thus, Dr. Maness did not even accurately measure damages in the safety syringe market that were causally linked to the alleged antitrust violation. Under the Fifth Circuit's decision in *Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 484-85 (5th Cir. 2000), this was a dispositive failure of proof.

Apart from the antitrust injury principle, a court should grant judgment as a matter of law "where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries." *Id.* at 485 (quoted citation omitted). "This showing, of course, may not be based on speculation. Rather the required causal link must be proved as a matter of fact and with a fair degree of certainty." *Id.* When other causal factors are involved, the plaintiff must "establish a tighter connection between the behavior and the damages." *Id.* Absent sufficient evidence that an antitrust violation "materially contributed" to the losses on which the damage award is premised, the plaintiff's antitrust "claim[s] fail[] as a matter of law."

8

*Id.* Because Dr. Maness did not rely on the results of Professor Elhauge's regression analyses, the causal link he assumed was not supported by either Professor Elhauge's testimony or any other evidence.

Because Retractable's trial evidence about the safety syringe market did not prove any link between the amount of damages calculated by Dr. Maness and the alleged antitrust violation as a matter of fact; there is simply no evidence. For sure, that evidence did not prove any such link with any fair degree of certainty. There is no substantial evidence of "contract antitrust" damages suffered by Retractable in the safety syringe market. Therefore, as in *Taylor Publishing*, this Court should grant JMOL on this issue.

**Conventional Syringe and Safety Catheter Markets: the Yardstick Problem**

The trial record contains no evidence proving either as a matter of fact or with a fair degree of certainty that any challenged contract in the relevant conventional and catheter markets materially caused any damage to Retractable, much less that it caused Retractable to suffer damages in the amount calculated by Dr. Maness. For this reason alone, BD is entitled to JMOL on the damage claims for the conventional and catheter markets under *Taylor Publishing*.

Moreover, for the conventional and catheter markets, Dr. Maness did not present or purport to rely on any such evidence in any event. Instead, he used Professor Elhauge's analysis of the safety syringe market and his own calculation of damages in the safety syringe market as a supposed "yardstick" for calculating damages in the conventional and catheter markets. As a matter of law, this is not a valid damage calculation in these markets.

As noted above, "[a]n antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow." *Eleven Line*, 213 F.3d at 208. Dr. Maness did not point to any such evidence of similarity between the safety syringe market on the one hand and the

9

conventional syringe and safety catheter markets on the other, no doubt because the trial evidence conclusively disproves any such similarity.

In the safety syringe market, Retractable's retractable products use patented technology. It is Retractable's position that its retractable technology is better than the other non-retractable safety syringe technology. It is uncontested that Retractable has had a significant presence in the market for years. It is also uncontested that the Retractable syringe is priced less than BD's comparable retractable syringe. For these reasons unique to the safety syringe market, Retractable enjoys a majority of the retractable segment of the market.

In stark contrast, Retractable has had minimal success in either the conventional or catheter markets. For this reason, Professor Elhauge was not able to quantify any impact of the challenged contracts on either market.

Retractable only claims that its catheter is equivalent in quality to one of BD's five catheter products. And it is BD that is offering new, innovative technology in its more recent product offerings. Retractable has only recently entered the catheter market.

In the conventional market, Retractable claims a marginal improvement in product safety. But it has never had a technical advantage over BD, especially not in the hospital market. And Retractable has charged prices for its conventional syringe significantly higher than the prices charged by BD for arguably "equivalent" products.

In these circumstances overwhelmingly established by the trial evidence, Dr. Maness' use of the safety syringe market as a yardstick for calculating damages in the dissimilar conventional and catheter markets was improper as a matter of law. "Damage assumptions that find no support in the actual facts of the case cannot support a verdict." *Eleven Line*, 213 F.3d at 209. There is no substantial evidence that any BD contract materially caused any "contract antitrust" damage to Retractable in the relevant conventional and catheter markets.

**False and Deceptive Advertising "Damages"**

Dr. Maness' calculation of "deception antitrust" damages also suffers from fatal flaws. Dr. Maness merely assumed, without any supporting facts, that the entire scope of Retractable's lost profits, beyond the lost profits he calculated as "contract antitrust" damages, were "deception antitrust" damages. He had to readily concede, of course, that he could not confirm that all these lost profits were attributable to BD false or deceptive advertising. Yet he made no effort to exclude alternative causes – which under the trial evidence include BD's low prices, truthful advertising, longstanding reputation, high-quality products, longstanding nurse confidence in and familiarity with use of BD products, the higher sharpness of the needle in the BD conventional syringe, superior service, and overall "selection bias."

Furthermore, the trial evidence conclusively defeats the Maness assumption. The most significant portion of Retractable's deceptive advertising evidence related to the waste space in Retractable's syringe as compared to the waste space in BD's retractable Integra syringe. That advertising comparing two products could not have had an impact on the ability of BD to sell the remainder of its safety syringe products in the safety syringe markets or on BD's sales in the conventional syringe market. Moreover, whether or not the safety syringe claims were actionable under the Lanham Act, BD's advertising mostly identified the product offerings that it was making available in a market that all competitors, consumers, and regulators (and the lawyers in this case) refer to as the safety syringe market.

There is no evidence in the record to show, either as a matter of fact or with any certainty at all, much less a fair degree of certainty, that BD false or deceptive advertising was a material cause of the losses that Dr. Maness used to calculate "deception antitrust" damages. Just as in *Taylor Publishing*, Retractable's "deception antitrust" damages claim fails as a matter of law.

11

The principle stated in *Eleven Line* applies here as well: "Damage assumptions that find no support in the actual facts of the case cannot support a verdict." 213 F.3d at 209.

## CONCLUSION

BD should be granted JMOL on Retractable's damage claims for independent reasons. In contravention of Clayton Act § 4, as definitively construed by *Brunswick* and its progeny, Retractable's damage model "failed to measure damages resulting from the particular antitrust injury on which" any BD antitrust liability might be premised. Equally dispositive, there is no substantial evidence in any event to support Retractable's calculation of damages under more general causation and damage calculation principles applicable under Clayton Act § 4.

Respectfully submitted,

/s/ *Samuel F. Baxter*
Samuel F. Baxter
Texas Bar No. 01938000
MCKOOL SMITH, P.C.
104 East Houston, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099
E-mail: sbaxter@mckoolsmith.com

Robert A. Atkins, Lead Attorney
Jacqueline P. Rubin
William B. Michael (admitted pro hac vice)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-mail: ratkins@paulweiss.com

BECK REDDEN, L.L.P.
Alistair B. Dawson
Texas Bar No. 05596100
Russell S. Post
Texas Bar No. 00797258
One Houston Center
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-6225
Facsimile: (713) 951-3720
E-mail: adawson@brsfirm.com

MERCY, CARTER, TIDWELL, L.L.P.
W. David Carter
Texas Bar No. 03932780
1724 Galleria Oaks Drive
Texarkana, Texas 75503
Telephone: (903) 794-9419
Facsimile: (903) 794-1268
E-mail: wdcarter@texarkanalawyers.com

*Attorneys for Defendant*
*Becton, Dickinson and Company*

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies September 18, 2013, that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

                    /s/ Russell S. Post