IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC. and THOMAS J. SHAW, | § § § | |
| Plaintiffs, | § § | Civil Action No. 2:08-cv-16 |
| v. | § § | |
| BECTON, DICKINSON & COMPANY, | § § § | |
| Defendant. | | |

## CHARGE OF THE COURT

### 1.    Introduction

MEMBERS OF THE JURY:

You have heard the evidence in this case.  I will now instruct you on the law that you must apply.  It is your duty to follow the law as I give it to you.  On the other hand, you the jury are the judges of the facts.  Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of the case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist you in understanding the evidence and the parties' contentions.

## 1.1    General Instructions

A verdict form has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.

Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly.  Your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

## 1.2    Considering witness testimony

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence.  You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess.  We met because often during a trial something comes up that does not involve the jury. You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

### 1.3    Instruction Regarding Juror Questions

As I told you in the preliminary instructions, I have given you the opportunity to give me written questions anonymously after a witness testified when you had an important question of the witness that was strictly limited to the

substance of the witness's testimony.   Remember that I asked you not to be offended if I did not present your question to be answered by the witness.  That has happened in this case, and so I want to instruct you further that I have entered orders in this case that prohibit the parties from presenting evidence to the jury that is not relevant to the questions that you will be answering in this case.  You should not speculate on the answer to any unasked question and you should not speculate on or consider any facts or events outside the testimony and exhibits you have heard and seen in this courtroom

### 1.4    How to examine the evidence

Certain testimony in this case has been presented to you through a deposition.  A deposition is the sworn, recorded answers to questions asked of a witness in advance of trial.   Deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weight as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.   In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case.  One is direct evidence – such as testimony of an eyewitness.  The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.  As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

### 1.5    Demonstrative Exhibits

Certain exhibits shown to you are illustrations.  We call these types of exhibits "demonstrative exhibits."  Demonstrative exhibits are a party's description, picture, or model to describe something involved in this trial.  If your recollection of the evidence differs from the exhibit, rely on your recollection.

### 1.6    Expert Witnesses

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters.

However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert has been or will be paid for reviewing the case and testifying, or from evidence that he or she testifies regularly as an expert witness and that income from such testimony represents a significant portion of the expert's income.

**2.     Summary of Contentions**

I will first give you a summary of each side's contentions in this case.  I will then tell you what Plaintiff Retractable Technologies, Inc. must prove to win the case.

Plaintiff Retractable and Defendant BD both manufacture and sell conventional syringes, safety syringes, and safety IV catheters. Retractable contends BD has used various kinds of unlawful conduct to restrain competition, maintain a monopoly, and restrict Retractable's access to and success in the relevant markets.  Retractable contends BD entered into improper contracts and engaged in other behavior that had anticompetitive effects.  Retractable further contends BD engaged in false advertising wherein BD misrepresented the qualities and characteristics of Retractable's VanishPoint safety syringes and BD's

competing products.  Retractable asserts causes of action for violations of federal antitrust laws and federal false advertising laws.

BD contends it has not engaged in any unlawful conduct and denies Retractable's allegations.  BD contends that its agreements with hospitals and other customers benefit those customers by offering them discounts and lower prices, and do not prevent Retractable or any other competitor from competing in the relevant markets.  BD also contends that its advertising has been truthful and has not harmed Retractable or interfered with its ability to sell its products.  BD also contends that its conduct has caused no injury to competition or to Retractable and that Retractable is not entitled to recover any of the damages it is seeking.

## 3.    Burden of Proof

As I told you at the beginning of this trial, in any legal action, facts must be proved by a required amount of evidence, known as the burden of proof.

When a party has the burden of proof on any claim or defense by a preponderance of the evidence, that means the evidence must persuade you that the claim or defense is more likely than not true.

Retractable must prove every essential part of its claims by a preponderance of the evidence.  BD bears the burden of proving its mitigation defense by a preponderance of the evidence.

In determining whether any fact has been proved, you should, unless otherwise instructed, consider all of the evidence, including the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them.

## 4.      Purpose of Antitrust Laws

The antitrust laws were designed to ensure economic liberty by preserving free and unfettered competition, securing everyone an equal opportunity to engage in business, trade, and commerce. They rest on the central premise that free competition produces the best allocation of our economic resources, the lowest prices, the highest quality, the greatest output of products, and the greatest material progress.   An act only becomes unlawful when it constitutes an unreasonable restraint on interstate commerce.

