## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC., and THOMAS J. SHAW | § § § | |
| **Plaintiff,** | § § | |
| VS. | § § | Civil Action No. 2:08-CV-16 |
| BECTON DICKINSON AND COMPANY, INC. | § § § | **Chief Judge Leonard Davis** |
| **Defendant.** | § § § § | **Jury Trial** |

### DEFENDANT BECTON, DICKINSON AND COMPANY'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR ALTERNATIVELY, FOR NEW TRIAL OR REMITTITUR

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Robert A. Atkins, Lead Attorney
Jacqueline P. Rubin
William B. Michael (admitted pro hac vice)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
E-mail:  ratkins@paulweiss.com

BECK REDDEN, L.L.P.
Alistair B. Dawson
Texas Bar No. 05596100
Russell S. Post
Texas Bar No. 00797258
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
Telephone:  (713) 951-6225
Facsimile:  (713) 951-3720
E-mail:  adawson@brsfirm.com

MCKOOL SMITH, P.C.
Samuel F. Baxter
Texas Bar No. 01938000
Robert Elkin
Texas Bar No. 06522600
104 East Houston, Suite 300
Marshall, Texas  75670
Telephone:  (903) 923-9000
Facsimile:  (903) 923-9099
E-mail:  sbaxter@mckoolsmith.com

*Attorneys for Defendant Becton, Dickinson and Company*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................................. i

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.     Judgment as a Matter of Law Should Be Granted to BD Because There Is No Substantial Evidence to Support the Attempted Monopolization Verdict .......................................................................................................... 2

     A.     RTI Failed to Present Substantial Evidence that BD Engaged in "Predatory or Exclusionary Conduct." ...................................................... 3

          1.     As a Matter of Law, the Challenged Conduct Is Not Anticompetitive or Exclusionary. ................................................. 5

          2.     There Is No Substantial Evidence that BD's Conduct Was, In Fact, Exclusionary. ......................................................... 7

               (a)     False Advertising: There Is No Substantial Evidence that BD's Advertising Was Exclusionary Conduct. ......................................................... 8

                    (i)     *No Substantial Evidence that BD's Advertising Was Capable of Creating Monopoly Power.* ................................................... 9

                    (ii)     *No Substantial Evidence that BD's Advertising Prevented RTI, or Any Other Competitor, From Competing for Business.* .............................................. 12

               (b)     Disparagement/Tainting: There is No Substantial Evidence that BD's Advertising Was Exclusionary Conduct. ............................................... 13

                    (i)     *No Substantial Evidence that BD's Integra "Tainted" the Market.* .............................. 13

                    (ii)     *No Substantial Evidence that "Tainting" Was Anticompetitive.* .............................................. 14

(c)     Patent Infringement: There is No Substantial Evidence that BD's Non-Willful Patent Infringement Was Exclusionary Conduct. ........................ 15

B.     RTI Failed to Present Substantial Evidence Establishing a "Dangerous Probability" that BD Would Achieve Monopoly Power in the Market for Safety Syringes. ................................................. 16

1.     There Is No Substantial Evidence that the Challenged Conduct Was Likely to Lead to the Creation of Monopoly Power in the Future. ................................................... 17

2.     RTI Failed to Prove that the Challenged Conduct Was Likely to Lead to Monopoly Power, Even If It Might Have Led to a Reduction in RTI's Market Share. ....................... 20

3.     RTI Failed to Prove that the Challenged Conduct Could Overcome the Exercise of Buyer Power by the Consumers of Safety Syringes. .................................................... 22

C.     RTI Failed to Present Substantial Evidence Establishing that BD Had a "Specific Intent" to Monopolize the Safety Syringe Market. .................................................................................................. 22

D.     Alternatively, the Court Should Grant a New Trial on Antitrust Liability.................................................................................................. 23

II.     RTI Failed to Carry Its Burden of Proving Damages Caused by an Antitrust Injury............................................................................................... 24

A.     RTI Failed to Carry Its Burden of Proving an Antitrust Injury. .............. 24

1.     RTI Failed to Prove that It Suffered Any Injury "Attributable to an Anti-Competitive Aspect" of BD's Conduct. ...................................................................................... 25

2.     The Damage Model Does Not Substitute for Proof of Antitrust Injury.......................................................................... 27

B.     There Is No Evidence of Causation to Support the "Deception Damages." ............................................................................................... 28

C.     The Failure to Disaggregate Is Fatal to the "Deception Damages." ............................................................................................... 30

1.     RTI Had a Burden to Disaggregate Its Damage Model. ............... 30

|  | 2. | RTI Failed to Disaggregate Its Damage Model. | 30 |

III. The Evidence Does Not Support $113 Million in "Deception" Damages. ... 32

A. RTI Had the Burden to Prove that Its Benchmark Was "Closely Comparable" and as "Nearly Identical" as Possible. ... 32

B. RTI Failed to Meet Its Burden of Proving a Valid Benchmark. ... 34

C. The Evidence Proved that the Markets and Businesses Maness Compared Are Not Nearly Identical or Closely Comparable. ... 35

  1. The Products Are Significantly Different, Not Comparable. ... 35

  2. The Markets Are Significantly Different, Not Comparable. ... 37

  3. The Businesses Are Significantly Different, Not Comparable. ... 38

D. Alternatively, the Court Should Grant a New Trial or Suggest a Remittitur. ... 39

IV. *Res Judicata* Bars the Lanham Act Claims and the Related Antitrust Claims. ... 40

V. Release Bars the Lanham Act Claims and the Related Antitrust Claims. ... 43

VI. There Is No Evidence to Support the Lanham Act Claims. ... 45

A. There Is No Evidence to Support RTI's Needle Sharpness Claims. ... 46

B. There Is No Evidence to Support RTI's Waste Space Claims. ... 48

C. There Is No Evidence to Support RTI's "Data on File" Claims. ... 50

D. Alternatively, BD Is Entitled to a New Trial. ... 50

CONCLUSION AND PRAYER FOR RELIEF ... 50

CERTIFICATE OF SERVICE ... 52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abraham* v. *Alpha Chi Omega*,
  708 F.3d 614 (5th Cir. 2013) .................................................42

*Adjusters Replace-a-Car, Inc.* v. *Agency Rent-a-Car, Inc.*,
  735 F.2d 884 (5th Cir. 1984) ...........................................22, 23

*Am. Council of Certified Podiatric Physicians & Surgeons* v. *Am. Bd. of Podiatric Surgery, Inc.*,
  323 F.3d 366 (6th Cir. 2003) ............................................7, 12

*Am. Prof'l. Testing Serv., Inc.* v. *Harcourt Brace Jovanovich Legal and Prof'l. Pubs., Inc.*,
  108 F.3d 1147 (9th Cir. 1997) ...........................................7, 8

*United States* v. *American Airlines, Inc.*,
  743 F.2d 1114 (5th Cir. 1984) .....................................9, 16, 17

*Arthur S. Langenderfer, Inc.* v. *S.E. Johnson Co.*,
  917 F.2d 1413 (6th Cir. 1990) ............................................19

*Atl. Richfield Co.* v. *USA Petroleum. Co.*,
  495 U.S. 328 (1990)..............................................24, 25, 26, 30

*Augustine Med., Inc.* v. *Progressive Dynamics Inc.*,
  194 F.3d 1367 (Fed. Cir. 1999)............................................44

*Bell Atl. Corp.* v. *AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ...................................30, 33, 37

*Berkey Photo, Inc.* v. *Eastman Kodak Co*,
  603 F. 2d 263 (2d Cir. 1979)...............................................3

*Blair Foods, Inc.* v. *Ranchers Cotton Oil*,
  610 F.2d 665 (9th Cir. 1980) .............................................22

*State of Alabama* v. *Blue Bird Body Co., Inc.*,
  573 F.2d 309 (5th Cir. 1978) .........................................29, 30

*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)............................................... *passim*

*Brunnemann* v. *Terra Intern., Inc.*,
  975 F.2d 175 (5th Cir. 1992) .............................................39

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...........................................................................................24, 27

*Buetow* v. *A.L.S. Enterprises*,
    650 F.3d 1178 (8th Cir. 2011) ...................................................................46, 47, 48

*Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*,
    780 F.2d 1212 (5th Cir. 1986) ...........................................................................35

*Cates* v. *Creamer*,
    431 F.3d 456 (5th Cir. 2005) .........................................................................1, 23

*Colo. Interstate Gas Co.* v. *Natural Gas Pipeline Co. of Am.*,
    885 F.2d 683 (10th Cir. 1989) .............................................................................21

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ...............................................................................28

*United States* v. *Davenport*,
    484 F.3d 321 (5th Cir. 2007) ..............................................................................43

*David L. Aldridge Co.* v. *Microsoft Corp.*,
    995 F. Supp. 728 (S.D. Tex. 1998) ........................................................................8

*Doctor's Hosp. of Jefferson, Inc.* v. *Se. Med. Alliance, Inc.*,
    123 F.3d 301 (5th Cir. 1997) ...............................................................................25

*EBay* v. *Mercexchange LLC*,
    547 U.S. 388 (2006)...............................................................................................46

*El Aguila Food Prods., Inc.* v. *Gruma Corp.*,
    131 F.App'x 450 (5th Cir. 2005) ..............................................................30, 31, 32, 33

*Eleven Line, Inc* v. *North Texas State Soccer Ass'n*,
    213 F.3d 198 (5th Cir. 2000) .............................................................. *passim*

*Eyewear, Inc.* v. *Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012)...........................................................................43

*Faris* v. *Williams WPC-1, Inc.*,
    332 F.3d 316 (5th Cir. 2003) ...............................................................................44

*Fractus, S.A.* v. *Samsung Elecs. Co.*,
    876 F. Supp. 2d 802 (E.D. Tex. 2012).....................................................................1

*Funeral Consumers Alliance, Inc.* v. *Serv. Corp. Int'l*,
    2008 WL 7356272 (S.D. Tex. Nov. 24, 2008) .........................................................8

*Gorsalitz* v. *Olin Mathieson Chem. Corp.*,
    429 F.2d 1033 (5th Cir. 1970) ........................................................................2

*Henry* v. *Bridgestone/Firestone Inc.*,
    63 F.App'x 953 (7th Cir. 2003) ...................................................................28

*Hurlbut* v. *Gulf Atl. Life Ins. Co.*,
    749 S.W.2d 762 (Tex. 1987)..........................................................................15

*Ingram Corp.* v. *J. Ray McDermott & Co.*,
    698 F.2d 1295 (5th Cir. 1983) .....................................................................44

*IQ Products Co.* v. *Pennzoil Products Co.*,
    305 F.3d 368 (5th Cir. 2002) ...................................................................45, 46

*Kinnear-Weed Corp.* v. *Humble Oil & Refining Co.*,
    214 F.2d 891 (5th Cir. 1954) .........................................................................5

*L-3 Commc'ns Integrated Sys., L.P.* v. *Lockheed Martin Corp.*,
    2008 WL 4391020 (N.D. Tex. Sept. 29, 2008)..........................................8

*Lehrman* v. *Gulf Oil Corp.*,
    500 F.2d 659 (5th Cir. 1974) ...........................................................33, 34, 38

*Masimo Corp.* v. *Tyco Healthcare Grp., L.P.*,
    2004 WL 5907538 (C.D. Cal. June 10, 2004) .......................................16

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................10, 26

*MCI Commc'ns* v. *Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .....................................................................30

*Mercatus Group, LLC* v. *Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) .........................................................................6

*Monsanto Co.* v. *Geertsen*,
    130 S. Ct. 2743 (2010)..................................................................................46

*Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988)........................................................................7, 8

*Norris* v. *Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ..................................................................24, 25

*Northeastern Tele. Co.* v. *AT&T Co.*,
    651 F.2d 76 (2d Cir. 1981)..........................................................................24

*Nw. Power Prods, Inc.* v. *Omark Indus., Inc.*,
    576 F.2d 83 (5th Cir. 1978) ................................................................ *passim*

*Oreck Direct, LLC* v. *Dyson, Inc.*,
    560 F.3d 398 (5th Cir. 2009) ....................................................40, 41, 44

*PBM Products, LLC* v. *Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ................................................................42

*Pernod Ricard USA, LLC* v. *Bacardi U.S.A., Inc.*,
    653 F.3d 241 (3d Cir. 2011)..................................................................46

*Pipitone* v. *Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ................................................................28

*Pizza Hut, Inc.* v. *Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ..............................................45, 46, 47, 48

*Reeves* v. *Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000)................................................................................1

*Richter Concrete Corp.* v. *Hilltop Concrete Corp.*,
    691 F.2d 818 (6th Cir. 1982) ................................................................19

*Sanderson* v. *Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ......................................................5, 6, 23

*United States* v. *Shambaum*,
    10 F.3d 305 (5th Cir. 1994) ..................................................................43

*Spectrum Sports, Inc.* v. *McQuillan*,
    506 U.S. 447 (1993)..........................................................................4, 16

*Stearns Airport Equip. Co.* v. *FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ......................................................3, 6, 23

*Sterling Merch., Inc.* v. *Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011)................................................................18

*Tate* v. *Pac. Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2002) ..............................................12

*Taylor Pub. Co.* v. *Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ................................................... *passim*

*Times-Picayune Pub. Co.* v. *United States*,
    345 U.S. 594 (1953)........................................................................22, 23

*Treadaway* v. *Societe Anonyme Louis-Dreyfus*,
   894 F.2d 161 (5th Cir. 1990) ................................................................39

*Virgin Atl. Airways Ltd.* v. *British Airways, PLC*,
   257 F.3d 256 (2d Cir. 2001)................................................................18

*Walgreen Co.* v. *AstraZeneca Pharm. L.P.*,
   534 F. Supp. 2d 146 (D.D.C. 2008) ..............................................12, 15

*Weisgram* v. *Marley Co.*,
   528 U.S. 440 (2000)............................................................1, 9, 34, 49

*Wellogix, Inc.* v. *Accenture*,
   716 F.3d 867 (5th Cir. 2013) ..........................................................1, 50

*White* v. *Grinfas*,
   809 F.2d 1157 (5th Cir. 1987) ..............................................................44

*United States* v. *William Cramp & Sons Ship & Engine Bldg. Co.*,
   206 U.S. 118 (1907)..............................................................................44

*Winter* v. *NRDC*,
   129 S. Ct. 365 (2008) ...........................................................................46

**STATUTES**

15 U.S.C. § 1125(a)(1)(B) .........................................................................45

Sherman Act § 2................................................................................ *passim*

**OTHER AUTHORITIES**

Areeda & Hovenkamp, Antitrust Law (3d ed. 2008)........................... *passim*

Fed. R. Civ. P. 50..............................................................................1, 50

Fed. R. Civ. P. 59..............................................................................1, 50

Fed. R. Evid. 301 ...................................................................................46

Herbert Hovenkamp, ed., 5 MOD. SCI. EVID. § 46:8 (2012-2013 ed.)............38

Restatement (Second) of Judgments 524(2) ...........................................41

# INTRODUCTION

Because Plaintiffs Retractable Technologies, Inc. and Thomas J. Shaw[1] ("RTI") failed to present sufficient evidence to support the verdict on their Sherman Act and Lanham Act claims, BD renews its motions for judgment as a matter of law on those claims.   Docs. 563-566. Alternatively, BD seeks a new trial or a suggestion of remittitur.

