1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3
   RETRACTABLE TECHNOLOGIES, INC. )
 4 AND THOMAS J. SHAW            DOCKET NO. 2:08cv16

 5     -vs-                      )
                                   Tyler, Texas
 6 BECTON, DICKINSON              9:20 a.m.
   AND COMPANY                  ) September 3, 2013
 7

 8
       TRANSCRIPT OF VOIR DIRE EXAMINATION OF THE JURY PANEL
 9            BEFORE THE HONORABLE LEONARD DAVIS,
                UNITED STATES CHIEF DISTRICT JUDGE
10

11              A P P E A R A N C E S

12  (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE HEARING.)

13

14                      SPEAKERS

15
   FOR THE PLAINTIFFS:
16
   MR. OTIS CARROLL
17 MR. ROY HARDIN
   MR. PAUL SCHUSTER
18

19
   FOR THE DEFENDANTS:
20
   MR. SAM BAXTER
21

22
   COURT REPORTER:        MS. SHEA SLOAN
23                        shea_sloan@txed.uscourts.gov

24
   Proceedings taken by Machine Stenotype; transcript was produced
25 by a Computer.
```

```
 1                    P R O C E E D I N G S

 2                 (Call To Order Of The Court.)

 3                 THE COURT:  Please be seated.

 4                 All right.  Ms. Ferguson, if you will call the

 5  case, please.

 6                 THE CLERK:  Court calls Case No. 2:08cv16,

 7  Retractable Technologies, Inc. v. Becton Dickinson and

 8  Company.

 9                 THE COURT:  All right.  Announcements.

10                 MR. CARROLL:  Good morning, Your Honor.  Otis

11  Carroll for the plaintiff, Retractable Technologies.  We are

12  here and ready.

13                 Would the Court prefer I introduce my table now

14  or wait?

15                 THE COURT:  We will do that in a moment.  That

16  will be fine.

17                 MR. CARROLL:  All right.  Thank you.

18                 MR. BAXTER:  Good morning, Your Honor.  Sam

19  Baxter for the defendant, Becton Dickinson.  And we are here

20  and ready, Your Honor.

21                 THE COURT:  All right.  Very well.

22                 All right.  Good morning, Ladies and Gentlemen

23  of the Jury.  I am United States District Judge Leonard Davis,

24  and I want to welcome you to jury service in the Eastern

25  District of Texas.
```

 1             Let me start by thanking you for your service

 2   here today.  I know I can tell by some of the looks on your

 3   faces that on the Tuesday after Labor Day a lot of you would

 4   like to be some place other than where you are today.

 5             But I do want to just take a moment to remind

 6   you about our country and the right to trial by jury.  And in

 7   this country we have that right.  That is a right that is not

 8   enjoyed in hardly any other country in the world.

 9             And I think we only have to turn on the evening

10   news to see how disputes get settled in a lot of other

11   countries in the world.  So we are very fortunate to live in

12   this country, to have this method of resolving disputes, which

13   these two parties have between them; but it could not happen

14   without you being here and being part of the process by being

15   the jury that will decide this case.

16             So I hope even though you would probably rather

17   be somewhere else this morning, that you will consider it a

18   small price to pay for the freedoms that we enjoy in this

19   country and look on it much -- as your small contribution.

20   Just as our military contributes to protect our freedoms, this

21   is part of your small contribution to do that; and view it in

22   that light.

23             So this is a civil lawsuit where the plaintiff,

24   Retractable Technologies -- which Mr. Carroll just announced

25   for -- and Mr. Thomas Shaw were the plaintiffs, Retractable,

4

1   and Mr. Shaw accused the defendant, Becton Dickinson, of

2   antitrust violations, false advertising, product disparagement,

3   and tortious interference with prospective contract or business

4   relations.

5              I and the parties will have much more to say

6   about what the causes of action and the legal theories are

7   involved in this dispute later, but I wanted you to have that

8   basic knowledge of what the case is about.

9              I anticipate that the presentation of evidence

10  in this case will take probably eight days.  So this case is

11  going to take up basically two weeks.

12             This morning we are selecting the jury, and that

13  is all that we will do today.  So -- and I would guess that

14  will take us until about noon today, and then all of you will

15  be released at that time.

16             Eight of you will be selected to be on the jury

17  in this case to decide that case.  We will not hold court in

18  this case any more this week.  We are just picking the jury.

19  And the eight of you that are selected will come back next

20  Monday, and we will begin hearing evidence on next Monday.  We

21  will plan to go through Thursday.  And we will take Friday off.

22             We normally go from about 9:00 in the morning

23  until 4:00 in the afternoon.  It is going to take, like I said,

24  basically two weeks; I think eight days of testimony, so --

25  seven to eight.  So we will start on Monday, go through

1  Thursday of next week, come back the next week, start on

2  Monday, and probably go through Thursday or Friday and

3  hopefully finish the case that week.

4                Right now, though, we are beginning the first

5  stage of the trial, which is what we call Voir Dire

6  Examination.

7                This is where the Court and the attorneys will

8  be asking you some questions to help us evaluate you as a

9  potential jury in this case.  This will probably take about an

10 hour or so.

11               Each side is then allowed to strike a certain

12 number of jurors, and the first remaining eight jurors will be

13 sworn in as the jury which will decide this case.

14               When we come back next Monday you will next hear

15 the opening statements of the attorneys, which are what they

16 believe that the evidence is going to show in the case.  And

17 then we will begin the presentation of the evidence.

18               The plaintiff will present their evidence first,

19 testimony, exhibits.  The defendant will cross-examine.  And

20 the defendant will have an opportunity to present evidence.

21 And the plaintiff will have an opportunity to cross-examine.

22 And then, finally, the plaintiff will have an opportunity to

23 put on some rebuttal evidence.  That will take up the majority

24 of the time.

25               After all of the evidence is in, I will then

1  give you what is called the Court's charge or jury

2  instructions.  That is where I will instruct you in detail on

3  the law that you must follow in deciding the case.

4            After you have heard the Court's charge, then

5  you will hear closing arguments by the attorneys for both

6  sides.  This is where they sum up or give a summation of what

7  they believe that the evidence has shown in the case and what

8  your verdict should be.

9            So that is an overview of what will be going on

10  in the case.  After you have heard the closing arguments, then

11  the eight of you that are selected will retire to the jury

12  room, begin your deliberations, and reach a verdict in the

13  case.

14            Now, back to what we are doing today, voir dire.

15            The purpose of voir dire is to enable the Court

16  to determine whether or not any prospective juror should be

17  excused from jury service either by the Court, for what we call

18  cause, or by counsel for the parties by way of what we call a

19  preemptory challenge.  That is a challenge for which no reason

20  need be given.

21            "Voir dire" is Latin phrase which means "to

22  speak the truth," which I know each of you will do as you

23  answer the questions which will be asked of you this morning.

24            Please listen very carefully to the questions

25  asked of you, and do not be timid to speak up if they apply to

1 you.

2           In other words, as you hear these questions if

3 you are sitting there in the back of your mind going, well, I'm

4 not sure whether that question applies to me or not, please go

5 ahead and raise your hand and answer.  We would rather have too

6 much information than not enough information.  And in answering

7 these questions it is very important that you answer fully and

8 completely.

9           If at any time there is a question that you

10 would rather not discuss in front of everyone, just say:

11 Judge, could I discuss that with you at the bench later?  And I

12 will be glad to do that with you.

13           Now, just to -- as you answer and to get used to

14 you answering questions, I am going to begin over here with

15 Juror No. 1, which would be Mr. Seat.

16           And I'm going to ask each of you as the

17 microphone is passed to you to please stand, state your name,

18 and what your favorite thing to do in your spare time is.  The

19 purpose of this little exercise is just to get you used to

20 standing up.

21           Each time you answer a question, please stand

22 up, wait for the microphone, state your name so the Court

23 Reporter will know who is speaking, and then you can answer the

24 question.  But for now tell us who you are and what you enjoy

25 doing in your spare time.

1                    JUROR SEAT:  Thomas Gary Seat.  And I enjoy, I

2  guess, working with my grandchildren the most right now.

3                    THE COURT:  Okay.  Thank you.

4                    All right.  Next?

5                    JUROR LUTZ:  Marcus Lutz.  Coaching youth sports

6  with my son, I guess.

7                    THE COURT:  All right.  Thank you, Mr. Lutz.

8                    JUROR TIDWELL:  Betsy Tidwell, and right now I

9  am treasurer of our condominiums.

10                    JUROR MORELAND:  I'm Julia Moreland, and I love

11  to read.

12                    THE COURT:  Thank you.

13                    JUROR GLOSSON:  I am Larry Glosson.  And I enjoy

14  playing baseball with my two boys.

15                    THE COURT:  Alrighty.

16                    JUROR MCGOWEN:  I'm Yolonda McGowen, and I like

17  to spend time with my music.

18                    THE COURT:  Okay.

19                    JUROR HENDERSON:  David Henderson.  I am an avid

20  gardener.

21                    THE COURT:  All right.  Thank you.

22                    If you will, let's go back down to this end, and

23  we will try to keep them in order here.  Next will be Ms.

24  Besson.

25                    JUROR BESSON:  Cecilia Besson (different

1  pronunciation) and spending time with my kids.

2                  THE COURT:  Okay.

3                  JUROR HANNA:  My name is Ray Hanna.

4                  THE COURT:  I'm sorry?

5                  JUROR HANNA:  My name is Ray Hanna.

6                  THE COURT:  All right.  And what do you enjoy

7  doing in your spare time, Mr. Hanna?  What do you enjoy doing

8  in your spare time?

9                  JUROR HANNA:  Just relaxing.  I work six days a

10 week, so relaxing is what I like to do.

11                 THE COURT:  I'm sorry.  I couldn't hear you.  If

12 you would raise the microphone.

13                 JUROR HANNA:  I work six days a week, so

14 relaxing is what I like to do.

15                 THE COURT:  Okay.  Thank you.

16                 JUROR MEDLIN:  Kari Medlin, and I like to

17 read.

18                 JUROR LAND:  Lori Land, and just the outdoors.

19                 THE COURT:  Okay.

20                 JUROR HUDSON:  Sara Hudson, and I enjoy

21 reading.

22                 THE COURT:  Thank you, Ms. Hudson.

23                 JUROR REED:  Jamie Reed, and I like to read,

24 too.

25                 THE COURT:  We've got a lot of readers on here.

1  This is good.

2               JUROR COPELAND:  Robert Copeland.  Spend time

3  with my grandkids.

4               THE COURT:  All right.  Mr. Sturrock.

5               JUROR STURROCK:  Mark Sturrock (different

6  pronunciation), and I like remodeling my house.

7               THE COURT:  Okay.

8               JUROR MARSH:  Shirley Marsh, and I like to

9  read.

10              JUROR FRATER:  Loucinda Frater, and I like to

11 fish.

12              THE COURT:  Okay.

13              JUROR SCHNETZER:  Joseph Schnetzer, and I enjoy

14 playing video games.

15              THE COURT:  Thank you.

16              JUROR HOLMES:  Martha Holmes, and I like cooking

17 and having my family come home for dinner.

18              THE COURT:  Alrighty.

19              JUROR STAFFORD:  Candace Stafford, and I lead a

20 Cub Scout group, and I like to clog.

21              THE COURT:  Okay.

22              JUROR MCGAUGHEY:  Janice McGaughey, and I love

23 my many grandchildren and great grandchildren.

24              THE COURT:  Okay.

25              JUROR SHUMAKER:  Ronda Shumaker, and I like to

1  work out, run.

2              THE COURT:  Okay.  Thank you.

3              JUROR HARRIS:  Steven Harris.  I like various

4  outdoor activities.

5              THE COURT:  Alrighty.

6              JUROR ROGERS:  I'm Fred Rogers.  Charles Rogers,

7  I believe you may have on your list.

8              THE COURT:  Yes, uh-huh.

9              JUROR ROGERS:  I guess since I got three cows

10 recently, figuring out the front end from the back end.  I've

11 about got it down.

12             THE COURT:  Okay.

13             JUROR ROOSTH:  Regina Roosth.  I have teenagers,

14 so I do a lot of driving.  But I enjoy relaxing and reading.

15             THE COURT:  Okay.  Thank you.

16             JUROR VAUGHN:  Tina Vaughn, working in the yard.

17             THE COURT:  All right.  Thank you.

18             JUROR WRIGHT:  Shirley Wright, and I enjoy

19 sewing and crafts.

20             THE COURT:  Thank you.

21             JUROR SMITH:  Christopher Smith.  I enjoy

22 playing golf.

23             THE COURT:  All right.

24             JUROR MITCHELL:  Carol Mitchell.  I love the

25 grandkids and my horses.

1                THE COURT:  Okay.  Thank you.

2                JUROR LESAUVAGE:  Joan Lesauvage.  Grandchildren

3  and cooking.

4                THE COURT:  Okay.  Thank you.

5                All right.  Thank you.  Y'all did very well.

6                Now, in just a moment I'm going to ask Counsel

7  for each party to introduce their clients, their co-Counsel and

8  to list any witnesses that are from the East Texas area that

9  they may be calling to testify in this case.

10                And the reason I am doing this is because I want

11  you to listen to their names very carefully, and then I am

12  going to ask if you or any of your family members know any of

13  these individuals.  So listen carefully to the names.  Then

14  after each one has given you all of the names, I will ask for

15  those of you who know any of these people to stand.  And we

16  will have further questions for you.

17                So, Mr. Carroll, would you like to introduce

18  your client and your co-Counsel and witnesses?

19                MR. CARROLL:  If the Court please, Your Honor.

20                Ladies and Gentlemen, my name is Otis Carroll.

21  I am a lawyer here in Tyler.  I am one of the lawyers for the

22  plaintiff -- or plaintiffs in this case, and the plaintiff

23  corporation is called Retractable Technologies, Retractable

24  Technologies.

25                Our folks are over here at the table, and I

1   might ask all three of them to stand.  Tom Shaw is the tall

2   fellow in the middle.  He founded the company.  Kathryn Duesman

3   is to Mr. Shaw's right.  She is a clinical nurse.  She is head

4   of the clinical part of our company.  And to the left is my

5   boss Michelle Larios, who is the General Counsel.

6                    And they all live and work in Denton, County

7   which is north of Dallas.  The company is in a little town

8   called Little Elm.

9                    THE COURT:  Mr. Carroll, move that microphone a

10  little bit to your left.  You are kind of fading.

11                   MR. CARROLL:  I beg your pardon.

12                   THE COURT:  That's good.  Thank you.

13                   MR. CARROLL:  Thank you.

14                   Then the lawyers at our table -- and I don't

15  know if you all out here can see, and I'm going to ask them to

16  stand up.  The first fellow to my left is Paul Schuster.  Paul

17  is from Dallas.  To his left is his partner Steve Wilson.  To

18  Steve's -- Steve is a Dallas fellow.  Jim Parsons is from

19  Palestine.  And Susan --

20                   Thank you, Judge.

21                   Susan Adams is from Dallas.  And our quarterback

22  is Roy Hardin.  And he is from Dallas.

23                   And we have witnesses from Denton County, Your

24  Honor, but none from the Eastern District that I know of.

25                   THE COURT:  Okay.  Thank you.

1                   All right.  Does anyone on the jury panel know

2    Mr. Carroll or any of the people that he has just introduced to

3    you?  If you would, please raise your hand on the first row.

4                   All right.  That would be Mr. Henderson.

5                   If you would take the microphone to Mr.

6    Henderson.

7                   Who do you know, Mr. Henderson?

8                   JUROR HENDERSON:  Mr. Carroll.

9                   THE COURT:  How do you know him?

10                   JUROR HENDERSON:  He is one of my predecessors

11   as Chair of the Smith County Democratic Party.

12                   THE COURT:  All right.

13                   JUROR HENDERSON:  And we go to the same

14   church.

15                   THE COURT:  All right.  Thank you, sir.

16                   All right.  Anyone on the first row?  Anyone

17   else on the first row?

18                   JUROR SEAT:  Jim Parsons, I have known him for

19   30 years.

20                   THE COURT:  How do you know Mr. Parsons?

21                   JUROR SEAT:  Socially.

22                   THE COURT:  Okay.  All right.  Thank you.

23                   All right.  Anyone on the second row?  Third

24   row?  Fourth row?

25                   All right.  Pass that down, if you would.

1                    Let's see, that would be Ms. Roosth.

2                    JUROR ROOSTH:  Regina Roosth.

3                    THE COURT:  Who do you know?

4                    JUROR ROOSTH:  I used to work at the Ireland

5    Carroll & Kelley Law Firm.

6                    THE COURT:  How long ago was that?

7                    JUROR ROOSTH:  '88 to '92.

8                    THE COURT:  Okay.  So that is how you know Mr.

9    Carroll?

10                   JUROR ROOSTH:  Yes.

11                   THE COURT:  Thank you.

12                   Anyone else?  Yes, sir.

13                   JUROR ROGERS:  Charles Rogers.  I don't -- in

14   your direct you said if you or family members know.

15                   THE COURT:  Right.

16                   JUROR ROGERS:  I have a son-in-law who is a

17   patent attorney.  I don't know that he knows some of these

18   gentlemen, but I would be very surprised if he did not.

19                   THE COURT:  Who is your son-in-law?

20                   JUROR ROGERS:  That would be Mr. Brad Seidel.

21   He probably has practiced in this Court.

22                   THE COURT:  Right.  I know Mr. Seidel.  Thank

23   you.

24                   Anyone else?

25                   All right.  Very well.  Thank you very much.

16

