IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC., et al. | § § § | |
| v. | § | Case No. 2:08-CV-16 |
| BECTON, DICKINSON AND CO. | § § § | |

### ORDER

Before the Court is Becton, Dickinson and Co.'s ("BD") Renewed Motion for Judgment as a Matter of Law, or Alternatively, for New Trial or Remittitur against Retractable Technologies, Inc., et al. ("RTI") (Docket No. 589). For the reasons below, the Motion is **DENIED**.

### BACKGROUND

On September 19, 2013, following an eight-day trial, a jury returned a verdict finding that BD attempted to monopolize the safety syringe market, and awarded $113,508,014 in damages. Docket No. 577. The jury also found that BD engaged in false advertising under the Lanham Act; however, the parties did not submit a Lanham Act damages question to the jury. *Id*.

These parties are well acquainted. BD is a large medical supplier that manufactures and sells, among other things, safety syringe products and conventional syringe products. Throughout this lawsuit, the parties used the term "conventional syringes" to describe the common, plastic, hypodermic needles that have been used in the healthcare industry for many years. Safety syringes generally serve the same purpose as conventional syringes, but have various mechanisms to reduce the chance of accidental needlesticks. RTI competes with BD in the safety syringe market by manufacturing and selling its VanishPoint safety syringe.

In addition to being competitors in the marketplace, the parties are frequent adversaries in the courtroom. RTI initially sued BD in 2001, asserting unfair competition and antitrust claims. *Retractable Techs., Inc. v. Becton, Dickinson and Co. et al.*, No. 5:01-cv-036 (E.D. Tex. filed Jan. 29, 2001). BD settled these claims with RTI in 2004 for $100 million in a publicly disclosed settlement. Docket No. 590-1 at 12. Then, on June 15, 2007, RTI brought a second suit against BD, alleging patent infringement, antitrust violations, false advertising, and unfair competition in cause no. 2:07-cv-250. On January 18, 2008, at BD's request, the non-patent portions of that lawsuit were severed and stayed pending resolution of the patent claims. Cause No. 2:07-cv-250, Docket No. 66. The severed portions created the instant (and now third) lawsuit between the parties. In the second suit, a jury found BD liable for patent infringement and awarded damages of $5,000,000 on November 9, 2009. After entry of final judgment, the Court lifted the stay in the instant action. Docket No. 11.

On July 23, 2010, RTI amended its complaint to specifically identify the two allegedly false advertisements that were the subject of jury trial. RTI alleged BD's advertisements claiming RTI's VanishPoint has 0.185 mL of waste space volume were literally false and misleading. Docket No. 15, ¶¶ 88–119. RTI also alleged that BD's advertisements claiming BD's syringes as the "World's Sharpest Needle," were likewise false and misleading. *Id.*, ¶¶ 211–23. After an eight-day trial, the jury was asked a series of antitrust questions: whether BD monopolized the safety syringe, conventional syringe, or safety IV catheters markets; whether BD attempted to monopolize any of those markets; whether BD entered into contracts that unreasonably restrained trade in any of those markets; and whether BD entered into competition-restricting contracts that decreased or restricted competition within any of those markets. Docket No. 577 at 1–3. The jury found that BD had attempted to monopolize the safety syringe market,

but found for BD on all other antitrust claims. The jury awarded $113,508,014 in antitrust damages. *Id*. at 4. The jury also found that BD had engaged in false advertising under the Lanham Act with regards to its waste space and World's Sharpest Needle claims; however, the jury was not asked for any relief with regard to the Lanham Act.

BD now renews its motions for judgment as a matter of law on these claims, or alternatively, for a new trial.

## APPLICABLE LAW

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(A). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must also be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving

party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under Federal Rule of Civil Procedure 59, a new trial may be granted to a party on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

## ANALYSIS

### I. ATTEMPTED MONOPOLIZATION

To establish attempted monopolization, a plaintiff must show (A) that the defendant has engaged in predatory or anticompetitive conduct with (B) a specific intent to monopolize and (C) a dangerous probability of achieving monopoly power, and (D) that the defendant's violation caused injury to his business or property. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). BD alleges that RTI failed to prove each of these elements.

*A. Anticompetitive Conduct*

In support of its position, BD first contends that RTI failed to present sufficient evidence of anticompetitive conduct. Docket No. 589 at 3. The Court disagrees. There was a sufficient evidentiary basis for the jury to find anticompetitive conduct—including tainting of the market with improperly functioning syringes, false statements about its products, questionable contracting practices, and infringement of RTI's patents—all of which supported behavior that "unfairly tend[ed] to destroy competition itself." *See Spectrum Sports, Inc.*, 506 U.S. at 458.

