IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **RETRACTABLE TECHNOLOGIES, INC., and THOMAS SHAW.** § § § | | |
| **Plaintiffs,** § | | |
| v. § | | **Cause No. 2:08-CV-16** |
| **BECTON, DICKINSON AND CO.** § § | | |
| **Defendant.** § | | |

**ORDER**

Before the Court are Plaintiffs Retractable Technologies, Inc. and Thomas J. Shaw's (collectively, "RTI" or "Retractable") Motion to Recover Defendant's Profits (Docket No. 592), RTI's Motion for Injunctive Relief (Docket No. 593), and RTI's Motion for Attorneys' Fees (Docket No. 594). The Court rules as follows:

- RTI's Motion to Recover Defendant's Profits is **GRANTED-IN-PART** and **DENIED-IN-PART**;

- RTI's Motion for Injunctive Relief is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

- RTI's Motion for Attorneys' Fees is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**BACKGROUND**

On September 19, 2013, following an eight-day trial, a jury found that Defendant Becton, Dickinson and Company ("BD") attempted to monopolize the safety syringe market and awarded RTI $113,508,014 in damages. Docket No. 577. The jury also found that BD had engaged in

false advertising under the Lanham Act; however, the parties did not submit a Lanham Act damages question to the jury. *Id.*

These parties are well acquainted. BD is a large medical supplier that manufactures and sells, among other things, safety syringe products and conventional syringe products. Throughout this lawsuit, the parties used the term "conventional syringes" to describe the common hypodermic needles that have been used in the healthcare industry for many years. Safety syringes generally serve the same purpose as conventional syringes, but have various mechanisms to reduce the chance of accidental needlesticks. RTI competes with BD in the safety syringe market by manufacturing and selling its VanishPoint syringe. The needle in the VanishPoint syringe automatically retracts into the syringe housing after it administers a dose. BD makes the Integra safety syringe, which has a needle that automatically retracts, as well as the Safety-Lok, SafetyGlide, and Eclipse safety syringes, which do not have needles that automatically retract.

In addition to being competitors in the marketplace, the parties are frequent adversaries in the courtroom. RTI initially sued BD in 2001, asserting unfair competition and antitrust claims. *Retractable Techs., Inc. v. Becton, Dickinson and Co. et al.*, No. 5:01-cv-036 (E.D. Tex. filed Jan. 29, 2001). BD settled these claims with RTI in 2004 for $100 million in a publicly disclosed settlement. Docket No. 590-1 at 12. On June 15, 2007, RTI brought a second suit against BD, alleging patent infringement, antitrust violations, false advertising, and unfair competition. *Retractable Technologies, Inc. v. Becton Dickinson and Company*, No. 2:07-cv-250 (E.D. Tex. filed June 6, 2007) ("*RTI 2*"). On January 18, 2008, at BD's request, the non-patent portions of that lawsuit were severed and stayed pending resolution of the patent disputes. *RTI 2*, Docket No. 66. The severed portions created the instant (and now third) lawsuit between

the parties. In the second suit, a jury found BD liable for patent infringement and awarded damages of $5 million on November 9, 2009.[1] *RTI 2*, Docket Nos. 319, 416. After entry of final judgment, the Court lifted the stay in the instant action. Docket No. 11.

On July 23, 2010, RTI amended its complaint to specifically identify the two allegedly false advertisements that ultimately became the subject of the jury trial. RTI averred that BD's advertisements, which claimed RTI's VanishPoint syringe has 0.185 mL of waste space (or dead space) volume were literally false and misleading. Docket No. 15, ¶¶ 88–119. RTI also alleged that BD's advertisements describing BD's syringes as containing the "World's Sharpest Needle" were likewise false and misleading. *Id.*, ¶¶ 211–23.

