IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC. AND THOMAS J. SHAW, § § § | | |
| Plaintiffs, § § § | CIVIL ACTION NO. 2:08-cv-16-LED-RSP | |
| v. § § | | |
| BECTON, DICKINSON AND COMPANY, § § § | **JURY TRIAL** | |
| Defendant. § | | |

**PLAINTIFFS' RESPONSE TO DEFENDANT BECTON, DICKINSON'S
EMERGENCY MOTION FOR STAY OF INJUNCTION**

Plaintiffs ("RTI") respond to BD's Emergency Motion For Stay of Injunction (Dkt. 659).

**INTRODUCTION**

This is not the typical case where an injunction benefits one party and harms another with minimal, if any, impact on the public. Granting a stay of the injunctive relief would be antagonistic to public interests. This Court's injunction is squarely tailored to provide healthcare workers with information that could open eyes and result in adoption of innovative products that can finally halt a needlestick epidemic that has continued unabated. Moreover, the injunction is intended to and will correct public harm – stifled innovation – caused by BD's wrongful conduct. Contrary to BD's arguments, the mere fact that it took several years to expose BD's lies in court is no excuse to let the market misconceptions last a moment longer.

BD seeks equitable relief from this Court, but he who comes into equity must come with clean hands. BD used false advertising to stifle competition. In its Stay Motion, BD does not (and cannot) deny that it lied to the public about its products and RTI's products. Its own

1

documents and witnesses proved (and sometimes even admitted) the falsity of BD's representations beyond any doubt.

Against a backdrop of admitted lies, and harm to public interests, BD is left to make the remarkable argument that it will be <u>irreparably harmed by the truth</u>. BD weaves a truly tangled web. But, other than the natural (and deserved) embarrassment of exposure, BD utterly fails to explain the nature of, or present evidence to show, any irreparable injury. What BD really seeks is a status quo in which its lies persist, the public is misled, and innovation is suppressed. The stay should be denied.

## ARGUMENT

The Court should deny BD's requested stay, because each of the four factors relevant to such a request favor RTI and disfavor granting the stay. Following is a discussion of the standard to be applied, and then a discussion of the factors examined under the standard.

**A.     The Four Factor Test For Deciding A Motion To Stay An Injunction.**

In deciding a motion to stay an injunction pending appeal, courts consider the following four factors:

(1)   whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
(2)   whether the applicant will be irreparably injured absent a stay;
(3)   whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
(4)   where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009); *Moore v. Tangipahoa Parish Sch. Bd.*, 507 Fed. App'x. 389, 392 (5th Cir. 2013); *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

As the movant for a stay, BD carries the burden to satisfy the four factors, *see Ruiz v. Estelle*, 666 F.2d at 856, and BD "is not entitled to the stay as a matter of right." *Moore v. Tangipahoa Parish School Bd.*, 507 Fed. App'x. at 392; *see Nken*, 556 U.S. at 433.

While no one factor trumps all others, the law clearly contemplates that different factors can be of more importance in different cases. Where, as here, the purpose of the injunction is simply to get truthful information to the public, the public harm factor should be paramount. *Veritas nihil veretur nisi abscondi* – Truth fears nothing but to be hidden.

Because of the importance of the public interest factor, it is addressed first, followed by the lack of irreparable harm to BD, the irreparable harm to RTI if the injunction is stayed, and finally the lack of a strong showing of probable success on the merits on appeal.

1.  **The Public Interest Favors Denying the Stay.**

The public interest strongly favors denying the stay and enforcing BD's compliance with the injunction to stop the injury to the market.

At trial Dr. Edwards testified that the huge sales in so-called safety syringes since 2001 had not been effective to reduce needlesticks. Edwards, 9/12 AM pp. 37-41. A BD document called the situation "unabated." PX 983 p. 3. Post-trial, an article in an independent professional journal that reported on a national needlestick survey concluded in part:

> The lack of significant reduction in [Sharps Injuries] since 2001 (Figure 1) is of great concern. At a recent AOHP 2013 national conference, three papers were presented showing that their switch to a passive safety engineered device (SED) significantly reduced [Sharps Injuries] over that with an active SED.

