### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **RETRACTABLE TECHNOLOGIES, INC., et al.** | § § § | |
| **v.** | § § | **Case No. 2:08-CV-16** |
| **BECTON, DICKINSON AND CO.** | § § § | |

### ORDER

Before the Court is Becton, Dickinson and Co.'s ("BD") Motion for Stay of the Injunction (Docket No. 659).  For the reasons below, the Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

### BACKGROUND[1]

On September 30, 2014, this Court denied BD's Renewed Motion for Judgment as a Matter of Law, or Alternatively, for New Trial or Remittitur.  Docket No. 651.  On November 10, 2014, this Court denied the majority of RTI's request for injunctive relief.  Docket No. 652 (the "Injunction Order").  The Court ordered the following injunctive relief:

1. BD shall not advertise or otherwise state in its marketing activities that BD safety syringes have the "World's Sharpest Needle" or any similar assertion of superiority in sharpness, or reduced patient pain as a result of needle sharpness, for a period of five years from this Order.

2. BD shall notify all customers who purchased BD syringe products from July 2, 2004 to the date of this Order that BD wrongfully claimed that its syringe needles were sharper

---

[1] The detailed background between the parties has been documented several times.  *See, e.g.*, Docket No. 652 at 1–3.

than competitors', including RTI's, and that its statement that it had "data on file" proving the sharpness claim was false and misleading.

3. BD shall notify all employees, customers, distributors, Group Purchasing Organizations, and government agencies that: (1) the dead space of the VanishPoint syringe has been within the ISO standard of 0.07 mL dating back to at least July of 2004; (2) that BD overstated the dead space of the VanishPoint syringe to represent that it was higher than BD's conventional syringe, Safety-Lok, SafetyGlide, and Eclipse products when it was actually less than all of those products and (3) that BD's statement that data on file was false and misleading. In addition, BD shall post the notice on its web site where information regarding syringes is presented and shall maintain such notice on its web site for a period of 3 years.

4. BD shall not advertise or otherwise allege in its marketing activities that its syringe products save medication as compared to Retractable's VanishPoint syringes for a period of 3 years. BD shall destroy all marketing, training, and sales materials that currently include such allegations.

5. BD shall notify all of its employees, customers, distributors, Group Purchasing Organizations, and government agencies that its web site, cost calculator, printed materials and oral representations alleging that BD's syringes save medication as compared to Retractable's VanishPoint syringe were based on false and inaccurate measurements of Retractable's VanishPoint. In addition, BD shall post this notice on its web site where information regarding syringes is presented and shall maintain such notice on its web site for a period of 3 years.

6.  BD shall implement a comprehensive training program for its employees and distributors that specifically instructs employees and distributors not to use old marketing materials and not to make false representations regarding Retractable's VanishPoint syringes.

Docket No. 652 at 15–16.  The Court originally gave BD 66 days to comply with the injunction. *Id*. at 15.  However, after BD moved for an extension, the Court extended the deadline an additional 30 days.  Docket No. 667.  On December 8, 2014, BD appealed the Injunction Order to the United States Court of Appeals for the Fifth Circuit.  Docket No. 658; *Retractable Technologies, Inc., et al v. Becton Dickinson & Company*, 14-41384 (5th Cir. Dec. 8, 2014).  BD now moves the Court to stay the injunction pending the appeal.

## APPLICABLE LAW

A denial of a stay pending appeal is reviewed for abuse of discretion.  *Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x 389, 392 (5th Cir. 2013).  The factors for evaluating the appropriateness of a stay pending appeal are well established: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  "The first two factors of the traditional standard are the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The movant for a stay pending appeal carries the burden to satisfy the four factors and it is not entitled to the stay as a matter of right. *Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x at 392.

## ANALYSIS

### *Likelihood of Success on the Merits*

BD "submits that it is likely to succeed on the merits of its appeal" based on the arguments contained within its Renewed Motion for Judgment as a Matter of Law (Docket No.

598).  Docket No. 659 at 3.  BD does not expound on those arguments, but provides a list summarizing what it apparently believes are its strongest arguments on appeal.  *See Id.*  RTI responds that "the injunction is proper under both the antitrust laws and the Lanham Act."  Docket No. 663 at 9.

As RTI points out—and BD tacitly concedes—BD's arguments were extensively briefed in the post-trial motions and largely rejected.  *See* Docket No. 663 at 10–14.  BD offers no support for the notion that arguments rejected on summary judgment and at post-trial nevertheless will be successful on appeal.  If this were the case, then this factor would necessarily always favor a stay as a party could succeed by merely citing to its arguments at post-trial.  Injunctive relief was hotly contested throughout this litigation, and the Court considered BD's arguments on the matter.  The Injunction Order granted part of RTI's requested injunction and denied the rest.  For BD to say it will likely be successful on appeal without presenting any argument that has not already been raised and rejected, or pointing out a specific error in the Court's reasoning, is insufficient to carry its burden.

