# United States District Court

**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC. | § | |
| and THOMAS J. SHAW | § | |
| | § | Civil Action No.  2:08-cv-16 |
| v. | § | Judge Mazzant |
| | § | |
| BECTON, DICKINSON AND COMPANY | § | On Remand |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On remand from the Fifth Circuit, the Court has been instructed to determine whether Retractable Technologies, Inc. ("RTI") is entitled to an award of Becton, Dickinson and Company's ("BD") profits as an equitable remedy under the Lanham Act. The Court heard arguments based on the trial record and updated briefing for the limited purpose of determining whether and how much profit BD should disgorge for falsely advertising in violation of the Lanham Act.[1]

The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law, and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

## FINDINGS OF FACT

Parties and Products

1. Becton, Dickinson and Company was founded in 1897 and is a leading manufacturer of medical devices. BD is a New Jersey corporation with its principal place of business in

---

[1] The United States District Judge Leonard Davis presided over this case until his retirement, upon which the case was reassigned on April 28, 2015, to the undersigned (Dkt. #709).

Franklin Lakes, New Jersey. BD manufactures hypodermic needles, syringes, and IV catheters. ROA 11693–94.[2]

2. Retractable Technologies, Inc. is a Texas corporation with its principal place of business in Little Elm, Texas. RTI is also a medical device company and primarily manufactures hypodermic needles and syringes.

3. BD manufactures both "conventional" and "safety" syringes. Conventional syringes are common, plastic, hypodermic needles that have been in the industry for many years. Safety syringes generally serve similar functions as conventional syringes, but have various mechanisms to reduce the chance of accidental needlesticks. The four main safety syringe types are shielding needles, pivoting needles, sliding sleeve needles, and retracting needles. The principal competitors in the safety syringe market are BD, Covidien Ltd., Smiths Medical, Terumo, and RTI. ROA 10378.

4. In 1988, BD introduced the first safety syringe, the Safety-Lok, which features a sliding sleeve to help prevent accidental needlesticks. PX576 at p. 327. BD also manufactures a pivoting needle Eclipse syringe, a shielding needle SafetyGlide syringe, and the primary product at issue in this litigation, the retracting Integra syringe. ROA 10386–90. The SafetyGlide, Eclipse, and Integra syringes are needle-based devices. ROA 10141–44. The safety mechanism is part of the needle, which can be removed and changed as clinically required. ROA 10156. Conversely, syringe-based devices' safety mechanisms cannot be removed and changed as clinically required.

5. Unlike RTI, BD manufactures and markets over 130 types of conventional needles and syringes. These products, ranging in volume from 1mL to 60mL, are used for purposes

---

[2] "ROA" refers to the record on appeal that the parties submitted to the Fifth Circuit and utilized on remand to this Court.

other than giving injections to patients, such as drawing fluid from joints, irrigating wounds, collecting blood, and administering medication with intravenous pumps. ROA 10186–91. BD sold nearly 12 billion conventional syringes during the relevant period. DX2155.

6. In 1989, RTI's founder, Thomas Shaw ("Shaw"), developed and patented retractable syringe technology, a groundbreaking innovation in which the needle retracts into the body of the syringe after an injection. RTI's primary product, the VanishPoint syringe, has a fixed, retractable needle used for injections but is not adaptable for other clinical uses. The VanishPoint is a syringe-based safety device and is limited to delivering injections to patients through the skin. ROA 8623–24.

<u>Procedural Background</u>

7. On June 15, 2007, RTI filed a complaint in the Eastern District of Texas alleging various antitrust, false advertising, and business tort claims. The complaint also alleged BD's Integra syringe infringed on RTI's VanishPoint design patent. ROA 105.

8. On January 18, 2008, the Court severed RTI's patent claims and stayed the antitrust, false advertising, and other non-patent claims. ROA 105–09.

9. On November 9, 2009, the jury in the patent trial returned a verdict of infringement against BD with respect to its 1mL and 3mL Integra syringes.  The jury rejected RTI's willfulness claim and awarded RTI $5 million in damages. ROA 23138–43.

10. On July 8, 2011, the Federal Circuit upheld the judgment only as to the 1mL Integra, which BD then removed from the market. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1301 (Fed. Cir. 2011).

11. On January 7, 2013, the Supreme Court of the United States denied RTI's petition for writ of certiorari. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 133 S. Ct. 833 (2013). BD paid the $5 million judgment.

12. On May 24, 2010, the Court lifted the stay on RTI's non-patent claims. ROA 349. On July 23, 2010, RTI filed a second amended complaint for the remaining non-patent claims. ROA 588–93.

13. On May 13, 2011, RTI filed its third amended complaint (the "Complaint") alleging antitrust violations under the Sherman Act, Clayton Act, Texas Antitrust Act, and common law; false advertising under the Lanham Act; product disparagement; and tortious interference with prospective contract or business relations (Dkt. #73).

14. Specifically, the Complaint alleged that BD violated the Sherman Act by attempting to monopolize the markets for hypodermic syringes, safety syringes and needles, IV catheters, and safety IV catheters. ROA 11841.

15. RTI's central antitrust claim was that BD allegedly used "exclusionary" contracting and discount practices—including sole source contracts with hospitals, market share rebates, and loyalty discounts—to acquire or attempt to acquire monopoly power. ROA 11769–864.

16. Regarding false advertising, the Complaint alleged that BD violated the Lanham and Sherman Acts by making three allegedly false claims. First, RTI alleged that BD falsely promoted certain syringes as "safe." ROA 11763–64. Second, RTI alleged that BD falsely advertised its Integra syringe as having less waste space than RTI's VanishPoint syringe. ROA 11721–44. Finally, RTI alleged that BD falsely promoted its hypodermic needles as the "world's sharpest." ROA 11764–69.

17. A jury trial was held in Tyler, Texas, before United States District Judge Leonard Davis between September 9 and September 19, 2013. At the close of evidence, the Court ruled that RTI had failed to prove its "Safety and Superiority of Automatic Retraction" claims. ROA 11036–37. There was insufficient proof that BD falsely promoted its syringes as "safe," and the Court did not permit those claims to go to the jury "due to lack of evidence." ROA 6638.

18. Also at the close of evidence, RTI withdrew its claim for damages (but not equitable relief) under the Lanham Act and all state law claims for product disparagement, tortious interference, and unfair competition. ROA 6021, 11135.

19. The Court charged the jury to determine whether BD falsely advertised its waste space comparison. Waste space refers to the parts of the syringe where medicine can get trapped and remain after an injection is given. ROA 10251–52. BD began advertising its Integra syringe as having less waste space than RTI's syringe in 2002 when it first launched the 3mL Integra. ROA 10257. Specifically, the jury was charged with determining whether the following BD "waste space comparison" claims constituted false advertising under the Lanham Act: 1) BD's claims regarding the waste space of RTI's VanishPoint syringes; 2) BD's claims that users could not get the full number of doses from a multi-dose vial using RTI's VanishPoint syringes; and 3) BD's claims regarding the degree of medication and cost-savings related to waste space. For each of these waste space comparison claims, the jury was asked to determine whether BD falsely claimed it had "data on file" to support them.  ROA 6003–05, 11184–85.

