# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 26, 2019

Lyle W. Cayce
Clerk

No. 17-40960

RETRACTABLE TECHNOLOGIES, INCORPORATED; THOMAS J. SHAW,

Plaintiffs - Appellants

v.

BECTON DICKINSON & COMPANY,

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury found that Becton Dickinson & Co. falsely advertised its products for years. The district court determined that neither disgorgement of profits nor further injunctive relief would be equitable under the circumstances. It did not abuse its discretion. We affirm.

## I

This case involves a narrow subset of medical syringes: retractable syringes, a type of "safety syringe" designed to reduce risk of accidental needlesticks. Retractable syringes compete both with other varieties of safety

No. 17-40960

syringes and with "conventional" syringes.[1] Although retractable syringes provide significant protection against accidents, their fixed needles prevent use for some hospital and clinical purposes.[2]

Retractable Technologies, Inc. and Becton Dickinson & Co. compete in the U.S. safety syringe market alongside two other major safety syringe manufacturers.[3] RTI primarily manufactures retractable syringes and dominates the retractable syringe sub-market; while BD produces retractable syringes, it also produces several conventional and non-retractable safety products that account for the bulk of its revenue.[4] This appeal is the latest stage of ongoing litigation between the two.

## A

BD made two false claims in its marketing materials. First, it advertised itself as having the "world's sharpest needle," reflecting that needle sharpness is seen as a proxy for patient comfort, and persisted in doing so after its internal tests indicated otherwise.[5] Second, it promoted its retractable syringes as having seven times less "waste space" than RTI's product, meaning that the syringes would waste less medicine per use.[6] While BD's testing supported this claim at first, internal tests from 2003 onward demonstrated that RTI's syringes were less wasteful than claimed.[7]

RTI and its founder, Thomas J. Shaw, sued BD for antitrust violations and false advertising under the Lanham Act, pointing to these false claims and

---

[1] *Retractable Techs., Inc. v. Becton Dickinson & Co.* (*RTI I*), 842 F.3d 883, 889 (5th Cir. 2016).

[2] *Id.*

[3] *Id.* As of 2010, BD had a 49% share of the safety syringe market, Covidien Ltd. had a 30% share, Smiths Medical had a 10% share, and RTI had a 6% share. *Id.*

[4] *Id.*

[5] *Id.* at 893.

[6] *Id.* at 893–94.

[7] *Id.*

No. 17-40960

other allegedly unfair and anticompetitive business practices.[8] A jury sided with RTI on one of its antitrust claims and all of its Lanham Act false advertising claims. It found that RTI was due more than $113.5 million in antitrust damages.[9] RTI elected to not seek an award of damages for the Lanham Act claim from the jury.[10]

The district court statutorily trebled the antitrust damages and granted attorney's fees, resulting in a total award of approximately $352 million. RTI additionally requested disgorgement of BD's profits and injunctive relief. The district court concluded that equity favored disgorgement, but that any relevant profits were subsumed by the trebled antitrust damages award. It also crafted a six-part injunction requiring BD to cease certain advertising claims for several years, post a notice on its website, notify various entities of the false claims, and implement a training program for employees and distributors.[11] On BD's motion to stay the injunction pending appeal, the district court stayed only the portion of the injunction that would require BD to notify its "end users"—that is, the "hospitals, clinics, and other healthcare providers that do not resell the syringes in the ordinary course of business."[12]

---

[8] RTI initially filed state tort claims in addition to its Lanham Act and antitrust claims, but dismissed them after the close of evidence at trial. *Id.* at 890. RTI also sued BD for patent infringement, which was tried separately. On appeal, the Federal Circuit upheld one of the patent claims on which RTI had prevailed at trial. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011).

[9] *RTI I*, 842 F.3d at 890.

[10] *Id.*

[11] The injunction extended up to five years for certain portions and up to three years for other portions.

[12] The district court's rationale for staying this portion of the injunction was that intermediary distributors were the most likely to perpetuate BD's false statements and further harm RTI, whereas forcing BD to admit wrongdoing to end users posed a greater risk of irreparable harm to BD.

No. 17-40960

## B

While BD began to comply with the portions of the injunction that were not stayed, it appealed the jury's finding of antitrust liability and the district court's remedies determination.[13] We concluded that RTI's antitrust claim was legally insufficient and reversed that portion of the judgment—so at a minimum, RTI was no longer entitled to trebled antitrust damages and attorney's fees.[14] Having determined that the injunction was predicated at least in part on BD's antitrust liability, we also vacated the injunction and remanded to the district court to determine whether the Lanham Act violations standing alone justified continued equitable relief.[15]

As for disgorgement of BD's profits, we specifically approved of some of the district court's findings: "at least some portion of BD's profits were *attributable* to the false advertising," BD intended to confuse or deceive consumers, and RTI did not unreasonably delay in seeking relief.[16] Beyond that, recognizing that the district court had subsumed the disgorgement into the trebled antitrust damages, we remanded "for a thorough reweighing of the remaining factors and the entirety of the record to determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations."[17] "In particular," we observed, "when assessing [whether BD diverted sales from RTI], the district court should bear in mind that speculative and attenuated evidence of diversion of sales will not suffice."[18]

---

[13] *RTI I*, 842 F.3d at 893, 901. BD also appealed its Lanham Act liability, asserting res judicata and laches. *Id.* at 898–900. It did not contest the underlying finding of false advertising liability.