## 5.      General Definitions

**Interstate commerce:**   The federal antitrust laws apply only to conduct or restraints that affect interstate commerce.   In this case, the interstate commerce element of Retractable's federal antitrust claims is not in dispute between the parties.   This element, therefore, is established.

**Relevant market:**   To prove a "market," Retractable must prove both a relevant product market and a relevant geographic market.   The geographic market—the United States—and product markets for safety syringes, conventional (or "non-

safety") syringes, and safety IV catheters are not in dispute between the parties. This element, therefore, is established with respect to these three markets.

**Anticompetitive Conduct:**  The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine.  This is because all companies have a desire to increase their profits and increase their market share.  These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals – or the achievement of these goals – unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether BD's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits of price, quality, or service, whether it provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

Sellers often provide discounts to purchasers who buy large volumes and/or large shares of a particular product from a particular seller.  Sometimes the amount of the discounts increases with larger purchases.   Volume and market share discounts may apply to purchases made at a particular point in time or to cumulative purchases made over the course of a specified time period, such as one

year.  Volume and market share discounts often reflect cost savings and other efficiencies associated with larger purchases and provide incentives for buyers to purchase more from the seller.  Like other low prices, volume and market share discounts are not anticompetitive merely because smaller sellers cannot match them without losing money.

Anticompetitive conduct must represent something more than the conduct of business that is part of the normal competitive process or commercial success.  It must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason.

**Causation and Antitrust Injury:**  As part of each of its antitrust claims, Retractable must establish that it suffered injury in its business or property as a proximate result of any antitrust violation.

In the course of normal, lawful competition, some businesses may suffer economic losses or even go out of business.  An injury to a business is the "proximate result" of an antitrust violation only when the act or transaction constituting the violation directly and in natural and continuous sequence produces, or contributes substantially to producing, the injury.  In other words, the defendant's alleged violation of the antitrust laws must be a direct, substantial and identifiable cause of the injury that plaintiff claims to have suffered.  Proof of an antitrust violation does not necessarily mean the plaintiff was injured.  A plaintiff

can recover only if the loss stems from a reduction in competition because of the defendant's behavior.   There is no antitrust injury unless that behavior reduced competition, even if the behavior violated the antitrust law at issue.

### 6.    Monopolization Claims

Retractable alleges it was injured by BD's unlawful monopolization of the product markets for safety syringes, conventional syringes, and safety IV catheters in the United States.

To prevail on its monopolization claims, Retractable must prove the following elements:

1. First, that BD possessed monopoly power in a relevant market;

2. Second, that BD willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct; and

3. Third, that Retractable was injured in its business or property because of BD's anticompetitive conduct.

### 6.1    Monopoly power

Monopoly power is the power to control prices or exclude competition in a relevant market.   More precisely, a company has monopoly power if it can profitably raise its prices for a significant period of time substantially above the prices charged by its competitors.   Monopoly power, in and of itself, is not unlawful, but becomes unlawful where it involves anticompetitive or exclusionary

acts or conduct.  There can be both direct and indirect proof of the existence of monopoly power in a market.

**6.1.1** Monopoly power may be shown by direct evidence in several ways. Monopoly power may be shown by proving that BD has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels for a significant period of time.  Retractable must prove that BD has the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.  If BD attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then BD does not have monopoly power.

Similarly, monopoly power may exist if BD has the ability to exclude competition. For example, if BD attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then BD does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that BD has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit

margins than its competitors, such as the ability to offer superior products or services, the ability to maintain an efficient business operation, or superior marketing.   However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that BD would lose a substantial amount of sales if it raised prices substantially, or that BD's profit margins were low compared to its competitors, erratic, and/or decreasing, might be evidence that BD does not have monopoly power.

**6.1.2**   Monopoly power may also be proven indirectly, by evidence of the structure of the market, market share, and barriers to entry into the market.  If this evidence establishes that BD has the power to control prices or exclude competition in the relevant market, then you may conclude that BD has monopoly power in the market.

The first factor you should consider is BD's market share.  Based on the evidence you have heard, you should determine BD's market share in the relevant markets.   A market share above 50 percent may be sufficient to support an inference that BD has monopoly power, but in considering whether BD has monopoly power it is also important to consider other aspects of the market, such as: the existence of barriers to entry into the market to potential competitors, entry into and exit from the market by competitors, and the size and number of

competitors in the market. Along with BD's market share, these factors should inform you as to whether BD has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power, but this is not an absolute threshold.  If you find that the other evidence demonstrates that the defendant does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that the defendant has monopoly power.