The jury found for RTI on its Sherman Act claim for attempted monopolization of the safety syringe market based on "deception" (while rejecting the rest of RTI's antitrust claims). The jury also found for RTI on its Lanham Act claims related to BD's advertising regarding waste space and needle sharpness.   The jury awarded antitrust damages of $113,508,014 for "deception regarding safety syringes," but it awarded no "anticompetitive contracting damages" and it was not asked to award damages under the Lanham Act.  Doc. 577 at 2-4.

Judgment as a matter of law is proper if there was no legally sufficient evidentiary basis to find for RTI on any essential element of its case, or if the evidence points so strongly and so overwhelmingly in favor of BD that no reasonable juror could return a contrary verdict.  Fed. R. Civ. P. 50(a)-(b); *Reeves* v. *Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000); *Fractus, S.A.* v. *Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 813 (E.D. Tex. 2012).[2]

A new trial is appropriate if the verdict, though supported by legally sufficient evidence, is contrary to the great weight of the evidence.  Fed. R. Civ. P. 59; *Wellogix, Inc.* v. *Accenture*, 716 F.3d 867, 881 (5th Cir. 2013); *Cates* v. *Creamer*, 431 F.3d 456, 460 (5th Cir. 2005). Similarly, a suggestion of remittitur is appropriate if the damages awarded by the jury exceed the

---

[1]   In addition to the grounds set forth below, judgment as a matter of law should be granted as to all claims by Thomas J. Shaw because there is no evidence that Shaw suffered any injury in his individual capacity for which relief could be granted and he thus lacks standing.   *See* Docs. 171, 258.

[2]   In addition, neither speculative or conclusory assertions of experts nor unreliable expert opinions are "substantial evidence" under Rule 50.  *Weisgram* v. *Marley Co.*, 528 U.S. 440, 454-57 (2000); *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242-43 (1993).

maximum amount that a reasonable jury could award.  *Gorsalitz* v. *Olin Mathieson Chem. Corp.*, 429 F.2d 1033, 1046 (5th Cir. 1970).

<div align="center">

**ARGUMENT**

</div>

I.     **Judgment as a Matter of Law Should Be Granted to BD Because There Is No Substantial Evidence to Support the Attempted Monopolization Verdict.**

The jury rejected all of RTI's claims based on "anticompetitive contracting" and "deception" for monopolization, contractual restraint of trade, and exclusive dealing.  Doc. 577 at 2-3.  Based on "deception," the jury found for RTI on one claim:  attempted monopolization in the safety syringe market.  *Id.*  That verdict, along with the $113 million in "deception" damages, cannot be sustained as a matter of law and is not supported by the evidence at trial.

The claim that false advertising and product disparagement "would be sufficient to turn a nonmonopolist [like BD] into a monopolist" cannot succeed, except perhaps "in rare and gross cases."  3B Areeda & Hovenkamp Antitrust Law, ¶ 782a at 321-22 (3d ed. 2008).  Misleading ads and product comparisons are prevalent -- indeed, they most often are found -- in highly *competitive* markets.  Exaggerating the virtues of one's own product or misrepresenting the features of a rival's may be unfair, but they do not indicate a lack of competition and do not threaten to "destroy competition itself."  3B Areeda & Hovenkamp, ¶ 807c2.  That is why the Fifth Circuit has held that "the purposes of antitrust law and unfair competition law generally conflict."  *Nw. Power Prods, Inc.* v. *Omark Indus., Inc.*, 576 F.2d 83, 88 (5th Cir. 1978).  An act of "unfair competition" like false advertising "is still competition" and, therefore, raises no antitrust issue unless used in an extreme case to gain monopoly power "<u>by eliminating a rival concern from the market</u>."  *Id.* at 88-89 (emphasis added).

This is not such a "rare and gross" case.  There is no substantial evidence that the allegedly "deceptive" conduct satisfies the three liability elements for attempted monopolization:

<div align="center">2</div>

that "(1) the defendant engaged in predatory or exclusionary conduct, (2) the defendant had a specific intent to monopolize, and (3) there was a dangerous probability that the defendant would successfully attain monopoly power." *Taylor Pub. Co.* v. *Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000). Thus, BD is entitled to judgment as a matter of law on the attempted monopolization claim under Section 2 of the Sherman Act.

**A.**      **RTI Failed to Present Substantial Evidence that BD Engaged in "Predatory or Exclusionary Conduct."**

Exclusionary conduct under Section 2 is conduct "'other than competition on the merits . . . that reasonably appears <u>capable of making a significant contribution to creating or maintaining monopoly power</u>.'" *Taylor*, 216 F.3d at 475 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 651 at 82 (1996)) (emphasis added); *see Stearns Airport Equip. Co.* v. *FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). To find that BD engaged in exclusionary conduct for an attempted monopolization claim, there must be substantial evidence that BD's product claims (*e.g.*, "World's Sharpest Needle") and product offerings (*e.g.*, the 3mL Integra syringe) could "bring about reduced output and 'monopoly' prices" by "<u>tend[ing] to destroy competition itself</u>." 3B Areeda & Hovenkamp, ¶ 807c2 (emphasis added).

As one court explained in holding that false advertising presumptively is *not* exclusionary, "[t]he Sherman Act is not a panacea for all evils that may infect business life." *Berkey Photo, Inc.* v. *Eastman Kodak Co*, 603 F. 2d 263, 288 n.41 (2d Cir. 1979). While RTI argues that there is no finite list of anticompetitive acts, the Supreme Court ruled in its landmark case on attempted monopolization that such acts must tend "to destroy competition itself":

> The purpose of the [Sherman] Act is <u>not to protect businesses from the working of the market</u>; it is to protect the public from the failure of the market.
>
> The law directs itself not against conduct which is competitive, even severely so, but <u>against conduct which unfairly tends to destroy competition itself</u>.

3

*Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 458 (1993) (emphasis added).   As such, "Antitrust law is rife with . . . examples of what competitors find to be disreputable business practices that do not qualify as predatory behavior."  *Taylor*, 216 F.3d at 476.

Here, the conduct that RTI claimed to be exclusionary was: (1) false advertising about BD's own products and about RTI's products, and (2) disparagement by infringing RTI's patents, "combined with" making and selling retractable syringes (Integra) that functioned poorly and thereby "tainted the market" for all retractable syringes.  *See* Doc. 570 at 6.  RTI tried to prove that the false advertising and infringement/tainting were part of a single antitrust scheme involving "exclusionary" hospital contracts and "loyalty" discounts.   With respect to those contract-related claims, RTI presented the testimony of Einer Elhauge, who analyzed "10 million observations" of sales data, ran 15 statistical "regression" analyses, and wrote five expert reports purporting to show that BD's pricing and contracting practices were harmful to the competitive process.  9/11:12, 100, 104-105 (AM).  The jury rejected those claims, finding no liability for monopolization, restraint of trade or exclusive dealing, and finding that RTI is entitled to zero damages for its "anticompetitive contracting" claims.  Doc. 577 at 2-4.

Although the jury found that RTI is entitled to so-called antitrust "deception" damages, RTI presented no expert testimony or other evidence to prove that BD's advertising or "tainting" was exclusionary -- *i.e.,* threatened to destroy competition itself.  Unlike the voluminous (if erroneous) analytical work he did with respect to BD's contracts, Elhauge did not present a single economic test, calculation, regression or empirical study to try to show that BD's advertising was exclusionary.  He did not even mention patent infringement or "tainting."

This failure of proof is not surprising.   "The concern of § 2 is with monopoly, <u>not unfairness or deception</u>." 3 Areeda & Hovenkamp, ¶ 651h (emphasis added).  There must be substantial evidence that the unfair or deceptive conduct caused harm to competition, not to one

4

competitor.  "Accordingly, it is not enough under § 2 to find that a firm has engaged in 'unfair' conduct; the antitrust tribunal must also decide that the conduct has had, or is likely to have, the effect of significantly impairing the ability of rivals to compete."  *Id.*

As demonstrated below, BD is entitled to judgment as a matter of law under the first requirement for attempted monopolization -- "predatory or exclusionary conduct" -- because (1) none of the conduct complained of is cognizable as anticompetitive conduct; and (2) even if such conduct could in some "rare and gross cases" rise to the level of harming competition, there is no substantial evidence that this is such an extreme and unusual case.

### 1.     As a Matter of Law, the Challenged Conduct Is Not Anticompetitive or Exclusionary.

The Fifth Circuit has held that "patent infringement is not an injury cognizable under the Sherman Act."  *Nw. Power*, 576 F.2d at 88-89 (citing *Kinnear-Weed Corp.* v. *Humble Oil & Refining Co.*, 214 F.2d 891, 894 (5th Cir. 1954)).  The harm that patent infringement causes to patent holders, as individual competitors, is not harm to competition of the type prevented by the Sherman Act.  Patent infringement, by its nature, increases rather than decreases competition by increasing, rather than decreasing, the output of products available to consumers.  *See Kinnear-Weed*, 214 F.2d at 894.  RTI's infringement/tainting claim is legally untenable for that very reason:  RTI complains that BD marketed a competitive retractable syringe.  That is more competition, not less.

For similar reasons, the Seventh Circuit has held that making false statements about a competitor's products is not "actionable under the antitrust laws."  *Sanderson* v. *Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005).  "Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not."  *Id.*  This is because "[a]ntitrust law condemns practices that drive up prices by curtailing output. . . .  False

statements about a rival's goods do not curtail output in either the short or the long run.  They just set the stage for competition in a different venue:  the advertising market."  *Id.* at 623 (emphasis added).  Thus, a falsehood about a competitor is not a matter for the antitrust laws, "which are concerned with the protection of competition, not competitors."  *Mercatus Group, LLC* v. *Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011) (internal quotation marks omitted) (citing *Nw. Power*, 576 F.2d at 88).

This is consistent with the Fifth Circuit precedent cited by the Seventh Circuit:  "The thrust of antitrust law is to prevent restraints on competition.  Unfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition."   *Nw. Power*, 576 F.2d at 88.  In *Stearns*, the Fifth Circuit found that even if a firm's sales presentations contained "wrong or "misleading" statements about its products and its rival's products, "they are all arguments on the merits, <u>indicative of competition on the merits</u>." 170 F.3d at 524 (emphasis added).  The fact that promotional claims are misleading or false is *not* indicative of an anticompetitive purpose because its competitive purpose is "obvious:  it was trying to sell its product."  *Id.*[3]  The same principles apply to all of RTI's allegations of deception as exclusionary conduct.

Accordingly, BD's advertising and competing products -- even if "wrong" or "misleading" -- cannot legally constitute exclusionary conduct in support of a Section 2 claim.

---

[3]  By contrast, true exclusionary conduct is "economically irrational" absent an anticompetitive objective -- *e.g.*, below-cost pricing intended to put a rival out of business.  False advertising makes perfect economic sense as a method (albeit unfair) to win more business.  *See Stearns*, 107 F.3d at 524; *see also Sanderson*, 415 F.3d at 623 ("Much competition is unfair, or at least ungentlemanly; it is designed to take sales away from one's rivals.")  Here, there is no evidence that BD's advertising was "economically irrational" absent an intent to destroy competition.

###### 2.    There Is No Substantial Evidence that BD's Conduct Was, In Fact, Exclusionary.

Even if false advertising, disparagement or patent infringement could in theory constitute exclusionary conduct, far more than harm to a competitor (like RTI) would be necessary to establish that the conduct posed a "significant and enduring adverse impact to competition itself." *Am. Prof'l. Testing Serv., Inc.* v. *Harcourt Brace Jovanovich Legal and Prof'l. Pubs., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).   Though "disparagement of a rival . . . may be unethical and even impair the opportunities of a rival, its harmful effects on competitors are ordinarily not significant enough to warrant recognition under § 2 of the Sherman Act." *Id.* at 1151.  "Proof of harm to a specific competitor, which is all that tort law [*e.g.*, the Lanham Act] typically requires, is almost never sufficient to meet the antitrust concern" -- *i.e.*, does the conduct threaten to destroy the competitive restraints imposed on the defendant against charging monopoly prices.  3B Areeda & Hovenkamp, ¶ 782.

Thus, there must be substantial evidence of "'significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct."  *Harcourt*, 108 F.3d at 1151 (citing 3 Areeda & Turner, *Antitrust Law* ¶ 737b at 278 (1978)) (emphasis original).   Several Circuit Courts have adopted a presumption that such conduct has only a *de minimis* -- *i.e.,* non-actionable -- impact on competition.  *See Harcourt*, 108 F.3d at 1152; *Am. Council of Certified Podiatric Physicians & Surgeons* v. *Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003); *Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  As one held:

> While false or misleading advertising directed solely at a single competitor may not be competition on the merits, the fliers in question <u>must have a significant and enduring adverse impact on competition itself</u> in the relevant markets to rise to the level of an antitrust violation.