```
 1                 Now, Mr. Baxter, would you like to introduce
 2    your folks?
 3                 MR. BAXTER:  Thank you, Your Honor.
 4                 Good morning, Ladies and Gentlemen.  My name is
 5    Sam Baxter.  I am a lawyer from over in Marshall, Texas; and I
 6    represent Becton Dickinson.  I have got a couple of witnesses
 7    that aren't here today.  But let me tell you about them.
 8                 The first one is Kristin Hudson, who is from
 9    here in Tyler.  She grew up here in Tyler, married a Tyler
10    young man named Joe Hudson.  He is the captain of the fire
11    department over in Marshall.  She is an RN.  She will be
12    testifying in this case.
13                 The second one is Jeanette Akin.  She works in
14    Texarkana.  That is in this Federal Court District.  She will
15    be testifying by video deposition.
16                 And the last is Dr. Joe Beaman.  He is the
17    former head of the mechanical engineering department at the
18    University of Texas.  But one of the reasons I got him is
19    because he is a Marshall boy, went to Marshall High School and
20    graduated from Marshall.  He will be testifying live.
21                 I don't know if any of you know any of these
22    people, but they are the ones at least, Your Honor, from the
23    Eastern District.
24                 THE COURT:  Okay.  Thank you.
25                 MR. BAXTER:  At counsel table -- and I will get
```

1  you to stand up -- I have got my Becton Dickinson corporate

2  rep.  This is Mr. John Ledek.  John is an Air Force Academy

3  graduate, flew planes in the Gulf War.  And we are lucky enough

4  to have him at Becton Dickinson.

5               Thank you, John.

6               My two partners, Robert Elkin and Jennifer

7  Truelove.  At the far end, Jackie Rubin.

8               Sitting next to her Alistair Darson -- Dawson.

9               I will get it right in a minute, Alistair.

10              At the far end, Mr. Bob Atkins.

11              That's us, Your Honor.

12              THE COURT:  All right.  Does anyone on the jury

13  panel know Mr. Baxter or any of the witnesses that he

14  mentioned, Ms. Hudson, Ms. Akin, or Mr. --

15              MR. BAXTER:  Beaman, Your Honor.

16              THE COURT:  Beaman?  Or any of the attorneys

17  that he has introduced to you?  Or Mr. Baxter?  Do any of you

18  know any of these folks?

19              On the first row anyone know any of them?

20              Second row?

21              Third row?

22              Fourth?

23              Fifth?

24              All right.  Very well.

25              All right.  At this time I will let the

1   attorneys ask you some questions, and I will recognize Counsel

2   for the plaintiff first, Mr. Carroll.

3           MR. CARROLL:  Thank you, Your Honor.  Court

4   please, Your Honor?

5           THE COURT:  Yes.

6           MR. CARROLL:  Ms. Moreland?

7           JUROR MORELAND:  Yes, sir.

8           MR. CARROLL:  Are you afraid of shot needles?

9           JUROR MORELAND:  No, sir.

10          MR. CARROLL:  Not a bit?

11          JUROR MORELAND:  Not at all.

12          MR. CARROLL:  This case is about what can happen

13  to somebody if that somebody is unlucky enough to get stuck

14  with a dirty shot needle.

15          Have you ever heard anything -- you are a

16  reader, right?

17          JUROR MORELAND:  Yes, sir.

18          MR. CARROLL:  Have you ever read anything about

19  the health dangers associated with being stuck with a dirty

20  needle?

21          JUROR MORELAND:  Well, I have not particularly

22  read anything, but I have seen it on the news.

23          MR. CARROLL:  Okay.  One of the things that you

24  and the seven of you -- seven other of you who are going to

25  hear about in this case is two words called "needle stick."  Is

1   that what you read about?

2           JUROR MORELAND:  Yes, sir.

3           MR. CARROLL:  Okay.  One of the things that you

4   are going to learn if you are on this jury, is that needle

5   stick can kill people.  Is that what you have read?

6           JUROR MORELAND:  Well, I have seen it on the

7   news.  I didn't particularly read it, yes.

8           MR. CARROLL:  Right.  You can get one of 30

9   different diseases, viruses, bugs from problems with a dirty

10   needle.

11          JUROR MORELAND:  Yes, sir.

12          MR. CARROLL:  Okay.  So here is my question to

13   you:  Have you ever given anybody a shot?

14          JUROR MORELAND:  Yes, sir.

15          MR. CARROLL:  And who would that person be?

16          JUROR MORELAND:  That would have been my

17   mother.

18          MR. CARROLL:  Do you know whether when you were

19   giving your mom shots that you ever used a product that was

20   supposed to be a safety needle?

21          JUROR MORELAND:  Well, it was the needles given

22   to us by the Hospice, and we had disposable things to put them

23   in after they were used.

24          MR. CARROLL:  You had a box to drop them in?

25          JUROR MORELAND:  Yes, sir.

1                MR. CARROLL:  Now, you understand, Ms.

2   Moreland -- and by the way, I hope you don't think I am picking

3   on you.

4                JUROR MORELAND:  Oh, no, sir.

5                MR. CARROLL:  Okay.  Good.

6                You understand that one of the things that

7   happens in hospitals is that sometimes people get in a rush and

8   the pace of the activity is a lot more frantic than maybe at

9   your house when you were dealing with your mom?

10               JUROR MORELAND:  Yes, sir.

11               MR. CARROLL:  And did you ever have any problems

12  with needle sticks at your house?

13               JUROR MORELAND:  No, sir.

14               MR. CARROLL:  And you understand -- and, again,

15  I apologize if this sounds too personal, that needle sticks

16  aren't a problem for the person who gets stuck, by design?  You

17  see what I am saying?

18               JUROR MORELAND:  Yes, sir.

19               MR. CARROLL:  My bugs are my bugs.  Mr. Baxter

20  don't want my bugs.

21               JUROR MORELAND:  That's correct.

22               MR. CARROLL:  But if I got stuck and then if,

23  unfortunately, Mr. Baxter got stuck, that would be a needle

24  stick.

25               JUROR MORELAND:  Yes, sir.

 1                    MR. CARROLL:  Okay.  Now, and --

 2                    Your Honor, may I ask Ms. Ferguson to turn on

 3  the ELMO?

 4                    THE COURT:  Okay.  Sure.

 5                    MR. CARROLL:  And she tells me I am going to

 6  have to go right over there --

 7                    THE COURT:  That's fine.

 8                    MR. CARROLL:  -- if that is okay, Your Honor?

 9                    THE COURT:  You bet.

10                    MR. CARROLL:  Thank you, sir.

11                    Ms. Moreland, don't sit down.

12                    JUROR MORELAND:  Okay.

13                    MR. CARROLL:  Okay.  Now, can you see me over

14  here?

15                    JUROR MORELAND:  Yes, sir.

16                    MR. CARROLL:  Okay.  I'm going to try to deal

17  with the ELMO.

18                    You got any idea --

19                    May I have an ELMO helper?

20                    Pete, will you be my ELMO helper?  Thank you.

21  Thank you.  Great.  Thank you.  Is that it?  Thank you.

22  Okay.

23                    Now, everybody -- now, y'all can see up here,

24  right?  Everybody can see?

25                    Okay.  Ms. Moreland, bear with me.  Shot needle,

1  right, can you see it?

2              JUROR MORELAND:  Yes, sir.

3              MR. CARROLL:  Okay.  Now, obviously when that

4  needle goes into my arm and comes out, nobody else in the world

5  would want it stuck into her or him, correct?

6              JUROR MORELAND:  Correct.

7              MR. CARROLL:  So one of the ways that I guess

8  you might protect this needle from ever sticking anybody else

9  is to somehow cover it again just like it is covered before.

10              JUROR MORELAND:  Yes, sir.

11              MR. CARROLL:  Did you try that at home ever?

12              JUROR MORELAND:  Yes, sir.

13              MR. CARROLL:  Okay.  You are going to hear in

14  this case that is a no-no.

15              JUROR MORELAND:  Okay.

16              MR. CARROLL:  Okay.  And nobody is going to take

17  you to jail or anything.  But can you see why that would be a

18  no-no?

19              JUROR MORELAND:  Yes.

20              MR. CARROLL:  Watch what happens to my finger.

21  See how close it is to the point?  (Demonstrating.)

22              JUROR MORELAND:  Yes, sir.

23              MR. CARROLL:  And one of the things that you and

24  your juror members are going to hear from Ms. Duesman over

25  here, who has been doing this stuff a long time, is you don't

1  want to get your fingers too close to the point.  And they even

2  teach people to keep your fingers away from the sharp.

3              And that kind of makes sense, does it not?

4              JUROR MORELAND:  Yes, sir.

5              MR. CARROLL:  So if you have a device that you

6  have to manipulate to cover the needle, you've got to be extra

7  careful, correct?

8              JUROR MORELAND:  Yes, sir.

9              MR. CARROLL:  Suppose though -- suppose

10  though -- and I want everybody to watch this, please.  Suppose

11  you have a needle -- and you see this now?  (Indicating)

12              JUROR MORELAND:  Yes, sir.

13              MR. CARROLL:  I have got it drawn back, right?

14              JUROR MORELAND:  Yes, sir.

15              MR. CARROLL:  It is full of medicine, and it is

16  going into my arm.  Now, I want everybody to watch the needle.

17  I'm going to put my finger right under it.  (Demonstrating)

18  There goes the medicine.  I get a little ouch.  What happened

19  to the needle?

20              JUROR MORELAND:  It disappeared.

21              MR. CARROLL:  It disappeared.  That is what Tom

22  Shaw spent nine years of his life developing.  He developed it

23  so that nobody ever again would have to get stuck with a dirty

24  needle.

25              And our lawsuit is because we say that the folks

1   at this table don't want our innovation on the market because

2   they don't control it, and they are big and they control the

3   market and we are little and we don't.  That is what our

4   lawsuit is about.

5               Thank you, Ms. Moreland.

6               JUROR MORELAND:  Thank you.

7               MR. CARROLL:  Has anybody, in addition to Ms.

8   Moreland, given a shot?

9               All right.  Now, let me tell you how I want to

10  do this.  I want you to keep your hands up, if you will, so we

11  can write your names down.  And then I want to ask you a

12  question generally to everybody on the panel who has got a hand

13  up.

14              If I don't ask you specifically, it is not

15  because I am not interested in what you have to say, but I have

16  got a very limited amount of time to talk with you, and this is

17  important.

18              Those of you who have given shots, have you had

19  any experience different from Ms. Moreland; that is, you are

20  giving shots to somebody in your family like Ms. Moreland was

21  giving her Mama a shot?

22              Okay.  Hold on just one second.  Okay.  Don't

23  give up on me.  Ms. Hudson.

24              JUROR HUDSON:  Yes.

25              MR. CARROLL:  Do you mind standing up, please,

1  ma'am?  And you are from Beckville; is that right?

2                JUROR HUDSON:  That's correct.

3                MR. CARROLL:  Tell me about your shot-giving

4  experience?

5                JUROR HUDSON:  I am a diabetic and I take

6  insulin, and I give myself a shot.

7                MR. CARROLL:  Okay.  Okay.  Are you

8  knowledgeable about the same kinds of things Ms. Moreland

9  talked about?  The idea that dirty needles are bad business?

10                JUROR HUDSON:  Yes.

11                MR. CARROLL:  You probably use one of those

12  little teeny tiny insulin needles, do you not?

13                JUROR HUDSON:  It is small, yes.

14                MR. CARROLL:  They can make you sick, too; you

15  understand that?

16                JUROR HUDSON:  Yes, I do.

17                MR. CARROLL:  Okay.  Have you ever had an

18  experience with somebody getting stuck with a dirty needle?

19                JUROR HUDSON:  No.

20                MR. CARROLL:  Okay.  How do you dispose of your

21  dirty needles?

22                JUROR HUDSON:  I have a jug that I put them

23  in.

24                MR. CARROLL:  You understand one of the dangers

25  of these dirty needles is that -- it shouldn't be, but they end

1  up on the ground, right?

2                JUROR HUDSON:  Right.

3                MR. CARROLL:  And some kid could step on one of

4  them.  And that wouldn't be a good deal, would it?

5                JUROR HUDSON:  No.

6                MR. CARROLL:  And what did you do -- you worked

7  for Panola County.

8                JUROR HUDSON:  No, I am retired.

9                MR. CARROLL:  But what did you do before you

10  retired?

11                JUROR HUDSON:  I worked at Wal-Mart's.

12                MR. CARROLL:  You worked at Wal-Mart.  There in

13  Carthage?

14                JUROR HUDSON:  Yes.

15                MR. CARROLL:  Are you a life-long resident of

16  the County?

17                JUROR HUDSON:  Yes.

18                MR. CARROLL:  So far?

19                JUROR HUDSON:  Yeah, I was raised in Carthage,

20  and then we moved to Beckville, ten miles.

21                MR. CARROLL:  Moved to the country.  Do you know

22  where Rock Hill is?

23                JUROR HUDSON:  Oh, yeah.

24                MR. CARROLL:  Okay.  All right.  Thank you, Ms.

25  Hudson.

1              Okay.  Now, who else -- Ms. Stafford.  You are a

2  substitute teacher at Sabine.  Do you mind standing up for us?

3              Ms. Stafford, what is different in your

4  shot-giving experience than what Ms. Moreland and Ms. Hudson

5  talked about?

6              JUROR STAFFORD:  I didn't do shots.  I worked

7  doing phlebotomy for a little while.

8              MR. CARROLL:  I got you.  So you know about

9  needle sticks, too?

10             JUROR STAFFORD:  Yes.

11             MR. CARROLL:  Because one of the things that the

12  folks in this business talk about is something called a

13  "sharp"; you have heard that term?

14             JUROR STAFFORD:  Yes.

15             MR. CARROLL:  Did you generally understand and

16  agree with Ms. Moreland that whether it is a shot needle or a

17  sharp or an IV bag, point, or a scalpel, or lance it or

18  anything else, if it has been used it is dirty and it is

19  dangerous?

20             JUROR STAFFORD:  Yes.

21             MR. CARROLL:  All right.  And what do you teach

22  over at Sabine?

23             JUROR STAFFORD:  I substitute doing elementary,

24  just whatever they need me to do, classroom or aide.

25             MR. CARROLL:  How long have you been doing that

 1  job?

 2                  JUROR STAFFORD:  This is my third school year.

 3                  MR. CARROLL:  Well, thank you for doing that

 4  work.  Thank you.