BD's next argument, that the false advertising and patent portions of RTI's case cannot, as a matter of law, ever constitute anticompetitive conduct, is also without merit. For support,

BD relies upon *Kinnear-Weed*, which struck an antitrust claim from the complaint because it "alleges no facts showing an injury to the public," despite a viable claim for patent infringement. *Kinnear-Weed Corp. V. Humble Oil & Refining Co.*, 214 F.2d 891, 894 (5th Cir. 1954). BD interprets *Kinnear-Weed* to stand for the proposition that the same or similar conduct can never serve as the basis for both patent infringement and antitrust claims. This interpretation is not consistent with the actual holding in that case, and conflicts with the well-established understanding that antitrust claims should be analyzed with attention to the individual facts of the case rather than by reliance on "formalistic distinctions." *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 467 (1992). BD's argument that false and deceptive statements can never, as a matter of law, be anticompetitive is similarly flawed.

The more salient issue, rather, is whether the evidence presented by RTI constituted a legally sufficient evidentiary basis for the jury to find that BD's conduct was, in fact, exclusionary. Again, sufficient evidence was presented on this important point. As an example, RTI presented evidence showing that BD knew of substantial flaws with its Integra 1cc and 3cc retractable syringes and left those products on the market—even though doing so infringed RTI's patent (as to the 1cc)—because it was important to market even an "imperfect" retracting syringe despite its low profit margin. *See*, *e.g*., 9/16 PM Tr. at 205–14. RTI also presented evidence showing that BD continued to make its "World's Sharpest Needle" (and other) advertising claims that it knew were false or misleading because they were "foundational, differentiating claims" and "[l]osing them would potentially have a devastating effect on [BD's] ability to command premium pricing." PX 697; *see also* PX 260 at13 ("[i]dentify and implement needed changes to support World's Sharpest Needle claim"); PX 271 at 9 (". . . as we work toward supporting our claim of WSN"). Additionally, RTI presented evidence suggesting that BD

deceived its customers through misleading contract terms and suppression of information about its safety syringes. *See, e.g.*, 9/11 AM Tr. at 22. Accordingly, there was ample evidence of anticompetitive conduct to support the jury's verdict.

### B. *Specific Intent*

BD also contends generally that RTI failed to show specific intent to monopolize by illicit means. Docket No. 589 at 22. BD seems to suggest that without a "smoking gun" statement admitting specific intent, such intent cannot be found. However, the jury may infer specific intent to monopolize when the overall evidence logically and circumstantially leads to that conclusion, as it did here. *See*, *e.g.*, *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 992 (5th Cir. 1983) ("Multiflex . . . showed anticompetitive behavior from which a specific intent to monopolize can be inferred.") *abrogated on other grounds by Deauville Corp. v. Federated Dept. Stores,* 756 F.2d 1183, 1192 n.5 (5th Cir. 1985). Again, there is sufficient evidence to support the jury's finding of specific intent.

### C. *Dangerous Probability*

BD next contends that RTI failed to prove that BD had a dangerous probability of achieving monopoly power. BD argues that its lost market share during the time in question negates such a showing. However, lost market share is not dispositive in an attempted monopolization claim.[1] *Multiflex*, 709 F.2d at 991–92. Here, the jury heard expert testimony suggesting that when paired with BD's relatively high pricing in the safety syringe market, a very small decline of market share (not commensurate with the pricing premium) was probative of monopoly power or dangerous probability of achieving that power. 9/18 PM Tr. at 33:11–34:25. BD also claims that "[t]he fact that RTI was far more successful at selling the

---

[1] Notably, RTI did not succeed on its monopolization claim, suggesting that the jury considered the small decline in market share alleged by BD, but found that decline insufficient to defeat RTI's claim of *attempted* monopolization.