After an eight-day trial, the jury was asked a series of antitrust questions: whether BD monopolized the safety syringe, conventional syringe, or safety IV catheters markets; whether BD attempted to monopolize any of those markets; whether BD entered into contracts that unreasonably restrained trade in any of those markets; and whether BD entered into competition-restricting contracts that decreased or restricted competition within any of those markets. Docket No. 577 at 1–3. The jury found that BD had attempted to monopolize the safety syringe market, but found for BD on all other antitrust claims. *Id.* at 2–3. The jury awarded $113,508,014 in antitrust damages. *Id.* at 4. The jury also found that BD had engaged in false advertising under the Lanham Act with regard to its waste space and World's Sharpest Needle claims; however, RTI did not ask the jury for any relief under the Lanham Act. RTI now makes several requests for post-verdict relief.

---

[1] The jury found BD's 1 mL and 3 mL Integra syringes infringe various claims of RTI's patents. The United States Court of Appeals for the Federal Circuit partially reversed, holding the 3 mL Integra syringe did not infringe any claim. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1311 (Fed. Cir. 2011). However, the Federal Circuit affirmed this Court's subsequent ruling that the $5 million damage award was within the scope of the original judgment and not to be disturbed. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 757 F.3d 1366, 1372–73 (Fed. Cir.).

**RTI'S MOTION FOR DEFENDANT'S PROFITS (Docket No. 592)**

Under the Lanham Act, a plaintiff who proves trademark infringement can receive damages in the amount of "(1) defendant's profits, (2) any damages sustained by the plaintiff, or (3) the costs of the action." 15 U.S.C. § 1117(a). These damages, however, are "subject to the principles of equity." *Id.* A district court is not required to award damages. If proof of a defendant's profits and proof of a plaintiff's damages is too burdensome or is unavailable, a court may award damages "for such sum as the court shall find to be just, according to the circumstances of the case." *Id.*; *see also Seatrax v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000) ("The goal behind §§ 1116 and 1117 remedies is to achieve equity between or among the parties. . . . Because each case presents a different set of facts and circumstances, a case-by-case evaluation is warranted to determine the nature of the infringing conduct and its adverse effects, if any, on the plaintiff."). "Great latitude is given the district court in awarding damages under the Lanham Act." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1304 (5th Cir. 1997).

RTI argues that BD should forfeit "the profits BD made on its syringe products in excess of the antitrust damages awarded, or about $275 million."[2] Docket No. 592 at 17. BD responds that (1) RTI has failed to show BD's profits are attributable to the two advertising claims at issue; (2) disgorgement of profits would not be appropriate under the equitable factors established by the Fifth Circuit; and (3) RTI has miscalculated the amount of profits it requests.

---

[2] RTI apparently made a math error by claiming BD's profits are "about $275 million." RTI subtracts the damages award of $113,508,014 from BD's combined safety syringe and conventional syringe profits of $374,186,588 and should arrive at $260,678,574—not "about $275 million." BD pointed this error out in its response brief. RTI did not respond in its reply brief, ostensibly agreeing that RTI actually requests $260,678,574 in profits rather than "about $275 million."

4

Here, the principles of equity require BD to forfeit a portion of its profits. However, BD has already done so by paying the trebled amount of its antitrust damages. The $340,524,042 BD must pay is a sufficient monetary sanction in this case.

**(1) Attribution**

BD's primary contention regarding attribution is that RTI must prove that its profits were attributable to the false advertising. Docket No. 604 at 3. According to BD, RTI failed to do so. *Id*. at 5 ("RTI did nothing to identify the sales (or profits) that could fairly be traced to the particular advertising claims in question."). BD specifically criticizes RTI for requesting BD's profits from both its safety syringe products and its conventional syringes products, even though RTI does not make any conventional syringe products. *Id*. at 4. BD further argues "there also are lots of other reasons in the record for BD's sales" aside from the false advertisements. *Id*.

BD misstates RTI's burden and the evidence produced at trial. RTI need not show that *all* of BD's profits were attributable to its unlawful conduct, only "some proof that plaintiff lost sales or profits, or that defendant gained them."[3] *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 464 (5th Cir. 2001). RTI produced ample evidence that BD gained profits through its use of the false advertisements, often at the expense of RTI. Docket No. 592 at 3–6 (citing various BD documents that link the false advertisements to an increase in market share or premium pricing). Therefore, RTI has met its burden regarding attribution.