Terry Grimmond and Linda Good, *EXPO-S.T.O.P.: A national survey and estimate of sharps injuries and mucocutaneous blood exposures among healthcare workers in USA*, Association of Occupational Health Professionals in Healthcare (AOHP), Fall 2013 (attached as Ex. 18 to Wilson Decl.).

Also post-trial, a published independent hospital based study confirmed that when BD-type manual safety needles are used sticks go up, but then when VanishPoint® retractable syringes were introduced sticks fell to zero. Ashleigh J. Goris, *Reducing Needlestick Injuries from Active Safety Devices: A Passive Safety-Engineered Device Trial*, Association of Occupational Health Professionals in Healthcare (AOHP), Spring 2014 (attached as Ex. 19 to Wilson Decl.).

So a real and present needlestick danger continues, and BD's disinformation contributes to it. BD's response is that it has stopped the ads so there can be no further impediment to innovation. Not hardly. Just as this Court predicted in support of its injunction, the taint of the ads and their lingering market effect continues into the future. After years of false ad campaigns the market continues, post-trial, to publish the same false information BD used to squelch innovative syringe technology. Distributor websites still repeat BD claims of "World's Sharpest Needle" and the exaggerated medication saving claims for the BD Integra product (86% less waste). One web page has a consumer question asking about which needle is sharper "I heard BD needles are pretty sharp…" confirming, as was proven at trial, consumers are swayed by such claims. Perhaps most disturbing of all is that, contrary to its professions to this Court, <u>BD's own websites still contain the claims.</u> It is obvious that the phrase "World's Sharpest Needle" associated with BD products is still very much a part of what consumers see and it is contained and promoted in a wide array of commercial outlets on the web. *See* Ex. 1, Declaration of Roy Hardin. For additional specifics on the state of web use of the false statements today, *see* Ex. 2, Declaration of Stephen D. Wilson ("Wilson Decl."). And, of course, the web is just one conduit for such continued falsities.

In short, the very same market misconceptions and falsities the Court recognized as causing significant public harm continue and will continue unless corrected by BD. This Court found:

> "For the VanishPoint <u>to be fully available to the market, BD must take specific corrective action to remove the stain of its false advertisements</u>. Injunctive relief is therefore necessary to protect and foster innovation in the marketplace." Dkt. 652 pp. 13-14 (emphasis added).

> "BD's attempted monopolization of the safety syringe market <u>injured the public</u> by limiting the marketplace's access to retractable syringes. <u>Damages alone cannot</u> make RTI whole or <u>serve the public interest in fostering competition in the marketplace</u>." Dkt. 652 p. 12 (emphasis added).

The market continues to be harmed by BD's lies. That harm will continue until BD corrects its lies with the truth: "The <u>lingering impressions created by more than six years of false advertisements cannot be cured</u> by simply transferring a portion of BD's past sales to RTI." Dkt. 652 p. 13 (emphasis added).

Moreover, BD's correction of its deception will help the proper functioning of the market. As this Court correctly found, "The <u>public has an interest in truthful information and advertising</u>. Here, the public interest is especially pronounced because this suit involves safety products. BD's false advertising resulted in an artificially inflated price for BD syringes, but also lowered the number of RTI syringes in the marketplace." Dkt. 652 p. 9. Moreover, the injunction specifically targets the public injury from BD's lies: "Compensating RTI for its lost sales or forcing BD to sacrifice its ill-gotten sales merely shifts money from the wrongdoer to the plaintiff without redress to the public's injury." Dkt. 652 pp. 12-13. After years of harmful lies, the injunction calls for BD to tell the truth and to correct its prior lies. The public interest plainly benefits under the injunctions, and the public will continue to be harmed if a stay is granted.

## 2. BD Will Not Be Irreparably Injured Absent a Stay.

Disclosing the truth will not irreparably harm BD. The Court's injunction simply requires BD to publicly acknowledge what it admitted and/or was proved in open court—that it made false statements that misled the market and its customers about sharpness and deadspace/medication wastage.[1] Telling the truth and correcting its prior disinformation will not moot BD's appeal. BD fails to provide any evidence that telling the truth causes any harm, what the harm is, or how or why it is irreparable.