Nevertheless, the Court is mindful of the legal complexities in this matter.  Furthermore, the Court had to exercise considerable judicial discretion in determining which portions of RTI's requested injunctive relief to grant and which portions to deny.  The realities of this case distinguish it from what could be considered a more straightforward appeal of a case that only involved false advertising.  Accordingly, this factor is neutral.

***Irreparable Harm to BD***

Although the injunction has six categories of relief, BD focuses on the notice requirement whereby BD must send written notices that its advertisments were false and misleading to

customers (and customer-like entities) who purchased BD syringes from July 2004 onward.[2] Docket No. 659 at 4.  Given the volume of syringes BD has sold since 2004, BD notes "this is no ordinary undertaking," and will involve contacting "tens of thousands of hospitals, healthcare providers, product distributors and government agencies."  *Id*.  BD further notes that "[o]nce the mandated notices are delivered, they cannot be retrieved or undone."  *Id*.  Thus, BD argues, once the notices have been sent, any appellate relief on this requirement would be moot.  *Id*.

RTI responds that "[d]isclosing the truth will not irreparably harm BD."  Docket No. 663 at 6.  RTI contends that the "injunction simply requires BD to publicly acknowledge what it admitted and/or was proved in open court—that it made false statements that misled the market and its customers about sharpness and deadspace/medication wastage."  *Id*. &  n.1.  According to RTI, BD is advocating a position whereby "every injunction that ordered any disclosure would automatically qualify for a stay."  *Id*.

The instant disclosures run the risk of causing irreparable harm.  At trial, RTI showed that BD knowingly used false advertisements to suppress the competitive threat that RTI's retractable syringes posed to both BD's conventional and retractable syringe products.  The mandatory disclosures are therefore tailored to achieve two goals: (1) correct the false information in the marketplace; and (2) address the anticompetitive harm to the retractable syringe market that the false claims caused.  The disclosures require BD to correct inaccurate information regarding needle sharpness and wastespace and also disclose that BD's previous ads were wrongfully disseminated and misleading.  If BD does obtain appellate relief, irreparable harm from correcting inaccurate information (the first goal) would likely be negligible.  However, the threat of irreparable harm from the public confession of wrongdoing (the second

_____

[2] The date of July 2004 is to separate BD's use of the advertisements prior to the settlement and dismissal of the parties' previous lawsuit on July 2, 2004.  *See* Docket No. 651 at 9–14.

goal), however accurate, would likely be significant.  For example, BD may not face irreparable harm by acknowledging that its wastespace calculations were wrong, but it would face irreparable harm by unnecessarily admitting to customers that it intentionally misled them. Accordingly, this factor weighs in favor of a stay.[3]

***Substantial Injury to RTI***

BD argues that a stay will not injure RTI.  Docket No. 659 at 6.  For support, BD relies on the fact that RTI did not identify the specific false advertisements until its amended complaint in July 2010.  *Id*.  BD further claims to have "stopped using the challenged advertising claims," thereby limiting any harm to RTI if the injunction is stayed.  *Id*.  Finally, BD submits that "any risk to RTI from a stay can be mitigated by a bond securing the injunction."  *Id*.   RTI responds that it will suffer significant injury if the injunction is stayed.  Docket No. 663 at 8.  According to RTI, BD's anticompetitive conduct has prevented RTI from achieving sustainable operations. *Id*.

A stay of the injunction would result in substantial injury to RTI.  Although RTI did not identify the specific false advertisements until its amended complaint in 2010, BD's implication that RTI did not treat the repercussions of these advertisements as time-sensitive is disingenuous. RTI has been aggressively pursuing its rights against BD since its initial lawsuit in 2001 and has tried to limit the damage caused by false advertisement claims since at least that time.  *See* Docket No. 652 at 8 (Post-trial Order rejecting BD's laches arguments).

Further, BD's familiar refrain that it has "stopped using the challenged advertis[ements]" needs to be addressed.  BD severely mischaracterizes its culpability in this regard.  The fact that

---

[3] The Court is not persuaded by BD's argument that the notice requirement is so burdensome as to cause irreparable harm.  *See* Docket No. 659 at 4.  BD will have had over 90 days to comply with this requirement, and though the cost of sending these notices is not negligible, it is not overly burdensome compared to the damages award of over $340 million.

BD itself no longer disseminates these advertisements is a necessary step to remove the advertisements from the marketplace, but not a sufficient one.[4]   BD conspicuously omits the third-party distributors, resellers, Group Purchasing Organizations, and others that are continuing to use the false claims at issue here.  Docket No. 642 (RTI's "Notice of Additional Evidence of Irreparable Harm" listing several BD distributors that continue to use the false advertising claims as of January 2014); PX 574–76 (ongoing BD use into 2011); 9/16 PM Tr. at 198–99 (third-party use during trial).  Not only has RTI provided sworn affidavits that BD's own website used the false claims in 2014, but BD does not dispute that third-party resellers, including ones with whom it has ongoing relationships with, continue to use the false claims.  *See* Docket No. 642. BD sells significant quantities of its syringes through such third-party distribution channels, and the false advertising claims in those channels result in significant harm to RTI.  BD cannot escape culpability by creating and endorsing false advertisements for more than six years, and then claim to not be "using" the ads merely because they are being disseminated by third parties with whom BD maintains relationships.