20. The Court also charged the jury to determine whether BD's "world's sharpest needle" claim constituted false advertising under the Lanham Act. The jury was also asked to

determine whether BD falsely claimed it had "data on file" to support it manufactured the world's sharpest needle. ROA 6003–06.

21. Regarding the alleged Lanham Act violations, the jury was instructed that if it determined "that BD made a statement that is literally false," then it should "presume that the statement is material and deceptive." ROA 11188–89. Because of this instruction, and because RTI dropped its claim for Lanham Act damages, the jury was never asked to determine whether, and to what degree, BD's Lanham Act violations caused any injury or losses to RTI. The jury was instead instructed, "RTI has only asked you to determine antitrust damages, so when you are determining damages, you should only award damages for RTI's antitrust claims." ROA 11189.

22. On September 19, 2013, the jury returned a verdict finding BD violated Section 2 of the Sherman Act for attempting to monopolize the safety syringe market. The jury rejected RTI's claims that BD had monopolized or attempted to monopolize the other two markets—the conventional syringe market and the safety IV catheter market. The jury also rejected RTI's claims that BD violated Section 1 of the Sherman Act and Section 1 of the Clayton Act in all three relevant markets. ROA 6113–14.

23. The jury also found BD engaged in false advertising under Section 43(a) of the Lanham Act for each of the following categories of claims: "Waste space claims," "Waste Space 'Data on File' Claims," "World's Sharpest Needle Claims," and "World's Sharpest Needle 'Data on File' Claims." (Dkt. #577 at p. 5).

24. Regarding the alleged antitrust violations, the verdict form divided RTI's antitrust damages into "Anticompetitive Contracting," which referred to BD's contracting and pricing

6

practices, and "Deception," which referred to BD's alleged false advertising, patent infringement, and market tainting. ROA 6115.

25. The jury awarded RTI $113,508,014 in "Deception" damages for BD's antitrust violations. The jury found no damages for "Anticompetitive Contracting" in any of the three relevant markets. ROA 6115.

26. After trial, BD filed a Motion for Judgment as a Matter of Law, or Alternatively, for New Trial or Remittitur, challenging the jury's Lanham Act and Sherman Act findings on an evidentiary basis. ROA 6147–207. The Court denied BD's motion, stating, "RTI produced evidence sufficient to support a conclusion that BD's literally false claims were materially deceptive and injured RTI." The Court entered judgment for RTI for $340,524,042 after trebling the antitrust damages. ROA 6612–26.

27. RTI filed a post-trial motion to recover BD's profits under the Lanham Act; a motion for injunctive relief under the antitrust laws and the Lanham Act; and a motion for attorneys' fees under the antitrust laws and the Lanham Act. ROA 31380–437.

28. On November 10, 2014, the Court granted-in-part and denied-in-part RTI's Motion to Recover Defendant's Profits. RTI had calculated BD's total profit on conventional and safety syringes and needles to be $374 million. It subtracted from that figure the antitrust damages award by the jury, $113.5 million, and sought the difference, $260 million in BD profits. ROA 6630. The Court concluded that while "principles of equity require BD to forfeit a portion of its profits," it would not order disgorgement because "any profit to which RTI is entitled [was] included within the $340,524,042 antitrust award." ROA 6631. The Court noted that "BD presented evidence that many sales were made for reasons other than the false advertisements" and that "RTI never alleged nor provided evidence that

100% of BD's conventional sales were due to the false advertisements." ROA 6637. The Court also noted that if "RTI proves only $100 in attributable profits . . . that does not mean RTI is entitled to $260 million" because "it would not be equitable to award $260 million in profits if RTI could only show $100 profits (or less) from diverted sales." ROA 6631.

29. On November 10, 2014, the Court also granted-in-part and denied-in-part RTI's motion for injunctive relief and issued six injunctions relating to BD's needle sharpness and waste space advertising. ROA 6637–42. The Court enjoined BD from using the waste space comparison to RTI and "world's sharpest needle" claim for three years and five years, respectively. ROA 6642. Further, the Court directed BD to implement a comprehensive training program for its employees and distributors to abandon the sharpness and waste space claims and issue written notices to customers, distributors, employees, and Group Purchasing Organizations stating BD wrongfully made false and misleading advertising claims. The Court ordered injunctive relief, in part, to remedy the alleged antitrust violations.

30. On December 8, 2014, BD filed an Emergency Motion for Stay of Injunction. ROA 6662–73. On January 14, 2015, the Court granted-in-part and denied-in-part the motion, determining that BD need not notify the end-users about BD's false advertising tactics pending appeal because "the threat of irreparable harm" from the corrective advertising "would likely be significant." ROA 7127–28. The Court did not stay any other portion of the injunction, including BD's requirement to notify distributors, employees, and Group Purchasing Organizations that BD wrongfully made false and misleading advertising claims.

31. Pursuant to the injunction orders, BD sent notices to over 750 distributors, over 10,000 employees, and all the major Group Purchasing Organizations, stating that its needle sharpness and waste space claims were inaccurate. ROA 6641–42. BD also published a notice on its website.

The Fifth Circuit Opinion

32. BD appealed to the Fifth Circuit, challenging: (1) the Court's denial of its Motion for Judgment as a Matter of Law or Alternatively, for New Trial or Remittitur regarding the attempted monopolization and Lanham Act verdicts; (2) the Court's disgorgement decision; and (3) the Court's mandatory injunctions.

33. On December 2, 2016, the Fifth Circuit issued an opinion reversing BD's liability and damages under the Sherman Act, but affirming the Lanham Act judgment of liability for false advertising. The Fifth Circuit reversed and remanded "for a redetermination of disgorgement damages, if any." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 889 (5th Cir. 2016).

34. The Fifth Circuit set forth the six non-exclusive *Pebble Beach* factors the Court should weigh to determine whether an award of profits is appropriate: "(1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights; (5) the public interest in making the misconduct unprofitable; and (6) whether it is a case of palming off." *Retractable Techs.*, 842 F.3d at 900–01 (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998)).

35. The Fifth Circuit found that "RTI may have lost some sales or market share because of BD's false advertising, but it remains a vigorous competitor, and it did not contend that

BD's advertising erected barriers to entry in the safety syringe market." *Id.* at 895. Further, the Fifth Circuit noted, "not a single buyer's representative came forward to testify to a purchase motivated by the 'world's sharpest needle' and 'lower waste space' claims." *Id.* And "RTI produced no evidence of customers being misled or confused and purchasing BD's syringes instead of RTI's because of the advertisements." *Id.* at 896.