[14] *Id.* at 898.

[15] *Id.* at 902.

[16] *Id.* at 901 (emphasis added).

[17] *Id.*

[18] *Id.* (citing *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 & n.8 (5th Cir. 2000)).

No. 17-40960

On remand, the district court conducted a one-day bench trial and evaluated an otherwise closed record. It ultimately declined to disgorge BD's profits or reinstate any portion of the vacated injunction. RTI appeals.

## II

We review a district court's decision to grant or withhold disgorgement or injunctive relief under the Lanham Act for abuse of discretion.[19] Exercise of its discretion must not have been based on an "erroneous view of the law" or a "clearly erroneous assessment of the evidence."[20] The district court otherwise has "[g]reat latitude"[21] to "determine the nature of the infringing conduct and its adverse effects, if any, on the plaintiff," and to fashion relief accordingly.[22]

## III

We will begin with the district court's denial of further injunctive relief. A district court's discretion to grant injunctive relief is both broad and constrained by well-settled principles. When we remanded the issue to the district court, while recognizing that a further need for injunctive relief was "theoretically possible," we emphasized that "[a] plaintiff seeking injunctive relief must show a real and immediate threat of future or continuing injury apart from any past injury," and that any injunction should be "no broader than reasonably necessary to prevent the deception."[23]

---

[19] *See, e.g., Quick Techs., Inc. v. Sage Grp., PLC*, 313 F.3d 338, 347 (5th Cir. 2002).

[20] *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (per curiam). RTI argues that because the district judge on remand did not preside over the original trial, the court's factual conclusions on remand should be subject to higher scrutiny. Here, where the remand court conducted a one-day bench trial and could review extensive documentary evidence presented in the initial trial, we will review its factual determinations for clear error. *Cf. Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (confirming that clear error review accounts for the trial court's expertise in determining facts, so even factual findings that do not rest on in-person testimony must be reviewed for clear error).

[21] *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA Co.*, 112 F.3d 1296, 1304 (5th Cir. 1997).

[22] *Seatrax*, 200 F.3d at 369.

[23] *RTI I*, 842 F.3d at 902 (quoting *Aransas Project*, 775 F.3d at 663, and *Better Bus. Bureau of Metro. Hous., Inc. v. Med. Dirs., Inc.*, 681 F.2d 397, 405 (5th Cir. 1982)).

5

No. 17-40960

The district court hewed to these reminders on remand. It observed that although it had stayed the requirement that BD notify its end users of the false advertising, BD took multiple steps to comply with the remainder of the injunction for the two-year period[24] before we reversed BD's false advertising liability on appeal. BD notified "over 750 distributors, over 10,000 employees, and all the major Group Purchasing Organizations, stating that its needle sharpness and waste space claims were inaccurate." Further, "BD removed the false advertising from its marketing materials . . . and posted a notice on its website." It also implemented a training program for employees and distributors. The district court concluded that these steps had been sufficient to remedy any injury or threat of injury RTI had suffered from the false advertising.

RTI argues that this analysis was flawed because it failed to account for notification to end users, the portion of the original injunction that never went into effect because the district court stayed it pending appeal; that because end users play a significant role in medical decisions to purchase syringes, BD's false advertising cannot be fully remedied without requiring end user notification. While aware that this portion of the original injunction never took effect, the district court concluded that RTI had not demonstrated a real and immediate threat of future or continuing injury that would warrant further injunctive relief. RTI has presented no reason to conclude that the district court clearly erred in this determination or that it abused its discretion by denying further injunctive relief.

---

[24] The district court required BD to begin complying with the injunction on February 14, 2015, and our opinion issued on December 2, 2016.

No. 17-40960

## IV

The heart of the parties' dispute is whether the district court erred in denying disgorgement of BD's profits. Section 35 of the Lanham Act allows monetary recovery for certain Lanham Act violations in the form of actual damages, disgorgement, and costs.[25] A plaintiff's entitlement to disgorged profits is assessed based on the equities of the case and does not automatically follow from liability.[26]

Our caselaw establishes two distinct considerations in assessing whether disgorgement is appropriate. The first is whether disgorgement is equitable under the six factors set forth in *Pebble Beach Co. v. Tour 18 I Ltd.*:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.[27]

The *Pebble Beach* factors are non-mandatory and non-exclusive: the district court is free to consider other facts in assessing whether disgorgement of profits would be equitable, just as it may exercise discretion in weighing the individual factors.[28]

---

[25] 15 U.S.C. § 1117(a) (2018). The statute further clarifies that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Id.*

[26] *See, e.g.*, *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 338 (5th Cir. 2008); *Seatrax*, 200 F.3d at 369.

[27] *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). While these factors were formulated in the trademark infringement context, they also apply to false advertising. *See, e.g.*, *RTI I*, 842 F.3d at 900–01.

[28] *See, e.g.*, *Quick Techs.*, 313 F.3d at 348–49.