The trend in BD's market share is also something you may consider.  An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

You may also consider whether there are barriers to entry into the relevant market.  Barriers to entry are long-run costs that were not incurred by the existing companies in a relevant market but must be incurred by new competitors to enter the market, or other factors in a market that deter entry of new competitors while permitting existing companies to earn monopoly profits.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.  Evidence of low or no entry barriers may

be evidence that BD does not have monopoly power, regardless of BD's market share, because new competitors could enter easily if BD attempted to raise prices for a substantial period of time.   By contrast, evidence of high barriers to entry along with high market share may support an inference that BD has monopoly power.

The history of entry and exit in the relevant market may be helpful to consider.   Entry of new competitors or expansion of existing competitors may be evidence that BD lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that BD has monopoly power.

You may consider whether BD's competitors are capable of effectively competing.   In other words, you should consider whether the financial strength, market shares and number of competitors act as a check on defendant's ability to price its products.   If BD's competitors are vigorous or have large or increasing market shares, this may be evidence that BD lacks monopoly power.   On the other hand, if you determine that BD's competitors are weak or have small or declining market shares, this may support an inference that BD has monopoly power.

### 6.2    Anticompetitive conduct

If you find BD possessed monopoly power, you must next determine whether it willfully acquired or maintained monopoly power through anticompetitive conduct.  As I stated previously, anticompetitive conduct is acts or practices, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete for customers within the relevant market.  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.  In addition, you should distinguish the acquisition or maintenance of monopoly power through anticompetitive conduct from the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, which is not unlawful.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  A company with monopoly power may compete aggressively without violating the antitrust laws, and may charge monopoly prices without violating the antitrust laws.  Conduct only becomes unlawful where it involves anticompetitive conduct.

In evaluating BD's conduct, you should consider whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to

consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

Competitive harm occurs when a reduction in competition results in the loss of some of the benefits of competition – for example, lower prices, increased output, or higher product quality.  If the challenged conduct has not resulted in higher prices, decreased output, or lower quality, or the loss of some other competitive benefit, then there is no competitive harm.  Your focus here should be on harm to competition as a whole, not just to an individual competitor—although, harm to an individual competitor can be relevant and may help to establish harm to competition.

**6.2.1** Retractable contends BD has engaged in allegedly anticompetitive conduct, including, but not limited to, the following: entering into alleged penalty contracts with customers; entering into sole- and dual-sourced GPO contracts for conventional syringes and IV catheters; entering into allegedly exclusionary or restrictive contracts with distributors; engaging in allegedly deceptive false advertising to customers concerning Retractable's products; engaging in allegedly deceptive false advertising to customers concerning the quality and safety of BD's products; infringing upon Retractable's patents by selling a product that allegedly exhibited design flaws and allegedly tainted the market with respect to all retractable syringe products.

Retractable contends each of these practices is anticompetitive and that, when taken together, also demonstrate a pattern of anticompetitive and/or exclusionary conduct that is harmful to competition.  The law states that you should consider BD's conduct as a whole, but unless you find that an act is anticompetitive as described above, you should not consider it as a basis for finding a pattern of anticompetitive conduct.

BD contends that its GPO agreements offer discounts that benefit customers through lower prices; that contracts offering lower prices to customers who buy more are not "penalty" contracts and that BD does not penalize customers; that BD's GPO agreements do not require hospitals to buy any products and do not prevent competitors (including Retractable) from competing by offering lower prices; that its agreements with distributors are not exclusive and do not prevent competitors from distributing their products; that its advertising is neither false nor deceptive; and that it has competed fairly in the market and Retractable's alleged injuries are the result of competition on the merits.  BD contends its practices are beneficial to competition and Retractable has failed to prove that these practices harm competition.

## 7.    Attempted Monopolization Claims

Retractable alleges that it was injured by BD's attempted monopolization of the product markets at issue in this case.  BD contends that it engaged in legitimate

competition and Retractable's alleged injuries are the result of competition on the merits.

To prevail on this claim, Retractable must prove:

1. First, that BD engaged in anticompetitive conduct;

2. Second, that BD had a specific intent to achieve monopoly power in a relevant market;

3. Third, that there was a dangerous probability that BD would achieve monopoly power in the relevant market.

4. Fourth, that Retractable was injured in its business and property by BD's anticompetitive conduct.

You should rely on the instructions given to you in the previous sections concerning monopolization; relevant markets; anticompetitive conduct; and causation and antitrust injury in deciding whether BD engaged in anticompetitive conduct.