*Harcourt*, 108 F.3d at 1152 (emphasis added). [4]

District courts in the Fifth Circuit likewise have found that, "[o]nly in the most extreme circumstances can disparagement form the basis for an antitrust claim; it is assumed to have a *de minimis* impact on competition." *Funeral Consumers Alliance, Inc.* v. *Serv. Corp. Int'l*, 2008 WL 7356272, at *12 (S.D. Tex. Nov. 24, 2008) (emphasis added); *see also L-3 Commc'ns Integrated Sys., L.P.* v. *Lockheed Martin Corp.*, 2008 WL 4391020, at *7 (N.D. Tex. Sept. 29, 2008) (the *de minimis* presumption is "relatively consistent with the Fifth Circuit's fundamental view of the nature of exclusionary conduct").

As shown below, whether a *de minimis* presumption is applied or not, there is no substantial evidence to show that BD's advertising, disparagement ("tainting"), or patent infringement threatened to destroy competition itself in the safety syringe market.

> **(a)      False Advertising: There Is No Substantial Evidence that BD's Advertising Was Exclusionary Conduct.**

The evidence is legally insufficient to prove that BD's needle sharpness or waste space advertising claims were exclusionary. There also is no substantial evidence that BD's "safety" claims are exclusionary, especially as the Court determined that none of those claims is actionable as false advertising.

First, RTI presented no substantial evidence to prove that BD's advertising was "capable of making a significant contribution to creating or maintaining monopoly power" in the market for safety syringes. *Taylor*, 216 F.3d at 475 (internal quotation marks omitted).

---

[4] There is a six-factor test to rebut the presumption, which the Second and Ninth Circuits (among other courts) have adopted: The presumption could be overcome "by cumulative proof that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Harcourt*, 108 F.3d at 1152; *Ayerst*, 850 F.2d at 916; *see also David L. Aldridge Co.* v. *Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998) (applying the six-factor test). There is no substantial evidence to meet that test in this case.

Second, the trial evidence demonstrates that the alleged false advertising did *not* prevent RTI or any other competitor from competing to sell its products in the market.

### (i) *No Substantial Evidence that BD's Advertising Was Capable of Creating Monopoly Power.*

RTI presented no expert opinion and no fact testimony to establish that BD's alleged false advertising was capable of creating monopoly power in the market for safety syringes -- that is, "'the power to control price or exclude competition.'" *United States* v. *American Airlines, Inc.*, 743 F.2d 1114, 1117 (5th Cir. 1984) (quoting *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).

RTI's antitrust liability expert, Einer Elhauge, conducted no economic tests, studies or statistical analyses to even try to demonstrate that BD's advertising had an anticompetitive effect. At trial, Elhauge finessed this absence of proof by stating his belief that BD's advertising, if proven to be false, would be anticompetitive. 9/11:120-21 (AM). He theorized how false advertising could harm *competitors* by causing them to lose sales and by raising their costs. *Id.* at 121-22. But he offered no economic evidence to prove that any such harm to competitors had actually occurred or was likely to occur as a result of BD's advertising -- much less any harm to competition. Elhauge's theory does not constitute "substantial evidence" in support of the verdict. *See Weisgram* v. *Marley Co.*, 528 U.S. 440, 454-57 (2000); *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242-43 (1993).

The basis for Elhague's unsubstantiated theory is a hypothetical that illustrates the kind of "rare and gross" facts that are completely missing here. *See* Doc. 395 Ex. A-1 at 135-36. Elhague hypothesizes an imaginary market with only two firms (A and B), and supposes that Firm A uses deceptive advertising aimed at Firm B. Because of its cost structure, Firm B is

unable to compete offering lower prices.  *Id.*  As a result, Firm B is driven out of business, leaving Firm A alone with monopoly power.  *Id.*

RTI offered no evidence, via Elhauge or otherwise, to prove that BD's advertising had, or could have had, that type of exclusionary effect.  The evidence proves to the contrary:

(1)   BD faces substantial competition from multiple rivals in the market for safety syringes.  As of 2010, Covidien had 30% market share in safety syringes and Smiths had 10%.  9/17:50 (AM); Declaration of William B. Michael dated Oct. 11, 2013, Ex. A; DX2155.  Even if BD's ads had prevented RTI from offering lower prices (which they did not), and even if the ads had driven RTI out of the market (which they did not), there is no evidence that the price-restraining effect of these other formidable competitors could have been so impaired by BD's advertising that BD could have acquired the power to charge monopoly prices.  *See* 9/17:49-52, 58-60, 71-72, 152-54 (AM).

(2)   BD's allegedly deceptive conduct has not driven RTI, *or anyone else*, out of the safety syringe market.  The competitors' share of the market has steadily *risen* -- to more than 50% -- since BD embarked on its course of allegedly anticompetitive advertising.  9/17:52-53 (AM); Michael Ex. B; DX2155.  BD, meanwhile, has not succeeded in becoming the only seller of safety syringes, or even come close.  9/17:50 (AM); Michael Ex. C; DX2155.  Its market share went *down* during the period in question.  9/17:52-53 (AM); Michael Ex. B; DX2155.[5]

(3)  There is no substantial evidence that BD's advertising prevented RTI, *or anyone else*, from competing for business by offering lower prices.  RTI presented no evidence that BD's

---

[5]   In *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 591 (1986), the Supreme Court rejected the plaintiffs' claim of a predatory pricing conspiracy in part because, "two decades after their conspiracy is alleged to have commenced," the defendants had failed to drive plaintiffs out of the market or even reduce their market shares and, thus, their goal of obtaining enough market power to charge monopoly prices was "yet far distant."  Here, similarly, BD's alleged anticompetitive conduct lasted for at least seven, and as many as 25 years (*see infra* at 18), and yet BD has not succeeded in driving any competitor out of the market or in obtaining the monopoly power it allegedly sought.

advertising affected, or was capable of affecting, marketwide pricing of safety syringes. All the economic evidence proves otherwise. *See* 9/17:153-54 (AM). The selling prices for BD, Covidien and Smiths safety syringes fall within a tight competitive range of 21 to 23 cents, and prices have not risen significantly over time -- all of which indicates active price competition. 9/17:58 (AM); Michael Exs. C, E-J; DX2153; DX2155. Within the segments of the safety syringe market, the economic evidence shows aggressive competition between BD, Covidien and Smiths. 9/17:53-56, 58-61 (AM); Michael Exs. C, F-H; DX1661; DX2153; DX2115. And while RTI *chooses* to charge higher prices, the evidence proves that RTI's cost and capacity enable it to price its products for much less to match or beat the competition. 9/16:78, 167 (AM); 9/17:58-62, 112-18 (AM); 9/18:135-36 (AM); Michael Exs. E-H; DX1661; DX2155; *see also* 9/16:146-47, 153-54 (AM). Indeed, within the retractable segment of the market, RTI has successfully competed on price and won 67% of the business. 9/16:165 (AM); 9/17:54-55, 61-62, 156 (AM); Michael Exs. I-J; DX1661; DX2153; DX2155.

Lastly, the evidence also fails to establish that even RTI *itself* was harmed. RTI presented no witness to testify that the challenged advertising had an impact on marketwide purchasing decisions. To the contrary, RTI's marketing expert Carol Scott admitted that she made no inquiry into whether any of the challenged advertising affected decisions to purchase from BD or RTI; that she had no opinion as to whether BD's advertising hurt RTI's sales; and that she had no statistically meaningful evidence that BD's allegedly false waste space claim had any impact on consumers. 9/12:30-32, 37-42 (PM). Likewise, she did not examine whether the advertising affected buyers' decisions to purchase from Smiths or Covidien. 9/12:29-30 (PM). RTI also presented no testimony from actual purchasers that they were misled by BD's

advertising, or that it was material to their purchasing decisions.  The only purchaser testimony proves the opposite.  9/17:16, 31-33 (AM);  9/17:153-54, 177, 191 (PM).[6]

In sum, there is no evidentiary basis on which a reasonable jury could conclude that BD's advertising had the potential to destroy competition itself.

### (ii)   No Substantial Evidence that BD's Advertising Prevented RTI, or Any Other Competitor, From Competing for Business.

There is no substantial evidence that BD's advertising had the potential to harm competition as a whole by "significantly impairing the ability of rivals to compete."  3 Areeda & Hovenkamp, ¶ 651h.  RTI presented no evidence to show that BD's advertising had any impact on the ability of the *other competitors*, like Smiths and Covidien, to compete for and win business.  In fact, the economic evidence proves otherwise.  *See supra* at 10-11.  The evidence also shows that other rivals were able to respond directly to BD's advertising through advertising of their own.  *See Am. Council*, 323 F.3d at 372 ("There can be no harm to competition, such as the exclusion of competitors, when the victims of false advertising are easily able to counter it.").  With respect to needle sharpness, at least one competitor (Terumo) conducted its own tests and ran its own advertisements challenging BD's claims.  9/17:101 (PM); PX731.

Further, as discussed above, RTI failed to prove any substantial harm, *even to itself*.  At trial, RTI referred to a handful of customers whose business RTI *might* have lost as a result of

---

[6]  That testimony demonstrates that buyers of safety syringes are sophisticated and highly-trained medical professionals, including nurses and doctors, who evaluate competing safety syringe products themselves and make purchasing decisions based on their own experiences. 9/17:12-15, 27-30 (AM); 9/17:175-177, 187-188, 191, 199-200 (PM); 9/18:26-28 (AM).  With respect to the "waste space" and "safety" claims, buyers of the products not only are knowledgeable about the subject matter, but conduct their own product tests and studies.  9/17:32-33 (AM); 9/17:173-177, 189-190, 199-200 (PM); 9/18:26-30 (AM). *See Walgreen Co.* v. *AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 152 (D.D.C. 2008) (dismissing § 2 claim based in part on false prescription drug information because, *inter alia*, plaintiff could not "hope" to show a substantial competitive effect where the consumers  of the information were "medical professionals, that is, persons knowledgeable of the subject matter"); *Tate* v. *Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002) (holding that plaintiff's allegations of product disparagement were insufficient to constitute anticompetitive conduct where, *inter alia*, the "type of customers at issue was sufficiently sophisticated so as not to be fooled easily by [defendant's] misinformation").

BD's advertising, but did not try to prove the amount of business -- if any -- that RTI actually lost. *See, e.g.*, 9/9:115-16 (PM); 9/12:170-77 (AM). That is the very definition of a *de minimis* effect. In fact, the evidence showed that with respect to some of the biggest pharmacy chains that were exposed to BD's waste space claim (*e.g.*, Walgreens and Safeway), RTI's sales increased dramatically. 9/16:119, 163 (AM); 9/18:77-78 (AM); Michael Exs. K-N; DX1661. And while claiming that BD made false and disparaging statements to GPOs and distributors, the evidence showed that RTI won safety syringe contracts with every major GPO and made distribution arrangements with every major distributor. DX0059; DX0028; Michael Exs. O-P; DX1661; 9/17:78-79, 155 (AM).

> **(b)** **Disparagement/Tainting: There is No Substantial Evidence that BD's Advertising Was Exclusionary Conduct.**

There is no substantial evidence from which a reasonable jury could conclude that BD's alleged disparagement, or "tainting" of the market for retractable syringes, constituted exclusionary conduct. At trial, RTI devoted significant time trying to show that BD's retractable syringe (the Integra) was a faulty product. However, RTI failed to prove (i) that Integra actually "tainted" the market or disparaged RTI -- *i.e.,* that a single customer declined to buy from RTI because Integra turned them off to retractables; and (ii) assuming Integra did "disparage" RTI, that such unfair competition threatened to destroy competition in the safety syringe market.

> **(i)** *No Substantial Evidence that BD's Integra "Tainted" the Market.*

<u>First</u>, RTI presented no fact witness testimony to prove that customers were dissuaded from buying RTI's syringe because of the Integra. Not a single customer testified at trial that he or she chose not to buy RTI's product because of the Integra. Nor did any RTI sales representatives testify that their efforts were thwarted by the "taint" left by Integra.

Second, RTI presented no expert testimony to show that RTI's sales were reduced by a single unit due to Integra, or that consumers had a negative perception of retractable syringes as a result of the Integra.  On the contrary, RTI's consumer perception expert, Carol Scott, testified that a representative sample of nurses rated RTI's VanishPoint to be the best, safest and most desirable safety syringe.  9/12:13-17 (PM).  Scott surveyed the market for RTI and found no evidence of tainting.  9/12:56 (PM).

Third, customers that purchased *both* Integra and VanishPoint syringes were not "poisoned" against retractables by their experiences with the Integra.  *See* 9/18:71-73 (AM). Customers exposed to Integra were just as likely to keep using RTI's product as customers who never bought Integra.  *Id.* at 72.  The customers who tried the Integra actually went on to buy *more* retractable syringes from RTI than customers who did not.  *Id.* at 72-73.  Further, when BD removed its allegedly tainting (and patent infringing) 1mL Integra from the market in 2009, the sales of that product shifted to RTI's 1mL VanishPoint.  Michael Ex. Q; DX2155.  Rather than poisoning customers against retractables, the volume of 1mL Integra purchases migrated to RTI.

### *(ii)  No Substantial Evidence that "Tainting" Was Anticompetitive.*

Even if there were evidence that the Integra actually "tainted" the market, there is no evidence that the effect was exclusionary -- *i.e.*, that it threatened to destroy the competitive process in the entire safety syringe market, rather than merely reduce the sales of one competitor (RTI) in one segment (retractables).  Elhauge did not even mention RTI's tainting claim.  And RTI presented no evidence that by offering a low quality product, BD prevented competitors from competing for business -- especially competitors *other than RTI*.