 5                  Okay.  So that is all -- all the rest of you

 6  shot-givers I guess your experiences are about the same as what

 7  you have heard, right?

 8                  Is that Ms. Lesauvage?

 9                  JUROR MITCHELL:  Mitchell.

10                  MR. CARROLL:  Ma'am?

11                  JUROR MITCHELL:  Mitchell.

12                  MR. CARROLL:  Oh, Ms. Mitchell.  I'm sorry.  Ms.

13  Mitchell, is your experience different from what you heard?

14                  JUROR MITCHELL:  Yes, I'm an RN.

15                  MR. CARROLL:  You're an RN.  So you know about

16  needle sticks?

17                  JUROR MITCHELL:  Yes.

18                  MR. CARROLL:  And I don't know how to ask this

19  tactfully, so I will just ask it.  How long ago were you

20  trained?

21                  JUROR MITCHELL:  1967.

22                  MR. CARROLL:  Would you agree with me, because

23  this is what you are going to hear from Kathryn Duesman over

24  here, that the world has turned a couple of times since 1969?

25                  JUROR MITCHELL:  Oh, yes.  Oh, yes.

1           MR. CARROLL:  I reckon -- don't know -- but I

2   reckon your experience is probably pretty similar to Kathryn

3   Duesman who said when she was a training nurse in the hospital,

4   the way you dealt with sharps is you held them as high as you

5   could and said "sharp"; does that sound familiar?

6           JUROR MITCHELL:  No, I didn't do that.

7           MR. CARROLL:  Okay.  Well, do you know anything

8   about safety needles?

9           JUROR MITCHELL:  Yes.

10          MR. CARROLL:  What do you know about safety

11  needles?

12          JUROR MITCHELL:  They are a lot better than when

13  I first started.

14          MR. CARROLL:  Do you know about retractable

15  safety needles?

16          JUROR MITCHELL:  Yes.

17          MR. CARROLL:  Do you know about either of the

18  companies --

19          JUROR MITCHELL:  No.

20          MR. CARROLL:  You don't know about -- Becton

21  Dickson -- Dickinson, excuse me, sells about 60 percent of all

22  of the shot needles in the United States, so if you have had a

23  shot, you probably got shot with one of their needles?  And you

24  have never heard of their company?

25          JUROR MITCHELL:  No.

1                    MR. CARROLL:  And our company sells about two

2    percent of the safety needles in the United States, and you

3    have never heard of us?

4                    JUROR MITCHELL:  No.

5                    MR. CARROLL:  Have you ever actually used a

6    retractable?

7                    JUROR MITCHELL:  Yes.

8                    MR. CARROLL:  Did what I showed on the screen

9    look familiar to you?

10                   JUROR MITCHELL:  No, it seemed better.

11                   MR. CARROLL:  What you saw?

12                   JUROR MITCHELL:  Yes.

13                   MR. CARROLL:  And does it make sense to you, Ms.

14   Mitchell -- are you retired now?

15                   JUROR MITCHELL:  Yes.

16                   MR. CARROLL:  Okay.  Congratulations.

17                   JUROR MITCHELL:  Thank you.

18                   MR. CARROLL:  Does it makes sense to you as a

19   retired medical professional that if the dirty needle vanishes,

20   it is better?

21                   JUROR MITCHELL:  Yes.

22                   MR. CARROLL:  All right.  Thank you.  And, Ms.

23   Mitchell, you live here in Tyler?

24                   JUROR MITCHELL:  Yes.

25                   MR. CARROLL:  Okay.  Thank you so much, Ms.

1  Mitchell.  Enjoy your retirement.

2              JUROR MITCHELL:  Thank you.

3              THE COURT:  Okay.  Let me ask a couple of other

4  questions while I have got a few minutes left.

5              One of the concepts that Judge Davis will talk

6  to you about is something called market power.  Market power.

7  I am not going to tell you what it means because Judge Davis is

8  the Judge of the law.  He will tell you what it means.

9              But one of the applications of this term "market

10 power" is that it is applied differently to different companies

11 depending on whether they do or don't have market power.

12             Now, that sounds confusing.  Let me tell you

13 what I mean by that.

14             Mr. Seat, may I talk with you just a second,

15 please, sir?  Now, do I get it right you work with Little

16 Mexico down in Palestine?

17             JUROR SEAT:  Yes.

18             MR. CARROLL:  I figured y'all would have closed

19 your doors when Tate McCain died.

20             JUROR SEAT:  We should have.

21             MR. CARROLL:  He was a good customer, wasn't he?

22             JUROR SEAT:  Yes.

23             MR. CARROLL:  Now, here is the question I have

24 for you:  Do you have dogs at your house down there in

25 Palestine?

1                    JUROR SEAT:  We do.

2                    MR. CARROLL:  Big ones, little ones, or both?

3                    JUROR SEAT:  Medium.

4                    MR. CARROLL:  Medium.  At my house we have got

5     little tiny dogs, we have got two- and three-pound dogs, and we

6     have got great big dogs, 80- and 90-pound dogs.

7                    We have a rule at the Carroll house for dogs;

8     and that is, little dogs can get on laps, big dogs can't get on

9     laps.

10                   Now, that kind of makes sense, does it not?

11                   JUROR SEAT:  That's a good rule.

12                   MR. CARROLL:  That's a good rule.

13                   And the little dogs may feel like they are

14    special and get treated different because they get to get on

15    laps.  And the big dogs may feel like they are discriminated

16    against because they are -- because nobody wants a 90-pound

17    Golden Retriever that has been in the lake, sitting on his or

18    her lap.

19                   The law I think that Judge Davis is going to

20    give the eight of you who are the jury in this case, is similar

21    to my big-dog, little-dog example.  And that is, big dogs which

22    have market power can't do some of the same things that little

23    dogs which have no market power can do under the law, under the

24    law.

25                   I didn't make it up.  We didn't make it up.  The

1  law made it up.

2          So my question to you, Mr. Seat, is:  If that is

3  the law and if you are a big dog, there are certain things you

4  can't do that a little dog can do because you are a big dog,

5  can you apply that law?

6          JUROR SEAT:  (Pause in proceedings.) I think you

7  lost me somewhere.

8          MR. CARROLL:  Sorry.  Mr. Seat, I'm going to

9  tell you it won't be the first time.

10          Let me tell you what I mean.  If the law says

11  that you are a big dog and you have market power, you may not

12  do certain things.

13          JUROR SEAT:  Okay.

14          MR. CARROLL:  But at the same time if you are a

15  little dog, that restriction doesn't apply to you because you

16  are a little dog.  That is a different standard of applying

17  conduct.

18          Do you see what I am saying?  You with me?  You

19  see?

20          JUROR SEAT:  I do, I do.

21          MR. CARROLL:  So the question to you is, that

22  may not sound fair to some people.  Are you one of those

23  people?

24          JUROR SEAT:  It --

25          MR. CARROLL:  Yes?

1               JUROR SEAT:  I guess I am.

2               MR. CARROLL:  You guess you are.  So my question

3   is, if you have -- you have a restaurant in Palestine, Texas.

4               JUROR SEAT:  Yes.

5               MR. CARROLL:  And your restaurant is a good

6   restaurant and a big deal in Palestine, Texas.  But if you are

7   competing with a chain restaurant, an El Chico, say -- you

8   don't have one of those down there, I don't think?

9               JUROR SEAT:  We do not.

10              MR. CARROLL:  You do not.  It may be if El Chico

11  qualifies as a big dog, they can't do things that affect

12  consumers, that affect the public, that don't apply to you.  Do

13  you see what I am saying?  Because of the size.

14              JUROR SEAT:  Okay.

15              MR. CARROLL:  Do you see what I am saying?

16              Well, if that is the rule, would that make sense

17  to you that you wouldn't want a bigger competitor doing certain

18  things even though you as a smaller competitor may be free to

19  do them?

20              JUROR SEAT:  Okay.  Yes.

21              MR. CARROLL:  Does that make sense to you?

22              JUROR SEAT:  Yes, it does.

23              MR. CARROLL:  Understanding that, can you apply

24  the law if that is, in fact, what Judge Davis tells you the law

25  is?

1                    JUROR SEAT:  I can.

2                    MR. CARROLL:  You can.  Good.  Thank you, Mr.

3  Seat.

4                    Now, that is a tough concept.  Is there

5  anybody -- and I am sure it could have been asked a lot better

6  than I asked it.  I bet Mr. Baxter will give it a whirl.  But

7  is there anybody, in addition to Mr. Seat, who thinks that,

8  while that may not be right, that may not be fair, that may not

9  be the American way, everybody ought to be treated different

10  whether you are a big dog or you are a little dog even though

11  the antitrust law may say different, anybody just think, well,

12  that is not right; I don't want to be a part of anything where

13  big dogs are treated different from little dogs?

14                    Anybody on the front row?

15                    Anybody on the second row?

16                    Anybody beginning with Mr. Sturrock?

17                    Mr. Sturrock, how does that strike you?

18                    JUROR STURROCK:  It's fair.

19                    MR. CARROLL:  It's fair.

20                    JUROR STURROCK:  I can apply that.

21                    MR. CARROLL:  That's all I wanted to know.  And

22  you are an engineer for the State?

23                    JUROR STURROCK:  Yes, sir.

24                    MR. CARROLL:  For TxDOT?

25                    JUROR STURROCK:  Yes, sir.

1                    MR. CARROLL:  Do you work with regulators?

2                    JUROR STURROCK:  Not all the time.

3                    MR. CARROLL:  What do you do out there?

4                    JUROR STURROCK:  Design bridges.

5                    MR. CARROLL:  You work for the district here --

6                    JUROR STURROCK:  Yes, I do, for the district.

7                    MR. CARROLL:  And you live here -- you live in

8    Jacksonville?

9                    JUROR STURROCK:  Yes, sir.

10                   MR. CARROLL:  Thank you, Mr. Sturrock.

11                   Okay.  Anybody on Mr. Sturrock's row have any

12   disagreement that it is fair under the antirust laws for big

13   dogs to be treated different than little dogs?

14                   Anybody on Ms. Shumaker's row?

15                   And, finally, the last row?

16                   Okay.  So everybody can go with that if Judge

17   Davis tells you that is the law, correct?

18                   Okay.  Now, let me ask you a couple of other

19   things.

20                   Should there be -- does anybody believe there

21   shouldn't be any laws or rules or restrictions on the way

22   companies compete?  In other words, root, hog, or die, as they

23   would say in Beckville?  Anybody believe that that ought to be

24   the lay of the land; that if you compete, you got to play with

25   the big ones and it is root, hog, or die?  No rules?  All

1  right?  Anybody believe that?

2            Okay.  We are suing for loss of profits because

3  we say that this company through a deliberate campaign of lying

4  about our product and scaring off our customers and putting a

5  lemon on the market that they knew was a defective product,

6  that they have kept us down for all the years that we have been

7  trying to break into the market; that they have kept their big

8  hand on top of our head just enough where we can barely clear

9  the river water.

10           And because of that, we are suing for what our

11 people are going to tell you is a calculation of the money we

12 would have made if they had played by the rules.  And that

13 number is going to be around 300 million dollars, 300 million

14 dollars; a ton of money.

15           But I will tell you that the evidence is going

16 to be that it is a drop in the bucket compared to what these

17 people make.

18           So the question I have for you is, is there

19 anybody on the panel who simply couldn't ever give a little dog

20 300 million dollars even if the little dog proves to you that

21 that was what the little dog didn't make because of this unfair

22 conduct?  Anybody?

23           Okay.  Let me ask a couple of other questions,

24 and then I am done.

25           I have got two minutes, Judge?

1                    THE COURT:  No, you have actually got -- you

2   have got about five minutes.

3                    MR. CARROLL:  Well, that is good news probably

4   for -- only for me.

5                    Okay.  Who has been on a Grand Jury?  Ms.

6   Tidwell?

7                    JUROR TIDWELL:  Yes.

8                    MR. CARROLL:  Okay.  Let me start to your right.

9                    Go ahead, Ms. Tidwell.  That is fine.  And you

10  live over in Longview?

11                   JUROR TIDWELL:  Yes, sir.

12                   MR. CARROLL:  You were on the Gregg County Grand

13  Jury?

14                   JUROR TIDWELL:  No.  This --

15                   MR. CARROLL:  On the Federal Grand Jury here in

16  Tyler?

17                   JUROR TIDWELL:  Uh-huh.

18                   MR. CARROLL:  How long ago was that?

19                   JUROR TIDWELL:  A couple of years.

20                   MR. CARROLL:  Have you ever served on a trial

21  jury?

22                   JUROR TIDWELL:  No.

23                   MR. CARROLL:  You have not.  And you work for

24  Gregg County.  Were you the elected Clerk over there?

25                   JUROR TIDWELL:  No.

1                    MR. CARROLL:  You worked for one of the clerks?

2                    JUROR TIDWELL:  I work for a drug store.

3                    MR. CARROLL:  I don't know where I got it that

4    you worked for the County.

5                    What drug store did you work for?

6                    JUROR TIDWELL:  Lewis Morgan.

7                    MR. CARROLL:  There in Longview?

8                    JUROR TIDWELL:  Yes.

9                    MR. CARROLL:  Did y'all sell shot needles at

10   Lewis Morgan's drug?

11                   JUROR TIDWELL:  Yeah, and they give flu shots

12   and pneumonia shots.

13                   MR. CARROLL:  Okay.  All this business about

14   safety needles and non-safety needles, you have heard about all

15   that?

16                   JUROR TIDWELL:  Yeah.

17                   MR. CARROLL:  Have you ever seen a retractable

18   needle similar to the one that Mr. Shaw back here spent nine

19   years of his life building?

20                   JUROR TIDWELL:  I never gave shots.

21                   MR. CARROLL:  You never gave the shot?

22                   JUROR TIDWELL:  No.

23                   MR. CARROLL:  Thank you, Ms. Tidwell.