VanishPoint against the higher-priced Integra proves that price competition is working, not lacking." Docket No. 589 at 20. But BD ignores the other evidence presented by RTI on this point, including the evidence suggesting that the Integra was a severely flawed (and less-marketed) product that RTI contended was only sold for the purpose of tainting the market. When coupled with evidence showing BD's already high market share and very high barriers to entry, there was sufficient evidence for the jury to conclude that BD had a dangerous probability of success. BD finally argues that even if RTI did show a dangerous probability of success, that probability would be negated by "the presence and power of hospitals and their group purchasing organizations (GPOs)." *Id*. at 22. The mixed incentives and actual effect of GPOs were debated at length during the trial, and the jury had ample evidence to conclude that the presence of GPOs did not negate BD's dangerous probability of success. *See, e.g*., 9/18 PM Tr. at 74:25–77:2. Accordingly, there was sufficient evidence to support the jury's conclusion that BD possessed a dangerous probability of achieving market power.

      D.     *Damages and Injury Caused by Antitrust Injury*

BD also objects to the entirety of RTI's damages case. BD first takes issue with antitrust injury and causation. BD takes the position that RTI failed to show market harm and instead showed only lagging RTI sales. While partially true on its face, BD's position is misleading here: RTI submitted evidence that, because RTI was the only other relevant retractable syringe manufacturer during the pertinent time period, harm to RTI injured competition by raising market-wide costs and constraining innovation, among other deleterious effects. *See, e.g.*, 9/11 AM Tr. at 111:11–112:22. It is thus entirely logical for RTI to show suppression of the retractable syringe in the safety syringe market using evidence of its own lost sales. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) (affirming verdict of

antitrust liability where harm to the market was shown through harm to a company attempting to market a new type of product); *see also Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (holding that harm to one party can be demonstrative of harm to competition). The evidence presented at trial was sufficient to show an antitrust injury and injury in fact to RTI that was attributable to BD.

BD next challenges the jury's damages award. Specifically, BD takes issue with Mr. Maness' damages model, alleging that testimony from its own witnesses proved that the "benchmark" analysis used by Mr. Maness was improper because it was based on different businesses and different markets. In order to be used as a benchmark, "the business used as a standard must be as nearly identical to [the subject of comparison] *as possible*." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974) (emphasis added). BD construes this rule to mean that the benchmark must be "nearly identical" in an absolute sense. BD's argument fails because the allegations in this case by their very nature necessitate some inferential reasoning with regard to damages, which a jury is uniquely qualified to provide. Courts have addressed objections like BD's on numerous occasions:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (citing *Eastman Kodak Co.* v. *Southern Photo Co.*, 273 U.S. 359, 379 (1927)). Having proved that BD caused damages to RTI, RTI need only provide a just and reasonable estimate of the damages

based on relevant data, and it is BD who must "bear the risk of the uncertainty which [its] own wrong created." *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 984 (5th Cir. 1975). Mr. Maness constructed a reasonable model to compare RTI's actual performance to what its performance would have been but for BD's anticompetitive conduct. Mr. Maness identified the most closely comparable market where BD had not practiced the deception alleged by RTI. Having heard the testimony of both sides, the jury had sufficient evidence to conclude that RTI had proven the amount of damages it awarded.

## II.     LANHAM ACT AND "RELATED ANTITRUST CLAIMS"

### A.     *Res Judicata*

According to BD, the misrepresentations at issue in the instant litigation stem from advertisements that were created before the July 2, 2004 dismissal of RTI's 2001 lawsuit, which involved claims of product misrepresentations. Docket No. 589 at 40, 42. BD thereby submits that the doctrine of res judicata precludes RTI from bringing any suit based on these misrepresentations, even if the misrepresentations occurred after July 2, 2004. *Id.* RTI responds that res judicata is inapplicable because the causes of action in the instant suit only concern BD's misrepresentations—and the resulting injuries—that occurred after July 2, 2004. Docket No. 599 at 47–49.

The federal law of res judicata applies to federal judgments. *See In re Ark–La–Tex Timber Co.*, 482 F.3d 319, 330 n.12 (5th Cir. 2007) (citing *Semtek Int'l v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)). The doctrine of res judicata "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The party asserting the defense of res judicata must meet four elements: "(1) the parties in both

the prior suit and the current suit must be identical; (2) a court of competent jurisdiction must have rendered the prior judgment; (3) the prior judgment must have been final and on the merits; and (4) the plaintiff must raise the same cause of action in both suits." *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 313 (5th Cir. 2004). The U.S. Court of Appeals for the Fifth Circuit holds that res judicata, or claim preclusion, "forecloses relitigation of claims that were or could have been advanced in support of the cause of action on the occasion of the former adjudication." *Id.* at 312–13 (5th Cir. 2004) (citing *Allen,* 449 U.S. at 94).