---

[3] BD argues this cannot be the "view of the law" because "if RTI could prove $100 in attributable profits, it would be entitled to $260 million." Docket No. 618 at 10. Aside from the reality that $100 in view of $260 million would be a *de minimus* amount, BD's hypothetical omits a critical step. If RTI proves only $100 in attributable profits, that does not mean RTI is entitled to $260 million—it only means that the Court may then apply the principles of equity analyzed in light of the *Pebble Beach* factors. *See Pebble Beach Co,. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998). One of those factors is diversion. Without some countervailing reason, it would not be equitable to award $260 million in profits if RTI could only show $100 profits (or less) from diverted sales.

**(2) Equity**

The Fifth Circuit has adopted a factor-based approach to determine whether an award of profits is appropriate in trademark infringement cases. The factors include, but are not limited to, "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998).

  1. *Intent to Deceive or Confuse*

This factor favors granting an accounting of profits. Even though BD knew its advertisements were not accurate, BD refused to remove them because doing so would have had a potential impact on sales. *See, e.g.*, PX 697 (email from BD marketing explaining that losing the waste space and sharpest needle claims would "potentially have a devastating effect to command premium pricing"). BD continued to publicize its false waste space and sharpest needle claims through at least 2010, and BD benefited from third-party use of these advertisements through at least 2013. PX 574–76 (ongoing BD use into 2011); 9/16 PM Tr. at 198–99 (third-party use during trial). This evidence showed continued and knowing use of false advertising claims that either disparaged competitors or praised BD. Accordingly, this factor favors disgorging BD's profits.

  2. *Diversion*

This factor slightly favors granting an accounting of profits. BD placed a high value on the false advertisements. *See, e.g.*, PX568 (email describing BD's purported medication savings based on the false waste space claim as "the primary reason people use the product"). Although

6

BD profited from its false advertisements, it is less certain that the resulting sales came at RTI's expense. RTI and BD shared the safety syringe market with a handful of other competitors. Therefore, one cannot assume that every BD sale resulted in a lost sale for RTI. Nevertheless, RTI produced evidence that on occasion BD relied on these false advertisements to divert sales from RTI directly. *See, e.g.*, PX 568 at 20–25, 28–23 (BD discussing the success of replacing RTI for the VA Houston hospital because of its alleged medication cost savings). This evidence confirms the rational conclusion that *some* portion of BD's ill-gotten sales came at RTI's expense. Accordingly, this factor slightly favors disgorging BD's profits.

### 3. Adequacy of Other Remedies

This factor disfavors granting an accounting of profits. RTI prosecuted its claim for antitrust damages—forgoing trademark damages—based on BD's false advertisements. Docket No. 569 ("[RTI's] false advertising damages are an aspect of its antitrust deception damages so that Retractable will not be seeking separate Lanham Act damages, but expressly preserves its claims for equitable remedies, including disgorgement and injunctive relief, under the Lanham Act."). As a result, the jury awarded RTI antitrust damages of $113,508,014, which are necessarily trebled to $340,524,042 under the Sherman and Clayton Acts. In addition to the trebled antitrust award, the Court is granting RTI limited injunctive relief under the Lanham Act as detailed later in this Order. BD must engage in corrective advertising and comprehensive training programs to combat the lingering impressions of the false advertisements as detailed *infra*. RTI's relief—trebled damages and an injunction—is adequate for its injury. To claim otherwise is disingenuous.

*4. Unreasonable Delay*

This factor slightly favors granting an accounting of profits. The relevant timeline is not in dispute: both parties were aware of the false advertisements by the time they settled their first lawsuit in July 2004; RTI sued BD on June 15, 2007, citing Lanham Act violations; on January 18, 2008, the Court granted BD's request to sever and stay the portion of the case with the Lanham Act violations; on May 14, 2010, the stay was lifted; and on July 23, 2010, RTI amended its complaint to specifically identify the waste space and world's sharpest needle claims.