BD presents no arguments and points to no evidence that refute that (a) it continued to use the "World's Sharpest Needle" ads after knowing they were false, or (b) it continued to use the flawed waste space calculators well after the time it knew them to be inaccurate. BD does not here contest this Court's finding that the "evidence showed continued and knowing use of false advertising claims that either disparaged competitors or praised BD." Dkt. 652 p. 6. In short, BD makes no attempt to point to any evidence that challenges the truthfulness of the language of the injunction.

Instead, BD pleads that it will never be able to "un-speak its forced confessions." BD Stay Motion p. 5. On what basis could BD ever truthfully "un-speak" them?

And under BD's reasoning, <u>every</u> injunction that ordered any disclosure would automatically qualify for a stay. But that is not the law. *Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979), does not assist BD on this issue. The case does not stand for the

---

[1] BD's corporate representative admitted that BD's advertisements about RTI's waste space were false. Ledek, 9/10 PM pp. 69-72. Further, internal BD testing proved that BD knew that its statements about RTI's waste space were false. PX 614 (October 23, 2003 test); PX 628 p. 8 (BD reports in June 2008 test); Scott, 9/12 AM pp. 132-35. Despite the 2003, 2005, and 2008 BD test reports showing lower waste space, BD advertising continued to use the known-to-be false value of .185 mL for the VanishPoint. Scott, 9/12 AM p. 129; Hyman, 9/9 PM pp. 104-05; Goldman, 9/16 PM p. 164; PX 562 pp. 628, 713-14, 598, 575, 574, 576, 698.

Despite the August 2004 report (PX 617) showing that its needle was not the sharpest, BD continued to create and use U.S. advertising claiming its products had the "World's Sharpest Needle." Scott, 9/12 AM p. 129; Hyman, 9/9 PM pp. 134-37; *see also, e.g.*, PX 260 p. 11; PX 264 p. 26.

proposition that every injunction must be stayed because an appellant is entitled to appellate review. Rather, in that case, where the district court said "respectable minds might differ," the appellate court examined all of the factors and determined that appellant made a sufficient showing of merit on appeal, that the denial of the stay would irreparably harm the appellant, and a stay would do relatively slight harm to the appellee. *Id.* at 890. Moreover, the nature of the injunction – requiring the FBI to turn over specific documents reflecting the results of wiretaps – was the key issue in dispute. *See id.* at 889. If the injunction was not stayed, and the FBI was ordered to disclose the wiretap documents, the appeal over whether the FBI was required to turn over the wiretap documents would be moot. *Id.* at 890. Here, letting the injunction proceed will not moot the appeal (BD does not even contest that the ads contained false information), nor will it cause irreparable harm to BD, but rather will simply correct prior false statements.

### 3. A Stay Will Substantially Injure Retractable.

Conversely, issuance of a stay will substantially injure Retractable.

This Court has already explained that the injunction is necessary to prevent future harm. The damages awarded will not correct BD's deception that still stains the market or compensate Retractable for the damages that will occur as the market continues to be deceived because of the lies BD has spread. As the Court said, BD "injured the public by limiting the marketplace's access to retractable syringes," and "[d]amages alone cannot make RTI whole or serve the public interest." Dkt. 652 p. 12.

Retractable does not make widgets whose production is a direct function of the price/demand curve. Retractable practices innovation, bets the company on innovation, and will survive or not based on the ability of its innovation to have unfettered market access. This Court found that "BD's business practices also limited innovation. Innovation and market competition

go hand-in-hand, and antitrust laws protect both." Dkt. 652 p. 13. The Court's injunctive relief protects this innovation and works to stop the continuing harm being done to the public by BD's as-of-yet-uncorrected lies.