By all accounts, RTI has suffered harm due to BD's conduct.  RTI has sought the Court's intervention to address its injury.  If the injunction is stayed, RTI will continue to suffer. Accordingly, this factor weighs against a stay.

***Public Interest***

BD argues that the public interest lies in granting a stay because "a stay would serve the public interest in the orderly administration of justice, by preserving the opportunity for effective

---

[4] Additionally, RTI has provided post-trial evidence that BD continues to use these false claims on its own website.  *See* Docket No. 663-3 at 10–14 (Wilson Declaration listing several false claims that appeared on BD's website throughout 2014).

appellate review of the Injunction Order." Docket No. 659 at 7. BD claims there is no threat of public harm because it has "discontinued [the] use of the alleged false advertising claims." *Id*.

RTI argues that the public interest in this case is particularly important and that it strongly favors denying a stay. Docket No. 663 at 3. RTI asserts that the evidence at trial showed that retractable needles are a superior way to prevent needlesticks, which are a serious health and safety concern in the healthcare industry. *Id*. at 3–5. According to RTI, a stay would keep retractable needles out of the marketplace, thereby resulting in a larger number of needlesticks. *Id*. RTI claims this safety hazard makes the public interest "especially pronounced." *Id*. at 5.

The public interest lies in denying a stay of the injunction. As an initial matter, BD's claim that it has discontinued the use of the false advertising claims is rejected for the reasons set forth above. Additionally, as the Court previously noted, "[t]he public has an interest in truthful information and advertising. Here, the public interest is especially pronounced because this suit involves safety products. BD's false advertising resulted in an artificially inflated price for BD syringes, but also lowered the number of RTI syringes in the marketplace." Docket No. 652 at 9. Accordingly, this factor weighs against a stay.

***Weighing the Factors***

Two factors favor denying a stay, one factor favors granting a stay, and one factor is neutral. The one factor favoring a stay (irreparable harm to BD) can be mitigated by a partial stay of the injunction. Doing so would result in all factors disfavoring a stay or being neutral.

In both its Motion for an Extension (Docket No. 569) and the instant Motion, BD focuses on the mandatory disclosure requirement.[5]  BD paints the disclosure requirement with too broad a brush, wrongly grouping all the written notice requirements together without distinction as to whether the notice must be sent to BD employees, third-party distributors, or end-user customers.[6]  The mandatory disclosure to end users, such as hospitals and clinics, serves different purposes than the written notices to employees, GPOs, distributors, and other resellers. The first group (end users) directly uses BD's syringes and likely does not re-disseminate the false advertisements.  The second group (distributors) consists of individuals and organizations that most likely have re-disseminated the false advertising claims.  BD faces a larger threat of irreparable harm from admitting its wrong doing to the end users who ultimately drive the demand of its syringes, compared to the distributors who merely resell the syringes based on that demand.  At the same time, the distributors create a larger injury for RTI because they are more likely to publicly disseminate the false advertising claims compared to the end users.

Considering these facts, the equitable solution is a partial stay of the injunction.  Pending the appeal of this matter in its entirety, BD is not required to send the mandatory disclosure to end users who have purchased syringes from July 2, 2004 to the date of the Injunction Order, November 10, 2014.  This includes entities such as hospitals, clinics, and other healthcare providers that do not resell the syringes in the ordinary course of business.  However, BD

---

[5] BD's arguments regarding the disclosure requirement do not support or justify staying the other portions of the injunction.

[6] By characterizing the "mandatory injunctive relief" so broadly, BD unnecessarily includes the required comprehensive training program for its employees and distributors instructing them not to use the old marketing materials.  Nothing in BD's Motion addresses the comprehensive training program and none of BD's reasoning supports excusing BD from instructing its own employees and distributors to stop using the false advertisements.  In fact, implementing the program would be consistent with BD's repeated claims to have stopped using the advertisements.

**SHALL** send the mandatory disclosures to its employees, customers, distributors, and Group Purchasing Organizations.  This includes any entity who in the normal course of business resells the syringe, or any entity whose normal course of business is to publicly disseminate BD advertisements.  BD **SHALL** comply with the injunction in all other regards no later than **February 14, 2015**.

The Court recognizes that a partial stay places a hardship on RTI.  It prevents end users from having a full and accurate view of retractable syringes.  Nevertheless, this is the current status quo.  Attempting to change the status quo at this point places an even greater hardship on BD: forcing BD to send out mandatory disclosures to end users cannot be readily undone in the event BD receives appellate relief.  On the other hand, RTI's hardship is partially addressed by ordering BD to comply with the other portions of the injunction, and will be further addressed at the appropriate time if BD does not obtain appellate relief.  Accordingly, maintaining the present circumstances with regards to the end users is the more equitable result.

**CONCLUSION**

Accordingly, the Motion (Docket No. 569) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**So ORDERED and SIGNED this 14th day of January, 2015.**



_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**