36. On the issue of Lanham Act disgorgement, the Fifth Circuit recognized that subject to principles of equity, a defendant's Lanham Act violations may entitle the plaintiff to a portion of the defendant's profits attributable to the false advertising. The Fifth Circuit noted that even if disgorgement is appropriate under the six-factor test, "if a plaintiff fails to present evidence that the defendant benefitted from the false advertising, the plaintiff may not recover any of the defendant's profits." *Id.* at 901.

37. The Fifth Circuit found "no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising," but remanded "for a thorough re-weighing of the remaining factors and the entirety of the record to determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations. *Id.*

38. The Fifth Circuit directed the Court to "bear in mind that speculative and attenuated evidence of diversion of sales will not suffice," and that the "defendant has the burden of showing all elements of cost and other deductions." *Id.* Finally, the Fifth Circuit directed the Court to reconsider whether injunctive relief is an appropriate remedy. *Id.* at 902.

39. On March 27, 2017, RTI filed an opening trial brief (Dkt. #718). On April 19, 2017, BD filed a pre-trial response brief (Dkt. #727). On April 27, 2017, RTI filed a reply (Dkt. #730). On May 4, 2017, BD filed a sur-reply (Dkt. #733). On May 11, 2017, the Court

heard arguments based on the trial record and updated briefing. On June 16, 2017, the parties filed their proposed findings of fact and conclusions of law (Dkts. #747, #748).

40. In sum, the Fifth Circuit found factors one and four favor disgorgement, but directed the Court to thoroughly reweigh the remaining factors to determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations. Thus, the Court will make its findings of fact and conclusions of law for each factor in turn.

Factor One: Whether the Defendant had the Intent to Confuse or Deceive

41. BD's Integra advertisements claimed its needle was the "the world's sharpest" and featured a "waste space comparison" claim, advertising that it had less waste space than RTI's VanishPoint. PX576 at p. 181–82. BD also advertised Integra's detachable needle, wide flanges for comfort and stability, clear barrel for dosing accuracy, and single-handed activation. PX576 at p. 181–82.

42. In 1991, BD began to claim in some of its advertisements that it made the "world's sharpest needle." DX0009 at p. 2–5. This claim was true at the time it was first introduced.

43. On August 11, 2004, a BD "Sharpness Center of Excellence Laboratory Report" concluded that RTI and three other competitors were "equal to or better than BD." PX617. Further testing in 2005 also concluded that RTI's VanishPoint syringes had sharper needles than BD's Integra. PX624.

44. In December 2004, BD advertised that its needle was the "world's sharpest," despite having data on file proving RTI's VanishPoint was sharper. PX576.  At trial, RTI presented an exhibit with 46 distinct BD advertisements, 8 of which contained the "world's sharpest needle" claim. PX576. Another exhibit contained 134 distinct BD advertisements, 18 of which contained the "world's sharpest needle" claim. PX598.

45. Regarding the waste space claims, BD first introduced the waste space comparison claim when it first launched the 3mL Integra in 2002. At that time, RTI's 3mL counterpart, the VanishPoint, had seven times more waste space than BD's Integra (.185mL compared to .026mL). ROA 10258–59.

46. In June 2005, BD tested RTI's 3mL syringe and discovered it had .12–.14mL of waste space. In July 2005, BD launched its Integra web pages advertising RTI's syringe as having .185 mL of waste space. PX575. The website featured a cost calculator, which compared how much medication costs customers could save by using a lower waste space syringe.

47. On September 26, 2005, BD issued an internal memorandum recognizing RTI's lower-than-advertised waste space and instructed its sales force to use the website's BD Integra cost calculator to show customers that RTI's high waste space made its use more costly than BD's syringes. PX695.

48. In March 2007, BD's Senior Director George Goldman recognized that RTI's new waste space numbers were "closer to 0.13." PX568–99. In June 2008, BD conducted another waste space test and discovered RTI's 3mL VanishPoint syringe waste space was .0561mL. PX628. Despite this knowledge, BD continued to use the false advertising through 2011. *Retractable Techs.*, 842 F.3d at 900. The advertisements continued to compare RTI's VanishPoint syringe to BD's conventional and safety syringes.

49. In September 2008, Senior Director of Marketing Kathy Sullivan suggested to Senior Business Director Michael Ferrara that BD managers should "fight to keep and defend any claims," which include "world's sharpest needle," because "[l]osing them would potentially have a devastating effect on our ability to command premium pricing . . . ." ROA 9684–85.

50. The next month, BD updated its hypodermic marketing materials and kept the "world's sharpest needle" claim. PX598. BD continued to use the false needle sharpness claims through 2011. *Retractable Techs.*, 842 F.3d at 900.

51. The evidence showed that BD's waste space and sharpest needle claims were objectively measurable. Further, both RTI's and BD's objective measurements showed the claims to be literally false. ROA 8838, 8867–70, 8874–75.

52. The Court found BD intended to deceive or confuse the public in advertising its syringe as the world's sharpest and less wasteful than RTI's. The Court found even though BD knew its advertisements were not accurate, BD refused to remove them because removing them would have a "devastating effect" on sales. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, No. 2:08-CV-16, 2014 WL 12596469, at *3 (E.D. Tex. Nov. 10, 2014).

53. On appeal, the Fifth Circuit found "unassailable" the Court's "finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false." *Retractable Techs.*, 842 F.3d at 901. Although BD's advertising claims were initially true, "tests began to indicate that competitors' needles were equaling or surpassing BD needles to some extent." *Id.* at 893. Further, the Court found "BD had every reason to know that its ongoing advertisements of the [needle sharpness and waste space] claims, which continued through 2011, were inaccurate." *Id.* at 900.

54. BD does not contest this finding, but contends that even when false advertising is willful, courts in the Fifth Circuit deny disgorgement absent proof of diversion or palming off (Dkt. #748 at p. 83) (citing *Tex. Pig Stands, Inc. v. Hard Rock Café Intern., Inc. (Tex. Pig Stands I)*, 951 F.2d 684, 695 (5th Cir. 1992); *Sw. Recreational Indus., Inc. v. FieldTurf, Inc.*, No. 01-50073, 2002 WL 32783971, at *9 (5th Cir. 2002)).

Factor Two: Whether Sales Have Been Diverted

55. BD argues that RTI has not proven that any sales were diverted from RTI to BD because of BD's false advertising. BD argues RTI did not produce evidence of a single customer who switched from RTI's VanishPoint to BD's Integra due to the waste space comparison or world's sharpest needle claim. Further, BD contends RTI did not produce a single witness, customer or otherwise, to prove sales were diverted from RTI to BD. Finally, BD points to RTI's counsel's admission at oral argument before the Fifth Circuit that RTI produced "[n]o direct evidence" of a single customer who did not purchase RTI's syringes because of the false advertising. *See* Recording of Oral Argument at 21:13, *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 14-41384 (5th Cir. 2016), *available at* hhttp://www.ca5.uscourts.gov/OralArgRecordings/14/14-41384_2-29-2016.mp3.