No. 17-40960

The second consideration is whether the defendant's profits are attributable to the Lanham Act violation.[29] In short, "where a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefited from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits," even where the *Pebble Beach* test favors disgorgement.[30]

On remand, the district court correctly recognized that we had affirmed certain portions of its disgorgement analysis, making that analysis the law of the case. We agreed with the district court's conclusion that "at least some portion of BD's profits were attributable to the false advertising."[31] As for the *Pebble Beach* factors, we specifically affirmed its findings that the "intent to confuse or deceive" and "unreasonable delay" *Pebble Beach* factors favored disgorgement.[32] Following our instructions to engage in "a thorough re-weighing of the remaining factors and the entirety of the record to determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations,"[33] the district court reevaluated the remaining *Pebble Beach* factors. It found that although BD had intended to confuse or deceive, RTI had not unreasonably delayed in asserting its rights, and the public interest favored disgorgement, the equities weighed against disgorgement because RTI had not shown diversion of sales or palming off and injunctive relief was an adequate remedy. RTI challenges the district court's assessment of several of the individual *Pebble Beach* factors, as well as its ultimate balancing of the factors.

---

[29] *See, e.g., id.* at 350; *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* (*Texas Pig Stands II*), 966 F.2d 956, 957 (1992), *on denial of reh'g.*

[30] *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 464 (5th Cir. 2001).

[31] *See RTI I*, 842 F.3d at 901.

[32] *See id.*

[33] *Id.*

No. 17-40960

## A

RTI contests the district court's conclusion on remand that the "diversion of sales" factor did not favor disgorgement. The district court initially found that this factor favored disgorgement, but only slightly. As we have explained, the district court found that at least some of BD's profits were attributable to its false advertising. But although it recognized that "BD profited from its false advertisements," the court observed that "it is less certain that the resulting sales came at RTI's expense," because RTI and BD were not the only participants in the safety syringe market. Despite this hesitation, the court ultimately found that RTI had produced *enough* evidence, in the form of internal BD emails touting commercial successes attributable to its needle-sharpness and waste-space advertisements, to confirm the "rational conclusion that *some* portion of BD's ill-gotten sales came at RTI's expense." It therefore weighed the diversion factor slightly in favor of disgorgement.

On remand, guided by our reminder that "speculative and attenuated" evidence of diversion is insufficient to support disgorgement, the district court reevaluated the "diversion of sales" factor. It ultimately concluded that the factor weighed against disgorgement because RTI had not adequately demonstrated diversion. RTI challenges this on two grounds: first, that the district court was bound by the case's prior history to find diversion of sales, and second, that the district court abused its discretion in finding no diversion. We disagree.

## 1

RTI first argues that the remand court should not have reassessed the diversion factor because the fact of diversion of sales was already conclusively established, both by the jury's liability finding and by our opinion. Not so.

The jury's finding of Lanham Act liability did not conclusively establish diversion of sales. To prevail on a false advertising claim, a plaintiff must

9

No. 17-40960

demonstrate injury or likely injury due to the defendant's false advertising.[34] We have cautioned against "conflat[ing] the injury requirement for [a] false advertisement claim with the requirement that [the plaintiff] prove his actual damages in order to obtain relief."[35] We have further explained that "[i]n fashioning the appropriate remedy, a legal determination of liability is not dispositive," and in determining whether disgorgement is appropriate a court must further consider the "adverse effects, if any, on the plaintiff."[36] In sum, a plaintiff could prove that a defendant is liable for false advertising, but not satisfactorily demonstrate tangible harm—such as diverted sales—as a result of that false advertising.[37]

Nor did our prior decision establish diversion of sales as the law of the case. RTI argues that when we found "no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising,"[38] we established that the diversion factor weighed in favor of disgorgement. Taken in context, this argument conflates the "attribution of profits" requirement with the "diversion of sales" factor.

When first determining whether disgorgement was appropriate, in keeping with our caselaw, the district court addressed the attribution

---

[34] *Logan*, 263 F.3d at 462.

[35] *Id.* at 462. Typically, injunctive relief is available even where a false advertising plaintiff cannot prove concrete enough damage to qualify for monetary relief. For example, while we generally will require a plaintiff seeking monetary relief to demonstrate actual consumer confusion or deception, we relax that requirement for a plaintiff seeking purely injunctive relief—the latter need only prove that the advertisement *tends* to deceive consumers. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497–98 (5th Cir. 2000).

[36] *Seatrax*, 200 F.3d at 369.

[37] *See Logan*, 263 F.3d at 462–63 (holding that the plaintiff had not proven damages with sufficient particularity to support an award of actual damages, even though the injury element of the false advertising claim was met); *see also Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir. 1997) ("Once it had established its [false advertising] claim, [the plaintiff] still bore the burden of proving an evidentiary basis to justify any monetary recovery.").

[38] *RTI I*, 842 F.3d at 901.