### 7.1    Intent to monopolize

To prove a claim for attempted monopolization, Retractable must prove BD had a specific intent to monopolize a relevant market.  In other words, you must decide if the evidence shows the defendant acted with the conscious aim of acquiring the power to control prices or to exclude competition in the relevant market.

There are several ways in which Retractable may prove BD had the specific intent to monopolize.  There may be evidence of direct statements of BD's intent to

obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of BD at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of BD.  You must be careful, however, to distinguish between a defendant's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Specific intent may be inferred from what BD did.  For example, if the evidence shows the natural and probable consequence of BD's conduct in the relevant market was to give BD control over prices or to exclude competition, and this was plainly foreseeable by BD, then you may (but are not required to) infer BD specifically intended to acquire monopoly power.

### 7.2    Dangerous probability of achieving monopoly power

In determining whether there was a dangerous probability that BD would acquire monopoly power in a market, you should consider such factors as BD's market share, whether the barriers to entry into the market made it difficult for competitors to enter the market, and the likely effect of any anticompetitive conduct on BD's share of the market.

A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that BD would ultimately acquire monopoly power.

**8.     Contractual Restraint of Trade Claims**

Retractable alleges that BD's agreements also unreasonably restrain trade.

To establish this claim, Retractable must prove the following:

1. First, that there was a contract or combination between or among at least two separate entities;

2. Second, that the contract and/or combination at issue unreasonably restrains trade in a relevant market; and

3. Third, that the restraint caused Retractable to suffer injury to its business or property.

**8.1     Existence of contracts**

Retractable contends there are three types of BD contracts at issue under this claim:

(a) Alleged penalty contracts with needle device users. These alleged penalty contracts with the end users were often brokered by group purchasing organizations ("GPOs"), but also were often entered into by BD directly with end users.

(b) Sole-source and dual-source arrangements with GPOs that allegedly prevented the GPOs from brokering contracts for BD's rivals.

(c) Distributor contracts that allegedly prevented distributors from offering their most efficient or effective means of distribution to BD's rivals.

BD contends that its agreements promote competition and generate competitive benefits.  BD contends that its agreements with GPOs offer price discounts that benefit customers through lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit.  BD contends that its agreements with GPOs do not require hospitals to buy products from BD and do not prevent hospitals from buying products from BD's competitors.  BD contends that its competitors (including Retractable) have their own agreements with GPOs and that BD's GPO agreements do not prevent competitors from selling their products to any customers.  BD contends that its agreements with distributors do not prevent competitors (including Retractable) from efficiently distributing their products and that competitors have access to the same distributors as BD.  BD contends that RTI's alleged injuries are a result of competition on the merits, including price competition.

You should refer to the definitions and instructions provided above for relevant market, anticompetitive conduct, and causation and antitrust injury.

## 8.2    Unreasonable restraints of trade

The "rule of reason" is the accepted standard for testing whether an agreement unreasonably restrains trade.  Under this rule, you must determine if the

restraints challenged here are unreasonable restraints on competition.  In making this determination, you must first determine whether Retractable has proven the challenged restraints have resulted in or are likely to result in substantial harm to competition in the relevant markets.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition – for example, lower prices, increased output, and higher product quality.  If the challenged conduct has not resulted in higher prices, decreased output, or lower quality, or the loss of some other competitive benefit, then there has been no competitive harm and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors: the effect of the restraint on prices, output, product quality, and service; the purpose and nature of the restraint; the nature and structure of the relevant markets, both before and after the restraint was imposed; the number of competitors in the market and level of competition among them; and whether BD possesses "market power."

The last factor mentioned, market power, has been defined as an ability profitably to raise prices above those that would be charged in a competitive market for a sustained period of time.  A firm that possesses market power

generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products, however, is not market power.

An important factor in determining whether BD possesses market power is market share; that is, BD's percentage of the products and services sold in each relevant market by all competitors.  If BD does not possess a substantial market share, it is less likely that BD possesses market power.

Other factors that you may consider in determining whether BD has market power include the trend in BD's market share, barriers to entry, entry and exit by other companies, the number and size of competitors, sophistication of buyers, and contracting practices of buyers in the market.