RTI failed to present any evidence to show that BD's marketing of that product was anything other than competition on the merits in the retractable segment -- a competition in which BD was the loser.  9/17:54-55, 61-62, 156 (AM); Michael Exs. I-J; DX1661; DX2153;

14

DX2155.  That Integra allegedly was inferior and cost more than RTI's syringe only created a competitive opportunity for RTI to prevail in the retractable segment of the market -- which it did.  *Id.*  But in any event, the introduction and marketing of additional new products, even poor quality products, creates more competition, not less.  *Walgreen Co.*, 534 F. Supp. 2d at 151.[7]

<div align="center">

**(c)     Patent Infringement: There is No Substantial Evidence that BD's Non-Willful Patent Infringement Was Exclusionary Conduct.**

</div>

Contrary to its argument before trial, that patent infringement formed an integral part of its "tainting" theory with respect to the 1mL Integra (*see, e.g.*, Doc. 484 at 1), RTI failed to present any evidence to establish such a link.  RTI's own engineering/infringement expert, Neil Sheehan, testified that he found no evidence that BD intended to taint the market:  "I have no opinion as to whether or not they were trying to taint the market."  9/9:60 (PM).

At RTI's request, the jury was asked to consider whether BD engaged in anticompetitive conduct by "infringing upon Retractable's patents by selling a product that allegedly exhibited design flaws and allegedly tainted the market with respect to all retractable syringe products."  Doc. 567 at 17.  Despite the patent jury's rejection of RTI's claim that the infringement was willful, RTI argued to this jury that BD had hampered RTI's success by "knocking off our patent" and "steal[ing]" RTI's technology.  9/19:136:2-6, 138:23-25; Michael Ex. S.

RTI presented no evidence, however, to establish that BD's act of patent infringement was anticompetitive.  Elhauge did not discuss patent infringement even once in his trial testimony, much less attempt to show through economic analysis how infringing a rival's patents could harm competition.  He presented no opinion and no proof that patent infringement by the

---

[7]  RTI also did not prove that the Integra conveyed any false statements about RTI or its retractable syringe.  RTI alleged a product disparagement claim, but dropped it at trial:  it could not, and did not, present substantial evidence to establish the requisite elements of that claim, including that BD published defamatory statements about RTI that were false.  *Hurlbut* v. *Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987).

1mL Integra led to higher prices or reduced output in the market for safety syringes, was likely to lead to higher prices or reduced output in that market in the future, or had any impact on any competitor in the market *other than RTI*.  Given that sales of the 1mL Integra amounted to less than 1% of the 8.3 billion unit safety syringe market, it is understandable why RTI failed to prove any adverse impact on competition.  DX2155.

RTI presented nothing more than what the patent jury already found:  that BD's 1mL Integra infringed RTI's patents, without a finding of willfulness, and caused an economic injury *solely to RTI*.  That fact is not legally sufficient to establish that such conduct was anticompetitive.  *See Nw. Power*, 576 F.2d 83 at 88-89; *Masimo Corp.* v. *Tyco Healthcare Grp., L.P.*, 2004 WL 5907538, at *13 (C.D. Cal. June 10, 2004).

**B.**     **RTI Failed to Present Substantial Evidence Establishing a "Dangerous Probability" that BD Would Achieve Monopoly Power in the Market for Safety Syringes.**

To uphold the attempted monopolization verdict, there must be substantial evidence that BD's advertising, alleged "tainting" and patent infringement created "a dangerous probability of actual monopolization."  *Spectrum Sports*, 506 U.S. at 456; *see* Doc. 567, § 7.2 at 21.

Evidence of a "dangerous probability" of monopolization is necessary to ensure that the antitrust law is not misapplied to overcompensate individual competitors for unfair or unethical business practices.  As the Fifth Circuit held, the "requirement that an accused's conduct have a dangerous probability of success expresses a significant antitrust principle that the antitrust laws protect competition, not competitors, and its related principle that the Sherman Act does not reach practices only unfair, impolite, or unethical."  *American Airlines*, 743 F.2d at 1117.  Thus, the dangerous probability test is *not* met "by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics."  *Spectrum Sports*, 506 U.S. at 459.  The "concern with an attempt" is *not* whether BD misrepresented its safety syringes or disparaged RTI's, *but* whether

it could "bring about reduced output and 'monopoly' prices in that very market."  3B Areeda &

Hovenkamp, ¶ 807c2 (citing *Spectrum Sports*, 506 U.S. at 455).

There is not sufficient evidence to find such a dangerous probability here:

First, BD's advertising claims and so-called "tainting" were in effect for at least seven

years -- and some of BD's "safety" claims have been in use for more than 20 years -- and yet BD

failed to increase its own market share; failed to prevent new products from entering the market;

failed to prevent competitors from expanding their market shares; failed to drive RTI (or anyone

else) out of the market; and failed to acquire "'the power to control prices or exclude

competition.'"  *Am. Airlines*, 743 F.2d at 1117 (quoting *du Pont*, 351 U.S. at 391).

Second, there is no substantial evidence that BD's conduct was dangerously likely to lead

to the acquisition of monopoly power, even if that conduct had prevented RTI from gaining a

larger market share (a fact which RTI also failed to prove).

Third, there is no substantial evidence that BD's "deceptive" conduct could lead to the

creation of monopoly power in a market where large and well-organized buyers serve as a

structural counterweight to the ability of any seller, including BD, to acquire such power.

### 1.      There Is No Substantial Evidence that the Challenged Conduct Was Likely to Lead to the Creation of Monopoly Power in the Future.

Finding a dangerous probability requires finding that the conduct "threatens to create

durable monopoly power."  3B Areeda & Hovenkamp, ¶ 807j.  The law, and common sense,

teach that if the challenged conduct has continued for a long time without achieving such

monopoly power, there is no "dangerous probability" that it will in the future.  "We would find

attempt claims presumptively implausible if the challenged conduct has been in place for at least

two years and the remaining market remains robustly competitive, as evidenced by ongoing

entry, profitability of rivals, and stability of their aggregate market share."  3B Areeda &

Hovenkamp, ¶ 807f (emphasis added); *see Sterling Merch., Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 126 (1st Cir. 2011) (applying implausibility presumption); *Virgin Atl. Airways Ltd.* v. *British Airways, PLC*, 257 F.3d 256, 269 (2d Cir. 2001) (same).

This is just such an implausible -- and unproven -- attempt claim.

BD's allegedly false and disparaging statements were in use much longer than two years. According to RTI, the needle sharpness and waste space claims ran at least 7 years, from 2004 through 2010.  Doc. 73 ¶¶ 85, 328; Doc. 178 at 6; *see also* 9/9:96 (PM).  Even if the Court had found them actionable, BD's "safety" claims have been in the market for decades:  BD began marketing its Safety-Lok Syringe as a "safety" product in 1988, 25 years ago and a decade before RTI's syringe was on the market.  Doc. 178 at 8; DX3279 at 41-42.  The "World's Sharpest Needle" claim dates back to at least 1991.  Doc. 178 at 11; DX0009 at 2-5.  The brochures with the "waste space" claims were first published in 2002.  Doc. 178 at 2, 6-7; 9/18:9-10 (PM Part 2).  And with respect to the "tainting" claim, BD began marketing the 3mL Integra in 2002.  9/9:131-32 (AM); 9/9:28 (PM).

Whether measured as 7 years or a quarter of a century, there is no substantial evidence that BD's product claims and comparisons prevented, much less threatened to destroy, competition through new product entry, successful rivals or competitive market share gains.  3B Areeda & Hovenkamp, ¶ 807f.  To the contrary, RTI and other competitors' share of the market not only remained stable "in the aggregate," but it *increased*.  The market share controlled by BD's competitors went *up* from 43.2% in 2004 to 51.4% in 2010.  DX2155; Michael Ex. B; 9/17:52-53 (AM).  RTI's own market share rose from 3.7% to 5.9%.  DX2155; Michael Ex. C.

BD's market share, meanwhile, *decreased* from 56.8% to 48.6%.   DX2155; Michael Ex. B; 9/17:52 (AM).[8]

In addition, BD's biggest rival, Covidien, introduced a brand new safety syringe product (the "Magellan") in the face of BD's alleged conduct, and increased its share of "shielding needles" by 20% at BD's expense.  9/17:55-57 (AM); *see* Michael Ex. D; DX2155.  Evidence of expansion shows there is no "dangerous probability" of monopolization because the defendant -- by definition -- "is not yet a monopolist, and the market is currently performing more competitively."  3B Areeda & Hovenkamp, ¶ 807g.  The fact that an existing rival is able to expand proves that BD is not succeeding, and is not likely to succeed, in "reducing marketwide output to monopoly levels without an offsetting output expansion by smaller rivals."  *Id.*

The best evidence, however, that the market for safety syringes remained "robustly competitive" during BD's long-running advertisements and "disparaging" product offering is the unabated price competition between BD, Covidien and Smiths.  9/17:48-51, 71-72, 153-54 (AM); 9/17:11 (PM); 9/10:22-23 (PM).   BD's expert economist, Kevin Murphy, testified (without contradiction) that by offering lower prices and competing aggressively for sales, Covidien and Smiths have prevented BD from acquiring the ability to control prices or restrict output. 9/17:48-52, 60-62, 71-72 (AM):

- As of 2010, average selling prices for all Covidien, Smiths and BD safety syringes fell within a competitive band of 21-23 cents, with BD in the middle at 22 cents, which "tells us that there's a lot of competition going on between these sellers." 9/17:58-59 (AM); Michael Ex. E; DX2153; DX2155.

- BD's average selling price was flat for most of the relevant time period, and rose by only one cent per syringe from 2004 through 2010.  Prices marketwide have not risen significantly during the period of the alleged anticompetitive conduct.  Michael Ex. E; DX2153; DX2155; *see also* Michael Ex. R; DX1661; 9/17:144-45 (AM).

---

[8]  *See Arthur S. Langenderfer, Inc.* v. *S.E. Johnson Co.*, 917 F.2d 1413, 1431 (6th Cir. 1990); *Richter Concrete Corp.* v. *Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982).

- In two of the four categories of safety syringes, BD's average prices are *lower* than the competition.  9/17:59-61 (AM); Michael Exs. F-G; DX2153, DX2155.

- In the two categories where BD has a higher price than the competition -- retracting syringes and shielding needles -- it either comes in a distant second to its competitor (RTI, in the case of retracting syringes), or has lost significant share to its competitor (Covidien, in the case of shielding needles).  9/17:54-56, 61-63 (AM); Michael Exs. C-D, H-I; DX2153, DX2155.

The evidence also shows that, for reasons having nothing to do with BD's advertising, RTI *chose* not to price its safety syringe competitively.  9/16:78, 167 (AM); 9/17:58-62, 112-18 (AM); 9/18:135-36 (AM); Michael Ex. E-H; DX1661; DX2155; *see also* 9/16:146-47, 153-54 (AM).  RTI's average selling prices were as much as 48% higher than Covidien's Magellan; 51% higher than Smiths' Needle-Pro; and 114% higher than Covidien's Safety Syringe.  9/17:58-61; Michael Exs. F-H; DX1661; DX2155.  At trial, RTI made much of the fact that within the retracting syringe segment, its prices were lower than those of the BD Integra.  *See, e.g.*, 9/11:7, 90 (PM).  But, RTI outsold BD by a margin of 3 to 1 as of 2010.  9/17:61-63 (AM); Michael Exs. I-J; DX1661; DX2153; DX2155; *see also,* 9/16:165 (AM).   The fact that RTI was far more successful at selling the VanishPoint against the higher-priced Integra proves that price competition is working, not lacking.  9/17:61-64, 155-56 (AM).[9]

## 2.    RTI Failed to Prove that the Challenged Conduct Was Likely to Lead to Monopoly Power, Even If It Might Have Led to a Reduction in RTI's Market Share.

Even if the challenged advertising and products had suppressed RTI's own market share, that would not prove that BD had a dangerous probability of acquiring monopoly power.  For variations in RTI's market share to have an adverse impact on competition, it would have to be

---

[9]  Professor Murphy's opinions are supported not only by economic data, but by the testimony of actual purchasers of safety syringes, who explained that if BD were to raise prices, they could respond by moving their business to any of the multiple other safety syringe competitors.  9/17:36 (AM); 9/17:63, 66-67, 74, 177, 190, 199 (PM); 9/18:9-10 (AM).  A corporate representative of BD's rival Covidien (Colin Preis), likewise testified that competition in the market for safety syringes -- among BD, Covidien, Smiths and others -- is "fierce, very aggressive, and very healthy."  9/17:11 (PM).

the case that *RTI itself* is constraining its rivals' pricing.[10]

There is no such evidence, and the reason is simple: RTI charges the *highest* prices in the safety syringe market, other than Integra, and contends that it would charge the very same high prices in a "but for" world without BD's allegedly "deceptive" conduct.[11]  While BD, Covidien and Smiths are competing against each other in the 21-23 cent range, RTI prices its product 37-46% higher at 31 cents.  Michael Ex. E; DX1661; DX2153; DX2155; 9/17:58-63 (AM).  The notion that a non-competitively priced product is constraining the much lower-priced alternatives makes no economic or legal sense.  9/17:58-59, 71-72 (AM).

In any event, RTI remains a viable competitor, and has succeeded in the very segment of the market -- retractable syringes -- where the alleged deceptive conduct was focused.  If the retractable waste space claims and tainting actually created a dangerous probability of monopolizing the *entire* safety syringe market, one would expect that BD would at least have overtaken RTI in retractable syringes.   But, as of 2010, RTI's retractable syringe was far outselling BD's retractable syringe.  9/16:165 (AM); 9/17:61-62 (AM); Michael Ex. I; DX1661; DX2153; DX2155; s*ee also* 9/16:165 (AM).  RTI's sales of retractable syringes *increased* (61 to 67%), while BD's own retractable sales *decreased* (33 to 20%).  Michael Exs. C, I; DX1661; DX2153; DX2155; 9/16:165 (AM); 9/17:61-62 (AM).