24                   Mr. Seat, you have been on the Grand Jury down

25   there in Anderson County?

1                    JUROR SEAT:  No, sir.  Federal.

2                    MR. CARROLL:  Federal, too.  Well, did you and

3    Ms. Seat (sic) serve together?

4                    JUROR SEAT:  It has been about 12 or 13 years

5    since I was on the Grand Jury.

6                    MR. CARROLL:  Okay.  All right.  Thank you.  Was

7    it a good experience?

8                    JUROR SEAT:  I was -- very unusual.  Very

9    eye-opening to me.

10                   MR. CARROLL:  I know you were sworn to secrecy,

11   so say no more.

12                   Anybody else a Grand Juror in addition to Ms.

13   Tidwell or Mr. Seat?

14                   Okay.  How about a foreman, or as we say now, a

15   presiding juror of a trial jury who has been elected by your

16   fellow jurors to communicate with the Court to write the notes

17   out and that kind of thing?

18                   Anybody on the first row, on Mr. Seat's row?

19   Nobody has been that lucky?

20                   Anybody on Ms. Medlin's row.  Wait a minute.

21   That is not Ms. Medlin's row.  That is Ms. Besson's row.

22                   You are the only Rains County person here, Ms.

23   Besson.  Did you know that?

24                   JUROR BESSON:  I'm in Rusk County.

25                   MR. CARROLL:  I'm sorry?

1              JUROR BESSON:  I'm in Rusk County.

2              MR. CARROLL:  Oh, you are in Rusk County.  You

3   have now moved.  Bad news.  You better check.

4              What do you do over in Rusk County?

5              JUROR BESSON:  I'm an insurance agent.  Okay.

6   They got that part right.

7              And you have never sat on a jury over there in

8   Henderson?

9              JUROR BESSON:  No, sir.

10             MR. CARROLL:  Okay.  Thank you, ma'am.

11             Any jurors out here?  No presiding jurors.  Okie

12  dokie.

13             Anybody been the chairperson of a committee at

14  your church, at your school, at a club, any kind of

15  leadership -- what do you call it -- positions?

16             Mr. Henderson --

17             Yes, ma'am?

18             You are an elected official.

19             JUROR HENDERSON:  (Nods head)

20             MR. CARROLL:  Let's see -- well, I have lost my

21  place.

22             Ms. Besson, what about you, are you a

23  chairperson?

24             JUROR BESSON:  At church.  I have been a Cub

25  Master and other leadership at church.

1              MR. CARROLL:  You have a den of Cub Scouts?

2              JUROR BESSON:  Yes.

3              MR. CARROLL:  Okay.  That is the Lord's work.

4              JUROR BESSON:  I guess so.

5              MR. CARROLL:  Anybody out here?  Okay.  Put your

6  hands up high so we can write you down because I'm fixing to

7  run out of time.

8              Somebody up there with a pencil?

9              All right.  I am not going to be able to talk to

10 each one of you.  I know that you have something that we ought

11 to talk about, but I am about out of town -- time.

12             Okay.  Let me ask this last question --

13             Did we get them all?

14             Okay.  All right.  Who has a bumper sticker on

15 her or his car where if I read it I would know something very

16 important about you?

17             All right.  Mr. Henderson, you have got -- is it

18 a political bumper sticker?

19             JUROR HENDERSON:  (Nods head.)

20             MR. CARROLL:  How about on the second row?

21             Let's see, Mr. Copeland, is it a political

22 bumper sticker?

23             JUROR COPELAND:  No, NRA.

24             MR. CARROLL:  NRA.  The Second Amendment is

25 important.  Okie dokie.

1                    Anybody out here where if I saw that bumper

2    sticker I would say that person -- that is important to that

3    person.

4                    Anybody on the third row?

5                    Back row?

6                    Who has written letters to the editor?

7                    Mr. Henderson.  Do they ever get printed?

8                    JUROR HENDERSON:  Yes, sir.

9                    MR. CARROLL:  Lucky you.

10                   Okay.  That's Ms. McGaughey.

11                   JUROR MCGAUGHEY:  McGaughey (different

12   pronunciation.)

13                   MR. CARROLL:  McGaughey.  I have never heard it

14   pronounced that way.  And you live down in Cherokee County.

15                   JUROR MCGAUGHEY:  (Nods head.)

16                   MR. CARROLL:  Did it scratch your itch when you

17   wrote the letter?

18                   JUROR MCGAUGHEY:  (Nods head.)

19                   MR. CARROLL:  Hope it changed something.

20                   JUROR MCGAUGHEY:  Yes, it did.

21                   MR. CARROLL:  What did you do before you

22   retired?

23                   JUROR MCGAUGHEY:  I was a computer programmer

24   for a small business in Jacksonville.

25                   MR. CARROLL:  Was it in the plastics industry

1  down there?

2              JUROR MCGAUGHEY:  Air conditioning.

3              MR. CARROLL:  Air conditioning.  Okay.  Thank

4  you.  Is innovation important in the business that you were in?

5              JUROR MCGAUGHEY:  Uh-huh, yes.

6              MR. CARROLL:  Automation?

7              JUROR MCGAUGHEY:  Yes.

8              MR. CARROLL:  So that if you had your choice

9  between a fully-automatic retractable which operated

10  automatically or one you had to manually recap, would you go

11  with the automation?

12             JUROR MCGAUGHEY:  Personally, yes, because I am

13  clumsy.

14             MR. CARROLL:  Me, too.  All right.  Thank you,

15  ma'am.

16             Anybody else on the back row?

17             THE COURT:  Okay, Mr. Carroll, wrap it up.

18             MR. CARROLL:  All right.  Thank you, Your Honor.

19             I look forward to working with the eight of you

20  that are on our jury.

21             Thank you, Your Honor.

22             THE COURT:  Thank you, Mr. Carroll.

23             All right.  Mr. Baxter.

24             MR. BAXTER:  Thank you, Your Honor.  May it

25  please the Court.

1          Ladies and Gentlemen, as I told you, my name is

2   Sam Baxter.  It is my privilege to represent Becton Dickinson

3   in this case.

4          When my friend Mr. Carroll started out this

5   morning, I had a flashback to my earlier days as a lawyer

6   because I thought maybe just for a moment this was a products

7   case; and that we were going to talk about products that were

8   some better than others.

9          But let me assure you, that is not what kind of

10  case it is.  As Judge Davis told you, this is an antitrust

11  case.

12          And, really, this case is about contracts and

13  with a few sidelights thrown in that we will talk about in a

14  moment.  But it is really about contracts, and the contracts

15  that they complain about that we have in the marketplace and

16  that hospitals utilize to buy their products not only from us

17  but from our competitors, along with RTI that sign up on the

18  very same contracts that we have.  The problem is they just

19  don't want to compete in the marketplace.

20          And the problem always turns out to be this:

21  You might imagine -- and I am going to ask you some questions

22  in a moment -- everything comes down to price at the end of the

23  day, doesn't it?

24          When you go shop for things, eventually somebody

25  says:  What does it cost?  Well, everybody but my wife.  But

1  for most folks it is, what does it cost?  And you have to know

2  those sorts of things.  And when we are in a health-care crisis

3  that we are today, hospitals are very cognizant about what

4  things cost.

5             And when they are looking to buy products they

6  want companies like Becton Dickinson and our competitors.  The

7  primary competitors will be a company called Smiths and a

8  company called Covidien, to compete to give them low prices.

9             And one of the things that hospitals did a

10  number of years ago, if you look at the hospitals here in Tyler

11  or my little hospital in Marshall, they said:  What do we do to

12  get some sort of leverage against people that sell us things?

13             They said, we are going to form groups; we are

14  going to get hospitals together; and we are going to form

15  something called GPO's, or group purchasing organizations; and

16  we are going to leverage all of our hospitals together; and we

17  are going to go to these suppliers; and we are going to demand

18  low prices.

19             It turned out to be a really good idea because

20  when you show up by yourself and say, what will you sell it to

21  me for and you are just there by yourself, I might be tempted

22  to say, well, you are not very big, I'm going charge you a high

23  price.

24             But when you have got 2,000 of your buddies with

25  you, that turns out to be a different story.  And when they

1   come to us and they go to our competition and, say what is the

2   price, we started fighting among ourselves to give you the best

3   price that we can.

4              And after they get the best price, they say,

5   well, wait a minute, we are going to buy in volume, what will

6   you do for me now?  What we do is give them discounts if they

7   will buy in volume.  And that is how the world in safety

8   syringes and catheters -- which we will talk about in a

9   minute -- works.

10             That works for everybody except RTI.  They say

11  we don't want to play that game.  We don't want to charge you

12  lower prices, and we are not going to do it.  And they have the

13  highest prices in the industry.  And, in fact, what they say

14  is, you know what, if we had our way, we would charge even

15  higher prices, which is the goal of Mr. Shaw and RTI.

16             And you are going to hear that in this case

17  because he has already sworn to it.  And that is what this case

18  is about.  It is not about does the needle go back in the

19  syringe.  Everybody has safety products, and they all work.

20             It is about hospitals facing increased costs and

21  budgets and faced with ObamaCare, what are they going to do?

22  And the answer is, they have got to lower their costs.  And

23  they can't pay higher prices.  And you are here to decide if

24  they are going to have to do it or not.  And that is what this

25  case is about.

1            And it is important.  And the eight of you that

2   get to hear it are going to get to make a monumental decision.

3   It is not about who has the cleverest needle.  It is not about

4   who developed it for nine years because BD was the first in the

5   market with safety products.

6            We were there earliest.  We are the one that

7   forged ahead.  We are the one that developed the very first

8   safety product.  And we have been at the forefront of that

9   fight to reduce needle sticks and reduce injuries in the

10  hospitals and to reduce deaths.

11           As a matter of fact, when you look at the

12  statistics, the number of confirmed AID deaths since 1999 from

13  a needle stick from an injection is zero, thanks in large part

14  to the work that BD has done to get safety syringes and safety

15  catheters into the hospital.

16           Now, those are the facts.  That is what you are

17  going to hear about.

18           Now, I have got a few questions for you.  I

19  think you are going to enjoy this case, but it is an important

20  case.  And while Mr. Carroll and I are friends and have been

21  for 40 years, we are going to violently disagree about what

22  goes on in this case and what the facts are.

23           Now, let me ask a few of you a few questions,

24  and I am going to start with Ms. McGowen.  Ms. McGowen, you

25  work -- I think you are one of the few people that work in a

1 hospital; is that right?

2           JUROR MCGOWEN:  I work in and out.  I have

3 worked clinical site and hospital site.

4           MR. BAXTER:  Tell me what do you do at the

5 hospital, ma'am.

6           JUROR MCGOWEN:  At the hospital I'm an assistant

7 medical coder.

8           MR. BAXTER:  And tell me kind of -- because I

9 don't know, what do you do?

10          JUROR MCGOWEN:  We take the billing from the

11 doctors, and we audit their procedures and diagnosis to make

12 sure everything lines up for the insurance company.

13          MR. BAXTER:  Do you ever get around the

14 emergency rooms or any of the procedures that are taking place

15 in the hospital?

16          JUROR MCGOWEN:  Well, no.  I mean, I walk around

17 and about, but I am never up close and personal with those

18 procedures, no.

19          MR. BAXTER:  Ms. McGowen, do you know anything

20 about the committees that get formed up at hospitals where

21 nurses and doctors sit on committees and talk about what

22 products they would like to have in the hospitals?

23          JUROR MCGOWEN:  Not up close and personal, no.

24          MR. BAXTER:  Do you know some of the nurses at

25 the hospital?

1              JUROR MCGOWEN:  Yes.

2              MR. BAXTER:  Are nurses pretty competent there

3  at the hospital?

4              JUROR MCGOWEN:  Very.

5              MR. BAXTER:  And do you think that they know

6  what they are doing?

7              JUROR MCGOWEN:  Yes.

8              MR. BAXTER:  And do you feel like they are

9  pretty vocal -- if a product didn't work in the hospital, do

10  you think one of them might raise their hand and say I'm not

11  going to do this anymore?

12              JUROR MCGOWEN:  Oh, yes.

13              MR. BAXTER:  Okay.  Any question in your mind

14  that nurses are sort of the front-line health-care workers?

15              JUROR MCGOWEN:  Yes, I believe they are.

16              MR. BAXTER:  And your experience is they are

17  very competent?

18              JUROR MCGOWEN:  Yes.

19              MR. BAXTER:  And they know what they use and

20  either like what they use or they would protest it?

21              JUROR MCGOWEN:  At my hospital, yes.

22              MR. BAXTER:  All right.  Thank you.  I think

23  that is the experience every place I have been, Ms. McGowen.

24  Thank you.

25              Mr. Henderson?

1                    JUROR HENDERSON:  Yes.

2                    MR. BAXTER:  You are the Democratic Chairman in

3    Smith County.

4                    JUROR HENDERSON:  Smith County, yes.

5                    MR. BAXTER:  And you followed Mr. Carroll?

6                    JUROR HENDERSON:  Not directly.

7                    MR. BAXTER:  He is a former Chairman?

8                    JUROR HENDERSON:  Yes.

9                    MR. BAXTER:  Somebody had the good sense to get

10   rid of him.

11                   JUROR HENDERSON:  I think he got tired of it,

12   and --

13                   MR. BAXTER:  Well, that is a tough job over

14   here, isn't it?

15                   JUROR HENDERSON:  It is indeed.

16                   MR. BAXTER:  Anything about that, Mr. Henderson,

17   if you get on this jury and -- you have known Otis how many

18   years?

19                   JUROR HENDERSON:  Oh, seven, I think.