To determine whether two suits involve the same cause of action, the court applies the "transactional test" recited in the Restatement (Second) of Judgments § 24. *Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). Under this approach, the court asks "whether the two actions are based on the same nucleus of operative facts." *Davis*, 383 F.3d at 313. It is the "nucleus of operative facts" in the first action, rather than the "facts litigated" or the "type of relief requested, substantive theories advanced, or types of rights asserted, [that] defines the claim." *United States v. Davenport,* 484 F.3d 321, 326, 327 (5th Cir.2007) (citation omitted). The determination is a practical weighing of various factors, including "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Davis*, 383 F.3d at 313 (citations omitted). Furthermore, "[i]f the cases are based on the same nucleus of operative facts, the first judgment's preclusive effect extends to all rights the original plaintiff had 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [original] action arose.'" *Davenport*, 484 F.3d at 326 (quoting *Petro–Hunt*, 365 F.3d at 395.)

BD relies heavily on the Fifth Circuit's opinion in *Oreck Direct, LLC v. Dyson, Inc.*,

560 F.3d 398 (5th Cir. 2009). In that case, Oreck sued Dyson over allegedly false representations in Dyson's advertising regarding unspecified models of its vacuum cleaners. After settling and dismissing that claim, Oreck filed a new suit against Dyson for making the same misrepresentations about one specific model, the DC18. *Oreck Direct, LLC v. Dyson, Inc.*, 544 F. Supp. 2d 502, 505–507 (E.D. La. 2008). The Fifth Circuit affirmed the district court's grant of summary judgment based on res judicata, holding that "[b]ecause Oreck's claims concerning the DC18 *could have been* advanced in support of the cause[s] of action [in Oreck I], res judicata bars Oreck's present suit." *Oreck*, 560 F.3d at 403 (citations omitted) (emphasis in original). Although BD argues that this passage controls the instant dispute, it is important to note that the district court in *Oreck* had specifically held that "[t]his case does not present a situation in which plaintiff's claims are based on conduct transpiring only after the earlier litigation had concluded." *Oreck Direct*, 544 F. Supp. 2d at 511. As the Fifth Circuit noted, the second suit in *Oreck* was filed just two months after the settlement agreement was signed for the first suit. *Oreck,* 560 F.3d at 400. The only distinction between the two suits was that the new suit specified the DC18 model vacuum cleaner. This distinction was insignificant for res judicata purposes because the Court determined that the DC18 was on sale and being promoted with the allegedly misleading advertising claims before the first suit was dismissed.

A recent decision from the U.S. Court of Appeals for the Federal Circuit supports this interpretation of res judicata principles. In *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, the Federal Circuit held that "[u]nder well-settled principles, a party who sues a tortfeasor is ordinarily not barred by a prior judgment from seeking relief for discrete tortious action by the same tortfeasor that occurs subsequent to the original action." 672 F.3d 1335, 1343 (Fed. Cir. 2012). Citing Fifth Circuit authority, the Federal Circuit noted that "claims based on conduct

transpiring after the close of prior litigation were not precluded by res judicata *even though the earlier litigation involved the same kind of conduct.*" *Id.* (citing *Kilgoar v. Colbert County Bd. of Educ.*, 578 F.2d 1033 (5th Cir. 1978)) (emphasis added). The Court also quoted Professors Wright and Miller, who opine that "[a] substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues." *Id.* (citing 18 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4409, at 227 (2002)).[2] After acknowledging that this rule "affords some opportunity to generate new claims by manipulating the underlying facts," Wright and Miller conclude that "to the extent that greater protection is needed, it is better to rely on issue preclusion." Wright, Miller & Cooper, *supra* at 249, 251. Of course, issue preclusion is not available to BD here because there was no actual adjudication of any issues in the first suit.[3] Because RTI's allegations—and the questions before the jury—only involve BD's conduct engaged in after the July 2, 2004 dismissal of RTI's previous lawsuit, res judicata does not bar RTI from asserting these allegations in the instant lawsuit.

### B. Release

BD also argues that the 2004 Settlement Agreement and Release (the "Release") releases BD from RTI's current antitrust and Lanham Act causes of action. Docket No. 589 at 44.

---

[2] Professors Wright & Miller make clear that this rule also applies to antitrust claims: "[a] second suit could be permitted to challenge essentially the same course of conduct alleged to violate the antitrust laws after settlement of the first suit. There was no bar, 'whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort.'" Wright, Miller & Cooper, *supra*, at 227 n.26 (citing *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327–29 (1955)).