Excluding the 27 months during the stay, RTI waited approximately 3.5 years to bring the waste space and needle sharpness claims.[4] If the stay is not excluded, as BD advocates, RTI waited nearly six years to bring these claims. Despite RTI's delay in amending its complaint to identify these specific advertisements as the advertisements that are literally false and misleading, the parties' history shows that RTI was aggressively pursuing its claims against BD from the time it filed its first lawsuit against BD in 2001.

More importantly, BD cannot legitimately claim undue prejudice. RTI sued BD for false advertising on similar advertising in 2001. From 2004 at the latest, BD knew its advertisements relating to waste space and needle sharpness were not accurate—yet BD continued to use these advertisements through 2011. It did so at its own risk. BD cannot claim undue prejudice on the

---

[4] BD argues that RTI's disgorgement and injunction claims are barred by laches because RTI asserted these claims beyond the relevant statute of limitations, which BD argues is two years. Docket No. 604 at 13. According to BD, each element of laches is strongly presumed because RTI filed suit beyond the relevant statute of limitations. *Id.* In response, RTI argues the relevant statute of limitations provides a four-year period. Docket No. 612 at 14. However, the Court need not identify the relevant statute of limitations period in this case because the Fifth Circuit does not presume the elements of laches based on a statute of limitations. *See Jaso v. Coca Cola Co.*, 435 Fed. App'x 346, 356 & n.10 (5th Cir. 2011) (noting the Fifth Circuit does not apply same presumption as other circuits and requires the defendant to prove each element of laches). Accordingly, to assert laches as a defense, BD must prove (1) a delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay. *Id.* at 356. Because BD cannot show undue prejudice, *see infra* text accompanying note 5, BD's defense of laches fails.

basis that RTI failed identify the exact advertisements it would bring before the jury at the outset of its lawsuit. By analogy, consider a builder who begins construction on a building by creating a foundation that he knows is out-of-code. During construction, the builder receives a letter from the government that generally describes the building as out of code. If the builder decides to nevertheless finish the project, he cannot legitimately rely on the fact the government's letter did not identify the foundation as the issue to argue the government has no right to demolish the building. The builder, like BD, cannot claim undue prejudice in such circumstances.

On balance, this factor slightly favors disgorging BD's profits.[5]

### 5. *Public Interest*

This factor favors granting an accounting of profits. The public has an interest in truthful information and advertising. Here, the public interest is especially pronounced because this suit involves safety products. BD's false advertising resulted in an artificially inflated price for BD syringes, but also lowered the number of RTI syringes in the marketplace. RTI's syringes feature an innovative retractable design that reduces needlesticks. Accordingly, this factor favors disgorging BD's profits.

### 6. *Palming Off*

This factor disfavors granting an accounting of profits. Palming off "occurs when a producer misrepresents his own goods or services as someone else's." *McArdle v. Mattel Inc.*, 456 F. Supp. 2d 769, 783 (E.D. Tex. 2006). RTI does not contend that BD attempted to sell its goods under RTI's marks. Accordingly, this factor weighs against an accounting of profits. *See Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992).

---

[5] For the same reasons, the Court rejects BD's argument that disgorgement and injunctive relief are barred by laches. *See* Docket No. 618 at 12–15.

In sum, four factors weigh in favor of an accounting of profits (two only slightly) and two factors weigh against. Considering these factors and the record as a whole, RTI should be awarded a portion of BD's profits.

### (3) Calculation of profits

BD claims RTI's estimation of gross profits is inflated because it starts with an artificially high profit number and does not deduct the full costs. Docket No. 604 at 14–15. BD argues RTI's calculation should not include $231 million in profits from BD's conventional syringes and needles, for which there is no RTI competing product. *Id*. BD also argues that RTI should deduct the trebled damage award of $340 million, rather than the $113 million pre-trebled amount that RTI deducts. *Id*. at 15. Relying on its expert's testimony, BD argues it earned only $560,000 in profits on its safety syringe products as a result of the false advertising claims. *Id*. Therefore, once the Court deducts the trebled $340 million in damages, BD argues it has no profits to disgorge. *Id*.