BD's request that months or years should pass before any market correction can even be attempted keeps Retractable's innovation sealed off in the market's mind as an unattractive option, with false concerns of patient discomfort and medication waste. That BD says it stopped the ads and that somehow years of disinformation automatically cease to have an impact is ludicrous. As noted by this Court: "For the VanishPoint to be fully available to the market, BD must take specific corrective action to remove the stain of its false advertisements. Injunctive relief is therefore necessary to protect and foster innovation in the marketplace." Dkt. 652 p. 14.

The trial testimony carefully considered by this Court identifies three specific types of harm that a stay will make possible with respect to innovation (the core of Retractable's business).

First, if a stay is granted, the last years of patent protection for Retractable's innovation simply wither away under the same tainted market conditions. Having enjoyed the blockage of blatantly false ad campaigns for years, BD now seeks to extend those market conditions until patents protecting Retractable's innovation lose all their teeth. *See* PX 277B (partial) (BD's LCR document identifying "Launch date Q3 FY2015" for BD's new retractable syringe and "RTI patent expires May 2015").

Second, while the stay is in place, the economics for Retractable's Little Elm plant have little chance of improving past the "tipping point" volumes that would ensure the facility can continue to exist as a place where production fosters further improvements and innovation. Mr. Shaw explained at trial that R&D has been cut and that, without sufficient market access, the

plant itself cannot be used economically. Shaw, 9/16 AM pp. 41-42, 45-47; Sheehan, 9/9 AM pp. 103-106 (defining "tipping point"); Elhauge, 9/11 AM pp. 42-43 (Retractable's R&D has decreased).

Third, while the stay is in place, Retractable's ability to push new innovations forward is an uphill struggle because the platform of its original innovations remains illegally tilted. Retractable is readying second generation retracting needle products for market entrance. *See* Wilson Decl. Ex. 20, FDA Premarket Notification Letter on EasyPoint® Needle, dated June 17, 2014. Without market correction, BD's lies about retracting products make it just that much harder to get the market to try new retracting needle products.

In sum, the status quo continues irreparable market harm to Retractable's efforts to innovate. A stay, once granted, could stretch out indeterminately. For example, on its Rule 60 challenge to the Court's 2010 patent judgment, BD moved for rehearing and rehearing en banc after losing before a unanimous panel and just recently requested an extension of time to file a petition for writ of certiorari. There is little reason to believe BD will not pursue every appellate remedy and every extension of time available to it. BD's conduct would be rewarded by extending the illegal effects of market manipulation as patents run out, a plant remains underutilized, and new product launches are hampered by a false history BD manufactured.

### 4. BD Has Not Made a Strong Showing that It Is Likely to Succeed on the Merits.

BD has not made a strong showing that it is likely to succeed on the merits. The injunction is proper under both the antitrust laws and the Lanham Act. In its motion, BD does not deny that it deliberately conveyed false information to the market from 2004 forward. The injunctive relief is aimed at preventing future harm – not just to RTI, but also to the market and

the public. BD identifies four legal arguments on which it claims it will prevail, all of which this Court has already considered and rejected.

### a. *BD is wrong about res judicata.*

BD has not made a strong showing that it is likely to succeed on the merits of its res judicata argument.

Application of res judicata was extensively briefed and argued in summary judgment and post-trial motions.[2] This Court properly rejected BD's arguments at every turn.[3] In denying BD's motion for judgment as a matter of law, this Court specifically found that RTI's claims were not barred by res judicata. Dkt. 651. In its Order, the Court analyzed the *Oreck* decision (on which BD relies in its motion to stay) and the principles of res judicata and concluded:

> "Because RTI's allegations—and the questions before the jury—only involve BD's conduct engaged in after the July 2, 2004 dismissal of RTI's previous lawsuit, res judicata does not bar RTI from asserting these allegations in the instant lawsuit."

Dkt. 651 p. 12 (emphasis added).[4]

---

[2] *See* BD's BD's Motion for Partial Summary Judgment on Affirmative Defense of Res Judicata and Reply (Dkt. 175, 178, and Dkt. 259); RTI's Response and SurReply (Dkt. 249 and Dkt. 274); BD's Objection to Magistrate Judge's Report and Recommendation and Reply (Dkt. 441 and Dkt. 455); RTI's Response and SurReply (Dkt. 449 and Dkt. 459); BD's Motion for Judgment as a Matter of Law and Reply (Dkt. 589 pp. 40-43, and Dkt. 613 pp. 18-19); RTI's Response and SurReply (Dkt. 599 pp. 47-49 and Dkt. 615 pp. 17-18).