56. RTI argues it has provided the Court with specific examples of diverted sales. First, RTI alleges BD diverted RTI sales from VA Houston. BD Strategic Account Manager Keith Klinger reported to his team via email that VA Houston, which had been using RTI syringes, would now be ordering BD's Integra based on the attached "VA Houston Integra savings model." PX568 at p. 12. The savings model included the waste space calculator with RTI's false 0.185 mL of waste space claim. PX568 at p. 14.  However, there is no evidence before the Court indicating that VA Houston ever saw the savings model, relied on the model in making purchasing decisions, or actually purchased the BD Integra. BD's damages expert, Robert Sherwin ("Sherwin"), testified that he "went back to the evidence admitted" and verified that the sales data showed that VA Houston actually "[e]xpanded their purchases from RTI" after the date that RTI alleged VA Houston saw the waste space comparison. ROA 10796–97.

14

57. Next, RTI alleges BD diverted RTI sales from Wal-Mart. On September 12, 2005, a BD marketing employee claimed in an email regarding Wal-Mart that, "we won with Integra . . . due to our proof of med savings" for "800k units this year and 1.2MM next." PX568 at p. 60. A 2004–2005 performance evaluation of a BD employee named Kathy Miranowic stated she obtained "new business (Walmart—purchasing 2.00MM units over the next 12 months.)" PX568 at p. 63. The internal document does not say anything about why Wal-Mart supposedly selected BD. RTI drafted a press release in 2006 announcing that it had been selected as the "exclusive syringe supplier" for Wal-Mart's flu vaccination program and had "shipped more than 1.4 million syringes." DX6001. RTI's electronic sales data confirms these figures, showing that from August to September 2006, RTI sold 1.4 million units to Wal-Mart. DX1661. Further, Shaw confirmed that RTI won an exclusive contract with Wal-Mart. ROA 10037.

58. Following RTI's exclusive contract with Wal-Mart in 2006, RTI lost Wal-Mart as a client in 2007. ROA 10010. Wal-Mart did not purchase from BD in 2007, or ever again during the relevant time period. DX2153.

59. Next, RTI alleges BD diverted RTI sales from Kroger. Kathy Miranowic's performance evaluation states she "captured all 117 [of Kroger's Mid-Atlantic region] locations." PX568 at p. 63.  This is the only evidence RTI provides regarding alleged diversion of sales from Kroger. RTI's sales data from 2005 to 2010 shows that Kroger bought almost all of its safety syringes from RTI.  Kroger purchased $3,443,700 worth of RTI's VanishPoint syringes and $159,500 worth of BD's Integra syringes. DX1161; DX2153.

60. Next, RTI alleges BD diverted RTI sales from Maxim. On February 17, 2010, a BD marketing employee sent an email with a "presentation used with Maxim." PX562 at 571.

The document is a PowerPoint presentation titled "BD & Maxim Helping Maxim Deliver Optimal Outcomes for the '06 Flu Season, June 6, 2006." The PowerPoint contained the "world's sharpest needle" claim and waste space comparisons, including the false .185mL figure. PX562 at 576–78. At trial, the only testimony regarding Maxim was from RTI's marketing expert, who speculated that BD's false advertising caused Maxim to buy BD's Integra instead of RTI's VanishPoint. ROA 9713–19.

61. Finally, RTI alleges BD diverted RTI sales from H-E-B. RTI points to a PowerPoint presentation titled "Selling HEB: Getting it Right from the Start." PX562 at p. 787. At the argument before the Court, RTI's counsel conceded that the internal document "was not actually given . . . to HEB." (Dkt. #744 at p. 214). RTI presented no evidence that the PowerPoint was ever presented to H-E-B or that H-E-B was influenced by BD's waste space claims.

62. RTI also claims that their consumer survey expert witness, Carol Scott ("Scott"), showed that BD diverted sales from RTI (Dkt. #747 at p. 45). BD counters, pointing to Scott's admission that she was "not testifying that the [waste space] ad helped BD sales" or "hurt RTI's sales." ROA 9753. Scott did not even ask the participants in her surveys whether BD's needle sharpness or waste space claims would affect their purchasing decisions. ROA 1918–67.

63. BD presents sales data to suggest that BD's false advertising of the Integra syringe did not divert sales from RTI's VanishPoint customers. BD provided Integra sales data for each of RTI's alleged diverted customers in the relevant period. BD sold $248,862 to H-E-B, $45,690 to Kroger Mid-Atlantic, $3,329,006 to Maxim, and $54,679 to V.A. Houston. DX2153; ROA 10814–15. BD did not sell the Integra syringe to Wal-Mart during the

relevant period. During trial, BD's damages expert testified that the Integra syringe's profit margin is 7.2%. ROA 10815. Thus, even if the Court were to accept these $3,678,237 in sales RTI alleges were diverted from RTI, the record indicates that at best, BD would have only realized $264,833 in attributable profits from these customers.

64. Further, according to Shaw, BD's Integra syringes were not "commercially successful" and "didn't hardly sell at all" because they were "lemons." ROA 100001. BD's total sales for the Integra syringe during the relevant period were $51,082,407, approximately 3% of BD's $1.6 billion in syringe sales. DX2153. Conversely, "RTI's market share [for retractable syringes] simultaneously increased to two-thirds, and its sales nearly doubled" during the relevant period. *Retractable Techs.*, 842 F.3d at 897.

65. As the Fifth Circuit noted, "not a single buyer's representative came forward to testify to a purchase motivated by the 'world's sharpest needle' and 'lower waste space' claims." *Retractable Techs.*, 842 F.3d at 895. RTI's economic expert, Dr. Robert Maness ("Dr. Maness"), said he could not substantiate a causal connection between false advertising and BD's sales numbers. RTI admitted that it had no direct evidence of diverted sales. Recording of Oral Argument at 21:13, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 14-41384 (5th Cir. 2016), *available at* hhttp://www.ca5.uscourts.gov/OralArg Recordings/ 14/14-41384_2-29-2016.mp3.