No. 17-40960

requirement and the *Pebble Beach* factors separately. It found that RTI had sufficiently demonstrated that at least some of BD's profits were attributable to its wrongful conduct—internal BD documents suggested that the false advertising allowed BD to command premium pricing and claim increased market share. Despite finding that some profits were attributable to the false advertising, the district court expressed well-founded skepticism that RTI had proven diversion of sales—observing that "[a]lthough BD profited from its false advertisements, it is less certain that the resulting sales came at RTI's expense," since it was not clear that every dollar BD earned came out of RTI's pocket.  Nonetheless, as we have explained, it ultimately found that "*some portion of BD's ill-gotten sales came at RTI's expense.*"

When we affirmed the district court's conclusion that "at least some portion of BD's profits were attributable to the false advertising," we referred to the district court's initial finding that some of BD's profits were *attributable* to the false advertising, not its considerably more tentative finding that the false advertising diverted sales specifically from RTI to BD. Indeed, after directing the district court to re-weigh the *Pebble Beach* factors that we had not specifically addressed, we instructed it not to consider "speculative and attenuated" evidence of diversion when assessing the "diversion of sales" factor—reflecting our understanding that while the district court may have properly found some profits attributable to the false advertising, this did not necessarily mean that the diversion factor supported disgorgement.[39]

At base, the attribution and diversion inquiries serve different functions in assessing the propriety of disgorgement. The "diversion" factor plays an

---

[39] *Id.* Of course, we left open the possibility that the district court could find on remand that RTI *had* lost sales to BD. *See, e.g.*, *id.* at 895 (in discussing BD's potential antitrust liability, observing that "RTI may have lost some sales or market share because of BD's false advertising").

No. 17-40960

important role in establishing the *plaintiff*'s entitlement to profits. In many cases, disgorgement will not be equitable where few or no sales were ever diverted from the plaintiff to the defendant, because disgorgement in such contexts would grant the plaintiff an unjustified "windfall."[40] The "attribution" requirement ensures that once the district court has determined disgorgement is equitable, a *defendant* will only be forced to disgorge profits attributable to the Lanham Act violation.[41] It signifies that, while these inquiries will often overlap, they are not coextensive. For example, as the district court recognized from the beginning, RTI had presented evidence that BD benefited from its false advertising by commanding premium pricing—generating increased profits for BD without necessarily diverting sales from RTI.

In sum, there was no inconsistency between the district court's reweighing of the diversion factor on remand and either the jury verdict or our previous opinion on appeal. Although we affirmed the district court's recognition that BD benefited from the false advertising to some extent— satisfying the attribution requirement—we left open the possibility that RTI would be unable to present anything beyond "speculative and attenuated" evidence proving that this benefit came in the form of sales diverted from RTI to BD.

**2**

RTI also argues that once the district court reassessed the "diversion of sales" factor, it clearly erred in finding that RTI offered insufficient proof of diversion. Here too, we disagree. The district court found that the diversion factor did not favor disgorgement because the only evidence RTI had presented

---

[40] *Cf. Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* (*Texas Pig Stands I*), 951 F.2d 684, 696 (5th Cir. 1992) ("The granted permanent injunction adequately remedies the complained-of infringement, and awarding [the plaintiff] any of [the defendant's] profits would be far from equitable—it would be a windfall."); *accord Quick Techs.*, 313 F.3d at 348.

[41] *See, e.g.*, *Quick Techs.*, 313 F.3d at 349–50.

No. 17-40960

of diverted sales was "speculative and attenuated"; the best evidence of diversion RTI produced was internal BD correspondence boasting about the commercial impact of its "needle sharpness" and "waste space" claims, and the trial court was persuaded that this correspondence did not actually prove that RTI's customers or potential customers chose to purchase from BD instead of RTI as a result of the false advertising. Notably, RTI had not produced "a single witness or reliable study or data to prove a single example of a diverted sale," nor did it produce evidence that any potential customer "ever saw the waste space comparison or relied on it in making purchasing decisions."[42] At least some customers expanded their purchases from RTI after the dates they were allegedly presented with the deceptive waste space comparisons. In contrast, BD had difficulty selling its retractable syringes during the same period.

These findings closely tracked our reasons for concluding that BD's false advertising, standing alone, could not ground antitrust liability. We observed the sophisticated nature of the parties' customers, not one of which testified to a purchase motivated by either of BD's false claims about needle sharpness or waste space, but several of which testified that they were *not* impacted by advertisements.[43] We further observed that "RTI produced no evidence of customers being misled or confused and purchasing BD's syringes instead of RTI's because of the advertisements"—noting RTI's 67% share of the retractable syringe sub-market, RTI's own experts' recognition that they could not substantiate a causal connection between the false advertising and BD's

---

[42] RTI argues that the district court ignored evidence that a presentation including the false claims had been used with potential customers. Even if there was some evidence that BD presented the false advertising to clients, however, the district court did not clearly err in concluding that the false advertising did not affect client decisions or divert sales from RTI to BD. Further, RTI's counsel conceded that in at least one case, an internal document prepared for a customer presentation was "not actually given" to that customer.

[43] *RTI I*, 842 F.3d at 895.

No. 17-40960

sales, evidence that certain customers *increased* their purchases of RTI syringes after potentially being exposed to BD's false statements, and evidence that factors other than BD's advertising predominantly impacted its sales.[44] In sum, we concluded that "RTI's evidence consisted mostly of boastful e-mail exchanges between BD sales representatives recounting what they believed were successful sales pitches, but notably there was no testimony from the customers themselves."[45] While we discussed these facts in the context of RTI's antitrust claim, the district court appropriately accounted for them in its analysis of diversion of sales. We cannot conclude that the district court clearly erred in finding that RTI had only presented speculative and attenuated evidence of diversion of sales, and that the diversion factor therefore did not favor disgorgement.