If BD does not possess market power, then it is less likely that the challenged agreements have resulted in a substantial harmful effect on competition in the market.

If you find that Retractable has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether the restraint produces countervailing competitive benefits.  If you find that it does, then you must balance the competitive harm against the competitive benefit.   The challenged restraint is unreasonable only if you find that the competitive harm substantially outweighs the competitive benefit.

**9.    Exclusive Dealing Claims**

Retractable alleges BD used exclusive dealing contracts to restrain competition in a substantial portion of the relevant market, and that it was injured as a result of these contracts.  BD contends its agreements are not exclusive, do not prevent customers from buying products from BD's competitors, and promote competition for lower prices in the market.

To prevail on this claim, Retractable must prove the following elements:

1.  First, that there were exclusive dealing agreements between BD and its customers;

2.  Second, the agreements foreclose competition in a substantial share of the relevant market; and

3.  Third, that Retractable was injured as a result thereof.

You should follow the instructions given above for relevant market, anticompetitive conduct, and causation and antitrust injury.

**9.1    Exclusive dealing agreements**

An exclusive dealing agreement is an agreement where a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller.  Contracts do not need to contain specific terms of exclusivity as long as the practical effect of the agreement is to exclude competitors and harm competition.

Retractable alleges the contracts at issue under this claim are the same contracts previously described above on pages 20-22 (Section 8).

BD contends that its agreements offer price discounts that benefit end users by delivering lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit.  BD contends that its agreements do not require customers to buy products from BD exclusively (or at all) and do not foreclose competition in the market.

### 9.2    Likelihood of substantial foreclosure

If you determine that BD entered into exclusive dealing agreements in the relevant market, your next consideration should be to determine whether competition was substantially lessened in the relevant market.  Exclusive dealing agreements violate the antitrust laws when they foreclose competition in a substantial share of the market.  Competition with respect to buyers is foreclosed if rival sales to those buyers are restricted by a contract that imposes conditions that make it more difficult for rivals to sell to those buyers than would otherwise be the case.  In determining whether foreclosure from – or restraint on competition within – a relevant market is substantial, you should take into account the relative strength of Retractable and BD within the relevant market, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant

market, and the provable immediate and future effects of exclusion of competitors from the market on competition.

**10.     False Advertising Claims**

Retractable claims BD should be liable for false advertising for the following categories or types of statements made in BD's commercial advertising or promotion after July 2, 2004:

**Waste Space Claims.**   Retractable alleges BD engaged in false advertising by making a number of claims regarding waste space.  Those claims include:

**1. "Waste Space" Claims.**  Retractable alleges BD engaged in false advertising with regard to the following:   BD's claims regarding the waste space of Retractable's VanishPoint syringes; BD's claims that users could not get the full number of doses from a multi-dose vial using Retractable's VanishPoint syringes; and BD's claims regarding the degree of medication and cost savings, if any, that would result from any differences in waste space between BD's and Retractable's products.

**2.  "Waste Space Data on File Claims."**  Retractable alleges BD engaged in false advertising with regard to BD's claims to have test results or other "data on file" that proved BD's waste space claims.

**Needle Sharpness Claims.**  Retractable alleges BD made false claims regarding patient comfort/needle sharpness.  Those allegations include:

**1.  "World's Sharpest Needle Claims."**  Retractable alleges BD engaged in false advertising with regard to BD's claims that needles offered for use with its conventional, Safety-Lok, SafetyGlide, Eclipse and Integra hypodermic injection products were the world's sharpest needles.

**2.  "World's Sharpest Needle Data on File Claims."**  Retractable alleges BD engaged in false advertising with regard to BD's claims to have test results or other "data on file" that proved BD's conventional, Safety-Lok, SafetyGlide, Eclipse and Integra hypodermic injection products had the world's sharpest needles.

BD contends that its advertising about the products at issue was truthful. BD contends that this advertising never deceived a substantial segment of potential customers. BD contends that nothing materially deceptive was contained in any BD advertisement about the products at issue.  BD further denies that Retractable was injured as a result of any BD advertising statement.