Given that BD's advertising and marketing of the Integra failed to give BD more than a modest share of the product segment being targeted, there is no evidentiary basis to conclude that

---

[10]   *See Colo. Interstate Gas Co.* v. *Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 695-97 (10th Cir. 1989) (reversing jury's verdict on attempted monopolization claim where the only danger posed by defendant's conduct was that it would "shift 13% of the market" from the plaintiff to the defendant).

[11]   For example, in 2008, the average selling price of RTI's VanishPoint Syringe was 32 cents.  Michael Ex. E; DX1661.  By contrast, the average price of Covidien's Safety Syringe was 18 cents.  Michael Ex. F; DX2155.  And the average price of Smiths' Needle Pro was 23 cents.  Michael Ex. G; DX2155.  RTI's CEO (Shaw) testified that, absent BD's conduct, RTI's prices would be *even higher* than they already are. 9/16:146-54 (AM).  *See also Infra* at 27.

ff


As Areeda and Hovenkamp have explained, "there is at least one kind of intent that the proscribed 'specific intent' clearly *cannot* include:  the mere intention to prevail over one's rivals."  3B Areeda & Hovenkamp, ¶ 805b (emphasis added).  Therefore, RTI had to prove that BD had "a specific intent <u>to destroy competition or build monopoly</u>" in the safety syringe market.  *Times-Picayune*, 345 U.S. at 626 (emphasis added).  Specifically, "the forbidden specific intent is that of acquiring and exercising <u>the power to fix prices or to exclude competition</u>."  *Adjusters*, 735 F.2d at 887 (emphasis added) (internal quotation marks omitted).

Even assuming that RTI had sufficient proof to establish that BD engaged in false advertising in violation of the Lanham Act, or that BD disparaged retractable syringes by marketing a bad one, there is no substantial evidence that BD took those actions with the specific intent to acquire the power to fix prices or exclude competition.  The evidence shows no more than that BD intended to win business and "prevail over one's rivals."  Specific intent cannot be inferred from BD's alleged false advertising because "unfair" conduct "designed to take sales away from one's rivals," makes rational business sense without an intention to monopolize or destroy competition.  *Sanderson*, 415 F.3d at 623; *see also Stearns*, 170 F.3d at 523 (exclusionary conduct generally "requires some sign that the monopolist engaged in behavior that -- examined without reference to its effects on competitors -- is economically irrational").

As for the patent infringement, the patent jury rejected RTI's claim that BD's conduct was willful.  Michael Ex. S at 3.

### D.    Alternatively, the Court Should Grant a New Trial on Antitrust Liability.

A new trial is appropriate when a jury verdict is contrary to the great weight of evidence. *See*, *e.g.*, *Cates* v. *Creamer*, 431 F.3d 456, 460-61 (5th Cir. 2005).  As explained, there is no substantial evidence to support the elements of attempted monopolization.  But at the very least, given the evidence detailed above, the jury verdict is contrary to the great weight of the evidence.

23

BD is entitled to a new trial in which the attempted monopolization claim based on "deception" can be decided without the distraction of RTI's failed claims regarding BD's lawful contracts – and without the confusion caused by the inclusion of allegations that lack substantial evidence. *See*, *e.g.*, *Northeastern Tele. Co.* v. *AT&T Co.*, 651 F.2d 76, 96 (2d Cir. 1981) (reversing and remanding for a new trial in Sherman Act § 2 case "without resort to evidence of conduct that we have found not to have been anticompetitive").

## II.    RTI Failed to Carry Its Burden of Proving Damages Caused by an Antitrust Injury.

Even if the attempted monopolization finding were sound, it would not support the award of $113,508,014 in antitrust damages for "deception regarding safety syringes." Doc. 577 at 4. That award is unrecoverable as a matter of law, for three principal reasons.  <u>First</u>, there is no evidence that the claimed damages were an "antitrust injury."  <u>Second</u>, there is no evidence to establish that the claimed damages were caused by the conduct that forms the basis of the liability finding.  <u>Third</u>, the damage model fails to disaggregate losses caused by anticompetitive conduct from losses caused by lawful conduct.

### A.    RTI Failed to Carry Its Burden of Proving an Antitrust Injury.

RTI "may not recover damages under § 4 of the Clayton Act merely by showing 'injury causally linked to an illegal presence in the market.'" *Atl. Richfield Co.* v. *USA Petroleum. Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  It was RTI's burden to prove "'*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and <u>that flows from that which makes defendants' acts unlawful</u>.'" *Id.* (quoting *Brunswick*, 429 U.S. at 488) (second emphasis added).

The Supreme Court has explained that to constitute an antitrust injury, the "injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Brunswick*, 429 U.S. at 488; *accord Norris* v. *Hearst Trust*, 500 F.3d 454, 465

(5th Cir. 2007).  An "injury, although causally related to an antitrust violation, nevertheless will not qualify as antitrust injury unless it is <u>attributable to an anti-competitive aspect of the practice under scrutiny</u> . . . ."  *Atl. Richfield*, 495 U.S. at 334 (emphasis added, internal quotation marks omitted); *accord Norris*, 500 F.3d at 465.

Analysis of whether the plaintiff has suffered an antitrust injury is especially important in an "atypical antitrust case," like this one, where the alleged anticompetitive conduct -- false advertising, disparagement, patent infringement -- "is still competition," *Nw. Power*, 576 F.2d at 88, and generally harms only an individual competitor, not competition itself.  *Doctor's Hosp. of Jefferson, Inc.* v. *Se. Med. Alliance, Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

### 1. RTI Failed to Prove that It Suffered Any Injury "Attributable to an Anti-Competitive Aspect" of BD's Conduct.

RTI could not, and did not, demonstrate an antitrust injury by trying to prove the sales it lost as a result of BD's alleged false advertising or disparagement/tainting.  That might suffice for a tort claim, but not to establish antitrust standing.  *See Doctor's Hospital*, 123 F.3d at 305.

To try to show that RTI suffered an injury "attributable to an anti-competitive aspect" of BD's conduct, *Atl. Richfield*, 495 U.S. at 334, RTI's economics expert, Einer Elhauge, theorized that deceptive conduct "harms competitors" by causing them to lose sales, resulting in "less market share."  9/11:121 (PM).  Yet, recognizing that lost sales by one competitor is not enough to constitute antitrust injury, Elhauge pinpointed the *anticompetitive* aspect of BD's conduct as the tendency to lead to increased prices marketwide.  9/11:121-22 (PM); 9/18:77-78 (PM Part I).  By raising rivals' costs, Elhauge explained, deception can weaken their ability to serve as a competitive check on monopoly power and increase prices marketwide:  "The competitors are going to have higher costs, so they're not going to be able to inflict as great a price constraint on the firm with monopoly power."  9/11:121-22 (PM).

That is RTI's theory of antitrust injury.  But it is only a theory.  Neither Elhauge nor any other witness provided any evidence or economic analysis to show that BD's alleged false advertising and disparagement actually resulted in, or threatened to result in, higher marketwide prices or costs for safety syringes.[12]

Likewise, RTI did not present any evidence that BD's conduct resulted in any lost sales or lower market share that caused RTI to have higher *costs*.  There is no evidence that RTI's costs were any higher than they would have been absent BD's alleged false advertising and disparagement.  The evidence shows the opposite.  RTI's average incremental cost for the last several years has been around 13 cents, 9/18:135-36 (AM), enabling RTI (if it chose to) to charge lower and more competitive prices.  9/16:78, 167 (AM); 9/17:58-62, 112-118 (AM); Michael Exs. E-H; DX1661; DX2155; *see also* 9/16:146-147, 153-154 (AM).  It is undisputed that RTI can acquire VanishPoint syringes from an overseas manufacturer at a "fixed" cost of around 10 cents per syringe.  9/16:167 (AM); 9/18:135-36 (AM).  Yet, RTI *chose* to price its products far above the prices of its competitors in the safety syringe market -- 31 cents in 2010, versus competitors' prices that ranged from 21 to 23 cents on average.  9/17:58-61, 112-18 (AM); Michael Exs. E-H; DX1661; DX2153; DX2155.

There is no evidence that, in the absence of BD's alleged false advertisements or disparagement, RTI's average incremental cost per syringe would be lower than 13 cents or that RTI would be able to acquire syringes at a cost of less than 10 cents per syringe.  To the extent that RTI did have fewer sales because of its *choice* to charge a higher price, that is not an injury "attributable to an anticompetitive aspect" of BD's conduct.  *Atl. Richfield*, 495 U.S. at 334.

---

[12]  Even if such evidence had been presented, it could not, on its own, establish antitrust injury because higher market prices "would have worked to [RTI's] advantage," not to its detriment.  *Atl. Richfield*, 495 U.S. at 336; *see also Matsushita*, 475 U.S. at 583-84 (holding that a conspiracy to charge higher prices "would indeed violate the Sherman Act, but it could not injure respondents:  as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market  price").

### 2.     The Damage Model Does Not Substitute for Proof of Antitrust Injury.

The "deception damages" model presented by RTI's expert, Robert Maness, does not

supply the missing proof of antitrust injury.  Maness did not even try to identify or measure any

damages flowing from any "anti-competitive aspect" of BD's "deceptive" conduct.  Instead,

Maness purported to calculate all the profits RTI lost as a result of false advertising and

disparagement -- *i.e.*, he calculated what might be *Lanham Act* damages, if his methodology

were not totally invalid.  9/12:119-24, 179-85 (PM); 9/18:122-35 (PM).  His damages model

assumes that without BD's alleged deception, RTI would face no competition from Integra (or

other products) in the retractable syringe segment.  *See* 9/12:121 (PM).  In other words, in

Maness's "but for" world, there is *less* competition, not more.  That is not a measure of antitrust

injury.  *See Brunswick*, 429 U.S. at 488 ("The damages respondents obtained are designed to

provide them with the profits they would have realized had competition been reduced. . . .  It is

inimical to the purposes of these laws to award damages for the type of injury claimed here.").

Nothing Maness did was intended to prove an injury caused by the anticompetitive

effects theorized by Elhauge -- that is, the tendency to raise rivals' costs and thereby raise market

prices.  Maness constructed a damages model which *assumed* that RTI's price, as well as its

costs, would remain *exactly the same* absent BD's conduct.  9/18:83-88 (AM); 9/12:100-104,

122-123 (PM).  In Maness's model, RTI would have made significantly more sales at its *current*

price.  9/12:100-102, 122-23 (PM).  But if that were to occur, then marketwide prices for safety

syringes would be *higher*, not lower, in the "but for" world.  He assumed that consumers would

move from BD's lower-priced products (averaging 22 cents each as of 2010), to RTI's higher-

priced products (31 cents each as of 2010).  *See* Michael Ex. E.

What Maness demonstrated, at most, is that but for BD's conduct, RTI would have

*benefited* from consumers paying *higher* overall prices in the market than they would have if

BD's conduct had persisted.  He did not prove, or even attempt to prove, that RTI suffered harm as a result of higher marketwide prices or costs.  Because RTI failed to present substantial proof of antitrust injury, its Sherman Act §2 claim fails as a matter of law.

### B.      There Is No Evidence of Causation to Support the "Deception Damages."

There is no evidence that the $113 million award for "deception damages" can be causally linked to BD's challenged conduct.   RTI offered two theories of anticompetitive conduct and antitrust damages at trial: contract-based theories and deception theories.  *E.g.*, 9/18:102 (AM).  The jury did not award any "anticompetitive contracting damages."  Doc. 577 at 4.  Thus, the testimony related to the contract-based damages cannot support the damages award.

Maness purported to quantify $113 million in lost profits, which he assumed were caused by BD's alleged "deception."   *See* 9/12:119-24, 179-85 (PM); 9/18:122-35 (AM).   But no evidence supports that assumption.

It is unnecessary to dwell on the allegations about patent infringement and "tainting."  Neither Maness nor Elhauge said a word about patent infringement.  Likewise, Elhauge said nothing about the allegation of "tainting" the safety syringe market with inferior products.  Maness said nothing about the tainting claim in RTI's case-in-chief, 9/12:119-24, 179-85 (PM), and even in rebuttal, he testified only that such conduct "*could*" cause lost sales -- but not that it actually did so in this case.  9/18:127-30 (AM).  And he made no effort to identify any data or other evidence in this case that would support such a conclusion.  *Id*.

Expert testimony about causation is legally insufficient unless the expert testifies that a causal connection is "more likely than not"; testimony that a given fact "could" cause harm is not enough.  *See*, *e.g*., *Pipitone* v. *Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *Daubert* v. *Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1322 (9th Cir. 1995); *Henry* v. *Bridgestone/Firestone Inc.*, 63 F.App'x 953, 958 (7th Cir. 2003).   "When an expert opinion is not supported by

sufficient facts to validate it in the eyes of the law," the Supreme Court has emphasized in the antitrust context, "it cannot support a jury's verdict." *Brooke Group*, 509 U.S. at 242.

RTI offered no substantial evidence to demonstrate that it actually lost sales due to BD's advertising, much less $113 million in profits. RTI did not call a single witness from a hospital, GPO, or other purchasing organization who testified that purchases were affected by BD's advertising. RTI did not call a single salesperson from its own sales force who testified that its sales had been affected by BD's advertising. Even Carol Scott, RTI's expert on these issues, offered no data proving that BD's advertising affected purchasing. *See supra* at 11. The evidence introduced at trial conclusively negated any inference of causation. *See supra* at 10-16.

Given this lack of supporting data, Maness's conclusory statements about causation are unsupported speculation. 9/12:119-24, 179-85 (PM); 9/18:122-35 (AM). He could not identify any hard evidence to support his causation opinions. *Id*. Again, conclusory assertions by experts are entitled to no weight -- especially in antitrust cases. *Brooke Group*, 509 U.S. at 242. Antitrust causation "may not be based on speculation. Rather, the required causal link must be proved as a matter of fact and with a fair degree of certainty." *State of Alabama* v. *Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978) (emphasis added).