20                   MR. BAXTER:  And you don't know me from anybody.

21   And you sit on that jury and he starts telling you something is

22   X and I tell you it is not X, who are you going to believe?

23                   JUROR HENDERSON:  I guess it depends on whether

24   it looks like X or it looks like Y.

25                   MR. BAXTER:  Okay.  Anything about that I need

1  to worry about having you on this jury?

2           JUROR HENDERSON:  I think I can be objective.

3  But, you know, if you have a good friend arguing a case, it is

4  difficult to be completely objective.

5           MR. BAXTER:  Okay.  Would it be fair to say, Mr.

6  Henderson, that as we sit here today, we are probably not on a

7  level playing field?  And I understand that, you know --

8           JUROR HENDERSON:  Well, again, I think I am a

9  rational person.  A lot of people around here don't think so.

10 And I would try to be objective; but I couldn't tell you, in

11 all honesty, that I could be.

12          MR. BAXTER:  All right.  Thank you.  We will

13 take it up with the Judge, Mr. Henderson.  Thank you very much.

14          Let me go down --

15          I'm going to go over here, if you will, Mr.

16 Bailiff.

17          One of you worked for Mr. Carroll, and that

18 is -- there you are, that is Ms. Roosth.

19          JUROR ROOSTH:  Uh-huh, Roosth like rooster.

20          MR. BAXTER:  What did you do for Mr. Carroll?

21          JUROR ROOSTH:  Well, he was one of the partners

22 in the firm.  I worked for Pat Kelley.

23          MR. BAXTER:  And a great guy Pat is.

24          JUROR ROOSTH:  Uh-huh.

25          MR. BAXTER:  Anything about that, ma'am?  I mean

1  I am now deathly afraid to take you on my jury --

2              THE COURT:  Mr. Baxter, you are fading from the

3  microphone.

4              MR. BAXTER:  I'm sorry.  Thank you, Your Honor.

5              THE COURT:  I'm sorry.

6              MR. BAXTER:  I'm a little afraid to take you on

7  this jury now.  Should I be afraid of that?  I mean, you worked

8  for the law firm, and I understand that.

9              JUROR ROOSTH:  Are you excusing me?

10             MR. BAXTER:  No, no, ma'am.  If I could, I

11  would.  But, unfortunately, I am not wearing that black robe.

12             Would it be fair to say we are not going to be

13  on the same field?

14             JUROR ROOSTH:  Yes.

15             MR. BAXTER:  And you would favor Mr. Carroll --

16             JUROR ROOSTH:  I would love to sit and listen

17  and be rational and all that, but I would rather be excused.

18             MR. BAXTER:  Okay.  You feel like you couldn't

19  be fair to my client?

20             JUROR ROOSTH:  Correct.

21             MR. BAXTER:  Okay, ma'am.  We will take it up

22  with the Judge.  Thank you.

23             Ms. Frater.  Ms. Frater, you are a correctional

24  officer?

25             JUROR FRATER:  Yes, I am.

1                    MR. BAXTER:  What do you do?  Which unit do you

2  work at, ma'am?

3                    JUROR FRATER:  I work at the Michael Unit in

4  Palestine.

5                    MR. BAXTER:  In Palestine.  And what is your job

6  there, ma'am?

7                    JUROR FRATER:  Just what a correctional officer

8  does; try to keep and maintain order.

9                    MR. BAXTER:  Okay.  I used to be a DA over in

10  Marshall.  I know what an incredibly hard job you have.

11                    Are you familiar with the infirmary there at the

12  unit?

13                    JUROR FRATER:  Yes, I am.

14                    MR. BAXTER:  Do you ever have to work at that

15  particular beat?  Are you familiar with what kind of care they

16  give there or shots or anything?

17                    JUROR FRATER:  Only when I take them over there.

18  I don't see them administer it or anything.

19                    MR. BAXTER:  Okay.  You don't know what kind of

20  needles they use or anything?

21                    JUROR FRATER:  No, I don't.

22                    MR. BAXTER:  All right.  Thank you, Ms. Frater.

23  I appreciate it.

24                    JUROR FRATER:  You're welcome.

25                    MR. BAXTER:  And, lastly, I want to ask Ms.

1  Mitchell.  Ms. Mitchell, you are our RN here.

2                    At the very back, Mr. Bailiff.

3                    You are retired, Ms. Mitchell?

4                    JUROR MITCHELL:  Yes.

5                    MR. BAXTER:  When did you last work in a

6  hospital or a clinic or for a doctor?

7                    JUROR MITCHELL:  2011.

8                    MR. BAXTER:  Okay.  Did you ever work in a

9  hospital, ma'am, ever?

10                    JUROR MITCHELL:  Yes.

11                    MR. BAXTER:  Are you familiar with committees

12  that a hospital have --

13                    JUROR MITCHELL:  Yes.

14                    MR. BAXTER:  -- that they'll put doctors and

15  nurses on to pick products?

16                    JUROR MITCHELL:  Yes.

17                    MR. BAXTER:  Were you ever on one of those

18  committees?

19                    JUROR MITCHELL:  No.

20                    MR. BAXTER:  Okay.  Are you familiar with the

21  fact that they make recommendations to the hospital about what

22  products to use?

23                    MR. BAXTER:  Yes.

24                    JUROR MITCHELL:  Yes.

25                    MR. BAXTER:  Have you found, Ms. Mitchell, that

1  nurses, particularly nurses, are pretty vocal about the

2  products that they get?

3              JUROR MITCHELL:  Oh, yes.

4              MR. BAXTER:  And do you find that the

5  administrators listen to them?

6              JUROR MITCHELL:  Yes.

7              MR. BAXTER:  Any question in your mind about

8  that?

9              JUROR MITCHELL:  No.

10             MR. BAXTER:  If a hospital bought a product, Ms.

11 Mitchell, and they said here use this, and you started doing it

12 and you found it wasn't safe, what would happen then?

13             JUROR MITCHELL:  Oh, I would report it.

14             MR. BAXTER:  Okay.  And then what would you

15 expect the administrators to do?

16             JUROR MITCHELL:  Change products.

17             MR. BAXTER:  Any question in your mind that if

18 you nurses went to an administrator and said, look, you gave us

19 this product and it doesn't work or it is not safe, and it's

20 either going to hurt the patient or hurt me or hurt a

21 co-worker, do you have any question they would change it?

22             JUROR MITCHELL:  No question.

23             MR. BAXTER:  Okay.  Are they pretty good about

24 listening to the nurses and the doctors about what works?

25             JUROR MITCHELL:  Yes.

1                    MR. BAXTER:  If you were given a product that

2    turns out to be unsafe, do you think you could figure that out?

3                    JUROR MITCHELL:  Yes.

4                    MR. BAXTER:  Any question in your mind about

5    that?

6                    JUROR MITCHELL:  No.

7                    MR. BAXTER:  Did you use safety needles, Ms.

8    Mitchell?

9                    JUROR MITCHELL:  Yes.

10                   MR. BAXTER:  Do you remember how it worked?

11                   JUROR MITCHELL:  It seemed like it had a little

12   clasp on it or something and it retracted.

13                   MR. BAXTER:  Let me tell you how the ones I have

14   seen work.  There is one that has a device that slides up the

15   needle and covers it after you use it.

16                   JUROR MITCHELL:  Yes.

17                   MR. BAXTER:  Did you use that one?

18                   JUROR MITCHELL:  Yes.

19                   MR. BAXTER:  Okay.  I think that might be called

20   a SafetyGlide.  BD makes that one.  Smiths and Covidien also

21   make some sort of product that may be similar to that.

22                   They also make one that is called -- that has a

23   pivot device on the outside and it clicks over.

24                   JUROR MITCHELL:  Yes.

25                   MR. BAXTER:  Did you use those?

1                JUROR MITCHELL:  Yes.

2                MR. BAXTER:  Did you ever have any trouble with

3  those?

4                JUROR MITCHELL:  Not really trouble but a little

5  bit inconvenient.

6                MR. BAXTER:  Did you ever use a retractable?

7                JUROR MITCHELL:  Yes.

8                MR. BAXTER:  What kind did you use?

9                JUROR MITCHELL:  I don't remember.  It has been

10  a long time since I used retractables.

11                MR. BAXTER:  When you retracted it, was it still

12  in the patient's arm; or did you take it out?

13                JUROR MITCHELL:  Took it out.

14                MR. BAXTER:  Okay.  You took it out and

15  retracted it?

16                JUROR MITCHELL:  Yes.

17                MR. BAXTER:  Why did you do that?

18                JUROR MITCHELL:  I guess --

19                MR. BAXTER:  Do you remember?

20                JUROR MITCHELL:  No.  Maybe it was not a

21  retractable.

22                MR. BAXTER:  Okay.  All right.  It has been

23  awhile ago.

24                JUROR MITCHELL:  The last few years I worked in

25  psych, and we didn't -- we gave shots, but we didn't have

1  retractable.

2           MR. BAXTER:  Did you ever insert a catheter, Ms.

3  Mitchell?

4           JUROR MITCHELL:  Yes.

5           MR. BAXTER:  Okay.  Would it be true, Ms.

6  Mitchell, that once -- let's say I hit the hospital, as I have

7  a couple of times, and they would tell me I'm going to -- they

8  would say, young man -- which I wish were true -- I'm going to

9  stick you just one time.  I'm going to put a catheter in your

10 hand or your arm, and that is the last time we are going to

11 stick you.

12          Would that pretty much be what they tell people

13 that come in the hospital because they are going to give the

14 rest of the medication through that IV that is in your hand or

15 arm?

16          JUROR MITCHELL:  Well, once they get it in, they

17 can tell you that.

18          MR. BAXTER:  Yes, ma'am.  And when they give it

19 through that catheter, do they take a syringe and just screw it

20 into that catheter and pump it in, or do they put it in the

21 bag; one or the other?

22          JUROR MITCHELL:  Yes.

23          MR. BAXTER:  And they don't use a needle to do

24 any of that, do they?

25          JUROR MITCHELL:  No.

1          MR. BAXTER:  And one of the things that

2  hospitals figured out is they could take a lot of needles out

3  of the hospital so that you couldn't get a needle stick by just

4  going needleless with a catheter?

5          JUROR MITCHELL:  Right.

6          MR. BAXTER:  Once you put the catheter in, then

7  you didn't need a needle anymore, did you?

8          JUROR MITCHELL:  No.

9          MR. BAXTER:  And that cut a whole lot of needle

10  sticks down, didn't it?

11          JUROR MITCHELL:  Yes.

12          MR. BAXTER:  And you wouldn't want to take a

13  needle and stick it in that catheter, would you?

14          JUROR MITCHELL:  No.

15          MR. BAXTER:  Okay.  Thank you, Ms. Mitchell.  I

16  appreciate it.  Thank you, ma'am.

17          Let me ask, besides Ms. Mitchell, who has any

18  medical training at all?  Nurse, EMT, worked in a doctor's

19  office ever, your spouse?

20          Yes, ma'am, No. 20.

21          JUROR STAFFORD:  I just did the phlebotomy for a

22  little bit in a doctor's office.

23          MR. BAXTER:  And that means you were drawing

24  blood?

25          JUROR STAFFORD:  Yes.

1                   MR. BAXTER:  What kind of products did you use;

2  do you remember?

3                   JUROR STAFFORD:  We had the needles that had the

4  flap that went up.

5                   MR. BAXTER:  Okay.  Do you remember who made

6  them?

7                   JUROR STAFFORD:  No.

8                   MR. BAXTER:  Did you like using them?

9                   JUROR STAFFORD:  Yeah.

10                  MR. BAXTER:  Did you ever get stuck?

11                  JUROR STAFFORD:  No.

12                  MR. BAXTER:  Okay.  Anything about that

13  experience you bring to this courtroom that would be okay?

14                  JUROR STAFFORD:  No.

15                  MR. BAXTER:  Thank you, ma'am.

16                  Anybody else?  Anybody over here?

17                  Yes, sir?

18                  JUROR GLOSSON:  I worked at a medical lab

19  probably -- over 20 years ago when I was in college, but I

20  didn't personally, you know -- they wanted to train me to do

21  phlebotomy --

22                  MR. BAXTER:  Yeah.

23                  JUROR GLOSSON:  -- but I didn't do it.

24                  MR. BAXTER:  You didn't do any of that?

25                  JUROR GLOSSON:  But I was around it.  That was

1  all.

2              MR. BAXTER:  You are a teacher, aren't you,

3  Mr. --

4              JUROR GLOSSON:  Yes.

5              MR. BAXTER:  You teach at a Catholic school?

6              JUROR GLOSSON:  Yes, sir.

7              MR. BAXTER:  Do you know Collin Maloney?

8              JUROR GLOSSON:  Yes.

9              MR. BAXTER:  That is Mr. Carroll's partner.

10             And I forgot to ask folks if they knew any of

11 Mr. Carroll's partners; Pat Kelley, Deborah Race, Collin

12 Maloney, and his daughter Mandy Carroll Nelson.  Does anybody

13 know any of those folks, besides Mr. Glosson?  I'm going to

14 come back to you folks in just a minute.

15             JUROR GLOSSON:  I know the last name and I

16 know -- but I am not sure.

17             MR. BAXTER:  Okay.  I know that Collin is big in

18 the Catholic church and he is big in that school.  Do you know

19 him at all?

20             Is there any problem with you serving on this

21 jury knowing Mr. Maloney and knowing he is Otis's law partner,

22 Mr. Carroll's law partner?

23             JUROR GLOSSON:  I don't think there would be any

24 problem.

25             MR. BAXTER:  Okay.  All right.  Thank you.

1              There are some other folks back here, Mr.

2    Bailiff, that know either Ms. Race or Mr. Maloney or --

3              You do, of course, yes, ma'am.

4              Anybody else?  The very last juror --

5    prospective juror anyway.

6              JUROR LESAUVAGE:  Joan Lesauvage.  I know

7    Deborah, Deborah Race.

8              MR. BAXTER:  Anything about that -- Deborah is a

9    very nice lady.  Anything about that that would be a problem?

10             JUROR LESAUVAGE:  No.

11             MR. BAXTER:  I don't know if she will make an

12   appearance here or not, but I suspect she won't be doing any

13   witnesses or things like that.

14             JUROR LESAUVAGE:  No.

15             MR. BAXTER:  Okay.  Thank you.

16             Anyone else?

17             Okay.  Is there anyone that is -- besides our

18   juror up here that is a diabetic like I am and has to give

19   themselves insulin shots every day?

20             You don't use the pen --

21             JUROR HUDSON:  I use the pen.

22             MR. BAXTER:  You use the pen.

23             JUROR HUDSON:  Put the needle on it.

24             MR. BAXTER:  Yes, ma'am.  Do you use the Nano

25   needle like I do?

1                    JUROR HUDSON:  (Nods head.) Yes.