[3] "Issue preclusion, also known as collateral estoppel, applies when (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (*en banc*); *see also Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326 (1955) ("No question of collateral estoppel by the former judgment is involved because the case was never tried and there was not, therefore, such finding of fact which will preclude the parties to that litigation from questioning the finding thereafter.").

The defense of release is governed by federal law because the claims released are largely federal claims. *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir. 2002). "To obtain summary judgment on an affirmative claim of release, a defendant must establish that the plaintiff: (1) signed a release that addresses the claims at issue, (2) received adequate consideration, and (3) breached the release." *Tyler v. Cedar Hill Independent Sch. Dist.*, 426 Fed. App'x. 306, 308 (5th Cir. 2011).

The key question in determining whether the Release addresses the claims at issue is whether the claims asserted in the instant case had accrued on or at any time prior to the date of execution of the Release, as required by its terms. The Supreme Court made clear in *Lawlor* that a new antitrust cause of action, even if based on "essentially the same course of wrongful conduct," accrues as new conduct occurs. *Lawlor v. National Screen Service Corp.*, 349 U.S. at 327.[4] Importantly, *Lawlor* was a case dealing with the accrual issue in the context of res judicata, and is thus not one of the statute of limitations cases that BD distinguishes.[5] Lanham Act cases are to the same effect. *See, e.g.*, *Derrick Mfg., Inc. v. Sw. Wire Cloth, Inc.*, 934 F. Supp. 796, 808 (S.D. Tex. 1996).

It is undisputed that BD made similar misrepresentations before the Release. However, RTI has relied only on the use of those misrepresentations *after* that date as the basis for the claims in this case. Applying the transactional test described above, the Court finds that the new use of these prior misrepresentations is not properly protected from a new suit by the defense of release.

---

[4] *See also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act. . . .") (antitrust case); *Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 421 F.2d 1313, 1318 (5th Cir. 1970).

[5] The court in *PBM Products, LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 405 (E.D. Va. 2009), applied the same analysis to accrual of claims for the res judicata and statute of limitations defenses, rejecting both as to conduct occurring after the release.

Comparing the Release in this case with the release in *Oreck* is instructive on this point. In that release, Oreck "agreed that Dyson would be allowed to use advertising claims that it was making about any product existing" as of the date of the settlement "without incurring any further liability to Oreck." *Oreck Direct, LLC*, 544 F. Supp. 2d at 506. By contrast, BD's protection in the Release here extends to "any claims . . . *which accrued on or at any time prior to the date of execution* of this Settlement Agreement and Release." Docket No. 589 at 44 (quoting the Release) (emphasis added). As explained above, the RTI's allegations as to new conduct, even if the new conduct is the same as older released conduct, give rise to claims that accrued after the Release was executed.

### B. *Evidentiary Basis*

BD lastly contends that the jury's verdict on the Lanham Act claims lacked evidentiary basis. Specifically, BD contends that "BD's marketing slogan about the 'World's Sharpest Needle' . . . is [at worst] non-actionable puffery." Docket No. 589 at 46. Similarly, BD contends that with regard to its waste space claims, "even if that statistic became outdated over time, the statements about waste space were true 'when viewed in the light of the overall context' of the ads." *Id*. at 48. However, the evidence at trial showed that BD's claims were objectively measurable, and that those objective measurements showed the claims to be literally false. *See, e.g.*, PX 570, 571, 617, 624, 628; DX 6000; 9/9 PM Tr. at 101–38. RTI also produced evidence sufficient to support a conclusion that BD's literally false claims were materially deceptive and injured RTI. *See, e.g.*, PX 568, 562, 703, 637, 711; 9/12 AM Tr. at 165–66, 179–81.

## CONCLUSION

For the reasons set forth above, the Court finds that the jury's verdict in this case was reasonable and supported by substantial evidence. Judgment as a matter of law is inappropriate

because BD has failed to show that a reasonable jury would not have a legally sufficient evidentiary basis to find for RTI on the issues set forth above. A new trial is inappropriate because BD has failed to show that the jury's verdict was against the weight of the evidence, the damages awarded were excessive, or that the trial was unfair or prejudicial error was committed in its course. Finally, remittitur is inappropriate because BD has failed to show that the damages award in this case exceeds the bounds of a reasonable recovery.

Accordingly, the Motion is **DENIED**.

**So ORDERED and SIGNED this 30th day of September, 2014.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**