RTI does not explain why it excludes the baseline $113 million rather than the trebled $340 million. BD's actual cost tied to its false advertisements is $340 million, not $113 million. The fact that the damages are trebled because they are antitrust damages is irrelevant to the cost BD must bear as a result of using these false advertisements. RTI should therefore deduct $340 million from BD's profits rather than $113 million.

Moreover, $340 million is a sufficient disgorgement. An accounting of profits serves one or more of three distinct purposes: to compensate for diverted sales, to prevent unjust enrichment, and to deter future infringement. *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 584–85 (5th Cir. 1980). As noted *supra*, the combination of $340 million and an injunction is adequate compensation for RTI. Additionally, $340 million in damages ensures that BD is not

10

unjustly enriched by using the false advertisements. This award is greater than the entirety of BD's profits from safety syringe products, and is 91% of the profits from the safety syringe and conventional syringe markets in combination. *See* Docket No. 592 at 16 ($340,524,042 / $374,186,588). While RTI argued at trial that BD made sales of conventional syringe products due to the false advertisements, RTI never alleged nor provided evidence that 100% of BD's conventional sales were due to the false advertisements. Likewise, $340 million in damages is a strong deterrent: BD loses 91% of its profits even though BD presented evidence that many sales were made for reasons other than the false advertisements.

Accordingly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** RTI's Motion to Recover Defendant's Profits (Docket No. 592). The Court **GRANTS** RTI's request for an accounting of profits, but **DENIES** RTI's requested $260,678,574. Instead, any profit to which RTI is entitled is included within the $340,524,042 antitrust award.

### RTI'S MOTION FOR INJUNCTIVE RELIEF (Docket No. 593)

Under the traditional principles of equity, injunctive relief is an extraordinary remedy wherein the party seeking the injunction must demonstrate that "(1) it will suffer irreparable injury; (2) remedies available at law are inadequate; (3) the balance of hardships warrants an injunction; and (4) the public interest would not be disserved by an injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Moreover, in an antitrust dispute, the party seeking the injunction must show a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).

RTI makes 17 Requests for Injunctive Relief, grouped into three distinct categories: Safety and Superiority of Automatic Retraction and Production Bar, False Advertising, and

Contracting. Docket No. 593 at 5–8. BD primarily argues that RTI is not entitled to any injunctive relief because RTI has failed to show a threat of "a future or continued violation of the antitrust law that . . . will give rise to an antitrust injury." Docket No. 618 at 3. BD contends that the jury found BD's wrongful conduct related only to its use of false advertisements. Docket No. 605 at 1. BD submits that the jury's award of damages is sufficient relief for RTI because BD has stopped using the false advertisements. *Id.*

The Court did not allow RTI to present its "Safety and Superiority of Automatic Retraction" claims to the jury due to lack of evidence. 9/18 Tr. PM Part II at 25:13–26:19. Additionally, the Court agrees with the jury that RTI did not show BD's contracting practices amounted to an antitrust violation. Docket No. 577 at 3. Accordingly, no injunctive relief will be granted for the "Safety and Superiority of Automatic Retraction and Production Bar" and "Contracting" categories as those seek to enjoin BD from activities were never found to be unlawful. *See* Docket No. 593 at 5–8 (Request for Injunctive Relief Nos. 1–4, 11–17).

RTI is entitled to injunctive relief relating to the "False Advertising" category, however. Docket No. 593 at 6–8 (Request for Injunctive Relief Nos. 5–10). In arguing otherwise, BD mischaracterizes its violation of the antitrust laws and the relevant injury. BD's attempted monopolization of the safety syringe market injured the public by limiting the marketplace's access to retractable syringes. Damages alone cannot make RTI whole or serve the public interest in fostering competition in the marketplace. *See Zenith Radio Corp.*, 395 U.S. at 133 ("This is particularly true in treble-damage cases, which are brought for private ends, but which also serve the public interest in that 'they effectively pry open to competition a market that has been closed by defendants' illegal restraints.'") (citing *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). Compensating RTI for its lost sales or forcing BD to sacrifice its ill-gotten

sales merely shifts money from the wrongdoer to the plaintiff without redress to the public's injury. In addition to the attempted monopolization finding, the jury separately found that BD engaged in false advertising. Docket No. 577 at 2. The false advertisements disparaged RTI's products and praised BD's. The lingering impressions created by more than six years of false advertisements cannot be cured by simply transferring a portion of BD's past sales to RTI.