[3] Magistrate Judge's Report and Recommendation (Dkt. 415); Court's Order Denying Summary Judgment (Dkt. 499); Court's Order Denying Motion for Judgment as a Matter of Law (Dkt. 651 pp. 9-12).

[4] This Court provided reasoning behind this conclusion that res judicata did not bar RTI's claims, including the following discussion:

> "The Court [discussing *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*] also quoted Professors Wright and Miller, who opine that '[a] substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues.' *Id.* (citing 18 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4409, at 227 (2002)). After acknowledging that this rule 'affords some opportunity to generate new claims by manipulating the underlying facts,' Wright and Miller conclude that 'to the extent that greater protection is needed, it is better to rely on issue preclusion.' Wright, Miller & Cooper, *supra* at 249, 251. Of course, issue preclusion is not available to BD here because there was no actual adjudication of any issues in the first suit."

Dkt. 651 p. 12 (footnotes omitted).

Given the extensive briefing already submitted, the clear law, and this Court's well-reasoned decision, BD has made no showing, much less a strong showing, that it is likely to succeed on the merits of its res judicata defense.

### b. *BD is wrong that deception does not qualify as anticompetitive conduct.*

BD has not made a strong showing that it is likely to succeed on the merits of no-antitrust-conduct defense.

Like BD's failed res judicata defense, BD's no-antitrust-conduct argument was extensively briefed and argued in summary judgment and post-trial motions.[5] Again, this Court rejected BD's arguments at every turn.[6] In denying BD's motion for judgment as a matter of law, this Court reasoned:

> "BD's next argument, that the false advertising and patent portions of RTI's case cannot, as a matter of law, ever constitute anticompetitive conduct, is also without merit. . . . <u>BD's argument that false and deceptive statements can never, as a matter of law, be anticompetitive is similarly flawed</u>."

Dkt. 651 pp. 4-5 (emphasis added).[7] This court noted how BD's course of conduct, which obviously included its false ads, ran afoul of the antitrust laws by limiting innovation:

> "Furthermore, <u>BD's business practices also limited innovation</u>. Innovation and market competition go hand-in-hand, and <u>antitrust laws protect</u> both."

---

[5] *See* BD's Motion for Summary Judgment (Dkt. 173 pp. 25-29); RTI's Response (Dkt. 360 pp. 7, 27-29); BD's Objection to Magistrate Judge's Report and Recommendation and Reply (Dkt. 371 pp. 21-23 and Dkt. 403 pp. 9-10); RTI's Response and SurReply (Dkt. 392 pp. 6-7, 11-16, and Dkt. 438 pp. 8-10); BD's Motion for Judgment as a Matter of Law, Reply and Brief addressing Supplemental Authority (Dkt. 589 pp. 2-13, Dkt. 613 pp. 3-5, and Dkt. 647); RTI's Response, SurReply and Response to Supplemental Authority (Dkt. 599 pp. 9-10 and 22-27, Dkt. 615 pp. 3-6, and Dkt. 650).

[6] Magistrate Judge's Report and Recommendation (Dkt. 367); Court's Order Denying Summary Judgment (Dkt. 496); Court's Order Denying Motion for Judgment as a Matter of Law (Dkt. 651 pp. 9-12).

[7] This Court explained how BD's deception injured the market and how its false advertising was anticompetitive:

> "RTI also presented evidence showing that BD continued to make its 'World's Sharpest Needle' (and other) advertising claims that it knew were false or misleading because they were 'foundational, differentiating claims' and '[l]osing them would potentially have a devastating effect on [BD's] ability to command premium pricing.' . . . Accordingly, <u>there was ample evidence of anticompetitive conduct</u> to support the jury's verdict."