66. The Court found the diversion factor slightly favored granting an accounting of profits. The Court reasoned, "[a]lthough BD profited from its false advertisements, it is less certain that the resulting sales came at RTI's expense . . . one cannot assume that every BD sale resulted in a lost sale for RTI." *Retractable Techs.*, 2014 WL 12596469, at *4. The Court

concluded that because RTI produced evidence that "*some* portion of BD's ill-gotten sales

came at RTI's expense," the diversion factor slightly favored disgorging BD's profits. *Id.*

67. The Fifth Circuit did not hold that RTI proved diverted sales, nor did it affirm this Court's

finding that the diversion factor slightly favored disgorging BD's profits. Rather, the Fifth

Circuit recognized that "BD presented evidence that many sales were made for reasons

other than the false advertisements," and gave the Court specific instructions regarding

how to reassess the diverted sales factor. *Retractable Techs.*, 842 F.3d at 901. Specifically,

the Fifth Circuit directed the Court that:

> In particular, when assessing the "diversion" factor, the district court should
> bear in mind that speculative and attenuated evidence of diversion of sales
> will not suffice. *Seatrax*, 200 F.3d at 372 & n.8. Further, if disgorgement of
> profits is appropriate, the court must recall that "[u]nder 15 U.S.C. §
> 1117(a), the plaintiff has the burden of showing the amount of the
> defendant's sales of the infringing product. The defendant has the burden of
> showing all elements of cost and other deductions." *Maltina Corp. v. Cawy
> Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980).

*Id.*

### Factor Three: The Adequacy of Other Remedies

68. RTI argues that the injunctive relief was insufficient, and substantial disgorgement is

necessary to compensate RTI. RTI argues that their expert witness, Scott, found the harm

to RTI from years of false advertising will continue long after the advertising is stopped.

ROA 9744–46. Further, RTI argues injunctive relief has no deterrent effect and does not

rectify BD's unjust enrichment.

69. BD argues the false advertising has been adequately remedied. Specifically, BD argues the

false advertising has been enjoined, BD notified over 750 distributors and 10,000

employees that the advertisements were "false and misleading" and "based on false and

inaccurate measurements," BD implemented a training program for its employees and

distributors, and RTI waived its right to recover damages under the Lanham Act. BD cites various cases to show that injunctive relief alone is the only relief afforded in the majority of Lanham Act cases and the Fifth Circuit has never affirmed an award of disgorgement of profits in a Lanham Act false advertising case (Dkt. #727 at p. 35). Finally, BD argues RTI made a tactical litigation decision not to seek early injunctive relief in hopes of winning a damages award.

70. The Court previously considered disgorgement, but found the trebled amount of BD's antitrust damages a "sufficient monetary sanction in this case." *Retractable Techs.*, 2014 WL 12596469, at *3. The Court also granted injunctive relief, requiring BD to "notify distributors, and other market participants" that it "wrongfully made false and misleading advertising claims" in its "needle sharpness" and "waste space" advertisements. *Id.* at *8. The Court required BD to post this notice on its website for three years. Further, the Court enjoined BD from making the "world's sharpest needle" claim for five years and "waste space comparison" claim against RTI for three years. *Id.* Finally, the Court ordered BD to implement a comprehensive training program to instruct its employees and distributors not to use old marketing materials or otherwise make false representations regarding RTI's VanishPoint syringes. *Id.*

71. The Fifth Circuit reversed the antitrust damages award and noted that the Court's decision not to impose disgorgement "rested in large part on the premise that RTI was adequately compensated by a $340 million antitrust award." *Retractable Techs.*, 842 F.3d at 901. Having reversed the antitrust damages, the Fifth Circuit remanded to determine "whether and how much profit BD should disgorge to compensate for the Lanham Act violations." *Id.*

72. The Fifth Circuit also noted "our reversal of the antitrust verdict means that the injunction rests on 'erroneous conclusions of law' and is an abuse of discretion." *Id.* at 902. The Fifth Circuit vacated and remanded the injunction, finding "a viable injunction might still be an appropriate remedy for the Lanham Act violations." *Id.*

Factor Four: Any Unreasonable Delay by the Plaintiff in Asserting His Rights

73. RTI filed its first lawsuit against BD in 2001. The parties settled the first lawsuit in July 2004. On June 15, 2007, RTI initiated the present lawsuit for alleged Lanham Act violations. On January 18, 2008, the Court granted BD's request to sever and stay the Lanham Act portion of the lawsuit. On May 14, 2010, the Court lifted the stay. On July 23, 2010, RTI amended its complaint to specifically identify the waste space and world's sharpest needle claims. Excluding the stay, RTI waited over three years to bring these specific claims. BD contends RTI did not seek preliminary injunctive relief for the alleged false advertising in hopes of later receiving a damages award.

74. The Court considered this timeline and concluded, "[o]n balance, this factor slightly favors disgorging BD's profits" because despite RTI's delay in identifying the specific advertisements, "the parties' history shows that RTI was aggressively pursuing its claims against BD from the time it filed its first lawsuit against BD in 2001." *Retractable Techs.*, 2014 WL 12596469, at *4. Further, the Court explained, "[m]ore importantly, BD cannot legitimately claim undue prejudice . . . BD knew its advertising relating to waste space and needle sharpness were not accurate." *Id.* at *5.

75. The Fifth Circuit "approved the district court's finding that RTI did not unreasonably delay," but did not provide any further analysis. *Retractable Techs.*, 842 F.3d at 901.

Factor Five: The Public Interest in Making the Misconduct Unprofitable

76. RTI contends the public's interest in making false advertising unprofitable is particularly pronounced because the false advertisements involved safety products and lowered the number of safer RTI syringes in the marketplace (Dkt. #747 at p. 92). BD contends the false advertisements have already been enjoined, BD has issued corrective advertising, and disgorgement is not necessary to protect the public interest (Dkt. #748 at p. 81).

77. The Court found the public interest factor favors granting an accounting of profits because the public has an interest in truthful information and advertising. *Retractable Techs.*, 2014 WL 12596469, at *5. The Fifth Circuit did not address this factor. *See Retractable Techs.*, 842 F.3d at 901.

Factor Six: Whether it is a Case of Palming Off

78. Palming off "occurs when a producer misrepresents his own goods or services as someone else's." *McArdle v. Mattel Inc.*, 456 F. Supp. 2d 769, 783 (E.D. Tex. 2006). RTI does not contend that BD attempted to sell its syringes under RTI's mark. RTI concedes that palming off is not present here, but argues BD's false advertising "was every bit as harmful as passing off goods as those of another," citing various cases from other circuits (Dkt. #747 at p. 94).

79. The Court found the palming off factor disfavors granting an accounting of profits. *Retractable Techs.*, 2014 WL 12596469, at *5. The Fifth Circuit did not address this factor. *See Retractable Techs.*, 842 F.3d at 901.

Whether and How Much Profit BD Should Disgorge

80. The Fifth Circuit instructed this Court to "determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations." *Id.* The relevant statute

provides, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

81. The parties disagree on the burden of proof and the appropriate measure of disgorgement. RTI contends it has met its burden in showing BD's gross sales of all conventional syringes, safety syringes, and catheters. The record indicates that BD sold $571,381,216 worth of safety syringes and $1,084,311,650 worth of conventional syringes in the relevant period. ROA 9914. RTI argues that BD must show which portion of these $1.6 billion in total sales of all syringe products was not attributable to BD's false advertising.