Relatedly, RTI suggests that the district court on remand should have *presumed* diversion of sales because BD engaged in intentionally deceptive comparative advertising.[46] While some of our fellow circuits have applied this presumption to claims for disgorgement in false advertising cases, they have largely done so in cases of intentionally false comparative advertising "where [it is] reasonable to presume that every dollar defendant makes has come directly out of [the] plaintiff's pocket."[47] We need not decide the wisdom of this

---

[44] *Id.* at 896–97.

[45] *Id.* at 897.

[46] RTI also argues that the district court should have presumed diversion from the fact that BD's statements were literally false. While we have held that a plaintiff can presumptively satisfy the deception and materiality elements of a false advertising claim by showing literal falsity, this speaks to *liability*, not entitlement to disgorgement. *See Pizza Hut*, 227 F.3d at 497 ("*With respect to materiality*, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers." (emphasis added)).

[47] *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011); *see also Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) ("In a false advertising case such as this one, where the parties are direct competitors in a two-player market, and where literal falsity and willful, deliberate deception have been proved, the presumptions of injury and consumer confusion may be used for the purposes of awarding both injunctive

No. 17-40960

presumption in such cases, because it does not apply here. From the beginning, the district court recognized that RTI and BD were not the only players in the safety syringe market and that it could not presume that any benefit BD gained from its false advertising came directly at the expense of RTI.[48] The district court therefore did not err in looking for more concrete evidence of diversion.

## B

RTI also challenges the district court's decision on remand that the "adequacy of other remedies" factor disfavored disgorgement. Before we reversed BD's antitrust liability, the district court found that the trebled antitrust damages award and six-part injunction were likely adequate to remedy any harm caused by the false advertising. Even after we remanded, the district court concluded that the steps BD had *already* taken to comply with the injunction were sufficient—so the factor still weighed against disgorgement. This conclusion went hand-in-hand with the district court's determination that RTI had not sufficiently demonstrated that it suffered concrete harm—in the form of diverted sales or otherwise—as a result of the false advertising.

We have already explained why the district court did not clearly err in finding that further injunctive relief was unnecessary. For similar reasons, we cannot conclude that the district court clearly erred here. RTI has not demonstrated that the district court misunderstood or overestimated the scope

---

relief *and* monetary damages to a successful plaintiff."); *Balance Dynamics Corp. v. Schmidt Indus., Inc.*, 204 F.3d 683, 694–95 (6th Cir. 2000) ("[L]iteral falsity, without more, is insufficient to support an award of money damages to compensate for marketplace injury such as harm to goodwill . . . . While literal falsehood or the likelihood of deception may be sufficient to entitle [the plaintiff] to injunctive relief or reimbursement for responsive advertising, it should not permit [the plaintiff] to recover for injuries to goodwill in the absence of some more substantial indication that these injuries actually occurred.").

[48] *See RTI I*, 842 F.3d at 888, 896.

15

No. 17-40960

of the actions BD had already taken to comply with the injunction before it was vacated. Nor has RTI shown that the district court clearly erred in finding that the steps BD already took—including notifying over 750 distributors and Group Purchase Organizations—were adequate to remedy any harm RTI had experienced as a result of BD's actions, especially since RTI ultimately offered only "speculative and attenuated" evidence of harm to its business as a result of the false advertising. We have previously held that when a Lanham Act plaintiff has already received or will benefit from substantial injunctive relief, disgorgement may amount to a "windfall."[49]

The district court's treatment of this factor hinged on a straightforward application of the principle that where the relief that a plaintiff has already received is otherwise adequate to remedy any harm posed to the plaintiff, an award of profits may not be equitable.[50] It did not abuse its discretion in weighing this factor against disgorgement.

## C

Finally, RTI argues that the district court abused its discretion when it weighed the *Pebble Beach* factors to find that the equities did not favor disgorgement. RTI avers that the district court erred by assigning significant weight to the "palming off" factor. It also argues that the district court should have awarded disgorgement based solely on the need to deter future false advertising.

---

[49] *See, e.g.*, *Quick Techs.*, 313 F.3d at 350 (citing *Texas Pig Stands I*, 951 F.2d at 696).

[50] There is also no tension between the district court's conclusions here and our reminder that "equitable relief is normally appropriate only in the absence of an adequate remedy at law (i.e., money damages)." *RTI I*, 842 F.3d at 902. Here, a large portion of the injunctive relief had already been secured, and the district court was asked to determine whether the fact that BD had already taken several steps to comply with the injunction helped to mitigate the need for monetary relief. We do not necessarily approve of a general rule that, *ex ante*, injunctive relief is preferable to disgorgement.

No. 17-40960

### 1

The "palming off" factor applies when a Lanham Act defendant attempts to pass off its goods as the plaintiff's. RTI has never argued that BD palmed off its syringes as RTI's. Instead, it submits that "palming off" is an irrelevant factor in false advertising cases, and that the district court should have looked instead to the general loss of goodwill RTI experienced due to BD's false claims.