To recover on its false advertising claim, Retractable must prove:

1. First, that BD made a false or misleading statement of fact about the nature, characteristics, or quality of its own product or Retractable's product in commercial advertising or promotion;

2. Second, that the statement deceived, or had the capacity to deceive, a substantial segment of potential consumers;

3. Third, that the deception was material, meaning it was likely to influence consumers' purchasing decisions; and

4. Fourth, that Retractable either has been or is likely to be injured as a result of the statement at issue.

## 10.1   False or misleading statement of fact

<u>Statement of fact</u>. The statement at issue must be one of "fact" and not opinion.  A statement of fact is one that is objectively capable of proof or disproof. In other words, in order to constitute a statement of fact, a statement must make a specific and measurable claim.

<u>Falsity</u>.  In determining whether a statement of fact is "literally false," you must analyze each of the challenged statements in light of the overall context in which it appears.

A "data on file claim" is one where the defendant explicitly or implicitly represents it has data, tests or studies to prove or establish its statements.   An assertion that there are test results or data purporting to prove a claim can be a literally false statement if the tests or data do not actually prove the claim.

Even if a statement of fact is not literally false, it may still satisfy this element if the statement is misleading in its context, regardless of whether it is vague, ambiguous, or even literally true.

## 10.2 Deception and materiality

If you determine BD made a statement that is literally false as described above, then you may presume that the statement is material and deceptive.

If you determine BD made a statement that was not literally false, but was instead misleading, then Retractable bears the burden of proving that: (a) the statement was deceptive and (b) the deception was material.

Deception is material if a statement is likely to influence consumers' purchasing decisions. To prove a tendency to deceive, Retractable needs to show that at least some consumers were confused by the advertisements.

## 11. Antitrust Damages Generally

I will now instruct you as to the role of injury, causation, and damages, which are common issues for all of Retractable's claims. RTI has only asked you to determine antitrust damages, so when you are determining damages, you should only award damages for RTI's antitrust claims. If Retractable has proven any of its antitrust claims against BD by a preponderance of the evidence, you must determine the damages to which Retractable is entitled. You should not interpret the fact I am giving you instructions about Retractable's damages as an indication I believe Retractable should, or should not, win this case. It is your task to first decide whether BD is liable. I am instructing you on damages only so you will

have guidance in the event you decide that BD is liable and Retractable is entitled to recover money from BD.

## 11.1   Calculation of damages

If you find BD is liable for any of Retractable's antitrust claims, then you must determine an amount that is fair compensation for all of Retractable's damages.   These damages are called compensatory damages.   The purpose of compensatory damages is to make the plaintiff whole—that is, to compensate a plaintiff for the damage that it has suffered.

You may award compensatory damages only for injuries Retractable proves were proximately caused by BD's alleged wrongful conduct.   The damages you award must be fair compensation for all of Retractable's damages, no more and no less.   You should not award compensatory damages for speculative injuries, but only for those injuries which Retractable has actually suffered.

If you decide to award compensatory damages, you should be guided by dispassionate common sense.   Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.   On the other hand, the law does not require the plaintiff to prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts and circumstances in evidence where you find them appropriate.

You are further instructed, in answering questions about damages, you must answer each question separately.  Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be.  Any recovery will be determined by the court when it applies the law to your answers in entering judgment.

If you find for Retractable on any of its claims, Retractable is entitled to recover an amount that will fairly compensate it for any damages Retractable has suffered from July 2, 2004 to date.

## 12.   Calculation of Antitrust Damages

Now I will specifically instruct you about determining damages for an antitrust injury.

### 12.1   Lost Profits

Retractable claims that it was harmed because it lost profits as a result of BD's alleged antitrust violation.  If you find that BD committed an antitrust violation and that this violation caused antitrust injuries to Retractable, you may calculate the profits, if any, that Retractable lost as a result.  To calculate lost

profits, you must calculate net profit: the amount by which Retractable's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.  You may calculate net profit by using the following measure:

Retractable has proposed to calculate the net profits it would have earned if there had been no antitrust violation by showing evidence of sales to other customers that were not affected by the antitrust violation.  If you find that the sales to other customers is a reliable guide to estimate what plaintiff's actual net profits would have been in the absence of the antitrust violation, then you may calculate plaintiff's lost profits by comparing (a) the actual profit performance of plaintiff with (b) the profit performance with the other customers.  You may find, however, that the customers proposed by plaintiff as a yardstick for its performance are not representative of what plaintiff's profits would have been in the absence of the antitrust violation, such as if plaintiff's profits were impacted by different economic conditions, mismanagement, different levels of competition, or other factors.  The two sets of customers do not have to be identical ; they need only be sufficiently similar that conclusions may be drawn within the bounds of reasonableness.  However, if you find that the customers proposed by plaintiff as a yardstick for its performance are not representative of what plaintiff's profits would have been, and that plaintiff's lost profits may only be calculated using

speculation or guesswork, you may not award damages for lost profits based on this yardstick measure.