Lacking direct evidence to establish that BD's "deceptive" conduct caused it any injury, RTI may try to suggest that Maness's "benchmark" or "yardstick" calculation of damages (which compared the safety syringe market to the I.V. catheter market) could constitute circumstantial evidence of causation. But that approach would confuse the *fact* of damage with the *amount*. Under Fifth Circuit precedent, "[a] plaintiff must first prove the fact of antitrust damages, some 'element of actual damages caused by the defendant's violation of the antitrust laws.'" *Eleven Line, Inc* v. *North Texas State Soccer Ass'n*, 213 F.3d 198, 206-07 (5th Cir. 2000) (citation omitted). "If he does so, a more relaxed burden of proof obtains for the amount of

damages . . . ." *Id*. Yardstick analysis is a "common method[] of quantifying antitrust damages," *id*., but not a substitute for substantial evidence of the fact of damages (*i.e.,* causation). *See id*.[13] There is no evidence that BD's alleged "deception" caused any lost profits.

### C.   The Failure to Disaggregate Is Fatal to the "Deception Damages."

Maness also failed to exclude from his damages model those sales RTI lost due to causes other than BD's alleged false advertising or disparagement. This aspect of antitrust causation analysis is called "disaggregation," and it was properly included in the Court's jury instructions. Maness admitted that his damage model had to determine sales that were lost "only because of the deception, not for any other reason." 9/12:127-128 (PM) ("Correct."). Nonetheless, that is not what he did, which is fatal to the $113 million damage award.

### 1.   RTI Had a Burden to Disaggregate Its Damage Model.

The disaggregation requirement is rooted in the antitrust injury doctrine, which holds that "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. Thus, an antitrust plaintiff "must show that its damages were caused by the particular conduct" found to be an antitrust violation. *Taylor*, 216 F.3d at 484 (citing *Atl. Richfield*); *see El Aguila Food Prods., Inc.* v. *Gruma Corp.*, 131 F.App'x 450, 454 (5th Cir. 2005); *see also MCI Commc'ns* v. *Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983) (explaining the antitrust disaggregation requirement).

### 2.   RTI Failed to Disaggregate Its Damage Model.

Maness testified that his model of deception damages aimed to quantify "sales that were lost *only* because of the deception, *not for any other reason*." 9/12:127-128 (PM) (emphasis added). Maness admitted, however, that the alleged deception is "[n]ot the only" explanation for

---

[13]   *See El Aguila*, 131 F.App'x at 453-54 (analyzing yardstick analysis for amount of antitrust damages separately from fact of causation); *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (distinguishing between "causation, or 'fact of damage,'" and the amount); *Blue Bird*, 573 F.2d at 317 ("The term 'fact of damage' can be likened to the causation element . . . .").

the lost profits he computed.  9/12:184-85 (PM).  He asserted that the lost profits were "largely" due to deception, but presented no evidence to quantify what portion of the $113 million damages is, and is not, due to deception.  *Id.*  Because he admitted that the entirety of the award is *not* attributable to deception, the award of that amount is indefensible.

Moreover, there are at least three disaggregation defects that are also fatal to the award:

First, BD's advertising of three different safety products was included by Maness as a presumed cause of the "deception" damages.  9/12:180 (PM); 9/18:123-27 (AM).  But this Court ruled there was not sufficient evidence that BD's "safety" claims regarding those products constituted false advertising.  9/18:25-26 (PM Part II).  Failure to disaggregate any losses attributable to this *lawful* advertising is fatal.  When a plaintiff has multiple antitrust claims and a court rejects some of them as a matter of law, the plaintiff is obliged to "establish a tighter connection between the behavior and the damages." *Taylor*, 216 F.3d at 485.

Second, the same disaggregation problem invalidates the damages allegedly caused by BD's advertising regarding waste space and needle sharpness.  9/12:120-21, 180-82 (PM); 9/18:123-27 (AM).  Numerous aspects of the challenged brochures and websites were truthful. The centerpiece and main message of the Integra promotional materials was not proven to be false:  namely, that the Integra syringe has lower waste space than any other syringe (true) and enables users to get 11 doses out of a 10-dose vial (also true).  9/16:156-160 (PM).  Even though that "medication savings" claim was true, Maness did not disaggregate the sales RTI supposedly lost as a result of that *lawful* advertising claim from those (if any) lost due to the outdated data about RTI's waste space.  *See, e.g.*, *Taylor*, 216 F.3d at 485; *El Aguila*, 131 F.App'x at 454.

Third, Maness purported to include the anticompetitive effects of "tainting" in his damage model, but he offered no evidence of causation -- *i.e.*, what sales were, in fact, lost due to this supposed disparagement.  He *speculated* that marketing an inferior product *could* cause

consumer confusion and "*could* lead to a reduction in RTI sales." 9/18:127-28 (AM) (emphasis added), yet he did no quantitative analysis and offered no economic evidence to prove that BD's conduct *did* reduce RTI's sales. *See supra* at 28. Then, having failed to prove what, if any, portion of the damages amount was based on "tainting," Maness erroneously failed to disaggregate the effect of BD's *lawful* marketing of a competitive product. *See*, *e.g.*, *Taylor*, 216 F.3d at 485; *El Aguila*, 131 F.App'x at 454.

### III.   The Evidence Does Not Support $113 Million in "Deception" Damages.

The "yardstick" or "benchmark" approach used by RTI to compute damages is not supported by sufficient evidence and, therefore, the damages judgment cannot be sustained. *Eleven Line*, 213 F.3d 198. RTI failed to prove the "comparability" of the two markets (I.V. catheters and safety syringes) and the two businesses (BD's catheter business and RTI's safety syringe business). RTI merely *assumed*, without evidence, that those markets and businesses are similar. "Damage assumptions that find no support in the actual facts of the case cannot support a verdict." *Id.* at 209.

### A.   RTI Had the Burden to Prove that Its Benchmark Was "Closely Comparable" and as "Nearly Identical" as Possible.

RTI's damages expert, Maness, did not calculate real lost profits due to BD's advertising. 9/12:180 (PM). Rather, he used what he claimed to be a benchmark: He compared sales of "retractable catheters" in the I.V. catheter market (namely, BD's Autoguard catheter) to sales of "retractable syringes" in the safety syringe market. 9/12:120-24 (PM). Assuming that the *only* difference was BD's "deceptive" conduct, Maness opined that retractable syringes should have the same share of the safety syringe market that retractable catheters do of the catheter market -- *i.e.*, they "should be about half of the safety syringe market." 9/12:121 (PM).

Unsubstantiated assumptions of comparability will not suffice to award damages based on a benchmark. "An antitrust plaintiff who uses a yardstick method of determining lost profits bears the burden to demonstrate the reasonable similarity" of the businesses being compared. *Eleven Line*, 213 F.3d at 208. Specifically, the business used as the benchmark must be "closely comparable" and "as nearly identical to the plaintiff's as possible" *Lehrman* v. *Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974). Failure to prove the yardstick is "<u>as nearly identical</u>" as possible requires reversal of a jury verdict. *Eleven Line*, 213 F.3d at 209 (quotation omitted).

The reason for the "nearly identical" standard is that the Fifth Circuit has "rejected claims where the plaintiff's proposed method of calculating [antitrust] damages failed to reasonably approximate actual economic losses." *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 303 (5th Cir. 2003). That is the fatal legal defect in RTI's damages calculation. It is not based on RTI's actual losses. And neither Maness nor any other RTI witness even purported to prove that the I.V. catheter market is a reliable benchmark -- *i.e.*, that but for BD's conduct, the safety syringe market would perform just like the I.V. catheter market, and a *syringe* with a retracting needle would have the same success as a *catheter* with a retracting needle. As shown below, that simplistic assumption is not based on any evidence and, in fact, is contradicted by the medical and economic evidence: the two markets involve very different medical devices, used for different medical procedures, made by different competitors, using different designs and technologies, competing at different price points, and serving a different mix of customers and clinical needs. *See* 9/18:66-69 (AM).

It was just such a failure to prove comparability that required reversal in *Eleven Line*, 213 F.3d at 208-09; *see also El Aguila*, 131 F.App'x at 453-54 (expert testimony that fails to provide a proper yardstick is no evidence of antitrust damages). The "yardstick method" used in *Eleven Line* was rejected by the Fifth Circuit because, although the plaintiff computed damages for one

of its sports facilities based on the profitability of its other sports facilities, "[n]o evidence was offered of the geographical location, size or attractiveness of those facilities, the size and type of the [relevant] market that they served, the relative cost of the operation, the amounts charged per team, or the number of seasons run." 213 F.3d at 208.  Without such evidence of comparability, even a comparison between the *same* businesses run by the *same* owner is insufficient.  Here, RTI used *different* products in *different* markets, and presented no evidence of comparability.[14]

### B.      RTI Failed to Meet Its Burden of Proving a Valid Benchmark.

RTI did not present any witness, expert or fact, to try to prove that the I.V. catheter and safety syringe markets are comparable or that a retracting needle would have the same adoption rate in the two markets.  Maness himself has no relevant expertise or experience in either market, and did not purport to have conducted any study, *of any kind*, to demonstrate that the medical, economic, competitive, or product design dynamics of the two markets are substantially similar, much less "nearly identical."    9/12:86-87,  120-22,  182-84  (PM);  9/18:121-23  (AM).  Assumptions and estimates cannot be used to determine damages unless they "rest on adequate data." *Eleven Line*, 213 F.3d at 207; *Lehrman*, 500 F.2d at 668.  Maness had *no expertise* and *no data* to support his assumption of comparability.  His opinion was a bare conclusion unsupported by either expertise or data.  Therefore, it is no evidence.  *See Brooke Group*, 509 U.S. at 242; *Eleven Line*, 213 F.3d at 207-09.

Maness conceded that the *only* "characteristics that I'm concerned about are retraction, risk of needlestick, right, and -- lack of disparaging statement."  9/12:181-82 (PM); *see also id*. at 120-21, 184.  In other words, he asked only two questions:  Do the markets involve products with needles on them, and do some of those have a retraction feature?  He ignored the clinical

---

[14]   For the reasons stated in BD's motion to exclude the Maness testimony, his yardstick analysis was unreliable and should have been excluded in any event, so it is insufficient.  Doc. 373; *see also Weisgram*, 528 U.S. at 454-57.

uses and limitations of the products, patient needs, clinician preferences, prices, the businesses that make the products, the competitors they face, the other competitive safety technologies available in the different markets, and the clinical and economic reasons why the BD Autoguard is more commercially successful in the catheter market than the RTI syringe is in the safety syringe market.  *See* 9/10:125-27 (PM); 9/16:83-91(PM).  Maness disregarded all those other factors, admitting that he did not control for any potential differences between the markets other than BD's advertising.  *See* 9/12:120-21, 181-84 (PM).

RTI offered no evidence through any witness to support Maness' baseless assumption. Even though John Ledek, the former head of BD's catheter business, testified during RTI's case that the I.V. catheter and syringe markets are totally different, RTI did not call any witness or offer any evidence to prove otherwise.  Indeed, the only economic evidence developed by RTI proved that I.V. catheters and safety syringe are *different* product markets for antitrust purposes. *See* 9/11:14 (AM).

### C. The Evidence Proved that the Markets and Businesses Maness Compared Are Not Nearly Identical or Closely Comparable.

The testimony from John Ledek and Dr. Carl Vartian, and the economic evidence from Kevin Murphy and Robert Sherwin, proved that Maness was comparing very *different* products, used in very *different* markets, marketed by very *different* businesses.

#### 1. The Products Are Significantly Different, Not Comparable.

Maness did not compare the performance of two similar businesses in the same market making the same product, which is the conventional benchmark approach.  *See*, *e.g.*, *Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 780 F.2d 1212, 1220 (5th Cir. 1986).  Instead, he compared the performance of two completely different products in two completely different markets.

Maness admitted that I.V. catheters and safety syringes have very different materials and features, and "[t]hey're used for different purposes."  9/12:181-82 (PM).  The products, he conceded, are different and not interchangeable.  9/12:182 (PM); *see also* 9/18:66-68 (AM).  As Mr. Ledek testified, a "syringe is a completely different product than a catheter" and cannot be used to perform the sole function of the Autoguard, to "insert a catheter into a vein."  9/10:125-127 (PM).  Conversely, a catheter cannot be used "to perform the type of procedures that you do with syringes like blood-drawing, biopsies or intramuscular injections."  9/10:126 (PM).

Further, the evidence undermines the central premise of Maness's yardstick calculation: since the "retracting" needle of the Autoguard catheter is what accounts for its success, Maness just assumed, the "retracting" RTI syringe would have achieved the same success in the absence of BD's false advertising.  In truth, the evidence shows that the success of the Autoguard is due to myriad other *catheter*-related features, and the limited success of RTI is due to other *syringe*-related features, thereby rendering any un-controlled comparison between the two meaningless.

As the Fifth Circuit held in *Eleven Line*, the failure to submit or consider evidence of the "attractiveness" of the supposed comparable business, is grounds for rejecting a benchmark damages verdict.  213 F.3d at 208.  Maness made that very mistake by disregarding the evidence:

- The Autoguard can be used for 100% of peripheral I.V. catheter procedures, whereas the RTI syringe can only be used for some syringe procedures.  9/16:93-96, 99, 102, 104, 106 (PM).  It follows, as a matter of medical practice, that BD's retracting catheter would do better (in the catheter market) than RTI's retracting syringe would do (in the safety syringe market).  9/18:68 (AM).  Therefore, Maness' assumption that the products should have the same level of penetration in their respective markets is scientifically unsound and contradicted by the evidence.

- The success of the Autoguard catheter is due to numerous product benefits having nothing to do with needle retraction, *e.g.*, the proprietary Vialon catheter material, patient in-dwelling time, ease of insertion, the "Instaflash" feature, and the "push button" safety mechanism.  9/10:118-20, 122-25 (PM).  Maness ignored all these design, clinical, and performance factors that explain Autoguard's popularity.  9/18:65-66 (AM).