2                    MR. BAXTER:  Okay.  Is that made my BD; do you

3     remember?

4                    JUROR HUDSON:  Yes, it is.

5                    MR. BAXTER:  Do you like those needles?

6                    JUROR HUDSON:  Yes, I do.

7                    MR. BAXTER:  They are great, aren't they?

8                    JUROR HUDSON:  Yes, you can't hardly feel it.

9                    MR. BAXTER:  Right.  And you screw it on and

10    give yourself the injection, screw it off, and it is in that

11    safety cap, and you throw it in the jug?

12                   JUROR HUDSON:  True.

13                   MR. BAXTER:  Okay.  And that works pretty

14    well?

15                   JUROR HUDSON:  Yes.

16                   MR. BAXTER:  Okay.  Thank you, ma'am.

17                   Anybody else give themselves shots on a daily

18    basis for diabetes or anything of that sort?

19                   Anybody been in a hospital lately?

20                   Yes, ma'am?

21                   JUROR LESAUVAGE:  Not personally but my husband

22    was there.

23                   MR. BAXTER:  Okay.  Did -- I take it things came

24    out okay?

25                   JUROR LESAUVAGE:  Three weeks of complications

1  in and out of three hospitals.

2                MR. BAXTER:  Okay.  That is always a traumatic

3  experience, isn't it?

4                JUROR LESAUVAGE:  Yes.

5                MR. BAXTER:  Did you feel like the nurses gave

6  him good care, and the nurses were attentive and that sort of

7  thing?

8                JUROR LESAUVAGE:  Yes and no.

9                MR. BAXTER:  Okay.  Some were, some weren't.

10               Did he get a catheter in his hand?

11               JUROR LESAUVAGE:  Yes.

12               MR. BAXTER:  Did you ever see anybody stick a

13  needle in that catheter, or did they just screw something in

14  there?

15               JUROR LESAUVAGE:  To be honest, I really don't

16  remember.

17               MR. BAXTER:  Okay.  All right.  Okay.  Thank

18  you, ma'am.  I appreciate it.

19               Anybody else?  Yes, ma'am?

20               JUROR SCHUMAKER:  I spent the month of July in

21  the hospital with my mom.

22               MR. BAXTER:  Okay.  Same question.  Did the

23  nurses come in and they appear to be competent and knew what

24  they were doing?

25               JUROR SCHUMAKER:  Uh-huh.

1                  MR. BAXTER:  Yes, ma'am.

2                  Yes, ma'am, No. 19?

3                  JUROR HOLMES:  I just had a grandson in the NICU

4     that got out Sunday evening.  He was born five weeks early.

5                  MR. BAXTER:  Great.  Doing okay?

6                  JUROR HOLMES:  Doing wonderful.

7                  MR. BAXTER:  Great.

8                  Yes, ma'am?

9                  JUROR FRATER:  Yes.  My brother was just in the

10    hospital over last week.  He had triple -- no, five bypasses,

11    so he had open heart surgery.

12                 MR. BAXTER:  Is he doing okay?

13                 JUROR FRATER:  Yes, he is.  Thank you.

14                 MR. BAXTER:  Did you visit him in the hospital?

15                 JUROR FRATER:  Yes, I did.

16                 MR. BAXTER:  Did you see an IV in his hand?

17                 JUROR FRATER:  I was there when they inserted

18    it.

19                 MR. BAXTER:  Did you see them then screw the

20    syringe in there and not use another needle?

21                 JUROR FRATER:  Yes, I did.

22                 MR. BAXTER:  Okay.  Thank you, ma'am.

23                 JUROR FRATER:  You are welcome.

24                 MR. BAXTER:  Who all -- yes, ma'am.  One more

25    right up here.  No. 11.

1                    JUROR LAND:  Lori Land.  Obviously I was just

2    recently in an accident, so I was at the clinic, the ER for

3    ETMC.  And two years prior I was a full-time caregiver for my

4    husband with cancer, so we were in Mother Frances for about

5    eight months?

6                    MR. BAXTER:  Okay.  Thank you, ma'am.

7                    Who all thinks that when you buy something,

8    price is important?  Let me put it to you differently.  Does

9    anybody think price isn't important?  Anybody at all?

10                   Who goes to yard sales or garage sales or estate

11   sales?  Anybody on the jury panel?  One over here.  Raise your

12   hand.  I am just going to take the numbers down.  Okay.

13                   Is there anybody here that buys on volume?

14                   Yes, ma'am, No. 17.

15                   Anybody else?

16                   Who shops at Sam's or Costco, hold your hand up?

17                   All right.  Who is familiar with any sort of

18   loyalty card or discount so that if you give a company or store

19   repeat business, they will either give you a discount or they

20   will give you something free at the end of the promotion or

21   things of that sort?  Anybody taken advantage of that?

22                   Anybody see anything wrong with that?  Hold your

23   hand up if you think that is somehow wrong; that they shouldn't

24   do that?

25                   If you buy in volume, do you think you ought to

1  get a discount?  Is there anybody that thinks that is somehow

2  wrong if you get a discount if you buy in volume, anybody at

3  all?

4              All right.  Who thinks that if a doctor and a

5  nurse uses a product in a hospital, that they can figure out if

6  that product is safe or not?  Is there anybody that has got any

7  question that doctors and nurses can figure it out, like Ms.

8  Mitchell in the back, that if a product is safe that they can

9  figure it out in a heartbeat?  And if it is not, they will tell

10 somebody we are not going to use it?

11             Anybody disagree with that?

12             No. 24, yes, sir.  Do you agree with me,

13 Reverend?

14             JUROR ROGERS:  I would not presume to give every

15 doctor and nurse that I have ever run across that carte blanche

16 recognition.

17             MR. BAXTER:  Would you give most of them that

18 carte blanche recognition?

19             JUROR ROGERS:  Probably, but I think that makes

20 it not carte blanche?

21             MR. BAXTER:  Okay.  With the exception of a

22 hundred percent, do you think the vast, vast majority of nurses

23 and doctors can figure out if a product is going to hurt them

24 or hurt their patient or hurt their co-workers, they can figure

25 that out?

1                JUROR ROGERS:  I think over time and given

2    enough experience, yes.

3                MR. BAXTER:  Do you think that doctors and

4    nurses rely on their own experience, say, rather than a

5    salesman telling them what a product will do and whether it is

6    safe or not?

7                JUROR ROGERS:  Eventually, yes.

8                MR. BAXTER:  Okay.  Does everybody agree with

9    that; that doctors and nurses listen to their own experience,

10   as opposed to what a salesman or ad might say?  Anybody

11   disagree with that?

12               All right.  Now, this case, as I told you, is

13   about contracts.  The allegation is going to be that hospitals

14   somehow can't buy the products they want to buy, that is, they

15   can't buy the RTI product, that they are somehow prohibited or

16   kept from doing it; or as Mr. Carroll said, they are blocked

17   from doing it?

18               Now -- and that needle sticks are going on all

19   across America because they are using unsafe products.  Now,

20   that is the allegation.  That is really what he told you.

21               Now, if that were true --

22               Mr. Seat, let me ask you, if that were true,

23   sir, and you were doing an investigation to see if that were

24   true, who would you go ask to find out if that really were

25   true?

1              JUROR SEAT:  I would ask the personnel, ask the

2    nurses.

3              MR. BAXTER:  At the hospitals?

4              JUROR SEAT:  Yes.

5              MR. BAXTER:  So if it were true, you would

6    expect that you would go and ask hospital administrators?  Can

7    you buy what you want to buy?

8              JUROR SEAT:  Yes.

9              MR. BAXTER:  Would you ask a nurse and a doctor,

10   can you use the products you want to use?

11             JUROR SEAT:  Yes.

12             MR. BAXTER:  Would you ask them, if you don't

13   have what you want, can you get somebody to get it for you?

14             JUROR SEAT:  I would ask that.

15             MR. BAXTER:  Is that who you would expect -- if

16   that is the allegation in this case, is that who you are going

17   to expect to see get up here on this witness stand and testify

18   that that is what is happening?

19             JUROR SEAT:  I don't know who is going to get up

20   there.

21             MR. BAXTER:  I know, but is that what you would

22   expect?

23             JUROR SEAT:  I guess so.

24             MR. BAXTER:  Okay.  Thank you, sir.

25             Anybody disagree with what Mr. Seat says that if

1  that is true, who you would expect to see climb on this witness

2  stand are administrators and doctors and nurses and say, oh, my

3  goodness get me some help, I am being blocked from getting the

4  RTI product, help me out?  Would everybody agree that is who

5  you would expect to see testify?  Raise your hand if you agree

6  that is right.

7            Okay.  Is there anyone that has ever called on a

8  business to show them products, that's a salesman?

9            You, sir.  You are Mr. Lutz.

10            JUROR LUTZ:  Yes, sir.  That is what I do for a

11  living.

12            MR. BAXTER:  Okay.  Mr. Lutz, tell me what you

13  sell.

14            JUROR LUTZ:  I sell industrial automation

15  controls.  And I am not sure, but I have heard Retractable

16  Technologies at my company before.  It wouldn't be a customer

17  of mine, but it may be one of my company's customers.

18            MR. BAXTER:  Okay.  Anything about that that is

19  going to be a problem, Mr. Lutz?

20            JUROR LUTZ:  I wouldn't think so for me, no.

21            MR. BAXTER:  Let me ask you this, Mr. Lutz:

22  When you go out and sell, do the customers say, give me your

23  brochure and I will take a look at your product; but they

24  really depend upon their own experience?

25            JUROR LUTZ:  Sometimes, yes.

1           MR. BAXTER:  And do you think that if you have

2  been able to sell somebody a product and they have a good

3  experience, that that is the best salesman for you?

4           JUROR LUTZ:  Yes.

5           MR. BAXTER:  And do you think that if your

6  competitors, for example, have sold them a product and it

7  doesn't work very well, that is probably the second best

8  selling thing that you have got for you?

9           JUROR LUTZ:  Yes, that is the best time.

10          MR. BAXTER:  That customers, in fact, can figure

11 out what works and doesn't work?

12          JUROR LUTZ:  Yes.

13          MR. BAXTER:  They don't have any hesitation

14 about telling you, do they?

15          JUROR LUTZ:  Normally no.

16          MR. BAXTER:  If they have a problem with your

17 product, for example, they don't have any hesitation calling

18 you up and saying, you know Mr. Lutz, I bought it from you and

19 now I want you to do something about it.

20          JUROR LUTZ:  Yes.

21          MR. BAXTER:  They are pretty vocal?

22          JUROR LUTZ:  Most of the time, yes.

23          MR. BAXTER:  All right.  Thank you, Mr. Lutz.

24          THE COURT:  Mr. Baxter, you have about three

25 minutes left.

1                    MR. BAXTER:  Thank you, Your Honor.

2                    Has anyone on the jury panel ever been a member

3  of a bargaining unit at work?

4                    You have, Ms. Moreland?

5                    JUROR MORELAND:  Yes, sir.

6                    MR. BAXTER:  What bargaining unit were you a

7  member of?

8                    JUROR MORELAND:  Communication Workers of

9  America.

10                   MR. BAXTER:  Where was that, ma'am?

11                   JUROR MORELAND:  It started in Longview, and I

12  retired from AT&T out of Dallas.

13                   MR. BAXTER:  Okay.  Are you still a member in

14  good standing?

15                   JUROR MORELAND:  Yes, sir.

16                   MR. BAXTER:  Okay.  You still go to union

17  meetings or anything?

18                   JUROR MORELAND:  No, sir.

19                   MR. BAXTER:  Okay.  Thank you, Ms. Moreland.

20                   Anyone else besides Ms. Moreland?

21                   Is there anyone that has ever --

22                   Yes, ma'am.

23                   JUROR FRATER:  Could you repeat the question?

24                   MR. BAXTER:  Yes, ma'am.  Have you ever been a

25  union member of any sort?

1                    JUROR FRATER:  Yes, sir.

2                    THE COURT:  Who was that, Mr. Baxter?

3                    MR. BAXTER:  No. 17.

4                    THE COURT:  No. 17.

5                    MR. BAXTER:  Yes.

6                    Yes, ma'am?

7                    JUROR FRATER:  Yes, sir.  I used to belong to

8    the union out at Tyler Pipe when I was employed there.

9                    MR. BAXTER:  Oh, okay.  What did you do at Tyler

10   Pipe, ma'am?

11                   JUROR FRATER:  Well, I first started out as a

12   core scraper.

13                   MR. BAXTER:  Okay.

14                   JUROR FRATER:  Then I moved up to tool and BP

15   machine.  Then I worked in the weight warehouse for my last

16   nine years I was there.

17                   MR. BAXTER:  How long has it been since you were

18   at Tyler Pipe, ma'am?

19                   JUROR FRATER:  Ever since 1990.

20                   MR. BAXTER:  Okay.  Thank you very much.

21                   JUROR FRATER:  You are welcome.

22                   MR. BAXTER:  Anyone else?

23                   Is there anyone who has ever been a plaintiff in

24   a lawsuit where you sued somebody for a car wreck or a contract

25   dispute or a land dispute?  Anything besides a domestic case.

1  Anybody at all?

2           All right.  Is there -- yes, ma'am, you have.

3           JUROR FRATER:  Yes, sir.  It was just a lawsuit

4  going through Tyler Pipe for the asbestos case.

5           MR. BAXTER:  Oh, yes, ma'am, right.

6           JUROR FRATER:  So I was one of the plaintiffs.

7           MR. BAXTER:  Is that suit still going on?

8           JUROR FRATER:  Yes, sir, it is.

9           MR. BAXTER:  Okay.  Do you know kind of what

10  stage it is in?  Have they deposed you or anything?

11           JUROR FRATER:  No, they haven't deposed me yet.

12  I am still waiting.

13           MR. BAXTER:  All right.  Thank you, ma'am.

14           JUROR FRATER:  You are welcome.

15           MR. BAXTER:  Yes, ma'am.  Right here on the next

16  to last row.

17           JUROR VAUGHN:  I'm currently involved in a

18  lawsuit right now.

19           MR. BAXTER:  Do you mind if I ask kind of --

20  what kind that is?

21           JUROR VAUGHN:  It is a involving a trust.

22           MR. BAXTER:  Thank you, ma'am.

23           Anyone else?

24           THE COURT:  Who was that juror's last name?

25           MR. BAXTER:  It was No. 26, Your Honor.