Furthermore, BD's business practices also limited innovation. Innovation and market competition go hand-in-hand, and antitrust laws protect both. *See, e.g.*, *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 939 (2d Cir. 1987), *aff'd*, 486 U.S. 492 (1988) (affirming that antitrust law applies when a steel manufacture manipulates a standards setting organization to exclude plaintiff's innovative PVC piping); *United States v. Microsoft Corp.*, 253 F.3d 34, 77–78 (D.C. Cir. 2001) (holding that Microsoft's conduct in preventing wider adoption of Java and its innovative cross-platform capability violated the Sherman Act). Here, RTI first introduced its automatically retractable VanishPoint syringe in the late 1990s. 9/16 Tr. AM at 30–32. RTI presented evidence that many in the healthcare industry, including BD, consider automatic syringe needle retraction a superior way to reduce the frequency of accidental needlesticks. *See, e.g.*, PX 1111 at 4; Edwards, 9/12 AM Tr. at 14–16, 47–48; PX 920 at 3; PX 899. However, BD's false advertisements suppressed sales of the VanishPoint, thereby preventing the market from full access to this innovative product. *See, e.g.*, PX 711 pp. 1, 3, 6–7 (BD noting that its "World's Sharpest Needle" claim must be supported to avoid losing "16% of market share" in the instant market because "sharpness is a critical clinical requirement for many decision makers" and that BD enjoyed a "10-30% price premium vs. competition"); 9/12 AM Tr. at 143 (BD's National Sales meeting, wherein it was noted that "the World's Sharpest needle" claim accounted for "pricing and market share advantages from needle differentiation"); PX 637

13

at 16–20. For the VanishPoint to be fully available to the market, BD must take specific corrective action to remove the stain of its false advertisements. Injunctive relief is therefore necessary to protect and foster innovation in the marketplace.

Anticipating that the Court might grant injunctive relief related to its false advertising, BD proposes specific language in its response brief. Docket No. 605 at 4. BD criticizes RTI's proposed injunction as impermissibly vague and overbroad and argues its own language is narrowly tailored to the jury finding. However, BD's proposed language would only prohibit BD from using the exact advertisements it has used in the past. Meanwhile, it would allow BD to use advertisements so similar that the injunctive relief would be a sham. For example, an ad that promotes BD's needles as "sharper than the competition" would not be enjoined even though it would continue to promote the false claim that BD needles are the World's Sharpest Needles.[6] This problem would be exacerbated if BD does not engage in any corrective training programs or otherwise acknowledge the specific falsehoods in its enjoined advertisements. Additionally, BD's proposed injunction only stops BD from "publishing or disseminating" the false ads, but does not require BD to take any action regarding the false ads that are already in the marketplace. *See, e.g.*, PX 576 at 161–75 (various healthcare providers' web sites containing the false waste space advertisements); 9/16 PM Tr. at 198–99 (a large medical distributor advertising BD's cost calculator with the false waste space numbers on its web site as recently as 2013). Finally, BD fails to justify why injunctive relief should be limited to three years given that it knowingly promoted these false advertisements for more than six years.

---

[6] BD's proposal regarding its waste space claims suffers from the same problem. BD wants to make medication and cost-savings comparisons as long as it represents that RTI's VanishPoint waste space is 0.07 mL. Docket No. 605 at 4. If adopted, such an injunction would still allow BD to manipulate the comparisons by falsely stating the waste space of its own products, or by failing to update the comparisons if RTI reduces the waste space of its VanishPoint in the future.