Dkt. 651 pp. 5-6 (emphasis added).

Dkt. 652 p. 13 (emphasis added).[8]

BD's arguments for a stay add nothing to its previously-rejected efforts to immunize itself from liability by urging the Court to view aspects of its conduct in isolation. The law clearly prohibits this. *See, e.g.*, Plaintiffs' Response to BD's Motion for Judgment as a Matter of Law (Dkt. 599) pp. 22-25. Moreover, the two cases cited by BD, which it cited in its earlier papers, do not change this conclusion. RTI previously explained why *Nw. Power Prods., Inc. v. Omark Indus., Inc.,* 576 F.2d 83, 88-89 (5th Cir. 1978), and *Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 524 (5th Cir. 1999), do not support BD's positions. Interestingly, in prior briefing, BD argued that the question of whether false advertising constituted anticompetitive conduct was determined by a 6-factor test. While RTI disagrees that a 6-factor test is required, the mere existence of a 6-factor test necessarily means false advertising can qualify as anticompetitive conduct that violates the antitrust laws.

### *c. BD is wrong about dangerous probability of success.*

BD has not made a strong showing that it is likely to succeed on the merits of no-dangerous-probability-of-success defense.

This matter was extensively briefed and argued in post-trial motions.[9] Again, this Court considered and rejected BD's arguments.[10] In denying BD's Motion for Judgment as a Matter of Law, the Court held:

> "When coupled with evidence showing BD's already high market share and very high barriers to entry, there was sufficient evidence for the jury to conclude that

---

[8] Similarly, in discussing how RTI proved antitrust injury, the Court explained how BD's conduct injured competition: "RTI submitted evidence that, because RTI was the only other relevant retractable syringe manufacturer during the pertinent time period, <u>harm to RTI injured competition by raising market-wide costs and constraining innovation, among other deleterious effects</u>. *See, e.g.*, 9/11 AM Tr. pp. 111:11–112:22." Dkt. 651 p. 7 (emphasis added).

[9] *See* BD's Motion for Judgment as A Matter of Law and Reply (Dkt. 589 pp. 16-22 and Dkt. 613 pp. 9-11); RTI's Response and SurReply (Dkt. 599 pp. 15-16, 28-32 and Dkt. 615 pp. 9-11).

[10] Court's Order Denying Motion for Judgment as a Matter of Law (Dkt. 651 pp. 6-7).

> BD had a dangerous probability of success. . . . Accordingly, there was sufficient evidence to support the jury's conclusion that <u>BD possessed a dangerous probability of achieving market power</u>."

Dkt. 651 p. 7 (emphasis added).

### d. *BD is wrong that the Court does not have the power to issue an injunction in these circumstances.*

BD has not made a strong showing that it is likely to succeed on the merits of its absence-of-findings-to-support-injunction defense. Without even debating BD's legal proposition on what is required for an injunction, the record and the Court's findings are clear that BD's misinformation campaign is still tainting the market, and will continue to do so until it is corrected, and thus even under BD's interpretation, the injunction is proper.

The propriety of injunctive relief was briefed by both parties.[11] And the Court addressed this specific issue and explained that the injunction was necessary because, among other things, of the lasting, future harm caused by BD's deception. In several portions of its Orders, the Court explained the future harm and why the injunctive relief was necessary to combat it. For example, the Court acknowledged that the "<u>lingering impressions created by more than six years of false advertisements</u> cannot be cured by simply transferring a portion of BD's past sales to RTI." Dkt. 652 p. 13 (emphasis added). And in discussing the harm to the market, the Court explained that "BD must take specific corrective action <u>to remove the stain of its false advertisements</u>," and that "[i]njunctive relief is therefore <u>necessary to protect and foster innovation in the marketplace</u>." Dkt. 652 p. 14 (emphasis added). In the same vein, the Court explained why BD's proposed injunction was insufficient – it did nothing to ameliorate the lasting effects of its past lies: "Additionally, BD's proposed injunction . . . does not <u>require BD to take any action regarding the false ads that are already in the marketplace</u>." Dkt. 652 p. 14

---

[11] RTI's Motion for Injunction and Reply (Dkt. 593 and Dkt. 612 pp. 1-10); BD's Response and SurReply (Dkt. 605 and Dkt. 618 pp. 1-4, 8-9).