82. BD contends RTI must prove which sales were *attributable* to the false advertising rather than the entire universe of BD sales. BD concedes it must then prove the costs and deductions of those sales attributable to the false advertising to arrive at the appropriate measure of profits.

83.  BD's damages expert, Sherwin, analyzed all of BD's sales and conducted an analysis to determine the maximum amount of profits that could be attributable to the waste space comparison and world's sharpest needle claim. ROA 10796–814.  Sherwin testified that he found no evidence of causation with respect to the advertising, but assumed a causal connection for purposes of his attribution analysis. ROA 10782. In fact, Sherwin found that "some of the customers, after seeing the ads . . . expand[ed] their purchases from RTI." ROA 10796.

84. Sherwin analyzed the set of customers who purchased both VanishPoint and Integra syringes. ROA 10800. Sherwin then identified the customers who stopped using the Integra syringe and assumed they stopped because of the advertised waste space advantage. ROA

10800–01. Sherwin then concluded that, at most, $7.21 million in BD sales could have gone to BD rather than RTI as a result of BD's waste space comparison. ROA 10801. Sherwin concluded that there was not any indication of "lost sales as a result of the 'world's sharpest needle' in the marketplace." ROA 10812. RTI did not cross-examine Sherwin or present any evidence to refute Sherwin's attribution analysis.

85. RTI did not present any testimony at trial, fact or opinion, to prove what portion of BD's sales or profits were attributable to the two false advertising claims. RTI alleges Dr. Maness's antitrust deception damages model proves attribution. Dr. Maness calculated the damages from multiple forms of BD's alleged anticompetitive deception. Specifically, Dr. Maness considered the waste space claim, BD's allegedly false "safety" claims (which the Court did not submit to the jury due to lack of evidence), the world's sharpest needle claim, and "tainting" of retractable devices (rejected by the Fifth Circuit as a matter of law). ROA 9659–60; 9719–20; 10840–47. Dr. Maness admitted his damages calculation for these four distinct acts were "all grouped together" and he could not link his damages calculations to "specific disparaging statements." ROA 9902. Dr. Maness performed a benchmark comparison between the competitive dynamics in the safety syringe market and the competitive dynamics in the IV catheter market. ROA 9810. Dr. Maness admitted that he did not account for catheters' varied medical uses, differing features, and benefits that retractable catheters offer over retractable syringes used solely for injections. ROA 9902–07; 10784–85.

86. The record indicates that during the relevant period, BD sold $571,381,216 in safety syringes and $1,084,311,650 in conventional syringes. ROA 9914. BD's expert testified

that the profit margin was 7.2% on the Integra syringe, 25% on all safety products, and 22.6% on all safety and conventional syringes combined. ROA 10813.

## CONCLUSIONS OF LAW

1. Liability under the Lanham Act has been established. *See Retractable Techs.*, 842 F.3d at 900. Subject to the principles of equity, a defendant's Lanham Act violations may entitle the plaintiff to a portion of the defendant's profits attributable to the false advertising. 15 U.S.C. § 1117(a). Any award of profits is "not automatic" and "is committed to the discretion of the district court." *Pebble Beach*, 155 F.3d at 554.

2. A court considers six non-exclusive factors in determining whether an award of profits is appropriate: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Retractable Techs.*, 842 F.3d at 900–01 (quoting *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002)).

Factor One: Whether the Defendant had the Intent to Confuse or Deceive

3. The first factor favors disgorgement. The Fifth Circuit has held that willfulness is not a prerequisite for disgorgement. *See Quick Techs*, 313 F.3d at 347. However, the converse is not true—proving willfulness does not entitle plaintiffs to disgorgement. In fact, disgorgement is often denied in willful false advertising and deliberate infringement cases where there is no proof of diversion or palming off. *See, e.g.*, *Tex. Pig Stands I*, 951 F.2d at 695; *Sw. Recreational Indus.*, 2002 WL 32783971, at *9.

4. The Fifth Circuit found "unassailable" the district court's finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false. *Retractable*

*Techs.*, 842 F.3d at 901. Nothing in the record indicates this factor should weigh against disgorgement; thus, the Court finds factor one favors disgorgement.

Factor Two: Whether Sales Have Been Diverted

5. Diversion addresses whether, and how many, sales have been diverted from plaintiff to defendant as a result of the false advertising. "Speculative and attenuated evidence of diversion of sales will not suffice." *Retractable Techs.*, 842 F.3d at 901 (citing *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 & n.8 (5th Cir. 2000)).

6. The Court finds this factor important in the analysis, but not dispositive, for a number of reasons. First, the Fifth Circuit gave this Court specific direction regarding how to assess the diversion factor. The Fifth Circuit directed this Court to "bear in mind that speculative and attenuated evidence of diversion sales will not suffice." *Retractable Techs.*, 842 F.3d at 901 (citing *Seatrax*, 200 F.3d at 372 & n.8). The Fifth Circuit did not offer guidance on the other factors.

7. Second, other Fifth Circuit opinions aside from *Retractable* and *Seatrax* indicate that the diverted sales factor is important in the analysis. For example, in *Streamline*, the Fifth Circuit found an unjust enrichment award not supported by sufficient evidence where the plaintiff did not show any diverted sales. *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 463 (5th Cir. 2017). The Fifth Circuit recognized that a previous Fifth Circuit decision "emphasized the need for evidence of diverted sales and lost profits in order to justify an unjust enrichment award." *Id.* at 462–63. This previous decision, *Texas Pig Stands I*, found that the absence of diverted sales and palming off "fatally undercut[] the jury's conclusion" that the defendant was unjustly enriched. 951 F.2d at 695. The Court

25

recognizes that a showing of diverted sales is *not* a prerequisite to an award of profits. *See id.*; *Maltina*, 613 F.2d at 585.

8.  Third, RTI has not cited, and the Court's research has not revealed, *any* false advertising case in the Fifth Circuit in which a court awarded disgorgement absent sufficient proof of sales being diverted from plaintiff. In fact, some courts have found diversion essential to an unjust enrichment award. *See Mannatech, Inc. v. Glycoproducts Int'l, Inc.*, 2008 WL 2704425, at *3 (N.D. Tex. July 9, 2008) (denying plaintiff's request for disgorgement because plaintiff had not "adduced sufficient evidence that any of its sales were diverted as a result of the false advertising.").

9.  With these considerations in mind, the Court finds RTI has not shown that sales were diverted from RTI to BD because of BD's false advertising. All RTI has shown is "speculative" and "attenuated" evidence of diversion, the particular type of evidence the Fifth Circuit directed this Court to reject. *Retractable Techs.*, 842 F.3d at 901.