On remand, the district court observed that the "diversion of sales" and "palming off" factors are "especially important factors" in the *Pebble Beach* analysis under our caselaw. It concluded that disgorgement was inequitable because three *Pebble Beach* factors, "including the two most important," weighed against disgorgement. RTI argues that this approach sets false advertising plaintiffs at a disadvantage relative to trademark infringement plaintiffs: while an appropriate measure of egregious conduct in trademark cases, palming off will rarely be demonstrated in Lanham Act cases that do not involve trademark claims.

If a false advertising plaintiff has otherwise shown concrete harm due to the false advertising, such as diverted sales, a court should not heavily weigh the absence of palming off against disgorgement. Here, however, the district court appropriately considered the absence of palming off as another way in which RTI could have demonstrated concrete harm as a result of BD's false advertising, but did not. The district court concluded that since RTI demonstrated neither diversion of sales nor palming off, disgorgement of BD's profits would grant RTI an unjustifiable windfall.

The district court correctly read our caselaw, which establishes that a plaintiff who cannot demonstrate diversion or palming off faces an uphill battle

No. 17-40960

in obtaining disgorgement.[51] While a plaintiff seeking disgorgement need not demonstrate damages with the same degree of particularity as one seeking actual damages,[52] we are wary of disgorging profits to a party who can only speculate as to harm caused by the Lanham Act violation.

RTI argues that in lieu of palming off, the district court should have accounted for loss of goodwill that RTI experienced as a result of the false advertising. Because the *Pebble Beach* factors are non-exclusive, district courts are always free to consider other facts affecting the equity of disgorgement. RTI argues that even where a Lanham Act plaintiff has not shown diversion of sales or palming off, disgorgement of the defendant's profits may still be equitable where the plaintiff shows harm due to loss of consumer goodwill.

In principle, RTI is correct. Even without sufficient evidence of diverted sales or palming off, proof of lost goodwill might weigh in favor of disgorgement—especially, though perhaps not only, where the plaintiff can show that the loss of goodwill tangibly affected the plaintiff's business or would have affected the plaintiff's business had the plaintiff not taken steps to resuscitate consumer perception. But here, RTI's evidence of lost goodwill and steps taken to combat that lost goodwill, like its evidence of diverted sales, was

---

[51] *See Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 459 (5th Cir. 2017) (noting that monetary damages are especially unwarranted under the Lanham Act either "in the absence of a showing of wrongful intent" or where there is "lack of sufficient proof of actual damages"); *Sw. Recreational Indus., Inc. v. FieldTurf, Inc.*, No. 01-50073, 2002 WL 32783971, at *9 (5th Cir. Aug. 13, 2002) (unpublished opinion) (noting the absence of diversion and palming off in affirming a denial of disgorgement); *Seatrax*, 200 F.3d at 372 (noting that disgorgement was unjustified in light of a lack of willful infringement, lack of palming off, sufficiency of injunctive relief as a deterrent, and lack of "sufficient proof of actual damages"); *Pebble Beach*, 155 F.3d at 555 (emphasizing lack of proof of actual damages or intent to confuse or deceive).

[52] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135–36 (2014) (explaining that disgorgement or injunctive relief may be appropriate in false advertising cases even where actual damages cannot be quantified with "sufficient certainty").

No. 17-40960

speculative.[53] As we have already explained, RTI pointed to no concrete evidence of lost goodwill that affected the purchasing decisions of its sophisticated customer base—in fact, as we recognized, RTI's market share in the retractable syringe sub-market increased and its sales nearly doubled over the relevant period of false advertising.[54] The district court did not abuse its discretion in failing to place significant weight on the bare possibility that RTI lost goodwill with consumers due to BD's advertising, without more, just as it did not abuse its discretion in placing significant weight on the fact that RTI had not otherwise demonstrated concrete harm.

**2**

In sum, the district court did not abuse its discretion in determining that where RTI had not sufficiently demonstrated that its business suffered due to BD's false advertising and where BD had already taken significant steps to correct the false statements, disgorgement was not equitable. That another court could have evaluated the facts differently does not justify reversal, especially as "an award of profits with no proof of harm is an uncommon remedy in a false advertising suit."[55]

RTI argues that this outcome conflicts with our holding in *Maltina Corp. v. Cawy Bottling Co.*, which concluded that diversion of sales is not a prerequisite to disgorgement because disgorgement may also remedy unjust enrichment or deter future infringement,[56] thus helping to "take all the

---

[53] RTI cites evidence that its employees who were worried about loss of goodwill "had to expend effort and energy to go around and try to . . . tell people and convince them that it wasn't true" and "spent a lot of time going to customers and trying to correct the misinformation, a lot of meetings, direct meetings, letter-writing, things like that."

[54] *RTI I*, 842 F.3d at 897.

[55] *See TrafficSchool.com*, 653 F.3d at 831.