### 12.2   Causations and Disaggregation

If you find that BD violated the antitrust laws and that Retractable was injured by that violation, Retractable is entitled to recover only for injuries that were the direct result of that violation.  Retractable may recover damages only for antitrust injuries, that is, injuries that resulted from a reduction in competition. Retractable may not recover for injuries that resulted from other causes, including heightened competition, the competitive process, or acts that benefitted consumers.

Retractable claims that it suffered injury because it lost sales and profits as a result of BD's antitrust violation.  In the normal course of competitive business activity, competitors will lose sales to each other, and to third parties, for various causes that have nothing to do with antitrust law violations; and businesses can be unprofitable for causes that have nothing to do with the antitrust laws.  Retractable may not recover for lost sales if it lost those sales because of the superior business skills of a competitor, because a competitor offered a superior product, or because of lawful competition from BD or other competitors.  Retractable also may not recover if it lost profits as a result of causes that had nothing to do with BD's conduct, such as changes in demand, increased competition from new competitors,

changes in product technology, changes in market conditions, poor management or missed opportunities by Retractable, Retractable's prices, or other factors.

Retractable bears the burden of proving that its injuries were caused by the injury to competition from BD's alleged antitrust violation, as opposed to any other factors. If you find that Retractable's injuries were caused in part by the injury to competition from BD's antitrust violation and in part by other factors, then you may award damages only for that portion of Retractable's injuries that were caused by the injury to competition from BD's antitrust violation. Retractable bears the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes. If you find that there is no reasonable basis to apportion Retractable's injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

### 12.3   Multiple Claims and Double Recovery

You must not award compensatory damages more than once for the same injury. If Retractable prevails on more than one claim, and establishes a dollar amount for its injuries, you must not award additional compensatory damages on each claim. Retractable is only entitled to be compensated for its losses once, and may not recover more than it has lost. Of course, if different injuries are attributed

to the separate claims, then you must compensate Retractable fully for all of its injuries.

You have heard evidence that in a prior lawsuit, Retractable recovered damages from BD for patent infringement.  The fact that BD has been found to have infringed RTI's patent does not necessarily mean BD acted anticompetitively unless you also find that each element I have instructed you on for a given claim has been met.  Any damages awarded relating to the anticompetitive behavior based on patent infringement should not be for the infringement itself, but only for harm caused by BD's alleged restriction in competition by allegedly selling retractable syringes with known design flaws, allegedly tainting the market with respect to all retractable syringe products.

In considering Retractable's claims in this case, you may not consider any of BD's conduct before July 2, 2004.

### 12.4   Mitigation

Retractable may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. Retractable is not entitled to increase any damages through inaction.  The law requires an injured party to take the commercially reasonable steps it can to avoid further injury and thereby reduce its loss.  If Retractable failed to take reasonable steps available to it, and the failure to take those steps results in greater harm to

Retractable than it would have suffered had it taken those steps, then Retractable may not recover any damages for that part of the injury it could have avoided.

BD has the burden of proof on this issue. BD must prove by a preponderance of the evidence that Retractable acted unreasonably in failing to take specific steps to minimize or limit its losses, that the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps, and the amount by which Retractable's loss would have been reduced had Retractable taken those steps.

In determining whether Retractable failed to take reasonable measures to limit its damages, you must remember that the law does not require Retractable to have taken every conceivable step that might have reduced its damages.  The evidence must show that Retractable failed to take commercially reasonable measures that were open to it.  Commercially reasonable measures mean those measures that a prudent businessperson in Retractable's position would likely have adopted, given the circumstances as they appeared at that time. Retractable should be given a wide latitude in deciding how to handle the situation, so long as what Retractable did was not unreasonable in light of the existing circumstances.

## 13.    Closing Instructions

You must perform your duties as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or

public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence.  Select your Foreperson and conduct your deliberations.  If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during trial.  After you have reached your verdict, your Foreperson is to fill in on the form your answers to the questions.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory.  If your memory should differ from your notes, then you should rely on your memory and not on the notes.  The notes are not evidence.  A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any

greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the Court Security Officer, who will bring it to me.  I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.  I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.  You may now retire to the jury room to deliberate.