- The "attractiveness" of Autoguard to nurses and doctors is *not* merely that it has a "retracting" needle, *but* that it has a "push button" activation mechanism.  9/10:123-25 (PM).  As Mr. Ledek testified, the location of the Autoguard's activation button near the clinician's hand, allows for ease activation and provides a desirable measure of control during an already-complicated medical procedure.  *Id.*

In sum, I.V. catheters and safety syringes are *not* "closely comparable" or "nearly identical," and thus cannot be used to reasonably approximate RTI's economic loss.  *Bell Atl.*, 339 F.2d at 303.

## 2.    The Markets Are Significantly Different, Not Comparable.

Another ground for reversing the benchmark damages in *Eleven Line* was the failure to prove the "size and type of the [relevant] market[s]" being compared.  213 F.3d at 208.  Here, Maness failed to present such evidence, and gave no heed to the evidence that the I.V. catheter and safety syringe markets are not comparable at all:

- The two markets involve *different competitors*, which Maness admitted.  9/12:183 (PM).  B. Braun, the aggressive price competitor in the catheter market, 9/10:137 (PM), does not even make a syringe.  Covidien, the largest competitive threat to BD in the safety syringe market and the number one seller of sliding sheath safety syringes, 9/17:49-51 (AM), does not compete at all in the catheter market.

- The two markets have *different customer bases*.  Catheters are used primarily in hospitals, while retractable safety syringes are sold largely to non-hospitals:  flu clinics, doctors offices, and retail pharmacies.  9/18:67 (AM); *see also* 9/17:67-68 (AM).

- The two markets involve *different safety technologies*.  In other words, the BD retracting catheter competes against a totally different array of competitive safety designs (*e.g.*, passive and closed systems) than does the RTI retracting syringe (*e.g.*, sliding sheaths).  9/17:53-54 (AM); 9/10:135-40 (PM); 9/12:182 (PM); 9/16:32 (PM); Michael Exs. R, U.

Thus, the retracting catheter and the retracting syringe face very different competitive forces and different competitive threats.  In addition, Maness paid no attention to the impact of the prices for competing products in the two markets.  The RTI syringe is priced 35% to 140% higher than the non-retractable competitive alternatives -- which in large part explains why the retractable segment is a relatively small part of the safety syringe market.  9/17:58-61 (AM);

37

Michael Ex. F-H; DX1661; DX2153; DX2155; 9/18:68 (AM).   RTI presented no evidence to show that any comparable gap in pricing exists between retractable and non-retractable I.V. catheters, and the only evidence that is in the record shows that the two markets are *not* comparable in this regard.  9/18:68 (AM).

In *Eleven Line*, the Fifth Circuit found that the failure to consider differences in "relative costs" and differences in the "amounts charged" warranted reversal.  213 F.3d at 208.  Maness admitted that the relative "range of prices" for competing I.V. catheter products differs from the relative "range of prices" for safety syringes, 9/12:183 (PM), but he did nothing to control for that major variable.  That is directly contrary to the leading authority on antitrust law:  when a comparison is made between two markets, "[t]he expert makes suitable <u>adjustments for any cost differentials</u> between the two markets and then compares prices in the litigation market with those in the yardstick market."  Herbert Hovenkamp, ed., 5 MOD. SCI. EVID. § 46:8 (2012-2013 ed.) (emphasis added).

### 3.     The Businesses Are Significantly Different, Not Comparable.

Under a conventional yardstick analysis, the plaintiff's damages expert would compare the plaintiff's business to a comparable business in the same market that is not affected by the anticompetitive conduct -- *i.e.*, a business that is "as nearly identical to the plaintiff's as possible."  *See Lehrman*, 500 F.2d at 667; *see also* John J. Miles, 1 Health Care and Antitrust L. § 9:8 (2013) (citing cases).  Maness, however, did nothing to show that BD's catheter business is closely comparable to RTI's safety syringe business. The evidence shows that they are not comparable businesses -- and for reasons that explain why the BD Autoguard is more successful than RTI's syringe:

- BD's business *invented* the modern I.V. catheter in the 1950's.

- BD *invented* the current generation of catheter material.

- BD introduced its first safety catheter in 1993.

- BD sells Autoguard as part of a portfolio of five different safety catheters.

9/10:118-21, 135 (PM); Michael Ex. T.

RTI, by contrast and by its own account, is a relatively recent market entrant, has no history or heritage in the medical device industry, and sells only one type of safety syringe.  RTI also claims that it does not have the market advantages that come with BD's longevity in the industry, financial performance, and diversity of product offerings.   With or without the pejorative spin RTI puts on those market realities, no legally valid assessment of damages could be based on an uncontrolled comparison of such different businesses.  *Eleven Line* held that even a comparison among firms in the same business and owned by the same owner was invalid.  213 F.3d at 208.  RTI's benchmark is much worse.

### D.      Alternatively, the Court Should Grant a New Trial or Suggest a Remittitur.

If the Court declines to enter judgment as a matter of law on antitrust causation and damages, it should grant a new trial on damages or suggest a substantial remittitur.

At the very least, the evidence supporting the jury's finding of causation and the $113 million damage award is contrary to the great weight of the evidence.  *See supra* at 1.   If necessary, therefore, the Court should order a new trial on "deception damages" unaffected by the distractions of RTI's complaints about BD's lawful contracts and its contract-based damage claims.

Alternatively, the Court should suggest a remittitur because the damages are excessive. Juries may not award damages greater than the maximum amount supported by the evidence. *See*, *e.g.*, *Brunnemann* v. *Terra Intern., Inc.*, 975 F.2d 175, 178 (5th Cir. 1992); *Treadaway* v. *Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 169 (5th Cir. 1990).  The Court could suggest a remittitur based on the defects in Maness's damage model -- such as its failure to disaggregate

alternative causes of loss and the unreliability of its comparison between the I.V. catheter market and the safety syringe market.

But there is a more reliable basis to suggest a remittitur.  The trial record contains evidence on the cost of corrective advertising, which would be an appropriate remedy for the sort of antitrust injury theorized by Elhauge.  *See* 9/11:122 (AM).  Scott testified that $10 million would allow RTI to "correct the impressions" created by BD's advertising going forward. 9/12:78-79 (PM).  This is the only testimony from an RTI witness that even purports to estimate damages based on a potential antitrust injury and that is not afflicted by the flaws that invalidate the "deception damages" model.[15]   Accordingly, the Court should suggest a remittitur to $10 million or, alternatively, order a new trial on damages.

## IV.     *Res Judicata* Bars the Lanham Act Claims and the Related Antitrust Claims.

The jury found BD liable under the Lanham Act for four categories of false advertising: (1) waste space claims; (2) waste space "data on file" claims; (3) world's sharpest needle claims; and (4) world's sharpest needle "data on file" claims.  Doc. 577 at 5.  These claims, as well as the antitrust claims based on BD's alleged deception, are barred by *res judicata*.

The evidence at trial established that all the challenged advertising statements were made by BD *before* the July 2, 2004 dismissal of the parties' prior lawsuit.  DX6003.  Because RTI actually sued (or could have sued) BD about all those product misrepresentations in the prior suit, including the "safety" claims, it is precluded from doing so in this case.  *Oreck Direct, LLC* v. *Dyson, Inc.*, 560 F.3d 398, 404 (5th Cir. 2009).  Every element of *res judicata* is established, as a matter of law, under the analysis of *Oreck*.

---

[15]  BD's damages expert, Robert Sherwin, calculated that RTI's deception damages could be no greater than $7.21 million.  9/18:80-82 (AM).

The facts of *Oreck* are indistinguishable from the present case.  Oreck initially sued Dyson in 2005, alleging that Dyson made false advertising claims, *inter alia*, that "its vacuum cleaners do not lose suction."  *Oreck*, 560 F.3d at 400.  The parties settled and the district court dismissed the lawsuit with prejudice.  *Id.*  Oreck later filed a second suit against Dyson, asserting again that Dyson's claims that its DC18 model had "no loss of suction" were false advertising. *Id.*  In addition, Oreck challenged Dyson's claim that the DC18 model was the "most powerful lightweight" vacuum.  *Id.*  The district court granted summary judgment on both claims on the basis of *res judicata*, *id.*, and the Fifth Circuit affirmed:  A second lawsuit based on the post-dismissal use of pre-dismissal advertising statements is barred.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were <u>or could have been</u> raised in that action." *Id.* at 401 (citation omitted) (emphasis added).  Under the transactional test, *res judicata* requires only that the two actions be based on the "same nucleus of operative facts."  *Id.* at 401-02.  The transactional test asks "whether the facts are related in time, space, origin, or motivation; whether they form a convenient trial unit; and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."  *Id.* at 402; *see* Restatement (Second) of Judgments 524(2).  "[A] prior judgment's preclusive effect extends to all rights of the plaintiff 'with respect to all or any part of the transaction or series of connected transactions, out of which the [original] transaction arose.'"  *Id.* at 402 (citation omitted).

Oreck argued that its Lanham Act claims in the second suit were not barred because the particular advertisements in the second suit were not "the same as those involved in" the first suit.  *Id.* at 403.  The Fifth Circuit found "no merit in Oreck's contention."  *Id.* at 403-04.  The court's reasoning is dispositive here:  The challenged advertising statements "were being used by Dyson during" the first lawsuit to promote its products.  *Id.* at 404.  For this reason, the Court

41

concluded that the claims asserted in the second lawsuit all arose "from the same series of transactions." *Id.* Therefore, "these claims are barred by res judicata." *Id.*

Under *Oreck*, the dispositive issue is whether the advertising statements challenged in this lawsuit were being used by BD during (or before) the first lawsuit. *Id.* at 404. Now that the case has been tried and all the facts have been established, it is beyond dispute that the advertising statements at issue here all were being used by BD during or before the prior lawsuit. Indeed, RTI's own expert based her waste space study on a BD brochure *from 2002 or 2003.* 9/12:81 (PM). RTI's Lanham Act claims based on those advertising statements were brought, and certainly "could have been brought," in the first suit.

BD has used the "World's Sharpest Needle" claim in its advertising since at least 1991, DX0009 at 2-5, and used the claim in marketing materials long before July 2004. *Id.* at 8-20, 17, 27-32; DX3720 at 52-58; DX3932; DX3933; DX6005; PX576 at 40-42, 278-287, 281-82. As for the waste space claims, BD began using advertisements comparing the waste space of its Integra and RTI's VanishPoint syringes when it launched the Integra in 2002. *See* 9/18:3-13 (PM Part II); DX0009 at 6-7, 8-20, 27-32; DX3932; DX3933; DX3720 at 52-58; DX6005; DX6006; PX576 at 253-55, 278-87, 280-83. BD's "safety" product claims have been used since the late 1980's and the 1990's. Doc. 178 at 8.

RTI learned of BD's advertising claims no later than 2002. DX6005; DX0009 at 27-32; 9/18:3-13 (PM Part II). [16]   In fact, in 2001, RTI had sued BD in Case No. 5:01-cv-036-DF, asserting antitrust claims and disparagement claims based on alleged product misrepresentations. *See* DX6004 ¶¶ 45, 46, 50. After three years, that litigation settled and Judge Folsom entered a

---

[16]   These same facts establish the equitable defense of laches, which BD presented in its proposed findings of fact and conclusions of law (Doc. 539-1) and will reassert in response to any request by Retractable for equitable relief. *See Abraham* v. *Alpha Chi Omega*, 708 F.3d 614, 626 (5th Cir. 2013); *PBM Products, LLC* v. *Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011).

consent judgment dismissing all claims with prejudice on July 2, 2004.  DX6003.  Under *Oreck*, that judgment bars the claims in this case under the principle of *res judicata*.

In his ruling on BD's summary judgment motion, Judge Payne agreed that *Oreck* could "certainly be read expansively to reach the instant case."  Doc. 415 at 5.  But he read it narrowly, reasoning that *Oreck* did not apply to claims "'based on conduct transpiring *only* after the earlier litigation had concluded.'"  *Id*. (emphasis added).  This Court agreed, giving RTI a chance to prove its case under that interpretation.  Doc. 499 at 1-2.  Now that the trial is concluded, it is conclusively established that RTI's claims are *not* "'based on conduct transpiring *only* after the earlier litigation had concluded.'"  *Id*. at 1 (emphasis added).  Instead, there is conclusive proof that the advertising statements all originated prior to July 2004 -- *i.e*, none of the allegedly deceptive conduct transpired "only after" the dismissal of the first action.  Since in *Oreck* all the "advertisements were being used by Dyson during" the first *Oreck* case, the second case was foreclosed.  *Id*. at 404.  The same is true here.

Because the transactional test focuses on the claims that "could have been brought," the "legal theories advanced, forms of relief requested, [or] types of rights asserted" in the prior litigation do not matter.  *United States* v. *Davenport*, 484 F.3d 321, 327 (5th Cir. 2007).  "'The effect of a judgment extends to the litigation of all issues relevant to the same claim between the parties, whether or not raised at trial.'"  *United States* v. *Shambaum*, 10 F.3d 305, 310 (5th Cir. 1994) (citation omitted).  Thus, *Oreck* controls this case.[17]

## V.    Release Bars the Lanham Act Claims and the Related Antitrust Claims.

The affirmative defense of release independently bars the Lanham Act claims and related antitrust allegations.  This defense is distinct from *res judicata* because -- as the Fifth Circuit

---

[17] *Eyewear, Inc.* v. *Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012), does not warrant a contrary result.  There, the Federal Circuit applied its own law of *res judicata* for patent infringement, which is very different from the transactional rule followed in *Oreck* for false advertising claims.  *Id.* at 1342-43.

emphasized in *Oreck* -- the scope of *res judicata* is governed by the "transactional test," while the scope of a release is governed "by the parties' actual intentions as reflected in the Settlement Agreement."  560 F.3d at 402.  Thus, the release is an independent basis for judgment as a matter of law.  *Faris* v. *Williams WPC-1, Inc.*, 332 F.3d 316, 322 (5th Cir. 2003).