```
 1                    THE COURT:  Ms. Vaughn.

 2                    Okay.  Thank you, Ms. Vaughn.

 3                    MR. BAXTER:  Is there anyone else that knows any

 4   reason besides what we have asked, why you in this case might

 5   not be a fair and impartial juror?  Some other case maybe, but

 6   not this one.  Anybody at all?

 7                    Ladies and Gentlemen, on behalf of Becton

 8   Dickinson, we thank you very much for your attention; and we

 9   really look forward to bringing this case to you.  Thank you

10   very much.

11                    Thank you, Your Honor.

12                    THE COURT:  Thank you, Mr. Baxter.

13                    Let me see Counsel at the bench a moment.

14                    (Bench conference.)

15                    THE COURT:  Does plaintiff have any challenges

16   for cause?

17                    MR. CARROLL:  No Your Honor.

18                    THE COURT:  Defendant?

19                    MR. BAXTER:  Yes, Your Honor.  His former

20   secretary.

21                    THE COURT:  Ms. Roosth?

22                    MR. BAXTER:  Yes.  I challenge her for cause.

23                    And No. 7, your Honor.

24                    MR. CARROLL:  Mr. Henderson.

25                    THE COURT:  Any objection?
```

1                    MR. CARROLL:  We don't object to Ms. Roosth or

2    Mr. Henderson, Your Honor.  We have got plenty of jurors.

3                    THE COURT:  I will excuse those two for cause,

4    No. 25 and No. 7.  We have got 30 jurors, two for cause, eight

5    for the jury.  That leaves 20.  So you will each have ten

6    strikes.

7                    Anybody need to visit with anybody on the panel

8    individually?

9                    MR. BAXTER:  No, Your Honor.

10                   MR. CARROLL:  Are you going to try to do a

11   hardship, Judge?  Are you going to listen to any hardship

12   complaints?

13                   THE COURT:  Nobody raised anything.

14                   MR. CARROLL:  Fine with me.

15                   So we have 10 each?

16                   THE COURT:  10 each.  Strike through the end of

17   the panel.

18                   MR. CARROLL:  Right, thank you.

19                   MR. BAXTER:  Thank you.

20                   How long will we have?

21                   THE COURT:  How long do you need?

22                   MR. BAXTER:  A while, Your Honor.  I have a lot

23   of constituents.

24                   THE COURT:  We are doing pretty good on time.

25   I'll give you 30 minutes.

 1            MR. BAXTER:  Thank you, Your Honor.

 2            (Bench conference.)

 3            THE COURT:  All right.  Ladies and Gentlemen of

 4   the Jury, we are going to take our afternoon break -- or we are

 5   going to take our break at this time.  I am going to give you a

 6   30-minute recess.

 7            So it is five minutes until 11:00 now.  So you

 8   will be in recess until 11:25.  I'm going to allow you just a

 9   moment to leave the courtroom.  You can go outside or wherever

10   you want to.  Just plan to be back here by a few minutes before

11   11:25.

12            And when you come back just have a seat on this

13   side of the courtroom on my right, and you don't have to be in

14   any particular order.  Just have a seat there.  We will call

15   the names of the eight jurors who win the lottery this morning

16   and get to serve on this jury.  And we will have you come up

17   then and get you sworn in and excuse the rest of you.

18            Please during this break do a couple of things

19   for me.  One, don't discuss anything about this case among

20   yourselves or with anyone else.  And also if you want to visit

21   with anybody, visit with people with a Juror's badge on.  Don't

22   visit with any of the other people that might be in the hallway

23   that might be associated with one side or the other in this

24   case.

25            I will have more instructions for the eight of

1  you that are selected.  Please enjoy your break.  We will be in

2  recess for 30 minutes until 11:25.

3              Please let the jury leave first.  The jury may

4  go ahead and leave and take their break, and then everybody

5  else can be excused.

6              (Recess was taken at this time.)

7              (Jury panel out of the courtroom except three

8              panel members; Jurors Nos. 21, 23 and 24.)

9              THE COURT:  Please be seated.

10             All right.  I understand that -- let's see,

11  Juror No. 21, yes, that would be Ms. McGaughey; is that

12  correct?

13             JUROR MCGAUGHEY:  McGaughey (different

14  pronunciation.)

15             THE COURT:  Yes, McGaughey.  Ms. McGaughey, did

16  I understand that you had expressed some concern about the

17  length of the trial?

18             JUROR MCGAUGHEY:  Yes.  I have a non-refundable

19  airline ticket to go visit with my sister and her invalid

20  husband to help them pack up to move, and it starts on

21  September 13th; and I come back to Tyler on the evening of the

22  16th.

23             THE COURT:  Okay.  All right.  Thank you.

24             All right.  And Juror No. 23.  That would be Mr.

25  Harris.

1                    JUROR HARRIS:  Yes, sir, Your Honor.  I

2  apologize if I caused any problem.  I didn't anticipate the

3  length would be like it is.

4                    I also have already paid for vacation that

5  begins on the 13th through the 22nd.  I just assumed we would

6  be done in a couple of weeks.

7                    THE COURT:  Okay.  Thank you.

8                    All right.  And then I believe that next was Mr.

9  Rogers.

10                    JUROR ROGERS:  Yes, Your Honor, I wish I had

11  their problem.  My wife is facing a surgery here next Tuesday

12  here in Tyler.

13                    THE COURT:  All right.  Is that an in-hospital

14  surgery?

15                    JUROR ROGERS:  It is actually with Dr. Heaton at

16  his clinic.

17                    THE COURT:  Okay.  And is she going to need your

18  care, I guess, on Tuesday?

19                    JUROR ROGERS:  Yeah, they need drivers and then

20  post-care when they get home.

21                    All right.  Thank you.  The three of you may

22  take your break now.

23                    (Juror Nos. 21, 23, and 24 leave the

24                    courtroom.)

25                    THE COURT:  All right.  Gentlemen, I'm going to

1  excuse Jurors No. 21, 23, and 24.

2                And let's see, that will leave us with five

3  excused for cause, leave us with 25.  We need eight for the

4  jury.  So that leaves us with 17, which means each of you will

5  have eight strikes instead of the ten I told you earlier, and

6  we will strike down through Juror No. 29.

7                MR. CARROLL:  That includes 29, Your Honor?

8                THE COURT:  Yes, includes 29.

9                MR. CARROLL:  Thank you.

10                THE COURT:  Anything further?

11                MR. CARROLL:  Not from the plaintiff.

12                THE COURT:  Mr. Carroll, next time I will listen

13  to you.

14                MR. CARROLL:  About what?

15                THE COURT:  Well, you asked if I was going to

16  inquire about any hardships, and I thought they would have

17  spoken up by now if they did.

18                MR. CARROLL:  Me, too.

19                THE COURT:  Very good.

20                (Recess was taken at this time.)

21                (Jury Panel back in the courtroom.)

22                THE COURT:  Please be seated.

23                All right.  Ladies and Gentlemen of the Jury,

24  thank you for coming back.  We hit a little hitch this morning.

25  I failed to ask if anyone had a prepaid vacation during this

1   time period that we are going to be in trial.  And I had two or

2   three people come forward earlier, and I understand there are

3   two more now.

4                   And so I just wanted to ask, be sure everyone

5   got an opportunity, if you do have a prepaid vacation, please

6   stay in the courtroom.  Otherwise, you are excused, again, for

7   the rest of your break.  And it is going to be a little longer

8   break than I thought before; probably about another 20 minutes.

9                   So if you have a prepaid vacation that would

10  conflict with this trial setting, please remain in the

11  courtroom.  Otherwise, the rest of you may leave at this time.

12                  Plan to be back in here about 10 'til, if you

13  would.

14                  (Jury Panel leaves the courtroom except those

15                  specified by the Court.)

16                  THE COURT:  All right.  Please be seated.

17                  All right.  Let's start on the front here.  And,

18  if you would, please, give me your name and juror number on the

19  right and Mr. -- he'll bring you the --

20                  JUROR MARSH:  I'm Shirley Marsh, No. 16.

21                  THE COURT:  No. 16.  And what vacation do you

22  have planned, Ms. Marsh?

23                  JUROR MARSH:  New England.  We are leaving on

24  the 19th flying to Montreal, Canada.  We have already got our

25  flights and our cruise.  It is a cruise.

1                    THE COURT:  Okay.  The 19th.  All right.  Thank

2  you very much.  You may take your break now.

3                    (Juror No. 16 leaves the courtroom.)

4                    THE COURT:  All right.  And next would be Mr. --

5                    JUROR HARRIS:  And I spoke with you a few

6  moments ago.

7                    THE COURT:  Right.

8                    JUROR HARRIS:  Do I need to do any review?

9                    THE COURT:  Mr. Besson?

10                   JUROR HARRIS:  No, Mr. Harris.

11                   THE COURT:  Harrison (sic).

12                   JUROR HARRIS:  23.

13                   THE COURT:  23, yes, that's right.  All

14  right.  We have that.  Thank you, Mr. Harris.

15                   (Juror No. 23 leaves the courtroom.)

16                   THE COURT:  All right.  And then on -- I believe

17  we have spoken, haven't we, ma'am?

18                   JUROR HUDSON:  No.

19                   THE COURT:  What is your name?

20                   JUROR HUDSON:  Ms. Hudson, No. 12.

21                   THE COURT:  All right.  And what vacation do you

22  have?

23                   JUROR HUDSON:  We have reservations in New

24  Orleans beginning the 19th.

25                   THE COURT:  All right.  Thank you.  You may be

1  excused to the hallway.

2                   (Juror No. 12 leaves the courtroom.)

3                   THE COURT:  All right.  Next?

4                   JUROR LESAUVAGE:  It is not a vacation, but I

5  referred to it before --

6                   THE COURT:  Your name, ma'am?

7                   JUROR LESAUVAGE:  Joan Lesauvage, No. 30.  I'm

8  sorry.

9                   THE COURT:  Uh-huh.

10                  JUROR LESAUVAGE:  Not a vacation but a doctor's

11  appointment due to the complications that my husband had

12  through his surgery.  He is still going through it.  It is the

13  18th of September.

14                  THE COURT:  Okay.  Where is that?

15                  JUROR LESAUVAGE:  For an MRI.  It is here in

16  town.  He has an MRI scheduled and followup for a doctor's

17  appointment.

18                  THE COURT:  Okay.  And that is on what date?

19                  JUROR LESAUVAGE:  The 18th.

20                  THE COURT:  I'm sorry?

21                  JUROR LESAUVAGE:  18th.

22                  THE COURT:  18th.  All right.  Thank you. You

23  may -- you are excused to the hallway, Ms. Lesauvage.

24                  (Juror No. 30 leaves the courtroom.)

25                  THE COURT:  All right.  Next?

1              JUROR MCGAUGHEY:  No. 21, Janice McGaughey.  And

2  I spoke with you just a few minutes ago.

3              THE COURT:  Right.  I have that, Ms. McGaughey.

4  Thank you.

5              Next?

6              (Juror No. 21 leaves the courtroom.)

7              JUROR WRIGHT:  Shirley Wright, No. 27.  We had

8  plans to go to Philadelphia for my granddaughter's graduation

9  from the Coast Guard.

10              THE COURT:  Oh, okay.  Well, congratulations.

11  What date is that?

12              JUROR WRIGHT:  We are leaving on the 18th.  Her

13  graduation is on the 20th.

14              THE COURT:  Okay.  All right.  Thank you, ma'am.

15              (Juror No. 27 leaves the courtroom.)

16              (All Jury Panel Members out of the courtroom.)

17              THE COURT:  All right.  Is there any objection

18  from any party to excusing those jurors who have just spoken

19  with regard to their conflicts?

20              MR. CARROLL:  Not from the plaintiff, Your

21  Honor.

22              MR. BAXTER:  Not from defendants, Your Honor.

23              THE COURT:  Well, I will excuse those jurors.

24  So who we are excusing are Jurors No. 7, 12, 16, 21, 23, 24,

25  25, 27, and 30, which that is one, two, three, four, five, six,

1  seven, eight, nine from 30 leaves us with 21.  We need eight

2  for the jury, which leaves us with 13.  So you now each have

3  six strikes.  And we will strike down through, I guess it would

4  be Juror No. 28, if my arithmetic is correct.

5                    Anyone disagree with that?

6                    MR. CARROLL:  No, Judge.  Would you be kind

7  enough to read the numbers out again?

8                    THE COURT:  Yes, sir.  That would be Juror No.

9  7, Mr. Henderson.  Juror No. 12, Ms. Hudson.  Juror No. 16, Ms.

10  Marsh.  Juror 21, Ms. McGaughey.

11                    MR. CARROLL:  McGaughey (different

12  pronunciation).

13                    THE COURT:  McGaughey.  Juror No. 23, Mr.

14  Harris.  24, Mr. Rogers.  25, Ms. Roosth.  27, Ms. Wright.  And

15  30, Ms. Lesauvage.

16                    MR. CARROLL:  Thank you, Your Honor.  And we are

17  cutting six each.

18                    THE COURT:  That is correct.  You will each have

19  six preemptory challenges.

20                    MR. CARROLL:  We are going through -- I'm sorry?

21                    THE COURT:  I believe if my arithmetic is

22  correct and you cut six, I've already cut nine, that's 15.  And

23  then we have eight --

24                    MR. CARROLL:  That's 23.

25                    THE COURT:  Wait a minute.  We are cutting nine

1  and then we need eight for the jury, that is 17 from 30.  That

2  means we have got 13 jurors left and you are each cutting six,

3  so, yes, that will mean one juror would not be reached, which

4  would be Juror No. 29, Ms. Mitchell.  So you will be cutting

5  through Juror No. 28.

6            Can y'all have this done in about another 15

7  minutes?

8            MR. CARROLL:  Yes, Your Honor.

9            THE COURT:  All right.  We will be in recess.

10            (Recess was taken.)

11            (Jury Panel in the courtroom.)

12            THE COURT:  Please be seated.

13            All right.  Ladies and Gentlemen of the Jury

14  Panel, Ms. Ferguson is going to call the name of the eight

15  people selected for the jury.  If your name is called, if you

16  will come forward and the Court Security Officer will show you

17  where to be seated.

18            All right.  Ms. Ferguson.

19            THE CLERK:  Thank you, Judge.

20            Juror No. 1, Marcus Lutz.  Juror No. 2, Betsy

21  Tidwell.  Juror No. 3, Larry Glosson.  Juror No. 4, Yolonda

22  McGowen.  Juror No. 5, Jamie Reed.  Juror No. 6, Martha Holmes.

23  Juror No. 7, Candace Stafford.  And Juror No. 8, Ronda

24  Shumaker.

25            THE COURT:  All right.  If your name was not

1  called, I want to thank you for your service here today on the

2  jury panel.  And you are welcome to stay, but you are excused

3  at this time.  If you would like to leave, please leave as

4  quickly and quietly as possible.

5                    (Unselected Jury Panel Members excused and leave

6                    the courtroom.)

7                    THE COURT:  Please be seated.

8                    All right.  Ladies and Gentlemen of the Jury,

9  welcome to jury service.  You have now been selected as the

10 jury who will decide this case.

11                   If you will, please stand and raise your right

12 hand; and Ms. Ferguson will administer the oath.

13                   (Jury sworn.)

14                   THE COURT:  All right.  Please be seated.

15                   All right.  I have a few instructions I would

16 like to give you.  When you come back next Monday morning, I

17 will have quite a more instructions for you, but let me give

18 you these instructions and please listen to them carefully.

19                   You have now been sworn in as the jury to try

20 and decide this case.  Until this trial is over, do not discuss

21 this case with anyone; and do not permit anyone to discuss this

22 case in your presence.  This includes your family and friends.

23                   When you go home this evening, your spouse or

24 children or friend may say, well, what happened today?  It is

25 fine to say, well, I was selected for jury service.  Well, what

1  kind of case is it?  You can say it is an antitrust case.  But

2  that is all you should really say about it.

3              Don't discuss the case.  Don't discuss anything

4  about it with anyone, including your family and friends.

5              Also, do not discuss the case even with your

6  fellow jurors until all of the jurors are in the jury room

7  actually deliberating the case at the end of the case.

8              Now, the reason for this is simple.  It is the

9  collective wisdom of the jury that makes our system work.  But

10  it is the collection wisdom after you have heard all of the

11  evidence.

12              So if you were to start discussing the case

13  before all of the evidence is in, that would be improper.  As

14  you can imagine a great deal of effort and expense has been put

15  in to getting this case to this stage, so I know you don't want