RTI's proposed language must also be altered, however, because it contains forced confessions that are not tailored to correct the threat of injury from an impending or current antitrust violation. *See, e.g.*, Docket No. 593 at 7 ("BD *willfully and purposely* overstated the dead space of the VanishPoint syringe") (emphasis added). Additionally, RTI fails to justify why Request for Injunction Relief No. 8 should be permanent. *Id*. ("BD shall not advertise or otherwise allege in its marketing activities that its syringe products save medication as compared to Retractable's VanishPoint syringes . . . .").

Accordingly, RTI's Motion for Injunctive Relief (Docket No. 593) is **GRANTED-IN-PART** and **DENIED-IN-PART**. No later than January 15, 2015, the Court **ORDERS** the following:

- BD shall not advertise or otherwise state in its marketing activities that BD safety syringes have the "World's Sharpest Needle" or any similar assertion of superiority in sharpness, or reduced patient pain as a result of needle sharpness, for a period of five years from this Order.

- BD shall notify all customers who purchased BD syringe products from July 2, 2004 to the date of this Order that BD wrongfully claimed that its syringe needles were sharper than competitors', including RTI's, and that its statement that it had "data on file" proving the sharpness claim was false and misleading.

- BD shall notify all employees, customers, distributors, Group Purchasing Organizations, and government agencies that: (1) the dead space of the VanishPoint syringe has been within the ISO standard of 0.07 mL dating back to at least July of 2004; (2) that BD overstated the dead space of the VanishPoint syringe to represent that it was higher than BD's conventional syringe, Safety-Lok, SafetyGlide, and

- Eclipse products when it was actually less than all of those products and (3) that BD's statement that data on file was false and misleading. In addition, BD shall post the notice on its web site where information regarding syringes is presented and shall maintain such notice on its web site for a period of 3 years.

- BD shall not advertise or otherwise allege in its marketing activities that its syringe products save medication as compared to Retractable's VanishPoint syringes for a period of 3 years. BD shall destroy all marketing, training, and sales materials that currently include such allegations.

- BD shall notify all of its employees, customers, distributors, Group Purchasing Organizations, and government agencies that its web site, cost calculator, printed materials and oral representations alleging that BD's syringes save medication as compared to Retractable's VanishPoint syringe were based on false and inaccurate measurements of Retractable's VanishPoint. In addition, BD shall post this notice on its web site where information regarding syringes is presented and shall maintain such notice on its web site for a period of 3 years.

- BD shall implement a comprehensive training program for its employees and distributors that specifically instructs employees and distributors not to use old marketing materials and not to make false representations regarding Retractable's VanishPoint syringes.

## RTI'S MOTION FOR ATTORNEYS' FEES (Docket No. 594)

The Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable

attorney's fee." 15 U.S.C. § 15(a). Reasonable attorneys' fees are mandatory, and the only function of the court is to determine the amount. *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 339–40 (5th Cir. 2012). The Lanham Act provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "An exceptional case is one where the violative acts can be characterized as 'malicious,' 'fraudulent,' 'deliberate' or 'willful.'" *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996). The exceptional nature of a case must be shown by clear and convincing evidence and the determination as to whether a case is exceptional is left to the sound discretion of the trial court. *Id.* at 1390.

The determination of reasonable attorneys' fees involves a two-step procedure. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323–24 (5th Cir. 1995). The court must first determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers and multiply the two to calculate the lodestar. *Id.* at 324. The court then either accepts that sum or adjusts it upward or downward depending on the circumstances of the case. *Id.*; see also *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 771 (5th Cir. 1996) (discussing the various factors that lead to adjusting the fees). Additionally, "where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded." *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983).

RTI requests approximately $36,491,587.82 in attorneys' fees. Docket No. 594 at 6–7. RTI claims this amount reflects a reasonable billing rate for similarly situated attorneys in similarly situated firms. Docket No. 594 at 4. This amount includes RTI's suggested reduction of 10% to account for its unsuccessful or dropped claims. Docket No. 594 at 6. This amount

also includes RTI's requested 20% enhancement that allegedly is necessary because RTI's attorneys were "preclu[ded] from other employment" and "will have to rebuild [their] practice." Docket No. 612 at 17–18. Finally, this amount includes fees for post-trial motions and an appeal if one is filed. Docket No. 594 at 7.