(emphasis added and citing, among other things, to 9/16 PM Tr. pp. 198-99 (a large medical distributor advertising BD's cost calculator with the false waste space numbers on its web site as recently as 2013)).[12] The Court was right and nothing in BD's motion undermines the Court's conclusions.

Moreover, Professor Scott explained the persistence of beliefs and how the harm continues into the future after the advertising has stopped. Scott, 9/12 PM p. 23.[13] And as demonstrated in the attached declarations, there are still many examples of BD's lies being perpetuated in the market, creating future harm.

## CONCLUSION

As shown above, all four of the considerations for issuance of a stay decidedly weigh against that action. Retractable respectfully urges the Court to maintain its order in place and let truth begin to dawn in the safety syringe market on January 15, 2015. As the Court appreciates, pervasive, continuing public health dangers, the answer to which hinges on adoption of superior, innovative products, are at stake.

---

[12] In its discussion of Disgorgegment, the Court also noted: "BD continued to publicize its false waste space and sharpest needle claims through at least 2010, and BD benefited from third-party use of these advertisements through at least 2013. PX 574–576 (ongoing BD use into 2011); 9/16 PM Tr. pp. 198-99 (third-party use during trial). This evidence showed continued and knowing use of false advertising claims that either disparaged competitors or praised BD." Dkt. 652 p. 6.

[13] "[M]uch psychological literature, and there's also marketing literature, that suggests that once you -- once consumers really have a firm conclusion in their mind, then it can be very hard to undo it, because over time, you've built up a lot of reasons why it should be the truth. . . . And it's just like if one of your well-known advertisers stopped using its favorite -- your favorite slogan tonight, you wouldn't forget it tonight. You know, it would still be in your brain for some period of time. And how long it might take for that to all dissipate in the marketplace is -- you know, that could be a period of time. . . . It could take a long time."

14

Date:  December 16, 2014                           Respectfully submitted,

/s/ Roy W. Hardin
Roy W. Hardin
Texas Bar No. 08968300
Stephen D. Wilson
Texas Bar No. 24003187
Paul F. Schuster
Texas Bar No. 00784931
Mark R. Backofen
Texas Bar No. 24031838
Susan E. Adams
Texas Bar No. 24059354
LOCKE LORD, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Telephone: (214) 740-8000
Facsimile: (214) 740-8800
E-mail: rhardin@lockelord.com

| Otis Carroll | G. William Lavender |
|---|---|
| State Bar No. 03895700 | State Bar No. 11999590 |
| Deborah Race | Lavender Law |
| State Bar No. 16448700 | 210 N. State Line Ave., Suite 503 |
| IRELAND, CARROLL & KELLEY, PC | Texarkana, Arkansas 71854 |
| 6101 S. Broadway, Suite 500 | Telephone: (870) 773-3187 |
| Tyler, Texas 75703 | Facsimile: (870) 773-3181 |
| Telephone: (903) 561-1600 | E-mail: blav@lavenderlaw.com |
| Facsimile: (903) 581-1071 | |
| Email: ncrim@icklaw.com | |
| Jim Parsons | Monty L. Ross |
| State Bar No. 00000065 | Texas Bar No. 17297300 |
| Jim Parsons Law Offices | Ross Barnes LLP |
| 1007 N. Mallard St. | 801 E. Campbell Road, Suite 390 |
| Palestine, Texas 75801 | Richardson, Texas 75081 |
| Telephone: (903) 723-0580 | Telephone: 214.420.2300 |
| Facsimile: (903) 723-0580 | Facsimile: 214.420.2299 |
| E-mail: jparsons@jimparsons-law.com | Email: mross@rossbarneslaw.com |

ATTORNEYS FOR PLAINTIFFS
RETRACTABLE TECHNOLOGIES, INC.
AND THOMAS J. SHAW

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/ Roy W. Hardin