10. RTI did not produce a single witness or reliable study or data to prove a single example of a diverted sale. RTI's counsel admitted at oral argument that RTI had "[n]o direct evidence" of a single customer who did not purchase RTI's syringes because of BD's false advertising. *See* Recording of Oral Argument at 21:13,  *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 14-41384 (5th Cir. 2016), *available at*  http://www.ca5.uscourts.gov/ OralArgRecordings/14/14-41384_2-29-2016.mp3.  The "specific examples" of diversion offered in RTI's briefing are speculative at best. There is no evidence before the Court indicating that VA Houston ever saw the waste space comparison or relied on it in making purchasing decisions. In fact, VA Houston "[e]xpanded their purchases from RTI" after the date RTI alleges VA Houston saw the waste space comparison. ROA 10796–97. The

26

same analysis applies to Wal-Mart, Kroger Mid-Atlantic, H-E-B and Maxim. The record does not contain any direct evidence that RTI lost sales to BD from these retailers because of BD's waste space and needle sharpness claims. In *Seatrax*, the plaintiff "introduced approximately ten instances" where the defendant actually "distributed materials" to customers with the infringing mark. 200 F.3d at 372. However, the Fifth Circuit found "that evidence of unjust enrichment and diversion of sales is speculative at best" because plaintiff did not prove a decline in sales due to the infringement. *Id.* Here, RTI has not proven even a single instance that customers saw the advertisements, much less that they relied on them in making purchasing decisions. Further, the sales data indicates that RTI actually saw an *increase* in sales for some retailers after BD allegedly used the false claims. As in *Seatrax*, the "link between [defendant's] gross profits . . . and [plaintiff's] claim of unjust enrichment and diversion of sales is attenuated." *Id.* at n.8.

11.  RTI's expert witnesses only speculated about diverted sales. For example, when asked why H-E-B made certain purchasing decisions, RTI's consumer survey expert Scott responded, "nobody knows." ROA 9788–89. Shaw admitted he "would have no way of knowing" whether BD sold Wal-Mart anything. ROA 10037–38. This level of speculation is insufficient to prove diverted sales. *See Mannatech*, 2008 WL 2704425, at *3 (finding insufficient proof of diversion where plaintiff's CEO stated "[t]here is just no way" to quantify or even estimate the amount of sales lost on account of false advertising). Similarly, in *Logan*, the Fifth Circuit upheld a denial of disgorgement because "[plaintiff] failed to present any evidence that [defendant's] profits were attributable to false advertising" and "has not pointed to any evidence in the record demonstrating that consumers purchased [defendant's] product because of its false advertising." *Logan v.*

*Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 465 (5th Cir. 2001). The Court finds insufficient the speculative and attenuated evidence of diverted sales. *See Retractable Techs.*, 842 F.3d at 901. Thus, this factor weighs against disgorgement.

Factor Three: The Adequacy of Other Remedies

12. The Fifth Circuit has determined that "the goal behind [the Lanham Act] remedies is to achieve equity between or among the parties." *Seatrax*, 200 F.3d at 369. Disgorgement may be appropriate to compensate for any unjust enrichment. The Court finds RTI's previously granted injunctive relief adequate to achieve equity between the parties. The enjoined claims, corrective advertising, website notice, and training program amount to extensive injunctive relief that achieves equity among the parties. Thus, the Court finds a disgorgement of profits inappropriate.

13. The Fifth Circuit often finds injunctive relief alone adequate in Lanham Act cases, particularly where plaintiffs have not proven any lost or diverted sales. For example, the Fifth Circuit affirmed a district court's denial of disgorgement where "although there is some evidence that [defendant] intended to mislead customers . . . because of the way [plaintiff] presented its damage evidence in this case, it is impossible to tell . . . which sales were diverted as result of [defendant's] false or misleading advertising." *Sw. Recreational Indus.*, 2002 WL 32783971, at *9; *see Quick Techs.*, 313 F.3d at 350 (finding the "permanent injunction adequately remedies to complained-of-infringement, and awarding [the plaintiff] any of [the defendant's] profits would be far from equitable—it would be a windfall.") (quoting *Tex. Pig Stands I*, 951 F.2d at 696).

14. District courts in the Fifth Circuit also find injunctive relief adequate in Lanham Act false advertising cases. For example, in *Mannatech*, the district court denied plaintiff's request

for disgorgement because plaintiff had not "adduced sufficient evidence that any of its sales were diverted as a result of the false advertising." 2008 WL 2704425, at *3. When asked to quantify or estimate the amount of sales lost due to defendant's false advertising, plaintiff's witness said, "[t]here is just no way. I know their sales have grown, but I can't quantify how many people went there." *Id.* The court found this testimony "beyond speculative." *Id.* The court noted that "[p]rofits are rarely awarded where the plaintiff cannot establish that the false advertising caused a decline in sales," and granted injunctive relief. *Id.* (citing *Seatrax*, 200 F.3d at 372 n.8; *Pebble Beach*, 155 F.3d at 555); *see Galvotec Alloys, Inc. v. Gaus Anodes Int'l, LLC*, No. 7:13-CV-664, 2014 WL 6805458, at *11 (S.D. Tex. Dec. 2, 2014) (finding plaintiff was only entitled to injunctive relief because plaintiff "did not produce evidence that a substantial number of consumers were actually misled").

15. The Fifth Circuit has, however, affirmed both disgorgement and injunctive relief in some trademark cases. As a matter of first impression, the Fifth Circuit determined in *Maltina* that in the trademark context, an accounting of profits might be necessary absent proof of diverted sales. 613 F.2d at 582. The Fifth Circuit reasoned "that a trademark is a protected property right . . . This recognition of a trademark as property is consistent with the view that an accounting is proper even if . . . the defendants' infringement has not diverted sales from the plaintiff." *Id.* The Fifth Circuit granted disgorgement because even though the defendant had no sales, it had taken plaintiff's "protected property right." *Id.*

16. The Court recognizes that the Fifth Circuit treats trademark cases and false advertising cases under the Lanham Act similarly. *See Logan*, 263 F.3d at 464 (recognizing that the reasoning in trademark cases may be useful for false advertising cases). However, since *Maltina*, the Fifth Circuit has affirmed disgorgement only twice, and both cases involved

trademarks, which are protected property rights. *See Blendco, Inc. v. ConAgra Foods*, 132 Fed. App'x 520, 523 (5th Cir. 2005)*; Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 338 (5th Cir. 2008). The Fifth Circuit has not affirmed a disgorgement award in a false advertising case. *But see Logan*, 263 F.3d at 465 (denying disgorgement in a false advertising case where plaintiff failed to show diverted sales); *Sw. Recreational Indus.*, 2002 WL 32783971, at *9 (denying disgorgement in a false advertising case where it was "impossible to tell . . . which sales were diverted as a result of [defendant's] false or misleading advertising."). The Court does not interpret this line of cases as absolutely *precluding* disgorgement in false advertising cases. Rather, these cases indicate that disgorgement should only be awarded in false advertising cases on rare occasion, where the harm to the plaintiff is clear and injunctive relief cannot adequately achieve equity between the parties. Given that the case law indicates injunctive relief is sufficient and the Fifth Circuit has never affirmed an award of disgorgement in a false advertising case, the Court finds this factor weighs against disgorgement.