[56] *See Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 584–85 (5th Cir. 1980); *see also Texas Pig Stands II*, 966 F.2d at 957 ("This Court recognizes *Maltina* to be the law of the Fifth Circuit in its holding that (i) absence of competitors or (ii) failure of proof showing

No. 17-40960

economic incentive" out of a Lanham Act violation.[57] It observes that *Maltina* rejected the view that disgorgement is *only* a means of "compensating . . . for loss or diverted sales," and therefore held that diversion of sales is not necessarily a prerequisite to disgorgement.[58]

*Maltina* does not mandate disgorgement in every case where disgorgement might conceivably remedy unjust enrichment or deter future infringement, regardless of whether it would be equitable to disgorge profits to a particular plaintiff. To do so would effectively make disgorgement automatic any time the defendant has any profits attributable to a Lanham Act violation, in sharp contrast to our repeated reminder that disgorgement is ultimately an equitable remedy subject to the district court's sound discretion. Here, where the district court found that injunctive relief was sufficient and monetary relief would grant RTI an unjustified windfall, it did not abuse its discretion in refusing to award disgorgement—other potential purposes of disgorgement notwithstanding.[59]

---

diversion of the mark owner's sales is no defense to the claim for Defendant's profits under 15 U.S.C. § 1117.").

[57] *Am. Rice*, 518 F.3d at 340 (observing that "infringing conduct should be unprofitable to infringers").

The parties discuss the relevance of the Lanham Act's provision that at least certain monetary awards "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a). The statute is ambiguous as to whether this limitation applies to all monetary awards under the section, or whether it only applies to enhancements or reductions for inadequate or excessive awards. We have generally read this provision to broadly hold that any monetary damages under the Lanham Act should constitute compensation and not a penalty. *See, e.g.*, *Streamline Prod. Sys.*, 851 F.3d at 459 ("The Lanham Act . . . . instructs that . . . monetary damages [in the form of profits, damages, or costs] 'shall constitute compensation and not a penalty.'"); *Logan*, 263 F.3d at 464 n.15 ("Section 1117(a) states that the damages provided thereunder are 'subject to the principles of equity' and 'shall constitute compensation and not a penalty.'"). Our decision here, though, does not hinge on this provision but rather on the well-settled principles of equity repeatedly explained in our Lanham Act caselaw.

[58] *Maltina*, 613 F.2d at 584.

[59] The district court distinguished *Maltina* on the grounds that trademarks and trade dress are unique "protected property right[s]." *See Maltina*, 613 F.2d at 585 ("This recognition of a trademark as property is consistent with the view that an accounting is proper even if the defendant and plaintiff are not in direct competition, and the defendants' infringement

No. 17-40960

This is not a case, moreover, where the defendant violated the Lanham Act and emerged unscathed. BD complied with the district court's original injunction for nearly two years, including by notifying hundreds of intermediary distributors and Group Purchasing Organizations and by implementing a training program for employees and distributors. Further, our caselaw ensures that where a false advertiser succeeds in diverting sales or otherwise demonstrably harms another party's consumer goodwill, the district court will account for this in assessing the equities of disgorgement. While RTI may have failed to demonstrate such harm here, future would-be false advertisers would do well to heed that warning. RTI has demonstrated no interest in deterrence or remedying unjust enrichment that overcomes the district court's well-founded emphasis on other equitable considerations.

\* \* \*

The district court's denial of disgorgement of profits from RTI's competitor was made against the larger backdrop of its prosecution of a meritless antitrust claim against BD for conduct in the marketplace—during a time in which RTI nearly doubled its own sales and increased its share of the retractable syringe sub-market to two-thirds. RTI elected not to test its proof of Lanham Act damages before the jury, but rather to later argue, as now, that equity mandates disgorgement. Its effort to carry the flag of "public interest" and guide the profits of its competitor to its own coffers here must fail. That

---

has not diverted sales from the plaintiff."). RTI argues that the Lanham Act also protects trade reputation and goodwill as property interests. We need not sift through whether a business's goodwill is a property right similar to its trademark interests; at a minimum, without demonstrating that RTI's goodwill was harmed in a way that affected potential customers' decisions, RTI has not shown harm to its goodwill that parallels the harm caused a markholder whose mark is used without consent. *Cf. Maltina*, 613 F.2d at 585 ("Here, the only valuable property [the plaintiff] had when he arrived in this country was his right to the 'Cristal' mark. [The defendant] used this property, and an accounting is necessary to partially remedy its unjust enrichment.").

No. 17-40960

effort must be taken outside—to the marketplace. There the public interest is best vindicated. The district court did not abuse its discretion.

## V

We affirm the district court's denial of disgorgement and further injunctive relief.

No. 17-40960

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

Because I conclude that the district court erred in reweighing the diversion factor and in finding insufficient evidence to support disgorgement, I would vacate and remand. Therefore, I respectfully dissent.

As stated in the majority's recitation of the procedural history, the jury found for Retractable Technologies, Inc. (RTI) on one of its antitrust claims, attempted monopolization of the market for safety syringes, and all the Lanham Act false advertising claims. The jury awarded $113.5 million in antitrust damages. The district court trebled the antitrust damages and added attorneys' fees, resulting in a total of approximately $352 million. The district court concluded that RTI was entitled to disgorgement of Becton Dickinson & Co.'s (BD) profits under 15 U.S.C. §1117(a), but, found that the trebled antitrust damages and injunction were potentially adequate remedies.

Specifically, the district court found that, under the factors outlined in *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), four of the six factors favored disgorgement: 1) that BD had the intent to confuse or deceive; 2) that sales were at least slightly diverted; 3) that RTI did not unreasonably delay; and 4) public interest in making misconduct profitable. The court concluded that the two remaining factors, the adequacy of other remedies and whether it was a case of palming off, disfavored disgorgement.

The district court also granted a six-part injunction prohibiting BD from making certain advertising claims about needle sharpness for five years and about medical savings for three years; to notify various entities about its false statements; to post notice on its website for three years; and implement a training program for employees and distributors.

On appeal, this court reversed BD's antitrust liability, meaning RTI was no longer entitled to the $352 million in trebled antitrust damages, and

No. 17-40960

remanded for a new assessment of disgorgement remedies based on the
Lanham Act false advertising claims. *See Retractable Techs., Inc. v. Becton
Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016). Regarding the *Pebble Beach*
factors, the panel affirmed three portions: 1) The district court's conclusion
that at least some of BD's profits were attributable to false advertising; 2) the
finding that BD intended to confuse or deceive; and 3) the finding that RTI did
not unreasonably delay. *Retractable Techs.*, 842 F.3d at 901.

On remand, the district court evaluated the equities of disgorgement
under the *Pebble Beach* factors and found that disgorgement was not
warranted. Specifically, the district court found that public interest favored
disgorgement, but that RTI had not shown diversion of sales or palming off.
The remand court further weighted both diversion and palming off more
heavily than the other factors and found that prior temporary injunctive relief
was an adequate remedy. RTI then filed this appeal.

The majority now affirms, concluding that the district court did not err.
I disagree. The district court had previously determined that the diversion
factor at least slightly indicated that sales had been diverted. This court
affirmed that finding. It is helpful to look at the actual language used by this
court:

> BD first argues that RTI failed to identify what portion of BD's
> profits (if any) were attributable to false advertising. Additionally,
> BD contends that the district court abused its discretion in
> weighing *three of the Pebble Beach factors*, inasmuch as the court
> *(1) did not specify any amount of diverted sales*; (2) failed to find
> that BD willfully engaged in false advertising; and (3) erred in
> holding that RTI did not unreasonably delay in filing suit.
>
> *We find no clear error in the district court's conclusion that at least
> some portion of BD's profits were attributable to the false
> advertising. Indeed, BD acknowledged in the district court, its*

24

No. 17-40960

*expert witness's opinion that $7.2 million in profits—netting to $560,000 after deductions for costs and expenses—could be attributable to the waste space advertisements*. In *Logan* or *Texas Pig Stands*, by contrast, there was no evidence of attribution. Similarly unassailable is the finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false. That BD may not have willfully engaged in false advertising does not change this analysis because a finding of willfulness is not a prerequisite to remedial disgorgement. *Quick Techs.*, 313 F.3d at 349. Finally, we have approved the district court's finding that RTI did not unreasonably delay.

*Retractable Techs*. 842 F.3d at 901 (emphasis added). After setting out the factors, including diversion, that BD was taking issue with in the first paragraph, the court then said, "We find no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising." This was clearly addressing the diversion factor included in the prior paragraph. The court then set out a specific amount that could be attributable.

Moreover, this court's additional language regarding diversion does not contradict such a reading. This court said:

Nevertheless, the district court's equitably-founded decision not to impose disgorgement rested in large part on the premise that RTI was adequately compensated by a $340 million antitrust award. Having overturned the antitrust judgment, we must remand to the district court for a thorough *re-weighing* of the *remaining factors* and the entirety of the record to determine *whether and how much* profit BD should disgorge to compensate for the Lanham Act violations. In particular, *when assessing the "diversion" factor*, the district court should bear in mind that speculative and attenuated evidence of diversion of sales will not suffice.

*Retractable Techs*. 842 F.3d at 901 (emphasis added). This court's language regarding diversion clearly indicates a reference to the assessment of the

No. 17-40960

amount of profits to disgorge. This court did not say when reweighing the diversion factor as it said regarding the "remaining factors"; it said *when assessing the diversion factor*. Moreover, this court had already affirmed the district court on the diversion factor. This language indicates this court was referencing the "how much" profit to disgorge, as the district court had not initially made that exact calculation other than to say it was properly included as part of the trebled antitrust damages. But the district court had clearly already found that "RTI produced evidence that on occasion BD relied on these false advertisements to divert sales from RTI directly" and "[t]his evidence confirms the rational conclusion that *some* portion of BD's ill-gotten sales came at RTI's expense." (emphasis original).

For these reasons, I conclude that it was error for the remand court to reweigh the diversion factor. Further, RTI offered evidence of diversion. The district court had already found it sufficient to establish some diversion and this court had already affirmed. Because this court had already affirmed the district court on three factors favoring disgorgement (diversion, BD's intent to confuse or deceive, and no unreasonable delay by RTI), there were only three factors left for the remand court to reweigh.

Of those remaining three factors, the remand court found that the public interest factor favored disgorgement. Thus, only the two remaining factors, the adequacy of other remedies and palming off, could disfavor disgorgement. Moreover, the remand court improperly weighted the absence of diversion and palming off to the exclusion of other factors. Diversion was settled. Regardless, there is no authority for weighting these factors more heavily. Additionally, in light of these errors and the fact that the adequate remedies the district court had previously found no longer exist, the district court likewise erred in its reconsideration of the adequacy of other remedies.

26

No. 17-40960

For these reasons, I would vacate and remand.  Thus, I respectfully dissent.