Several elements are undisputed: (1) RTI and BD signed a Settlement Agreement and Release in 2004 (the "Release"), DX6002; (2) RTI received adequate consideration; and (3) the Release is legally binding.  RTI has denied only that the Release encompasses its claims in the current suit, but RTI is mistaken.  The Release broadly releases BD from:

> any and all causes of action, demands, damages, costs, debts, liabilities, losses or claims of any kind, whether known or unknown, that the RTI Releasors may now have or ever had, or hereafter, shall, or may have against BD, for, upon, or by reason of any matter, cause, or thing, whatsoever, which accrued on or at any time prior to the date of execution of this Settlement Agreement and Release.

DX6002, § 2.

Because BD was making the alleged false or disparaging statements prior to the date of the Release, those causes of action had accrued prior to the date of the Release.  In the Release, therefore, RTI unambiguously released all claims it "hereafter . . . may have against BD" based on those causes of action -- including the present Lanham Act claims and related antitrust claims. *E.g.*, *Ingram Corp.* v. *J. Ray McDermott & Co.*, 698 F.2d 1295, 1310, 1316 n.27 (5th Cir. 1983); *White* v. *Grinfas*, 809 F.2d 1157, 1160 (5th Cir. 1987); *Augustine Med., Inc.* v. *Progressive Dynamics Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999).

If RTI intended to "carve out" future false advertising claims from the Release based on conduct that was ongoing at the time of the release, it had to do so in clear and express language. *See United States* v. *William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907) ("If parties intend to leave some things open and unsettled their intent so to do should be made manifest."); *Augustine Med.*, 194 F.3d at 1373 ("Consistent also with judicial interpretations of

general releases, it is the burden of the parties entering into a settlement agreement to expressly

reserve in the agreement any rights that they wish to maintain. . .").  RTI knew how to do so,

expressly carving out patent infringement claims.  DX6002, § 2.  Alternatively, RTI could have

insisted on an injunction as a condition for any settlement, but it voluntarily decided not to do so.

Thus, its claims in this case have been released, as a matter of law.

**VI.     There Is No Evidence to Support the Lanham Act Claims.**

From the statutory text set forth in 15 U.S.C. § 1125(a)(1)(B), the Fifth Circuit has

distilled the following essential elements of a Lanham Act false advertising claim:

(1)     A false or misleading statement of fact about a product;

(2)     Such statement either deceived or had the capacity to deceive a substantial segment of potential customers;

(3)     The deception was material, in that it is likely to influence the customer's purchasing decision;

(4)     The plaintiff has been or is likely to be injured as a result of the statement at issue.

*IQ Products Co.* v. *Pennzoil Products Co.*, 305 F.3d 368, 375 (5th Cir. 2002).  "The failure to

prove the existence of any element is fatal to the plaintiff's claim."  *Pizza Hut, Inc.* v. *Papa*

*John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

In this case, RTI lacks substantial evidence to support any element of its claim for any of

the challenged advertisements, and BD is entitled to judgment as a matter of law.

If a statement is found to be "literally false," the plaintiff is relieved in the first instance

of the obligation to present prima facie evidence of deception and materiality.  *See Pizza Hut*,

227 F.3d at 497.  But if the defendant comes forward with evidence suggesting that the statement

was not deceptive or was immaterial, then the ultimate burden of proof remains on the plaintiff. *See* Fed. R. Evid. 301 & historical notes (discussing effect of presumptions).[18]

As a matter of law, a statement cannot be "literally false" unless it is "unambiguous." *See, e.g., Pernod Ricard USA, LLC* v. *Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011); *Buetow* v. *A.L.S. Enterprises*, 650 F.3d 1178, 1185 (8th Cir. 2011). If a statement is ambiguous, "plaintiff must demonstrate actual deception through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *IQ*, 305 F.3d at 375; *see also Pizza Hut*, 227 F.3d at 497 (same). In this case, all the statements challenged by RTI are either literally true or, at worst, ambiguous. Thus, the deception and materiality presumptions do not apply here as a matter of law. In any event, the evidence conclusively establishes that the challenged advertisements were neither deceptive nor material, as a matter of law.

### A.      There Is No Evidence to Support RTI's Needle Sharpness Claims.

BD's marketing slogan about the "World's Sharpest Needle" is the sort of "bald assertion of superiority" or "statement[ ] of opinion" that "cannot form the basis of Lanham Act liability." *Pizza Hut*, 227 F.3d at 496-97. At worst, it is non-actionable puffery. *Id.*

RTI has tried to avoid this conclusion by arguing that the needle sharpness claims were statements of fact because they might admit of empirical proof. The evidence proves that the statements were true, as a matter of law, and BD had data to prove its claims were legitimate.

---

[18]  BD acknowledges cases calling for an "assumption" about deception or tendency to deceive when statements are "literally false." *Pizza Hut*, 227 F.3d at 497. But such a presumption cannot support equitable relief under the Lanham Act after *EBay* v. *Mercexchange LLC*, 547 U.S. 388 (2006). In *eBay*, the presumption of irreparable harm for permanent injunctive relief was replaced by the admonition that "[n]o such thumb on the scales is warranted." *Monsanto Co.* v. *Geertsen*, 130 S. Ct. 2743, 2757 (2010); *see also Winter* v. *NRDC*, 129 S. Ct. 365, 381 (2008) (injunctive relief "does not follow from success on the merits as a matter of course"). The Lanham Act presumption arose in cases involving preliminary injunctions; the presumption is no basis for equitable relief after final judgment. Therefore, BD respectfully preserves the position that the Lanham Act presumptions of deception and materiality applied by the federal circuits are no longer good law after *eBay*.

According to the only mechanical engineering tests in evidence, the needle sharpness statements were not false. *See* 9/17:81-111 (PM). RTI offered no substantial evidence to the contrary.

More important, RTI's argument misses the larger point: When construing an allegedly false or misleading statement under the Lanham Act, "the statement must be viewed in the light of the overall context in which it appears." *Pizza Hut*, 227 F.3d at 495 n.5. Viewed in context, every statement about needle sharpness was part of a marketing campaign referring to the "World's Sharpest Needle." BD's "World's Sharpest Needle" claim conveyed the true fact that, *on average*, BD's needles are the sharpest. 9/16:192 (PM). The statements were all truthful.

Dr. Hyman disagreed with this reading of "sharpest." *See, e.g.*, 9/9:136 (PM). But his testimony proved only that the needle sharpness advertising claims were, at worst, ambiguous; two needles with identical sharpness can equally claim to be the "sharpest." Thus, these claims were not unambiguous and literally false. Because there are two plausible interpretations of the needle sharpness claims, it would be error "to base [a] determination of falsity on the most absolute of competing dictionary definitions." *Buetow*, 650 F.3d at 1186. As such, RTI retained its prima facie burden to demonstrate both deception and materiality.

On this record, even if the jury determined that the ambiguous references to the "World's Sharpest Needle" were false and misleading, there is no substantial evidence that any of the needle sharpness statements deceived customers or is likely to deceive future consumers. None of Professor Scott's surveys tested deception from BD's needle sharpness statements. 9/12:124 (AM); 9/12:3, 6-7, 9, 13-14, 18, 31-32 (PM). No customer testified he or she was deceived. As a matter of law, there is no evidence of deception and BD conclusively proved the contrary.

Likewise, the trial record contains no evidence that any needle sharpness statement was likely to influence a customer's purchasing decision. Professor Scott admitted that her surveys did not ask about purchasing decisions. 9/12:30 (PM). And the direct evidence from consumers

proved that their purchasing decisions are not influenced by advertising; they make informed choices based on their professional evaluations.   9/16:88-89 (PM); 9/17:16-17, 31-33 (AM); 9/17:57-58, 146-47, 173-77, 191, 194-96 (PM); 9/18:25-28 (AM).   As a matter of law, therefore, there is no evidence of materiality and BD has conclusively proved the contrary.

Finally, there is no evidence that RTI was injured or is likely to be injured by BD's needle sharpness statements, and BD proved the contrary.   9/12:31-32 (PM); 9/18:93 (AM).

**B.      There Is No Evidence to Support RTI's Waste Space Claims.**

RTI focused on the .185 figure for "Brand A" waste space in certain BD advertisements. But even if that statistic became outdated over time, the statements about waste space were true "when viewed in the light of the overall context" of the ads.  *Pizza Hut*, 227 F.3d at 495 n.5.

The overall message of the waste space advertisements was that the BD Integra syringe had less waste space than "Brand A."   That message was truthful, because it is undisputed that even with more recent waste space calculations for the RTI syringe, the waste space in BD's product was significantly less than the waste space in RTI's product. 9/10:79 (AM).   Dr. Scott admitted that the Integra syringe has one of the lowest waste space volumes -- lower than even the "corrected" VanishPoint waste space she used in her survey questions.   9/12:45-46 (PM). Viewed in context, therefore, the waste space advertisements were neither false nor misleading.

At worst, the waste space advertisements were ambiguous -- an ambiguity compounded by the reference to "Brand A" rather than RTI, which forecloses a judgment of "literal" falsity. *See Buetow*, 650 F.3d at 1186.   As such, even if those advertisements were false and misleading, RTI retained its prima facie burden to demonstrate both deception and materiality.

There is no substantial evidence that any waste space statement deceived customers or is likely to deceive future consumers.   To the contrary, the only evidence introduced at trial from actual customers conclusively disproves both deception and materiality.  *See supra* at 12-13.

48

Professor Scott's survey did not prove deception from any statements about waste space. *See* 9/12:124 (AM); 9/12:3, 6-7, 9, 13-14, 18 (PM).  It did not ask about, and thus did not test, customers' purchasing decisions.  9/12:29-32 (PM).  And it distorted the results by focusing respondents on the waste space comparison in a manner that was not comparable to the experience of a real customer, in real life.  *See* 9/12:37-40 (PM).  As a matter of law, there is no evidence of deception and BD conclusively proved the contrary.

Likewise, the trial record contains no evidence that any of the waste space statements was likely to influence a customer's purchasing decision.  Dr. Scott did conduct a survey in an effort to show that consumers were influenced by the waste space comparison between BD's Integra and RTI's VanishPoint, but that survey failed to prove that consumers were influenced.  Dr. Scott showed half of the respondents BD's actual Integra brochure, and she showed the other half the identical brochure with a "corrected" waste space amount for the VanishPoint.  When she compared the results of these two groups at trial, she offered no statistical test to prove that any difference was statistically significant.  9/12:37-42 (PM).  And she conceded that a statistical significance test showed any purported difference in the results between the two groups was not significant.  9/12:40-47 (PM).  As such, there is no substantial evidence that the waste space claims were likely to influence any customer's purchasing decision.  *See Weisgram*, 528 U.S. at 454-57; *Brooke Group*, 509 U.S. at 242-43.  Indeed, the evidence at trial conclusively proved that BD ultimately minimized its advertising based on waste space because these claims had no material impact on sales.  9/16:176-79 (PM).  As a matter of law, there is no evidence of materiality and BD conclusively proved the contrary.

Finally, there is no substantial evidence that RTI was injured or is likely to be injured as a result of any BD waste space statement.  RTI suggested a possible correlation between a waste space promotion and the decisions of a few retailers, but offered no evidence from these retailers

49

and no evidence that any retailer decided not to buy RTI's product because of BD's advertising. Rather, the evidence proved these retailers purchased RTI syringes *despite* the waste space ads. 9/16:119, 163 (AM); 9/18:77-78 (AM); Michael Exs. K-N; DX1661.   There is no substantial evidence to connect buying decisions to any false or misleading waste space claim, and BD conclusively disproved any allegation of injury.

### C.      There Is No Evidence to Support RTI's "Data on File" Claims.

The jury found BD's statements that it had "data on file" to support its advertising claims were false, but those findings fail as a matter of law.  First, these "data on file" claims related to needle sharpness and waste space, and they fail for the same reasons set forth above.  Second, the only distinct feature of these claims involves the claim that BD had no "data on file" to support its advertising.  But the trial record conclusively proves BD *did* have "data on file."  9/16:162-64, 187-94 (PM).  Third, for the reasons set forth above, there is no evidence that the "data on file" advertising was material, deceived customers, caused any past injury to RTI, or is likely to cause any future injury to RTI.  Thus, RTI's "data on file" claims fail as a matter of law.

### D.      Alternatively, BD Is Entitled to a New Trial.

If the Court determines that the Lanham Act claims are supported by sufficient evidence, it should nonetheless grant a new trial as to those claims because the jury's findings are contrary to the great weight of the evidence.  Fed. R. Civ. P. 59; *Wellogix*, 716 F.3d at 881.  This is especially true for the essential elements of deception and materiality, where RTI offered no evidence from any purchaser or salesperson and all the evidence introduced at trial demonstrated that the challenged advertising had no impact on customers or sales.  *See supra* at 10-16.

### CONCLUSION AND PRAYER FOR RELIEF

The Court should grant BD judgment as a matter of law.  *See* FED. R. CIV. P. 50(b)(3). Alternatively, the Court should order a new trial or suggest a remittitur.  *See* FED. R. CIV. P. 59.

Respectfully submitted,

/s/  *Robert A. Atkins*
Robert A. Atkins, Lead Attorney
Jacqueline P. Rubin
William B. Michael (admitted pro hac vice)
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
E-mail:  ratkins@paulweiss.com

MCKOOL SMITH, P.C.
Samuel F. Baxter
Texas Bar No. 0193800
Robert Elkin
Texas Bar No. 06522600
104 East Houston, Suite 300
Marshall, Texas  75670
Telephone:  (903) 923-9000
Facsimile:  (903) 923-9099
E-mail:  sbaxter@mckoolsmith.com

BECK REDDEN, L.L.P.
Alistair B. Dawson
Texas Bar No. 05596100
Russell S. Post
Texas Bar No. 00797258
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
Telephone:  (713) 951-6225
Facsimile:  (713) 951-3720
E-mail:  adawson@brsfirm.com


*Attorneys for Defendant*
*Becton, Dickinson and Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on October 11, 2013, that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).


/s/ *Robert A. Atkins*_____
Robert A. Atkins