16  to do anything that would jeopardize that.  So please follow

17  that, as well as all of these instructions.

18              I don't think this would occur; but if anyone

19  should attempt to discuss the case or approach you concerning

20  this case, you should inform the Court immediately.

21              Also, if you will become aware of the violation

22  of any of these instructions I have given you, you should

23  notify me immediately.  You can do that by simply asking the

24  Court Security Officer to let me know you need to visit with

25  me.

1          During the trial of this case I want you to hold

2 yourself completely apart from the people involved in the case.

3 This includes the parties, the witnesses, the attorneys, and

4 persons associated with them.

5          When you come in in the mornings or when you

6 leave in the evenings or if you take a break outside the jury

7 room, you may see some of these folks in the hallway.  They

8 understand that you are a juror and that you have that juror

9 badge on.  By the way, you don't have to wear your number next

10 week when you come.  We will know who you are.

11          But they understand you are a juror.  I have

12 instructed them not to have any communication with you, and I

13 am instructing you not to have any communication with them.

14 This includes even casual conversation.

15          Now, if you see one on the sidewalk in the

16 morning, it is fine to say good morning.  It should go no

17 further than that.

18          The reason for this is important.  Not that you

19 would do anything wrong or not that any of these fine attorneys

20 or parties would do anything wrong; but you need to not only be

21 fair and impartial but it is important that you give the

22 appearance of being fair and impartial.

23          So if, for example, one side were to see you

24 chatting with one of the attorneys on the other side, maybe you

25 are talking about the football game yesterday or something,

1  completely unrelated to this case, that could still give the

2  impression of partiality or an impression that you wouldn't

3  want to give.  So please follow those instructions.

4            Also, if you happen to have a social networking

5  site or tool, such as Facebook, MySpace, or Twitter, or any

6  other site, you should not discuss or even mention the case at

7  all on those sites.  Do not mention that you are even on jury

8  service on those sites.

9            Do not post updates about what is going on in

10 the case.  Do not send or receive text messages about this

11 case.  Again, it is important not only that you be fair and

12 impartial, but that you also give that appearance.

13           Also -- and this is very important in this day

14 and time -- do not make any independent investigation of any

15 fact or matter in this case.  Do not learn anything about the

16 case from any other source.

17           I don't think there will be anything on

18 television or in the newspaper about the case; but if you

19 should see something, just flip the channel, leave the room.

20 If you see something in the newspaper, don't read it.

21           Also, do not use the Internet or any search

22 engine such as Google to find out any information about the

23 case, the parties or the attorneys in this case.

24           And the reason for this is important:  And I

25 know in this day and time one of the first things any of us do

1   is we go to Google when we have a question about something.

2                   But you are in a different type of situation

3   now.  You are judges of the facts in this case.  And your

4   verdict should be reached based solely, solely on the evidence

5   that is legally admissible and that you hear here in court.

6                   One of the great things about our system, and I

7   think you will see it during the course of this trial, but it

8   is what we call cross-examination.  And it is one of the great

9   truth-finders in our system because a witness can get up and

10  say something, but then they have got to stand up under

11  cross-examination and the questions of the other side.

12                  And all of that is legally admissible evidence.

13  But if you were to go outside of this process and start

14  gathering information yourself or sharing that information with

15  anybody but even gathering it just yourself, that is

16  information that, one, it is not under oath; it is not

17  presented in court; nobody has had a chance to object to it;

18  and there is no cross-examination of it.

19                  So I wanted to give you the reason for that

20  rule.  It is not trying to deprive you of anything, but it is

21  an effort to be sure that you decide this case based solely on

22  the evidence that is legally admissible that you hear here in

23  court.

24                  The trial of this case will start on Monday,

25  September 9th, that is a week from today, at 9:00 a.m.

1              My practice during this case, at least for next

2    week, is to go from 9:00 to 4:00.  I used to go until 5:00 or

3    5:30; and I think you will agree after sitting here for six or

4    seven hours, your mind is kind of numb by that last hour.  So

5    we are going to try that approach.

6              I have given each side in this case so many

7    hours to put on their evidence, so they are going to be on a

8    strict clock which will keep this case on track.  It is not

9    going to -- it is going to be a lengthy case, but it is not

10   going to go on for weeks and weeks and weeks or months like you

11   see sometimes on TV.  We should finish this case towards the

12   end of the second week.

13             But it will be a very full week from 9:00 to

14   4:00, Monday through Thursday.  My plans right now are for us

15   to take next Friday off to give the attorneys and you a chance

16   to just kind of -- again, five days is a long time.

17             Then the next week we should be able to finish

18   the evidence, I am thinking, by probably Wednesday or Thursday

19   and, hopefully, get the case to you on Friday of the next week

20   for your deliberations and verdict with closing argument right

21   before that.

22             So that is what our schedule is going to be.

23   And when you come back on Monday, I will have some more

24   detailed instructions for you about your -- about how the case

25   is going to be tried.  Then you will hear the opening

1  statements by the attorneys.  Then we will proceed right into

2  the evidence.

3            You should have a 1-800 number that was on your

4  jury summons.  Is there anybody that doesn't still have that

5  number?  I can give it to you again, or you can get it

6  downstairs from the Clerk's Office.  It is 800-998-9056.

7            And I will encourage you to check.  There will

8  be a message left on that number over -- regarding this case

9  over the weekend and on Sunday.  I would suggest that you check

10  it Sunday evening just to be sure we are still on schedule to

11  start on Monday; that there has not been some delay.

12            It might save you a trip over, or getting here

13  and finding out we are not going to start until 1:00 o'clock or

14  something like that.  So you can check that during the course

15  of the trial just to see if anything has changed with the

16  schedule.

17            All right.  Are there any questions from any

18  Members of the Jury?

19            All right.  Let me explain to you, right through

20  this door over here is the jury room.  That is going to be sort

21  of your homebase for the next couple of weeks when you come

22  back next Monday.

23            There is a restroom in there.  There are

24  refreshments in there.  There is also another door to that room

25  that leads to the hallway.  And so when you leave today, the

 1   Court Security Officer will show you where all of that is.

 2   That will be your homebase.

 3              When you come back on Monday, try to be here

 4   about 10 or 15 minutes early.  And you can come in that way.

 5   You don't have to come through the courtroom and run into all

 6   of the lawyers and everything.  So you can just come in that

 7   side hallway and go straight to the jury room, and try to be

 8   there a few minutes early.

 9              Also, I want to tell you that the parties for

10   both sides and the attorneys will be providing you with snacks

11   in the morning and in the afternoon, and they are also going to

12   bring lunch in for you.  I do this in a lot of these lengthy

13   cases.  It allows us to not spend so much time where you have

14   to go out and find a restaurant and order and pay for it and

15   come back.  And they do a very good job.

16              It will be like maybe salad one day, sandwiches

17   the next, sometimes barbecue, sometimes pizza; different

18   things.  I think you will find it -- if any of you have any

19   dietary restrictions, please let the Court Security Officer

20   know, and we will try to accommodate that.  But doing it that

21   way we can break usually for 30 or 40 minutes for lunch rather

22   than an hour and a half, so it will allow us to stay on

23   schedule and hopefully finish this case on time and not take up

24   any more of your time than is necessary.

25              I try to be very respectful of your time.  I try

96

1  not to have you sitting in the jury room, you know, wasting

2  your time.  I try -- when you are here, I try to be in court

3  hearing evidence rather than other matters.  So we will try to

4  do that.

5              Sometimes there are things that I need to visit

6  with the attorneys about outside of your presence, but we will

7  try to keep that to a minimum.

8              So final chance, any questions?

9              All right.  Thank you again for your jury

10  service.  You are excused to the jury room.  And we will see

11  you here on Monday morning.

12             (Jury out.)

13             THE COURT:  All right.  Please be seated.

14             All right.  Well, y'all have your jury now.  So

15  we will get started next week.  Anything I can help you with

16  today before we adjourn?

17             Anything from the plaintiff?

18             MR. CARROLL:  I don't think so.  Thank you, Your

19  Honor.

20             THE COURT:  The defendant?

21             MR. BAXTER:  I guess really the only thing that

22  is outstanding, Your Honor, is the patent motion that is still

23  pending.

24             THE COURT:  Okay.  We will try to get to that.

25             MR. BAXTER:  And Mr. Carroll and I have talked

1  several times, Your Honor; and with the Court's permission we'd

2  like to talk this week about exchanging demonstratives and

3  exhibits and whatnot.

4                    THE COURT:  Y'all try to work it out.  If you

5  can't, I will work it out for you.

6                    MR. BAXTER:  Thank you.

7                    THE COURT:  Anything further?

8                    MR. BAXTER:  Not from the defendants.

9                    THE COURT:  All right.  I guess -- let me see

10  here.

11                    Oh, yes, I wanted to ask you about your juror

12  notebook.  I have received that.  Unlike a patent case, really

13  about the only thing y'all have in here are these juror sheets,

14  which I think are great and I think the jury will like.

15                    I guess my only question, gosh, are we really

16  going to call all these witnesses during this case that have a

17  tab in there, or is this just everybody that you possibly might

18  call?

19                    MR. BAXTER:  No, Your Honor.  I believe we tried

20  to limit it to people that we are actually going to call.

21                    Now, a number of those, Your Honor, are

22  depositions that are relatively short.  We have made great

23  efforts to cut those down, Your Honor.  I don't think, with the

24  possible exception of one, any of the depositions are much

25  longer than 15 minutes.  So probably at least 15 or 16 of those

1  or maybe 18 depositions that are short.

2              THE COURT:  Okay.

3              MR. BAXTER:  But I believe, Your Honor, those

4  are actual witnesses.  And if I didn't think it would offend

5  the Court, I would beg for more time, Your Honor.

6              THE COURT:  You have already done that, very

7  effectively I might add.

8              MR. BAXTER:  I believe, Your Honor, those are,

9  in fact -- now, I guess there is a slim possibility that maybe

10 one or two of those might fall by the wayside as the case goes

11 on, but I don't believe those are any "may" calls.  I think

12 those are "will" calls.

13             THE COURT:  Mr. Carroll?

14             MR. CARROLL:  Ours are all "will" calls, Your

15 Honor.

16             Do we have any dep transcripts?

17             Ours are all live witnesses.

18             MR. SCHUSTER:  We have two.

19             MR. CARROLL:  We have two.

20             THE COURT:  If y'all are satisfied with the

21 notebook, that is fine.  But it just seemed like there were an

22 awful lot of tabs in there.

23             MR. BAXTER:  There are a lot of witnesses.

24             THE COURT:  If y'all are representing that you

25 are pretty much going to call all of those folks, that is fine.

1                MR. CARROLL:  I guess our only concern would be

2    to make sure that if Mr. Baxter has some that fall out, the

3    jury notebook not go back there with people who haven't been

4    called.

5                THE COURT:  Right.

6                MR. BAXTER:  We will be sure and tell the Court,

7    Your Honor, and tell Mr. Carroll beforehand.

8                THE COURT:  I had actually thought about a

9    procedure, and I'll just see what y'all think would be the

10   easiest way would be, when you call a witness maybe you bring

11   those -- you will have a packet for those you give to the Court

12   Security Officer and he would pass them out, and they could put

13   them in their notebook at that time.

14               MR. BAXTER:  We'd be glad to do that.

15               MR. CARROLL:  We are in favor of that.

16               THE COURT:  Let's do it that way then.

17               MR. BAXTER:  Thank you, Your Honor.

18               THE COURT:  Whoever is calling the witness you

19   be responsible for, let's say, at the beginning of the day

20   giving to Ms. Ferguson those witnesses that you are going to be

21   calling that day, and she will give them to the Court Security

22   Officer and oversee -- be sure we give them to the jury.

23               MR. BAXTER:  I take it for planning purposes,

24   Your Honor, because obviously both with our witnesses and with

25   their witnesses there will be some counters.  The counters, of

1  course, are going to count against our time, ours and theirs.

2  We will give the Court the timing on those counters.  But it

3  also impacts how much time we have left.

4            So I am taking they gave us their actual

5  depositions because we gave them our actual depositions.  I

6  don't want to mislead them, and I'm sure they don't want to

7  mislead us about who actually is going to take the stand.

8            If we pull someone, I want to give them a lot of

9  advance notice so they will know how much time they have got

10  left.  If they are either pulling or adding, I need to know

11  that.  But I take it -- I believe they only indicated two

12  depositions.

13            Is that right, Mr. Hardin?

14            MR. HARDIN:  Yes, sir.

15            MR. BAXTER:  So if that changes, I would need to

16  get some advance notice on that because it affects my time with

17  my witnesses because the counter is going to count against me.

18  So I am taking they've got two.  The ones we put in there are

19  the ones we actually plan on playing.  If I am going to cull

20  any of those out because my time is running short, I am going

21  to tell them way in advance --

22            THE COURT:  How far is way in advance?

23            MR. BAXTER:  The minute I know it.  At least two

24  days before, Your Honor, so they will know how much time they

25  have left.  I don't want to short-change them either.

1              THE COURT:  Are you agreeable to that same

2  two-day, Mr. Hardin?

3              MR. HARDIN:  Yes, sir.

4              THE COURT:  So y'all notify each other at

5  least -- preferably earlier if you know that you are going to

6  pull or add anybody, but at least two days before the morning

7  of trial.

8              MR. BAXTER:  Really it is sort of adding to the

9  problem as opposed to pulling -- pulling you give more time

10  back, and that is great.

11             THE COURT:  Great.

12             MR. BAXTER:  But the adding severely impacts

13  what we have got to do --

14             THE COURT:  Because you have got to have cross

15  time?

16             MR. BAXTER:  Yes, sir.

17             THE COURT:  All right.  Very good.

18             Anything further?

19             MR. BAXTER:  That's all I have.

20             THE COURT:  What about -- I always like to

21  ask -- I know it may be pointless -- but is there anything

22  going on with the mediator or settlement negotiations?

23             MR. BAXTER:  No, Your Honor.

24             THE COURT:  Both sides just want this fine jury

25  to decide this case for you?

102

1              MR. BAXTER:  We do, yes, sir.

2              MR. HARDIN:  Yes, sir.

3              THE COURT:  Very good.  We will be adjourned.

4              (Hearing adjourned.)

5

6

7                        CERTIFICATION

8

9              I HEREBY CERTIFY that the foregoing is a true

10   and correct transcript from the stenographic notes of the

11   proceedings in the above-entitled matter to the best of my

12   ability.

13

14   /s/ Shea Sloan
     SHEA SLOAN, CSR, RPR
15   Official Court Reporter
     State of Texas No.:  3081
16   Expiration Date:  12/31/14

17

18

19

20

21

22

23

24

25