In response, BD argues that RTI "is not entitled to the award it has demanded because: (1) RTI cannot recover fees it incurred prosecuting its patent infringement claims, which are the subject of a separate *RTI 2* suit; (2) RTI cannot recover fees incurred in furtherance of unsuccessful and abandoned claims; (3) RTI cannot recover fees incurred in defending a patent infringement case BD filed against RTI; (4) RTI's attorneys failed to provide the necessary documentation identifying the distinct claims for which RTI may recover fees; (5) prospective fees are not recoverable; and (6) no basis exists for an upward adjustment to the lodestar amount. Docket No. 602 at 1.

BD argues that RTI cannot recover fees incurred in 2007, 2008, and 2009 because the two claims on which RTI prevailed were not pled until RTI filed its amended complaint on July, 23, 2010. Docket No. 602 at 9. Although RTI prevailed on claims that were first alleged in 2010, it does not necessarily follow that RTI did not rely on its efforts prior to 2010 to prosecute those successful claims. The issue is what percentage of that time should count towards the lodestar amount. RTI conclusory claims its 10% reduction in its fees is sufficient, whereas BD claims none of the time should count. *See* Docket No. 612 at 16. Considering the close relationship between RTI's prevailing antitrust claims and the claims in its original complaint in *RTI 2*, RTI is entitled to fees for 50% of the time spent on its prosecution of its antitrust claims from 2007 through the post trial in the instant suit.

18

As to the remaining disputes, the Court rules as follows: RTI may not recover fees for time spent on *prospective* post-trial motions or appeals. *See Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 433 (5th Cir. 2003). Additionally, RTI has not shown by clear and convincing evidence that this is an exceptional case within the meaning of the Lanham Act. Therefore, RTI is not entitled to any fees for time solely spent on its Lanham Act claims. Likewise, RTI does not argue that this qualifies as an exceptional case within the meaning of the Patent Act, and therefore RTI may not recover fees for time spent solely on its patent claims. However, RTI prevailed on its Lanham Act claims in the instant suit and its Patent Act claims in *RTI 2*. These claims underpin RTI's successful antitrust claims, for which RTI *is* entitled to its reasonable attorneys' fees. Accordingly, RTI may count the time spent on activities that co-mingle its antitrust claims with its Lanham Act and Patent Act claims at the above-mentioned 50% rate. Finally, RTI is not entitled to a 20% enhancement on the basis that its attorneys were precluded from other employment. Such "potential loss of income in refusing other employment is compensated for in the number of hours [the attorneys] billed in the instant case." *See Shipes v. Trinity Indus.*, 987 F.2d 311, 321–22 (5th Cir. 1993).

Accordingly, RTI's Motion for Attorneys' Fees (Docket No. 594) is **GRANTED-IN-PART** and **DENIED-IN-PART**. RTI is awarded for 50% of the time spent on RTI's prosecution of antitrust claims since the origination of the underlying suit—regardless of whether that time included activity that co-mingled its antitrust claims with its Lanham Act and Patent Act claims. RTI may not include any time spent on issues solely relevant to the Lanham Act, Patent Act, state law, or other claims. RTI's fees are not enhanced. RTI may not include fees spent on *prospective* post-trial activity[7] or fees in anticipation of an appeal. RTI **SHALL**

---

[7] RTI may include post-trial activity spent securing the judgment of its antitrust claims, consistent with the 50% reduction.

calculate this amount and submit it to BD.  The parties **SHALL** then meet and confer to verify the amount is consistent with this Order or otherwise determine an agreed amount.

## CONCLUSION

RTI's Motion to Recover Defendant's Profits (Docket No. 592) is **GRANTED-IN-PART** and **DENIED-IN-PART.**  RTI's Motion for Injunctive Relief (Docket No. 593) is **GRANTED-IN-PART** and **DENIED-IN-PART**.  RTI's Motion for Attorneys' Fees (Docket No. 594) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**So ORDERED and SIGNED this 10th day of November, 2014.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**