Factor Four:  Any Unreasonable Delay by the Plaintiff in Asserting His Rights

17. The Fifth Circuit approved of the district court's finding that this factor slightly favors disgorgement because RTI did not unreasonably delay. *Retractable Techs.*, 842 F.3d at 901. Nothing in the record indicates that this factor should disfavor disgorgement; thus, the Court finds that the fourth factor slightly favors disgorgement.

Factor Five: The Public Interest in Making the Misconduct Unprofitable

18. The public has an interest in truthful information and advertising. *See Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 n.13 (5th Cir. 1980). The Court agrees with RTI that the public has a heightened interest in truthful information

regarding public safety. *See Semler v. OR Bd. of Dental Examiners*, 294 U.S. 608, 612 (1935) (discussing the vital interest of public health). However, the advertising at issue had no effect on public safety. RTI's safety claims were denied for lack of evidence. The Court finds no evidence that BD's waste space comparison or its needle sharpness claims threatened any harm to the general public or to patients. *Cf. Mary Kay, Inc. v. Weber*, 3:08-CV-0776-G, 2009 WL 2569070, at *7 (N.D. Tex. Aug. 14, 2009) (discussing the harm in selling expired goods to the public). The Court thus rejects RTI's claim that the public interest is "particularly pronounced" (Dkt. #747 at p. 92).  However, there is no dispute that the advertising claims were false, and the public has an interest in truthful advertising. Thus, the Court finds this factor favors disgorgement.

Factor Six: Whether it is a Case of Palming Off

19. The Court finds this factor weighs against disgorgement. BD did not attempt to palm off their products as RTI's, and nothing in the record indicates this factor should favor disgorgement. The Fifth Circuit finds this a "significant" factor in determining whether disgorgement is appropriate, and RTI has not offered any relevant Fifth Circuit law to support its novel, yet creative, approach to this factor. *Pebble Beach*, 155 F.3d at 555.

Whether and How Much Profit BD Should Disgorge

20. The Court finds the *Pebble Beach* factors weigh against an award of disgorgement. The first factor, whether the defendant had the intent to confuse or deceive, favors disgorgement. The Fifth Circuit found "unassailable" the district court's finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false. *See Retractable Techs.*, 842 F.3d at 901. The second factor, whether sales have been diverted, disfavors disgorgement. RTI has not proven that sales were diverted from RTI to

BD as a result of BD's false advertising. RTI produced only "speculative" and "attenuated" evidence of diverted sales, which the Fifth Circuit finds deficient. *Id.* The third factor, adequacy of other remedies, disfavors disgorgement. The Court finds that the injunctive relief was extensive and adequate. The fourth factor, any unreasonable delay by the plaintiff in asserting his rights, slightly favors disgorgement because RTI did not delay in asserting its rights. The fifth factor, the public interest in making the misconduct unprofitable, favors disgorgement. The final factor, whether this is a case of palming off, disfavors disgorgement. In sum, two factors favor disgorgement, one factor slightly favors disgorgement, and three factors disfavor disgorgement. Further, the Court finds two of the three factors disfavoring disgorgement—no proof of diverted sales and no palming off— are especially important factors in the analysis. *See Tex. Pig Stands I*, 951 F.2d at 695 (finding that the absence of diverted sales and palming off "fatally undercut[] the jury's conclusion" that the defendant was unjustly enriched); *Streamline Prod. Sys.*, 851 F.3d at 462–63 (recognizing "the need for evidence of diverted sales and lost profits in order to justify an unjust enrichment award."). Thus, the Court finds an award of disgorgement of profits inappropriate because three *Pebble Beach* factors, including the two most important, weigh against awarding disgorgement and only two weigh in favor of disgorgement and one slightly favors disgorgement.

21. The weighing of the *Pebble Beach* factors indicates that an award of disgorgement of profits would be inequitable. This result is consistent with Fifth Circuit cases rejecting disgorgement. *See Pebble Beach*, 155 F.3d at 555 (finding disgorgement is inequitable where there is a "lack of sufficient proof of actual damages" and there are "no diverted sales nor palming off"); *Tex. Pig Stands I*, 951 F.2d at 696 (finding that awarding

defendant's profits in the absence of proof of diverted sales "would be far from equitable— it would be a windfall."); *Seatrax*, 200 F.3d at 372 (finding that because plaintiff's sales did not decline, "the link between [defendant's] gross profits . . . and [plaintiff's] claim of unjust enrichment and diversion of sales is attenuated."). RTI's counsel admitted at oral argument that RTI had "[n]o direct evidence" of a single customer who did not purchase RTI's syringes because of BD's false advertising. *See* Recording of Oral Argument at 21:13, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 14-41384 (5th Cir. 2016), *available at* http://www.ca5.uscourts.gov/OralArgRecordings/14/14-41384_2-29-2016. mp3. Not only did RTI's retractable sales not decline, its retractable "market share simultaneously increased two-thirds, and its sales nearly doubled" during the relevant period. *Retractable Techs.*, 842 F.3d at 897. In light of the foregoing, the Court finds to award RTI a disgorgement of BD's profits "would be far from equitable—it would be a windfall." *Tex. Pig Stands I*, 951 F.2d at 696.

<u>Injunctive Relief</u>

22. The Court finds additional injunctive relief unnecessary. The Fifth Circuit found it "theoretically possible" that an injunction "might still be an appropriate remedy," but noted that it would require evidence of a "real and immediate threat of future or continuing injury apart from any past injury." *Retractable Techs.*, 842 F.3d at 902.  BD complied with the previously ordered injunctive relief by notifying employees, distributors, Group Purchasing Organization, and government agencies that its needle sharpness and waste space comparison claims were falsely advertised. RTI has not shown any "real and immediate threat" of future or continuing injury. *Id.* BD removed the false advertising from its marketing materials, issued corrective advertising, and posted a notice on its website.

Thus, the Court finds that granting additional injunctive relief would be "broader than necessary to prevent the deception." *Id.* (quoting *Better Bus. Bureau of Metro. Hous., Inc. v. Med. Dirs., Inc.*, 681 F.2d 387, 405 (5th Cir. 1982)).

## CONCLUSION

The Court, having made its Findings of Fact and Conclusions of Law, finds an award of disgorgement of profits would be inequitable. It is therefore **ORDERED** that Defendant Becton, Dickinson and Company shall not disgorge any profits to Retractable Technologies, Inc. for its violation of the Lanham Act. The previously ordered injunctive relief adequately achieves equity between the parties.

**SIGNED this 17th day of August, 2017.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE